IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Consumer Financial Protection Bureau, | |
| Plaintiff, | Case No. |
| v. | |
| TransUnion, TransUnion, LLC, TransUnion Interactive, Inc., and John T. Danaher, | |
| Defendants. | |

## COMPLAINT

The Consumer Financial Protection Bureau (Bureau) brings this action against TransUnion, TransUnion, LLC, and TransUnion Interactive, Inc., (collectively, Corporate Defendants), and John T. Danaher (Danaher) under the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536(a), 5564, 5565, the Electronic Fund Transfer Act (EFTA), 15 U.S.C. § 1693e(a), and its implementing regulation, Regulation E, 12 C.F.R. § 1005.10(b), and the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681j(a), and its implementing regulation, Regulation V, 12 C.F.R. § 1022.136.

## INTRODUCTION

1.     In 2017, the Bureau found that Corporate Defendants had engaged in deceptive acts and practices in violation of the CFPA in connection with their marketing and sale of credit scores, credit reports, and credit-monitoring products to consumers. The Bureau agreed to resolve those findings without litigation through a consent order (the Order, which is Appendix A to this Complaint) that required Corporate Defendants to pay restitution and a civil penalty, and to abide by certain conduct provisions. Corporate Defendants' stipulation to the entry of the Order is Appendix B to this Complaint.

2.     Corporate Defendants have violated the Order since the day it went into effect. Corporate Defendants failed to implement the Order's core requirements, including (i) ensuring that consumers were not misled about the nature and terms of their credit-monitoring product; (ii) adding a checkbox to their trial offer subscription products to ensure consumers consented to enrolling in such products; and (iii) providing a way for consumers to immediately and easily cancel their subscriptions and obtain refunds instead of facing roadblocks.

3.     Not only did Corporate Defendants violate the Order and continue engaging in the same deceptive acts that necessitated it, but they also engaged in numerous other misleading tactics to cause consumers to enroll in their subscription products and prevent them from cancelling.

4.     Further, Corporate Defendants engaged in additional violations of Federal consumer financial laws; they failed to properly obtain consumers' authorization to make recurring withdrawals from their bank accounts—violating EFTA and Regulation E—and included misleading advertisements on annualcreditreport.com that diverted consumers seeking their free annual credit report to an indefinite paid subscription for credit monitoring.

5.     John T. Danaher, the long-time and now former President of TUI, also violated the Order.  Danaher had the authority and obligation to ensure Corporate Defendants complied with the Order, but failed to do so.  Instead, he allowed Corporate Defendants to defy the law and continue engaging in misleading marketing, even in the face of thousands of consumer complaints and refund requests.

6.     The Bureau files this Complaint to stop the Defendants' unlawful practices that have harmed consumers.

## JURISDICTION AND VENUE

7.     This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

8.    Venue is proper because Defendants are located, reside, or do business in this district.  12 U.S.C. § 5564(f).

## PARTIES

9.    The Bureau is an independent agency of the United States created by the CFPA.  12 U.S.C. § 5491(a).  The Bureau has independent litigating authority and may initiate civil actions in federal district court to secure appropriate relief for violations of "Federal consumer financial law," 12 U.S.C. § 5564(a)-(b), including the CFPA, EFTA, Regulation E, FCRA, and Regulation V, 12 C.F.R. part 1022.  12 U.S.C. §§ 5481(12)(C), (F), (14); 15 U.S.C. § 1693o.

10.    TransUnion Interactive, Inc. (TUI) is a Delaware corporation located in Chicago, Illinois that generates, markets, and sells Credit-Related Products.  Credit-Related Products are defined by the Order as "any product or service [Corporate Defendants] offer for sale directly to consumers, including but not limited to the [TU Credit Monitoring] Product, credit scores, credit reports, credit monitoring, or identity theft insurance or protection."

11.    At all times relevant to this Complaint, directly and indirectly, including through marketing affiliates, through a common enterprise with the other Corporate Defendants, and as an agent acting with actual or apparent authority for the other Corporate Defendants, TUI has offered or provided a "consumer financial product or service" and is therefore a "covered person" under the CFPA.  12 U.S.C. §§ 5481(5), (6), (15)(A)(ix).  TUI is a wholly-owned subsidiary of TransUnion LLC (TULLC).

12.    TULLC is a Delaware limited liability company located in Chicago, Illinois.  At all times relevant to this Complaint, TULLC has been a "nationwide consumer reporting agency" (NCRA).  15 U.S.C. § 1681a(p); 12 C.F.R. § 1022.130(h).  TULLC compiles and maintains financial, consumer, and commercial data from across the nation and worldwide.  TULLC uses credit information it has collected in consumer credit files to generate consumer reports, including credit reports, and makes such information available to TUI for its use in marketing Credit-Related Products to consumers.  TULLC markets, sells, and provides consumer reports to

commercial users, such as lenders, insurance companies, and potential employers. At all times relevant to this Complaint, directly, indirectly through its agent and affiliate, TUI, and through a common enterprise with the other Corporate Defendants, and acting as an agent with actual or apparent authority for the other Corporate Defendants, TULLC has offered or provided a "consumer financial product or service." 12 U.S.C. §§ 5481(5), (15)(A)(ix). TULLC has also provided various services to TUI, including compliance and legal services. TULLC is therefore a "covered person" under the CFPA. 12 U.S.C. § 5481(6).

13.     TransUnion is a publicly traded company that is incorporated in Delaware and located in Chicago, Illinois. TransUnion is the ultimate parent company of TUI and TULLC. For 2021, TransUnion publicly reported annual revenue of nearly $3 billion, approximately 18% of which came from TUI. At all times relevant to this Complaint, TransUnion has provided enterprise services to TULLC and TUI, including overall governance and financial support, and therefore is a "covered person" under 12 U.S.C. § 5481(6)(B). TransUnion has also been the "controlling shareholder" of TUI and TULLC at all times relevant to this Complaint. Thus, TransUnion is also a "related person" and, therefore, is deemed a "covered person" on this basis as well. 12 U.S.C. §§ 5481(25)(B), (C)(i).

14.     John T. Danaher was the President of TUI from 2004 until April 1, 2021. From April 2, 2021 until February 1, 2022, he was Executive Vice President for TUI. From 2004 until at least February 1, 2022, Danaher materially participated in the conduct of TUI's affairs and, consequently, he was a "related person," and therefore a covered person, under the CFPA. 12 U.S.C. § 5481(25)(B), (C)(i)-(ii).

15.     At all times relevant to this Complaint, TransUnion, TULLC and TUI have operated as a common enterprise (the TU Common Enterprise). They have conducted business through interconnected companies that operate under common control, share offices, and share advertising and marketing. TransUnion and TULLC have maintained officers and directors in common. In public SEC filings, TransUnion holds itself out to the public as an NCRA – even

though it is not itself an NCRA—by touting its fifty-year operating history as a leading provider of credit reports that has acquired and developed proprietary databases used to generate consumer reports and other "solutions" for its customers, including consumers. TransUnion's Board of Directors (the TransUnion Board) governs and oversees the entire enterprise, including TULLC and TUI. Among other things, through its Audit and Compliance Committee, the TransUnion Board oversees the Legal and Compliance Departments for the TransUnion enterprise, including TUI and TULLC. Directly and through its agents and affiliates, TUI and TULLC, and through a common enterprise with those other Corporate Defendants, TransUnion has offered or provided a "consumer financial product or service" at all times relevant to this Complaint. 12 U.S.C. §§ 5481(5), (6), (15)(A)(ix).

## FACTUAL BACKGROUND

### Corporate Defendants' Sale of Credit-Related Products to Consumers

16.     Corporate Defendants, through TUI, market and sell Credit-Related Products to consumers. These products include the TransUnion Credit Monitoring Product (TU Credit Monitoring), which is a bundled Credit-Related Product offered by TUI that is sold as a paid monthly subscription. It includes access to a credit score, credit report, credit monitoring, and a product called "Credit Lock" which enables the consumer to lock and unlock his or her TransUnion and Equifax credit reports.

17.     Through Corporate Defendants' direct-to-consumer, or "direct," marketing channel, Corporate Defendants provide consumers directly with credit scores, credit monitoring, credit reports, and other Credit-Related Products.

18.     Corporate Defendants have marketed and sold Credit-Related Products to consumers through a variety of online channels. This includes banner and display advertisements that appear on Corporate Defendants' main website (transunion.com) and on popular websites such as auto.com, bankrate.com, and Amazon; direct emails to certain consumers; search

engines; social media; and advertisements on websites operated by Corporate Defendants' marketing affiliates, including ConsumerTrack, Inc. (ConsumerTrack).

19.     Corporate Defendants have also marketed Credit-Related Products through annualcreditreport.com, which is the website through which consumers can obtain their free annual credit report from Corporate Defendants and the other NCRAs.

20.     At all times relevant to this Complaint, certain marketing affiliates (Affiliates), such as ConsumerTrack, offered Credit-Related Products directly to consumers on Corporate Defendants' behalf and at Corporate Defendants' direction, and are regarded by Corporate Defendants as part of their direct marketing channel. Corporate Defendants review and approve all marketing materials and disclosures, including enrollment forms and processes, used by Affiliates.

21.     After consumers click on Corporate Defendants' advertisements and/or landing pages for Credit-Related Products, they are taken to an enrollment form. An example of Corporate Defendants' TU Credit Monitoring enrollment form and identity verification questions on transunion.com (Homepage Enrollment Form) is attached as Appendix C. Corporate Defendants used that version of the Homepage Enrollment Form from June 2019 through May 2020 and have used substantially similar versions of the form at all other times relevant to this Complaint. Examples of Corporate Defendants' TU Credit Monitoring enrollment forms used by Affiliates (Affiliate Enrollment Forms) are attached as Appendix D. ConsumerTrack, on behalf of Corporate Defendants, used Affiliate Enrollment Form D.1 on or about November 21, 2020 and Affiliate Form D.2 on or about March 30, 2021 and, upon information and belief, has used substantially similar versions of the form from March 2017 through the date of this Complaint.

22.     After a consumer completes an enrollment form for TU Credit Monitoring, Corporate Defendants, acting directly or indirectly, or through an agent, enroll the consumer into the product, grant the consumer access to the TU Credit Monitoring online dashboard on transunion.com, charge the consumer's credit or debit card ($1 for trial offers or the full face value

for full price offers), and send an email to the consumer that confirms the consumer's enrollment into TU Credit Monitoring. Consumers remain enrolled in TU Credit Monitoring and are charged by Corporate Defendants for each month of enrollment (the price varies depending on the offer and channel but is typically $9.99 to $24.99 each month) until consumers affirmatively cancel the subscription, either by calling Corporate Defendants' customer service line or by using Corporate Defendants' online cancellation portal on transunion.com.

### The Order

23.     On January 3, 2017, the Bureau issued the Order under the caption *In re TransUnion Interactive, Inc., et al.,* No. 2017-CFPB-0002 (Jan. 3, 2017) (Appendix A), as extended on December 22, 2021 and April 1, 2022. The Order was, by its terms, effective on the date of its issuance, January 3, 2017 (the Effective Date).  In the Order, the Bureau found that Corporate Defendants violated the CFPA between July 21, 2011 through January 3, 2017 by deceptively marketing Credit-Related Products in two ways.  First, Corporate Defendants falsely represented that the credit scores they marketed and sold to consumers were the same scores lenders typically use to determine creditworthiness, when, in reality, the scores used to determine creditworthiness by lenders and other commercial users were highly unlikely to be the scores sold to consumers by Corporate Defendants.  Second, Corporate Defendants falsely represented that the scores and reports were "free" or "$1," when, in reality, a consumer who signed up for a "free" or "$1" trial was automatically enrolled in a subscription program with a recurring monthly fee.

24.     The Order required Corporate Defendants to pay $13.93 million in restitution to consumers and a $3 million civil penalty.

25.     The Order also imposed conduct provisions, including certain provisions specifically designed to protect consumers from continued wrongful conduct by Corporate Defendants. Order, ¶ 40.

26.     The conduct provisions in Paragraph 40 of the Order apply to Corporate Defendants, as well as "their officers, agents, servants, employees, and attorneys who have actual

notice of this Consent Order, whether acting directly or indirectly...." The provisions prohibit them from making certain misrepresentations in connection with the marketing and sale of Credit-Related Products; require them to obtain the express informed consent of consumers before enrolling them into Credit-Related Products with a negative option feature; require them to simplify the cancellation process for Credit-Related Products and enable consumers to immediately cancel the purchase of those products; require them to provide certain disclosures to consumers in connection with selling credit scores; and require them to collect, review, and assess consumer-related information and data and to modify their advertising accordingly. The distribution and acknowledgment provisions in Paragraph 65–67 of the Order require Corporate Defendants to distribute the Order to certain persons and obtain acknowledgments of receipt. The recordkeeping provisions in Paragraph 68 of the Order require Corporate Defendants to maintain certain records.

27.     The entire Order is binding on all three Corporate Defendants. The Order also provides that the TransUnion Board "will have the ultimate responsibility for proper and sound management of [Corporate Defendants] and for ensuring that [Corporate Defendants] comply with Federal consumer financial law and this Consent Order." Order, ¶ 45.

28.     Through the signatures of TransUnion's then-director, president and chief executive officer and its then-executive vice president and general counsel, Corporate Defendants stipulated to the entry of the Order on December 22, 2016. (Appendix B). Among other things, Corporate Defendants "admit[ted] the facts necessary to establish the Bureau's jurisdiction over [Corporate Defendants] and the subject matter of this action." Corporate Defendants further agreed in the stipulation that: (a) "the Consent Order will be deemed an 'order issued with the consent of the person concerned' under 12 U.S.C. § 5563(b)(4)"; (b) "the Order will become a final order, effective upon issuance, and will be fully enforceable by the Bureau under 12 U.S.C. §§ 5563(d)(1) and 5565"; and (c) "the facts described in Section IV of the Consent Order [the Bureau's Findings and Conclusions] will be taken as true and be given collateral estoppel effect, without

8

further proof, in any proceeding before the Bureau to enforce the Consent Order, or in any subsequent civil litigation by the Bureau to enforce the Consent Order or its rights to any payment or monetary judgment under the Consent Order."

29.     In October 2018, the Bureau commenced an examination of Corporate Defendants (the 2018 Examination) and requested information from Corporate Defendants about their compliance with the Order. In May 2019, Bureau examiners informed Corporate Defendants that they were violating several requirements of the Order.

30.     In June 2020, following an investigation, the Bureau's Office of Enforcement informed Corporate Defendants that they continued to violate the Order requirements identified during the 2018 Examination and were also violating additional Order requirements and Federal consumer financial laws.

31.     In June 2021, the Bureau's Office of Enforcement informed Corporate Defendants that they remained in non-compliance with the Order requirements identified in May 2019 and June 2020 and that Corporate Defendants were also violating several additional Order requirements and Federal consumer financial laws. The Bureau's Office of Enforcement also informed Danaher that he was violating the Order.

**Corporate Defendants Violated the Order, EFTA and Regulation E, and Engaged in Deceptive Practices, in Connection with the Marketing and Sale of Credit-Related Products**

*Corporate Defendants' misrepresentations regarding the nature of TU Credit Monitoring*

32.     Paragraph 40(a)(iii) of the Order prohibits Corporate Defendants and their officers, agents, and employees who have actual notice of the Order, whether acting directly or indirectly, from misrepresenting, expressly or impliedly, in connection with the advertising or marketing of a Credit-Related Product, any material fact about "any . . . conditions of the product or service, or any material aspect of its performance . . . nature, or central characteristics."

33.     The conditions, nature, and central characteristics of the TU Credit Monitoring product are that it is an ongoing monthly subscription for credit-monitoring services that includes

access to a credit score, credit report, and a "Credit Lock" option that blocks new application inquiries on a consumer's credit file. After a consumer is enrolled into TU Credit Monitoring, Corporate Defendants charge each consumer a recurring membership fee automatically and indefinitely each month until the consumer cancels.

34.     Though TU Credit Monitoring gives consumers access to a credit score, it is not a one-time transaction for a score or a report, and a consumer's access to a score is conditioned on enrollment in a subscription.

35.     Although TU Credit Monitoring does not offer consumers access to a standalone credit score or report without a subscription, after the Order's Effective Date and through the present, Corporate Defendants have advertised TU Credit Monitoring on Corporate Defendants' website and in other locations using prominent and brightly-colored buttons that Corporate Defendants refer to as "Call to Action" buttons. The buttons say, for example, "GET YOUR SCORE," "TAKE ME TO MY CREDIT SCORE," and "YES, SHOW ME MY CREDIT NOW." Any mention of credit monitoring in these advertisements is generally less prominent than the "credit" or "credit score" language.

36.     Figure 1, below, is an example of a "Call to Action" button that Corporate Defendants placed on transunion.com:

GET YOUR CREDIT SCORE

Figure 1

37.     On Corporate Defendants' website, between the Effective Date and the present, there has frequently been a "Call to Action" button similar to the one in Figure 1 on the upper right corner of the homepage, without any accompanying reference to credit monitoring, a price, or a subscription.

38.     These advertisements and others that focus on "scores" or "credit" are likely to mislead consumers acting reasonably under the circumstances because they give consumers the

impression that clicking on the advertisement will allow consumers to "get" or "see" a standalone credit score.

39.     But in reality, when a consumer clicks on the "GET YOUR CREDIT SCORE" button and other similar "Call to Action" buttons used by Corporate Defendants, the consumer is not given the opportunity to receive a standalone credit score. Rather, the consumer is taken to an enrollment process for TU Credit Monitoring.

40.     As discussed below, in Paragraphs 78–91, the Homepage Enrollment Form that Corporate Defendants use in connection with these advertisements is also misleading, giving consumers the impression that they are not purchasing anything, but instead providing credit card information for identity verification purposes.

41.     Corporate Defendants use advertisements that refer prominently to "credit scores" instead of "credit monitoring" to increase consumer enrollments.

42.     Corporate Defendants' misrepresentations about the conditions, nature, and central characteristics of TU Credit Monitoring are material to consumers. Since the Effective Date, Corporate Defendants have received many complaints and refund demands from consumers who intended to obtain only their credit scores or reports, including consumers who had come to the website for the purpose of completing tasks such as disputing something on their credit reports or managing security freezes on their credit reports, and did not understand how they came to be enrolled in an indefinite paid monthly subscription.

43.     In addition, and as described in further detail in Paragraphs 124–137 below, Corporate Defendants used similar "score" representations to advertise the TU Credit Monitoring product on web pages related to consumers' free annual file disclosure. Corporate Defendants have received many complaints and refund demands from consumers who thought they were accessing their "score" as part of their free annual file disclosure and were confused about how they came to be enrolled in the paid TU Credit Monitoring subscription product.

44.     Corporate Defendants have therefore violated Paragraph 40(a)(iii) of the Order by misrepresenting the conditions of TU Credit Monitoring and material aspects of its conditions, nature, and central characteristics.  This conduct was also deceptive.

*Corporate Defendants' misrepresentations about consumers' enrollment status*

45.     As set forth in Paragraph 32, above, Paragraph 40(a)(iii) of the Order prohibits Corporate Defendants and their officers, whether acting directly or indirectly, from making express or implied misrepresentations regarding the conditions of a Credit-Related Product.

46.     In addition, Paragraph 40(a)(i) of the Order prohibits Corporate Defendants and their officers, agents, and employees who have actual notice of the Order, whether acting directly or indirectly, from misrepresenting, expressly or impliedly, "[a]ny material fact about the cost or price of a Credit-Related Product, including that the product or service is free, discounted, a gift, a sample, a trial, a bonus, without cost or obligation, or words of similar import, denoting or implying the absence of an obligation on the part of the consumer to affirmatively act in order to avoid charges[.]"

47.     Corporate Defendants engage in email marketing campaigns, sending emails to specified groups of consumers to market Credit-Related Products.

48.     The marketing emails generally include images and text, including prominent "Call to Action" buttons of the type used by Corporate Defendants in other advertising channels.

49.     Since the Order's Effective Date, including beginning on or about December 1, 2019 and February 20, 2020, Corporate Defendants have sent marketing emails to consumers who were not already enrolled in TU Credit Monitoring suggesting those consumers already have access to TU Credit Monitoring or are otherwise eligible to obtain a credit score or report directly from Corporate Defendants without incurring an additional cost.

50.     For example, Corporate Defendants sent over 500,000 emails with the subject line, "You're in!"  The body of the email, as shown in Figure 2, said, in prominent type, "Thank you for signing up!" and contained a prominent orange "Call to Action" button that said, "YES,

SHOW ME MY CREDIT NOW."

Tips, articles, featured offers & more await. | View Online





### {{defaultIfEmpty firstName "Customer"}}, you're on your way...

You've taken a key step toward getting smarter about credit. Ready for your next step?

**YES, SHOW ME MY CREDIT NOW** →



#### What you need to know:

There are various types of credit scores, and lenders use a variety of different types of credit scores to make lending decisions. The credit score you receive is based on the VantageScore 3.0 model and may not be the credit score model used by your lender.

Your TransUnion Score & Credit Report are available as part of our subscription credit monitoring service. You will be billed at the low cost of only $24.95 per month (plus tax where applicable).

**ABOUT THIS EMAIL**
Please do not respond directly to this email, this is not a monitored inbox.

This email was sent to you by TransUnion Interactive. To ensure delivery, please add transunion@em-tuci.transunion.com to your address book.

You are receiving this email at [{email}] because you have opted-in to receive email from TransUnion. We respect your privacy and post our privacy policy prominently on our Website.

**ABOUT OFFERS**
TransUnion shares special offers with you, such as discounts on TransUnion products and offers from our third-party partners. Some of these third party-offers will appear in the emails we send to you, but they do not and are not intended to represent financial advice or guarantee future results. Before acting on any third-party offer, you should carefully consider the details, terms, conditions, and consult a qualified financial advisor. TransUnion is compensated by third-party partners when consumers follow through on a displayed third-party offer. You will continue to receive these emails from time to time because you expressed interest in our special offers when you placed your order or signed up for our newsletter.

**ABOUT TRANSUNION**
Information is a powerful thing. At TransUnion, we realize that. We are dedicated to finding innovative ways information can be used to help individuals make better and smarter decisions. We help uncover unique stories, trends and insights behind each data point, using historical information as well as alternative data sources. This allows a variety of markets and businesses to better manage risk and consumers to better manage their credit, personal information and identity. Today, TransUnion has a global presence in more than 30 countries and a leading presence in several international markets across North America, Africa, Latin America and Asia. Through the power of information, TransUnion is working to build stronger economies and families and safer communities worldwide. We call this Information for Good.℠ For more on TransUnion, please visit www.transunion.com/about-us/about-transunion.

**Unsubscribe** | **Privacy Policy** | **Terms of Use** | **Account Login**

© 2020 TransUnion Interactive, Inc. All Rights Reserved.

100 Cross Street, Suite 202, San Luis Obispo, CA 93401

**Figure 2**

51. The email gives reasonable consumers the misleading impression that they are already signed up for, and entitled to the benefits of, the product offered without cost or obligation.

52. In reality, the consumers who have received this email have, at most, only "signed up" to receive marketing emails from Corporate Defendants and have not in fact enrolled in TU Credit Monitoring. They are not eligible to obtain a credit score or report directly from Corporate Defendants without incurring an additional cost. But when a consumer clicks on the "YES, SHOW ME MY CREDIT NOW" button, the consumer is taken to the Homepage Enrollment Form.

53. The email's only mention of a subscription price is buried in fine print below the images on the email and is insufficient to overcome the misleading net impression caused by the prominent language and orange button in the email.

54. This misimpression is material to consumers because consumers who believed they were already enrolled in TU Credit Monitoring or eligible to obtain a credit score or report without incurring additional cost would be more likely to click the "YES, SHOW ME MY CREDIT NOW" button, travel to the Homepage Enrollment Form—which itself is misleading, as described in Paragraphs 78–91—and enroll in the TU Credit Monitoring product.

55. By misrepresenting through these and similar emails that TU Credit Monitoring was "without cost or obligation" and by misrepresenting the material conditions of TU Credit Monitoring—specifically, its price—Corporate Defendants violated Paragraphs 40(a)(i) and (iii) of the Order and committed deceptive acts and practices.

*Corporate Defendants' misrepresentations about the nature of the credit score provided*

56. Credit scores are, among other things, numerical summaries designed to predict consumer payment behavior on a wide range of credit products. Many lenders and other

commercial users rely, in part, on consumers' credit scores when deciding whether to extend credit to a consumer.

57. No single credit score or credit score model serves as the primary credit score for the marketplace. Lenders use a variety of credit scores, which vary by score provider, scoring model, and target industry.

58. Credit reporting companies like Corporate Defendants, and other companies, apply various analytical scoring models to the information in consumer credit files to produce the credit scores that lenders and commercial users rely upon.

59. Corporate Defendants generate a credit score based on a scoring model from VantageScore Solutions, LLC, which has offered several versions of its score since 2011. Corporate Defendants refer to this score as the VantageScore.

60. In addition to selling credit scores to lenders and other commercial users, Corporate Defendants market and sell the VantageScore credit scores to consumers as a part of the TU Credit Monitoring bundle.

61. In the Order, the Bureau found that the VantageScore credit scores were "not the same scores typically used by lenders or other commercial users for credit decisions." Consent Order ¶ 30.

62. Paragraph 40(c) of the Order requires Corporate Defendants, their officers, agents, servants, employees, and attorneys who have actual notice of the Order, whether acting directly or indirectly, to take the following actions, among others, when offering or providing a VantageScore credit score to consumers:

    a. "[c]learly and prominently disclose the nature of the credit score offered in each communication containing the offer and, for internet offers, on at least one page of the order process" (Order ¶ 40(c)(i));

    b. "[e]nsure that the disclosure clearly and prominently discloses or substantially states" that "the credit score [Corporate Defendants are]

selling is not likely to be the same score used by lenders or other commercial users for credit decisions" (Order ¶ 40(c)(ii)); and

c. "[f]or written communications, including for internet offers, ensure that the disclosure contains a label in font size double that of the disclosure that says: 'What You Need to Know'" (Order ¶ 40(c)(iii)).

63.    Corporate Defendants failed to implement these requirements in their direct marketing channel, including, on information and belief, in marketing materials used by Affiliates on Corporate Defendants' behalf.

64.    Specifically, from the Effective Date to the present, Corporate Defendants failed to place disclosures on most display or banner advertisements covered by ¶ 40(c)(i), despite the fact that such advertisements constituted "communication[s] containing the offer."

65.    Corporate Defendants also failed to include the required "What You Need to Know" label on any disclosures from the Effective Date until at least April 2019.

66.    Corporate Defendants have also, from the Effective Date through the present, failed to "clearly and prominently disclose or substantially state" that "the credit score [Corporate Defendants are] selling is not likely to be the same score used by lenders or other commercial users for credit decisions," as required by ¶ 40(c)(ii) of the Order.

67.    Instead, at all times since January 2017, the relevant part of Corporate Defendants' VantageScore disclosure for all advertisements and enrollments has stated that "[t]he credit score you receive is based on the VantageScore 3.0 and *may not* be the credit score model used by your lender" (emphasis added). This is substantially the same as the language Corporate Defendants used prior to the Effective Date of the Order, which stated "[t]he score you get from us may not be the one your lender uses."

68.    Corporate Defendants' use of "may not," instead of the Order's language "is not likely to be," suggests a reasonable probability that the consumer's lender would use the VantageScore 3.0 when making a lending decision regarding the consumer.

16

69.     In addition to the score disclosure language, Corporate Defendants have also, in other ways, continued to misrepresent to consumers that the VantageScore they are purchasing is the same score used by lenders or other commercial users to determine creditworthiness. For example, certain of Corporate Defendants' advertisements and landing pages offering "credit scores" after the Effective Date have represented to the consumer: "If your score is 580 or better, you can apply for a government-backed loan with the Federal Housing Administration;" "47% of employers do a credit check before hiring someone;" and "Drivers with excellent credit pay 50% less for car insurance." Corporate Defendants' website also features a mortgage calculator that prompts the consumer to enter her credit score, and if the consumer clicks on a link saying she is "not sure" of her credit score, she is taken to the TU Credit Monitoring enrollment process.

70.     In addition, Corporate Defendants send emails to consumers on behalf of certain lenders, marketing "personal loans" to those consumers. In those emails, Corporate Defendants embed advertisements for TU Credit Monitoring that say, for example: "P.S. you may want to see your credit score before applying for a personal loan." If a consumer clicks on the embedded link, the consumer is taken to the TU Credit Monitoring enrollment process.

71.     In fact, there is no way for Corporate Defendants or a consumer to know which credit score model or particular credit score a lender may rely upon when making a credit decision related to that consumer. Indeed, when responding to consumer complaints about credit scores, Corporate Defendants have admitted that "there are hundreds of scoring models utilized today from financial institutions throughout the United States. Each scoring model is chosen by the financial institution based on criteria they specify in relation to their business needs."

72.     For certain consumers, there are significant and meaningful differences between the VantageScore credit scores marketed and sold to consumers and the variety of credit scores used by lenders.

73.     As a result, for these consumers, the scores Corporate Defendants marketed and sold to them presented an inaccurate picture of how lenders, the vast majority of which use other scores and data providers, assess their creditworthiness.

74.     Corporate Defendants' failure to include the required disclosures on each internet advertising page, their failure until April 2019 to include the "What You Need to Know" label on any disclosures, and their failure to change their disclosure about VantageScore's prevalence from an assertion that it "may not" be used by a consumer's lender to the fact that it is "not likely to" be used by a consumer's lender, renders their conduct as essentially unchanged from prior to the Order.

75.     Thus, it remains the case that Corporate Defendants "have represented, directly or indirectly, expressly or impliedly, that the credit scores they market and sell to consumers are the same scores typically used by lenders or other commercial users for credit decisions," as the Bureau found in the Order. Order ¶ 29.  Such representations are likely to affect consumers' conduct or decisions regarding whether to provide payment information and have misled or have been likely to mislead consumers acting reasonably under the circumstances.

76.     These score representations are unsubstantiated and, therefore, deceptive because, as discussed above, Corporate Defendants lack a reasonable basis to assert that there is a reasonable probability that a lender would specifically use the VantageScore when making a lending decision about a consumer, instead of any of the hundreds of commercial and proprietary scoring models available.

77.     By failing to make the required disclosures, Corporate Defendants have violated Paragraph 40(c) of the Order and have continued to engage in deceptive acts and practices.

*Corporate Defendants' misrepresentations regarding the purpose for which payment information would be used*

78. Paragraph 40(a)(ii) of the Order prohibits Corporate Defendants and their officers, agents, and employees who have actual notice of the Order from misrepresenting, directly or indirectly, expressly or impliedly, "[a]ny material fact about the timing or manner of any charge or bill, . . . the purpose for which a consumer's credit card or payment information will be used, . . . the date(s) upon which the consumer will be charged or billed, and the deadline (by date or frequency) by which the consumer must act in order to stop any charges[.]"

79. After the Order's Effective Date, Corporate Defendants violated Paragraph 40(a)(ii) by giving consumers the misleading impression that their payment information was requested for purposes other than payment and that they would not be immediately charged. Corporate Defendants made these misrepresentations in connection with the Homepage Enrollment Form.

80. At least since the Order's Effective Date through the present, when a consumer clicks on a TU Credit Monitoring advertisement or landing page that Corporate Defendants did not place through an Affiliate, she is taken to the Homepage Enrollment Form. The form asks the consumer to "Tell Us About Yourself" and provide personal information.

81. After the consumer provides personal information, the form then asks the consumer to create a login to Corporate Defendants' website and to provide payment information. Although Corporate Defendants use that payment information to charge consumers, there is no indication that consumers will immediately be charged.

82. Instead, in close proximity to the request for payment information, Corporate Defendants represent that the consumer has authorized TUI to use "personal information you provide during the enrollment process . . . to confirm your identity, display your credit data to you and provide you with personalized offers."

83.     Consumers are also asked to answer questions about their financial history, such as the balance of their mortgage, in order to verify their identities and pull their credit files. Some consumers are given the option of verifying their identity with an authorization code.

84.     The last step many consumers take before their cards are charged is to click on a Call to Action that says, "VERIFY MY IDENTITY" or other language indicating that the consumer assents to having Corporate Defendants confirm his or her identity. For other consumers, the last button they click says "GET MY CREDIT SCORE." But even after clicking those final buttons, nothing on the screen tells consumers they have been charged; they simply gain access to the TU Credit Monitoring consumer portal.

85.     Corporate Defendants have used substantially the same Homepage Enrollment Form for all enrollments into TU Credit Monitoring through transunion.com during any given time period, except that consumers who clicked on advertisements on annualcreditreport.com are asked to verify their identity at an earlier point than other consumers.

86.     The only indication in the enrollment process that consumers are making some sort of purchase is through a fine print, low contrast disclosure, located off to the side of the enrollment form. The disclosure is inside an image that can take up to 30 seconds longer to load than the rest of the material in the form.

87.     For consumers residing in California only, Corporate Defendants provide an additional disclosure. But it appears in fine print, makes reference solely to a monthly charge, and fails to warn consumers that they will be charged immediately.

88.     These fine print disclosures about monthly charges are not sufficiently clear or prominent to overcome the impression left by the rest of the enrollment form that the payment information was for a purpose other than payment.

89.     The net impression created by the types of misrepresentations in the Homepage Enrollment Form has misled, or has been likely to mislead, consumers acting reasonably under the circumstances. Since the Order's Effective Date, Corporate Defendants have received

thousands of complaints and refund requests from consumers who did not understand how they came to be enrolled in a paid monthly subscription product, including many consumers who specifically stated that they had provided their payment information believing that Corporate Defendants were requesting it to verify their identities, not to charge them.

90.     The Homepage Enrollment Form was likely to affect consumers' conduct or decisions regarding whether to provide payment information.

91.     Corporate Defendants' misrepresentations in connection with the Homepage Enrollment Form, made from at least the Effective Date through the present, violated Paragraph 40(a)(ii) of the Order.  This conduct was also deceptive.

### Corporate Defendants offered Negative Option enrollments to consumers without obtaining express informed consent

92.     Paragraph 40(b)(i) of the Order requires Corporate Defendants and their officers, agents, and employees who have actual notice of the Order, whether acting directly or indirectly, to "obtain the express informed consent from the consumer" before enrolling any consumer into a Credit-Related Product with a Negative Option feature.  "Negative Option" is defined by Paragraph 3(j) of the Order as a "category of commercial transactions in which a seller markets an offer for a trial period and the seller then interprets a customer's failure to take an affirmative action, either to reject an offer or cancel an agreement, as assent or continuing assent to be charged for goods or services."

93.     Specifically, Paragraph 40(b)(i)(1) provides that, for internet offers, "express informed consent" in connection with a Negative Option feature requires "a check box on the final order page that consumers must affirmatively check to select the Negative Option feature (*i.e.*, it cannot be pre-checked), and which clearly and conspicuously states that the consumer agrees to be billed for the product unless the consumer cancels before the trial period expires[.]"

94.     Paragraph 40(b)(i)(2) requires that "[i]mmediately adjacent to the affirmative selection checkbox," Corporate Defendants "must clearly and conspicuously disclose: (i) if

applicable, the amount the consumer will be charged on a recurring (*e.g.*, monthly) basis if the product or service is not cancelled before the expiration of the trial period; and (ii) the date when the trial period expires and the amount the consumer will be billed[.]"

95.     After the Order's Effective Date, Corporate Defendants, acting directly and indirectly, continued to enroll consumers into Credit-Related Products with Negative Option features without obeying the specific requirements set forth in Paragraphs 40(b)(i)(1) and (2). Specifically, for most Negative Option enrollments that Corporate Defendants have completed since the Effective Date, which represent millions of consumer enrollments, Corporate Defendants have failed to use an affirmative selection checkbox as required by Paragraph 40(b)(i).

96.     These Negative Option enrollments that violated the Order occurred in two ways: (a) via the enrollment processes hosted on Corporate Defendants' own website after consumers were directed there from advertisements on annualcreditreport.com and elsewhere, including on popular websites and in email marketing campaigns; and (b) via enrollment processes hosted by Affiliates on behalf of and at the direction of Corporate Defendants.

97.     For example, between January 2017 and January 2019, for certain consumers who had viewed and clicked on advertisements on annualcreditreport.com, Corporate Defendants enrolled those consumers into TU Credit Monitoring subscriptions with Negative Option features. Like the Homepage Enrollment Form, none of the enrollment forms consumers completed contained "a check box on the final order page that consumers must affirmatively check to select the Negative Option feature," or any check box regarding billing at all. Corporate Defendants nonetheless enrolled those consumers into TU Credit Monitoring subscriptions with Negative Option features after the consumers completed enrollment forms.

98.     Following the Effective Date until sometime in 2020, Corporate Defendants failed to decommission certain trial offers for Credit-Related Products that had been made to consumers prior to the Effective Date. Like the Homepage Enrollment Form, none of the enrollment forms consumers completed contained "a check box on the final order page that consumers must

affirmatively check to select the Negative Option feature," or any check box regarding billing at all. Corporate Defendants nonetheless enrolled those consumers into Credit-Related Products with Negative Option features after the consumers completed enrollment forms.

99.     From March 2017 to the present, millions of consumers clicked on advertisements for Credit-Related Products that were placed on Corporate Defendants' behalf by ConsumerTrack and other Affiliates. The enrollment forms that these consumers completed did not contain "a check box on the final order page that consumers must affirmatively check to select the Negative Option feature," or any check box regarding billing at all. Corporate Defendants, acting directly or indirectly, or through an agent, nonetheless enrolled those consumers into Credit-Related Products with Negative Option features after the consumers completed enrollment forms.

100.    For example, on or about November 21, 2020, ConsumerTrack placed the advertisement in Figure 3 on a third-party website.



Offer Form Received

Thank you for choosing us to help with your financing needs.

Next Step:

The next step is to obtain a copy of your most recent Credit Score.

Your Credit Score is a determining factor in your loan approval and what your interest rate will be. It is important that you confirm the information in your credit profile is accurate.
This will help ensure you get the best rates.

Click below to get your FREE Credit Score with $1 Credit Report

Take me to my Credit Score ››

Terms and Conditions Apply

Figure 3

101.    Consumers who clicked on this advertisement were ultimately taken to Affiliate Enrollment Form D.1. The enrollment form did not contain "a check box on the final order page that consumers must affirmatively check to select the Negative Option feature," or any check box

regarding billing at all. Nonetheless, after a consumer completed and submitted the enrollment form, Corporate Defendants, acting directly or indirectly, or through an agent (1) enrolled the consumer into the TU Credit Monitoring product; (2) charged the consumer $1; and (3) sent the consumer an email with login instructions for the TU Credit Monitoring portal on transunion.com. After the expiration of the trial period, Corporate Defendants charged the consumers automatically and indefinitely for each month of the subscription until the consumers contacted Corporate Defendants to cancel the subscription.

102.    In another example, on or about March 30, 2021, ConsumerTrack placed the advertisement in Figure 4 on a third-party website.



<u>Figure 4</u>

103.    Consumers who clicked on this advertisement were taken to Affiliate Enrollment Form D.2. The enrollment form did not contain "a check box on the final order page that consumers must affirmatively check to select the Negative Option feature," or any check box regarding billing at all. Nonetheless, after the consumer completed and submitted the enrollment form, Corporate Defendants, acting directly or indirectly, or through an agent (1) enrolled the consumer into the TU Credit Monitoring product; (2) charged the consumer $1; and (3) sent the consumer an email with login instructions for the TU Credit Monitoring portal on transunion.com. After the expiration of a trial period, Corporate Defendants charged the

consumers automatically and indefinitely for each month of the subscription until the consumers contacted Corporate Defendants to cancel the subscription.

104.    This conduct violated Paragraph 40(b)(i) of the Order.

*Corporate Defendants continued to misrepresent that TU Credit Monitoring was "free" or $1 in connection with Negative Option enrollments*

105.    As set forth above, paragraph 40(a)(i) of the Order prohibits Corporate Defendants and their officers, agents, and employees who have actual notice of the Order, whether acting directly or indirectly, from misrepresenting, expressly or impliedly, "[a]ny material fact about the cost or price of a Credit-Related Product, including that the product or service is free, discounted, a gift, a sample, a trial, a bonus, without cost or obligation, or words of similar import, denoting or implying the absence of an obligation on the part of the consumer to affirmatively act in order to avoid charges[.]"

106.    After the Order's Effective Date, Corporate Defendants continued using advertisements for subscription Credit-Related Products that misrepresented to consumers that they would have access to "free" or $1 credit scores and credit reports, as reflected in Figures 3 and 4. These misrepresentations primarily occurred through advertisements placed by Affiliates on behalf of, at the direction of, Corporate Defendants.

107.    In fact, these advertisements were associated with a Negative Option billing structure, and consumers who completed an Affiliate Enrollment Form were enrolled by Corporate Defendants into a trial offer for TU Credit Monitoring. After the trial period, consumers who did not cancel their subscriptions were immediately enrolled in an indefinite paid monthly subscription for TU Credit Monitoring.

108.    Corporate Defendants failed to adequately disclose the Negative Option feature. The disclosures, if any, in the advertisements or in the Affiliate Enrollment Forms were neither clear nor conspicuous. And, as set forth in Paragraphs 92–107, Corporate Defendants failed to

obtain consumers' express informed consent to enrollment in the Negative Option feature. This rendered Corporate Defendants' conduct essentially unchanged from prior to the Effective Date.

109. Corporate Defendants' misrepresentations in connection with Affiliate advertisements and enrollments into TU Credit Monitoring subscriptions with Negative Option features violated Paragraph 40(a)(i) of the Order. This conduct was also deceptive.

*Corporate Defendants failed to obtain required authorization for recurring charges to consumers' accounts*

110. Section 903(10) of EFTA, 15 U.S.C. § 1693a(10), provides that the term "preauthorized electronic fund transfer" means "an electronic fund transfer authorized in advance to recur at substantially regular intervals[.]"

111. Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), provides that a "preauthorized" electronic fund transfer from a consumer's account must be "authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made." Section 1005.10(b) of EFTA's implementing regulation, Regulation E, 12 C.F.R. Part 1005, requires that "[p]reauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer. The person that obtains the authorization shall provide a copy to the consumer."

112. Section 1005.10 of the Official Interpretations to Regulation E, 12 C.F.R. part 1005, Supp. I., Sec. 1005.10, 10(b), cmt. 5, clarify that "[t]he authorization process should evidence the consumer's identity and assent to the authorization." The Interpretations further clarify that "[a]n authorization is valid if it is readily identifiable as such and the terms of the preauthorized transfer are clear and readily understandable." 12 C.F.R. part 1005, Supp. I., Sec. 1005.10, 10(b), cmt. 6.

113. Some consumers entered their debit card information into Corporate Defendants' enrollment forms, including Homepage Enrollment Forms and Affiliate Enrollment Forms. Corporate Defendants debited these consumers' monthly charges for TU Credit Monitoring from the consumers' bank accounts.

114.    Corporate Defendants' monthly charge for TU Credit Monitoring to a debit card is a "preauthorized electronic fund transfer" within the meaning of EFTA. Corporate Defendants' enrollment forms contain no separate language of consumer authorization for a specific amount of recurring payments to be charged to consumers' debit cards.

115.    For example, in the Homepage Enrollment Form, the button below the payment information field labeled "I Accept & Continue to Step 3" is accompanied by an explanation of some usages of the consumer's information that the consumer is accepting, but it makes no mention of recurring payments.

116.    Specifically, just above the button, the Homepage Enrollment Form states: "By clicking on the "I Accept & Continue to Step 3" button below, you are providing written instructions to [TUI] authorizing [TUI] to obtain and use on a recurring basis with your membership, personal information that you provide during the enrollment process, as well as information from your credit profiles at Transunion, Experian and/or Equifax to confirm your identity, display your credit data to you and provide you with personalized offers from Transunion's partners that are based on your personal information and credit scores."

117.    Likewise, in the Affiliate Enrollment Forms in Appendix D, the text below the debit or credit card information field states, "You are agreeing to the service agreement and providing written instructions to [TUI] to obtain information from your personal credit profile from Experian, Equifax, and/or TransUnion. You authorize [TUI] to obtain such information solely to confirm your identity and display your credit data to you." The text is accompanied by an orange button that states "VIEW CREDIT SCORE."

118.    In the Homepage and Affiliate Enrollment Forms, other than the variations of them for California consumers as described below, the sole references to specific charges appear on other pages of the forms where consumers are asked to enter only identifying information such as address and date of birth. These disclosures are inadequate and misleading.

119.    For the Homepage Enrollment Form, the consumer's clicking "I Accept & Continue to Step 3" is not a signed or authenticated statement in writing that the consumer authorizes debits to the consumer's bank account on a monthly schedule, as required by EFTA and Regulation E. That action by the consumer is not a readily identifiable authorization. Nor were the terms of the preauthorized transfer clear and readily understandable.

120.    For the Affiliate Enrollment Form, the consumer's clicking "VIEW CREDIT SCORE" is not a signed or authenticated statement in writing that the consumer authorizes debits to the consumer's bank account on a monthly schedule, as required by EFTA and Regulation E. That action by the consumer is not a readily identifiable authorization. Nor were the terms of the preauthorized transfer clear and readily understandable.

121.    For California consumers only, the disclosure above "I Accept & Continue to Step 3" in the Homepage Enrollment Form includes additional language regarding monthly payments. But given the placement and content of this additional language, the consumer's clicking "I Accept & Continue to Step 3" in this context is not a signed or authenticated statement in writing that the consumer authorizes debits to the consumer's bank account on a monthly schedule, as required by EFTA and Regulation E. That action by the consumer is not a readily identifiable authorization. Nor were the terms of the preauthorized transfer clear and readily understandable.

122.    Consequently, Corporate Defendants' recurring charges to consumers who enrolled in TU Credit Monitoring using the Homepage Enrollment Form, Affiliate Enrollment Forms, or similar forms and paid with a debit card were not authorized in accordance with the requirements of EFTA and Regulation E.

123.    Further, as Corporate Defendants never obtained an adequate signed or authenticated statement that consumers authorized recurring charges on their debit cards to pay for TU Credit Monitoring, Corporate Defendants could not and did not provide a copy of such a statement to the consumer, as required by EFTA and Regulation E.

28

**Corporate Defendants Violated the Order and Regulation V and Engaged in Deceptive Acts and Practices in Their Marketing of Credit-Related Products on annualcreditreport.com**

124. The Fair Credit Reporting Act (FCRA) imposes on each NCRA an obligation to provide a free file disclosure (*i.e.*, credit report) once every 12 months to any consumer who requests it. 15 U.S.C. § 1681j(a). Regulation V, FCRA's implementing regulation, requires all NCRAs to jointly design, fund, implement, maintain, and operate a "centralized source" to enable consumers to obtain free annual file disclosures from all NCRAs. 12 C.F.R. § 1022.136. The centralized source for free annual file disclosures is the website annualcreditreport.com.

125. A consumer who seeks to obtain her free credit report through annualcreditreport.com must first provide certain identifying information on the website, including her name, social security number, and current address. The consumer must then answer questions to verify her identity, which are similar to those in page 3 of the Homepage Enrollment Form. The consumer is then given a choice to obtain her file disclosure from one or more of the NCRAs, including Corporate Defendants.

126. Corporate Defendants control the placement of advertising for TransUnion-branded products and services on annualcreditreport.com and operate the website that consumers access through annualcreditreport.com to obtain their free annual file disclosures from Corporate Defendants.

127. Between February 2014 and March 2020, when Corporate Defendants delivered a free annual file disclosure to a consumer, Corporate Defendants placed a prominent "Call to

Action" button advertisement for a "credit score" at the top of the free annual file disclosure. The image in Figure 5 is one of the advertisements used frequently by Corporate Defendants:



Figure 5

128.    The button advertisement was a misrepresentation. By inviting consumers to "see" or "add" their "credit score," the button gave consumers the false impression that the credit score was part of their free file disclosure. But in reality, the product Corporate Defendants were advertising was their bundled, paid subscription product, TU Credit Monitoring.

129.    Corporate Defendants designed the button advertisements to appear in a bright color and large font, and strategically placed them just under the consumer's name on the free file disclosure. The button's placement compounded the false impression that the "score" was part of the consumer's free file disclosure. The button was much more prominent than, and placed above, the option to print or save a pdf of the file disclosure, which was located in much smaller print below the ad.

130.     Figure 6 reflects the placement of the button advertisement on a test consumer's file disclosure:



Figure 6

131.     The misrepresentation created by the button advertisement was material.   By giving consumers the false impression that the score was part of their free annual file disclosure,

31

the button advertisements influenced many consumers to click on them unwittingly. Consumers, acting reasonably under the circumstances, were misled by the button advertisements.

132.    Corporate Defendants' button advertisement offered a "credit score" ancillary to consumers' receipt of their free file disclosure. Therefore, the button advertisement falsely represented that the "credit score" was free.

133.    The button advertisements interfered with, detracted from, contradicted, or otherwise undermined the purpose of annualcreditreport.com. Upon clicking on the button advertisements, consumers were diverted from their free annual file disclosure on annualcreditreport.com and into an enrollment process that was substantially similar to the Homepage Enrollment Form, except that consumers had already answered identity verification questions similar to those in page 3 of the Homepage Enrollment Form in order to obtain their free report. Some consumers were unable to return to their free annual file disclosure after being diverted to the enrollment process, even if they did not ultimately enroll in the product.

134.    By misrepresenting, expressly or impliedly, that the credit score was free, the button advertisement on consumers' free file disclosures also violated Paragraph 40(a)(i) of the Order.

135.    By misrepresenting, expressly or impliedly, that the score was part of the consumer's annual file disclosure when, in truth and in fact, a material condition of receiving the score was enrollment in a paid subscription product, the button advertisement on consumers' free file disclosures also violated Paragraph 40(a)(iii) of the Order.

136.    Just since January 3, 2017, Corporate Defendants have received hundreds of complaints and refund requests from consumers who had sought to obtain their free annual file disclosures from annualcreditreport.com and did not understand how they came to be enrolled in a paid monthly subscription product.

137. Corporate Defendants' misrepresentations in connection with providing consumers' free file disclosures violated Paragraphs 40(a)(i) and (iii) of the Order, 12 C.F.R. §§ 1022.136(g)(2)-(3), and were deceptive.

### Corporate Defendants Violated the Order and Engaged in Deceptive Acts and Practices by Making it Difficult and Confusing for Consumers to Cancel Subscriptions for Credit-Related Products

138. Paragraph 40(b)(ii) of the Order requires Corporate Defendants and their officers, agents, and employees who have actual notice of the Order, whether acting directly or indirectly, to "provide a simple mechanism for a consumer to immediately cancel the purchase of any Credit-Related Product, and stop billing and collecting payments for any recurring charge for any good or service." It further requires that the cancellation mechanism "must not be difficult, costly, confusing, or time consuming, and must, at a minimum, be substantially similar to the mechanism(s) the consumer used to initiate the purchase of any Credit-Related Product[.]"

139. As of at least the Effective Date until the present, Corporate Defendants have not provided any online mechanism for consumers to immediately cancel the purchase of a Credit-Related Product. Rather, consumers who inadvertently enroll into a Credit-Related Product and want to immediately cancel the purchase must call Corporate Defendants' customer service line. But even when consumers called, Corporate Defendants often refused to allow consumers to immediately cancel their purchases and obtain a refund. Corporate Defendants would, instead, tell consumers that they would remain enrolled in the product for the remainder of the month they had inadvertently purchased, and no refund would be given. Cancelling the purchase thus was "time-consuming," and it was not "immediate[]," "simple," or "substantially similar" to the online mechanism the consumer used to initiate the purchase.

140. Corporate Defendants have also not provided a simple mechanism for cancellation of future recurring charges. Though Corporate Defendants added an online cancellation function to their website after the Order, it is difficult to locate: many consumers have complained that

they were not able to find it and had to call Corporate Defendants' customer service line to cancel future payments.

141.    Specifically, since shortly after the Order's Effective Date through the present, a consumer who would like to cancel a TU Credit Monitoring subscription online must first go to a small "support" link on the homepage. Then, the consumer must click on language that says, "You may cancel your membership here."

142.    But instead of allowing the consumer to cancel at that point, Corporate Defendants take the consumer through a series of confusing screens and questions designed to keep the consumer enrolled in TU Credit Monitoring.

143.    First, Corporate Defendants present the consumer with additional information about product benefits and what the consumer would "lose" by canceling TU Credit Monitoring. At the bottom of the product benefits screen, Corporate Defendants present the consumer with a confusing choice:



Figure 7

144.    The prominent yellow button on the right of Figure 7 offers to take the consumer "BACK TO MY DASHBOARD." This is confusing because it actually means that the consumer will exit the cancellation process and will continue to be enrolled in TU Credit Monitoring.

145.    After clicking on the less prominent blue "Continue & Cancel" text, many consumers are taken to yet another screen and presented with various retention offers for discounts to TU Credit Monitoring. At the bottom of the retention offer screen, reflected in Figure

8, the consumer is presented again with a choice between a prominent yellow button and smaller blue text.



Cancel My Membership

Figure 8

146. The prominent yellow button in Figure 8 takes the consumer out of the cancellation process and the consumer remains enrolled in TU Credit Monitoring. Only when a consumer clicks on the blue "Cancel My Membership" text is the consumer allowed to cancel the TU Credit Monitoring subscription.

147. Corporate Defendants' cancellation process for Credit-Related Products therefore has been and remains difficult, costly, confusing or time-consuming.

148. Corporate Defendants have received thousands of refund requests and hundreds of complaints from consumers who wished to cancel their subscriptions and were unable to do so online.

149. After the Effective Date through the present, and despite knowing that consumers found the cancellation process to be difficult, costly, confusing, and time-consuming, Corporate Defendants failed to make their cancellation mechanism simple, in violation of Paragraph 40(b)(ii) of the Order.

150. In addition, after consumers cancel their TU Credit Monitoring subscriptions, whether refunds are given or not, Corporate Defendants mount a campaign of deception to induce consumers to re-enroll in the product. Upon cancelling, consumers receive an email warning that if they do not re-enroll in TU Credit Monitoring, the consumer will no longer be able to "**make your TransUnion report off-limits to thieves with 1-touch Credit Lock**." The consumer

is also warned in a second email at the end of the final month of enrollment that "**Your credit report is unlocked**."

151.     These emails give consumers the misleading impression that they have publicly exposed the information in their TransUnion credit report by cancelling, and that re-enrolling in the product is the only way that consumers can protect the information in their credit report from "thieves."

152.     In reality, the cancellation of a TU Credit Monitoring subscription should simply return the consumer's credit report to the same status as before he or she enrolled in TU Credit Monitoring, and should not cause the consumer's information to become publicly exposed. In addition, a free security freeze provides the same security features as the (not free) TU Credit Monitoring "Credit Lock." Both block new application inquiries on a consumer's credit file.

153.     Corporate Defendants' website compounded the misleading nature of their re-enrollment messages by making false statements. For example, on a webpage titled "Why Credit Lock is a Game Changer," Corporate Defendants misrepresented until at least May 2021 that a TU Credit Monitoring "Credit Lock" is better than a security freeze because security freezes are "pretty dramatic" and cost consumers $2-$10 depending on the state where a consumer lives. But in reality, under federal law, a consumer has been able to freeze or unfreeze his or her credit report with any NCRA at no charge since September 21, 2018, and obtain the same security features as the (not free) TU Credit Monitoring "Credit Lock."

154.     The false and misleading representations made in Corporate Defendants' post-cancellation emails were likely to affect consumers' conduct or decisions regarding whether to re-enroll into a TU Credit Monitoring subscription.

155.     By misrepresenting facts material to consumers, the post-cancellation emails also violated Paragraph 40(a)(iii) of the Order. This conduct was also deceptive.

**Corporate Defendants Violated the Order by Failing to Collect, Review and Assess Information and Data for Evidence of Consumer Confusion**

156. Paragraph 40(d) of the Order requires Corporate Defendants and their officers to regularly collect, review and assess, among other things, consumer complaints, cancellation rates, and empirical data regarding consumers' perceptions of Corporate Defendants' advertising for evidence of consumer confusion about the Credit-Related Products, including the price and other material terms of those products. Paragraph 40(d) also requires Corporate Defendants and their officers to regularly review, assess and, as necessary, modify Corporate Defendants' advertising "to improve consumer understanding of Credit-Related Products in light of empirical evidence."

157. Corporate Defendants and their officers have failed to undertake the required collection, review and assessment of consumer complaints and empirical data, or the review, assessment and modification of their advertisements as required by the Order.

**Corporate Defendants Violated the Order by Failing to Create and Retain Required Records**

158. Paragraph 68 of the Order requires Corporate Defendants to create and retain for at least five years from the Effective Date of the Order nine specified categories of documents related to the violations addressed in the Order.

159. Corporate Defendants failed to create and retain the records required under the Order.

**Corporate Defendants Violated the Order by Failing to Distribute It to, and Obtain Acknowledgements from Required Persons**

160. Under Paragraph 65 of the Order, within 30 days of the Effective Date, Corporate Defendants were required to deliver a copy of the Order to "each of their board members and executive officers, as well as to any managers, employees, affiliates, service providers, or other agents and representatives who have responsibilities related to the subject matter of the [Order]."

161. Paragraph 66 of the Order requires that, for five years from the Effective Date, Corporate Defendants must deliver a copy of the Order to "any future board members and

executive officers, as well as to any managers, employees, affiliates, service providers, or other agents and representatives who will have responsibilities related to the subject matter of the [Order] before they assume their responsibilities."

162.     Paragraph 67 of the Order requires that Corporate Defendants secure a signed and dated statement acknowledging receipt of a copy of the Order within 30 days of delivery from all persons receiving a copy of the Order under Paragraphs 65 and 66 of the Order.

163.     Corporate Defendants did not secure the required acknowledgment of receipt of the Order from all executive officers as required by the Order.

164.     Specifically, Corporate Defendants did not secure the required acknowledgement from the Company's current Chief Executive Officer until March 23, 2021 – approximately 22 months after he assumed his responsibilities as CEO and a member of the TransUnion board.

165.     Corporate Defendants also failed to deliver a copy of the Order to numerous other board members and executive officers before they assumed their duties, as required by Paragraph 66 of the Order, or to timely secure from those individuals the acknowledgment required by Paragraph 67 of the Order.

## DANAHER'S ORDER VIOLATIONS

166.     As the President of TUI for many years before the Effective Date until on or about April 1, 2021, and as Executive Vice President of TUI from April 2, 2021 until at least February 1, 2022, Danaher was responsible for, had the authority to control, and did in fact control, the manner in which TUI marketed Credit-Related Products to consumers.

167.     Danaher has had actual notice of the Order since January 3, 2017.

168.      Danaher, acting directly or indirectly, including through omissions or failures to act, violated Consent Order Paragraph 40 and its subparagraphs (a)-(d).

169.     From at least the Effective Date through the present, Danaher has had actual knowledge of, or recklessly disregarded, TUI's violations of the Order.

170. Notwithstanding his personal legal obligations (as specified by Order Paragraphs 40 and its subparagraphs (a)-(d)) as TUI's President and Executive Vice President with actual notice of the Order, Danaher failed to ensure Corporate Defendants' compliance with the Order, despite having the authority to do so and knowledge or reckless disregard of the Consent Order violations committed by Corporate Defendants.

171. In fact, Danaher, along with others, determined that complying with the Order would reduce TUI's revenue and created a plan to delay or avoid implementation of the requirements of Paragraph 40 of the Order. Among other things, shortly after the Effective Date, Danaher determined that using the affirmative selection checkbox required by Order Paragraph 40(b)(i) in connection with Negative Option enrollments resulted in fewer enrollments into TU Credit Monitoring and therefore lower revenue. Danaher instructed TUI to cease using the checkbox in Affiliate marketing, leading to millions of enrollments that violated the Order.

## COUNT I: VIOLATIONS OF THE ORDER
## (CORPORATE DEFENDANTS)

172. The Bureau incorporates the allegations set forth in Paragraphs 1–109 and 124–171 of this Complaint.

173. Under § 1036(a)(1)(A) of the CFPA, it is unlawful for covered persons, such as Corporate Defendants, to "offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law[.]" 12 U.S.C. § 5536(a)(1)(A).

174. "Federal consumer financial law" is defined to include an "order prescribed by the Bureau." 12 U.S.C. § 5481(14).

175. The Order is an "order prescribed by the Bureau."

176. Corporate Defendants, acting directly and indirectly, through the TU Common Enterprise, or through an agent, violated the Order by:

a. misrepresenting, expressly or impliedly, material facts about the cost or price of a Credit-Related Product, including that the product or service is free, discounted, a gift, a sample, a trial, a bonus, without cost or obligation, or words of similar import, denoting or implying the absence of an obligation on the part of the consumer to affirmatively act in order to avoid charges, in violation Paragraph 40(a)(i) of this Order, as set forth in:

    i. Paragraphs 45–55 of this Complaint (misrepresenting consumers' enrollment status);

    ii. Paragraphs 105–109 of this Complaint (misrepresenting that scores or reports were "free" or "$1"), and

    iii. Paragraphs 124–137 of this Complaint (misrepresenting that scores on annualcreditreport.com were part of a consumer's free file disclosure);

b. misrepresenting, expressly or impliedly, material facts about the timing or manner of any charge or bill, the purpose for which a consumer's credit card or payment information will be used, the date(s) upon which the consumer will be charged or billed, and the deadline by which the consumer must act in order to stop any charges, in violation of Paragraph 40(a)(ii) of the Order, as set forth in Paragraphs 78–91 of this Complaint (misrepresenting that payment information would be used for identity verification purposes);

c. misrepresenting, expressly or impliedly, material facts about the conditions, nature, or central characteristics of TU Credit Monitoring, in violation of Paragraph 40(a)(iii) of the Order, as set forth in:

      i.   Paragraphs 32–44 of this Complaint (misrepresenting the nature of TU Credit Monitoring by advertising it as merely a "score" or "report");

     ii.   Paragraphs 45–55 of this Complaint (misrepresenting consumers' enrollment status in TU Credit Monitoring);

    iii.   Paragraphs 124–137 of this Complaint (misrepresenting that a score was part of a consumer's annual file disclosure when receiving the score was conditioned on enrollment in a paid subscription product); and

    iv.   Paragraphs 150–155 of this Complaint (misrepresenting the effect of cancellation of a TU Credit Monitoring subscription on a consumer's credit report);

d.   failing to obtain express informed consent from consumers before enrolling them into products with Negative Option features, in violation of Paragraph 40(b)(i) of the Order, as set forth in Paragraphs 92–104 of this Complaint;

e.   failing to provide consumers with a simple mechanism that is not costly, confusing, or time consuming for cancellation of enrollment, and failing to permit consumers to immediately cancel a purchase, in violation of Paragraph 40(b)(ii) of the Order, as set forth in in Paragraphs 138–155 of this Complaint;

f.   offering or providing VantageScore credit scores to consumers without required disclosures, in violation of Paragraph 40(c) of the Order, as set forth in Paragraphs 56–77 of this Complaint;

g.   failing to collect, review and assess the required information and data, and failing to modify their advertising of Credit-Related Products in light

thereof, in violation of Paragraph 40(d) of the Order, as set forth in Paragraphs 156–157 of this Complaint;

h. failing to deliver the Order to, and obtain a signed and dated acknowledgment of receipt of the Order from, all board members, executive officers, and other required recipients, in violation of Paragraphs 65-67 of the Order, as set forth in Paragraphs 160–165 of this Complaint; and

i. failing to create or retain required records, in violation of Paragraph 68 of the Order, as set forth in Paragraphs 158–159 of this Complaint.

177.    By violating the requirements of Paragraphs 40(a)(i)-(iii), (b)(i)-(ii), (c), and (d) of the Order, Corporate Defendants offered and provided to consumers financial products and services not in conformity with Federal consumer financial law.

178.    By violating the requirements of Paragraphs 40(a)(i)-(iii), (b)(i)-(ii), (c), and (d) and 65-68 of the Order, Corporate Defendants committed acts or omissions that violated Federal consumer financial law.

179.    Accordingly, Corporate Defendants violated § 1036(a)(1)(A) of the CFPA, 12 U.S.C. § 5536(a)(1)(A), and Corporate Defendants are each liable for these violations directly, through the TU Common Enterprise, and as principals or agents for one another.

## COUNT II: VIOLATIONS OF THE ORDER
### (DANAHER)

180.    The Bureau incorporates the allegations set forth in Paragraphs 1–109; 124–157; and 166–171 of this Complaint.

181.    Under § 1036(a)(1)(A) of the CFPA, it is unlawful for covered persons to "offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law[.]" 12 U.S.C. § 5536(a)(1)(A).

182.    "Federal consumer financial law" is defined to include an "order prescribed by the Bureau." 12 U.S.C. § 5481(14).

183.    The Order is an "order prescribed by the Bureau."

184.    Danaher has had actual knowledge of the Order since January 3, 2017.

185.    As President of TUI, after the Order's Effective Date until April 1, 2021, and as Executive Vice President of TUI from April 2, 2021 until at least February 1, 2022, Danaher had responsibility for ensuring that TUI complied with Federal consumer financial law and the Order.

186.    From at least January 3, 2017 until at least February 1, 2022, as an officer of TUI, Danaher was a "related person" and a "covered person" under the CFPA, 12 U.S.C. § 5481(25).

187.    Danaher, acting directly or indirectly, violated the Order, including by failing to ensure that TUI took the affirmative actions required by Paragraphs 40(a)(i)-(iii), (b)(i)-(ii), (c), and (d) of the Order and refrained from engaging in acts prohibited by those paragraphs of the Order, as set forth in Paragraph 176(a)–(g).

188.    Therefore, Danaher committed acts and omissions in violation of a Federal consumer financial law.

189.    Accordingly, Danaher violated § 1036(a)(1)(A) of the CFPA, 12 U.S.C. § 5536(a)(1)(A).

## COUNT III: DECEPTIVE ACTS AND PRACTICES
## (CORPORATE DEFENDANTS)

190.    The Bureau incorporates the allegations set forth in Paragraphs 1–171 of this Complaint.

191.    Section 1036(a)(1)(B) of the CFPA prohibits covered persons from engaging in deceptive acts or practices.  12 U.S.C. § 5536(a)(1)(B).

192.    An act or practice is deceptive if it involves a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances.

Information is material to consumers if it is likely to affect a consumer's conduct regarding the product or service.

193. Corporate Defendants, acting directly and indirectly, through the TU Common Enterprise, or through an agent, have engaged in the following deceptive acts and practices:

*a. Deceptive Acts and Practices Regarding the Nature and Central Characteristics of TU Credit Monitoring*

194. Corporate Defendants' representations about the nature and central characteristics of TU Credit Monitoring, made from the Effective Date through the present, have been deceptive.

195. As set forth in Paragraphs 32–44 of this Complaint, Corporate Defendants have represented, directly or indirectly, expressly or impliedly, that Corporate Defendants offered consumers the ability to see or purchase a standalone credit report or score.

196. These representations were false because, in truth and in fact, Corporate Defendants were actually offering an ongoing subscription for credit monitoring and were not offering consumers the ability to see or purchase a standalone credit report or score.

*b. Deceptive Acts and Practices Regarding Consumers' Enrollment Status*

197. Corporate Defendants' representations in marketing emails about consumers' enrollment status in TU Credit Monitoring, made from the Effective Date through the present, have been deceptive.

198. As set forth in Paragraphs 45–55 of this Complaint, Corporate Defendants have represented, directly or indirectly, expressly or impliedly, that consumers are already signed up for, and entitled to the benefits of, TU Credit Monitoring without cost or obligation.

199. These representations were false because, in truth and in fact, the consumers were not yet signed up for or entitled to the benefits of TU Credit Monitoring.

### c. Deceptive Acts and Practices in Connection with Enrollment Processes

200.     Corporate Defendants' representations in connection with the TU Credit Monitoring enrollment process, made from the Effective Date through the present, have been deceptive.

201.     As set forth in Paragraphs 78–91 of this Complaint, Corporate Defendants have represented, directly or indirectly, expressly or impliedly, that they are requesting consumers' debit or credit card information for reasons other than to charge the consumer.

202.     These representations were false because, in truth and in fact, Corporate Defendants requested consumers' payment information in order to charge consumers, and consumers who provided debit or credit card information were immediately charged for the TU Credit Monitoring product.

### d. Deceptive Acts and Practices Regarding the Nature of the Credit Score Offered

203.     Corporate Defendants' representations regarding the nature of the credit scores it offered or provided to consumers, made from the Effective Date through the present, have been deceptive.

204.     As described in Paragraphs 56–77 of this Complaint, Corporate Defendants have represented, directly or indirectly, expressly or impliedly, that the VantageScore credit scores Corporate Defendants offer or provide to consumers may be the same scores typically used by lenders or other commercial users for credit decisions.

205.     The representations are unsubstantiated and, therefore, deceptive because Corporate Defendants lack a reasonable basis to assert that a consumer's lender would use the VantageScore, instead of any other of the hundreds of available credit score models.

### e. Deceptive Acts and Practices Regarding "Free" or "$1" Credit Scores and Reports

206.     Corporate Defendants' representations regarding "free" and "$1" scores and reports, made from the Effective Date through the present, have been deceptive.

45

207.     As described in Paragraphs 92–109 of this Complaint, Corporate Defendants represented, directly or indirectly, expressly or impliedly, that consumers could obtain a "free" or "$1" score or report in its advertisements for TU Credit Monitoring.

208.     These representations were false because, in fact, these advertisements were associated with a Negative Option billing structure and a trial offer for a subscription. Consumers who did not cancel their subscriptions were immediately enrolled in an indefinite paid monthly subscription for TU Credit Monitoring.

### f. Deceptive Acts and Practices in Connection with Marketing on annualcreditreport.com

209.     Corporate Defendants' marketing of Credit-Related Products on the website annualcreditreport.com was deceptive.

210.     As described in Paragraphs 124–137 of this Complaint, Corporate Defendants have represented directly or indirectly, expressly or impliedly, that consumers' credit scores were free as a part of their free annual file disclosure.

211.     These representations were false because, in truth and in fact, Corporate Defendants did not offer consumers free credit scores in connection with their annual file disclosures, but instead enrolled consumers into an indefinite paid monthly subscription product that included a credit score.

### g. Deceptive Acts and Practices Regarding Effect of Cancelling TU Credit Monitoring Subscriptions

212.     As set forth in Paragraphs 138–155 of this Complaint, Corporate Defendants have represented, directly and indirectly, expressly or impliedly, that consumers have publicly exposed their credit report information by cancelling their subscriptions to TU Credit Monitoring and that re-enrolling in the product is the only way they can protect their credit report information.

213.     These representations were false because the cancellation of a TU Credit Monitoring subscription does not cause the consumer's credit report information to become

publicly exposed, and a free security freeze would provide the same security features as the Credit Lock option included in the TU Credit Monitoring subscription.

* * *

214.     The misrepresentations cited in paragraphs 190–213 were material and likely to mislead consumers acting reasonably under the circumstances.

215.     Thus, Corporate Defendants engaged in deceptive acts and practices in violation of §§ 1031(a) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

216.     Corporate Defendants are each liable for these violations directly, through the TU Common Enterprise, and as principals or agents of one another.

## COUNT IV: SUBSTANTIAL ASSISTANCE
## (TRANSUNION)

217.     The Bureau incorporates the allegations set forth in Paragraphs 1–109; 124–179; and 190–216 of this Complaint.

218.     Under § 1036(a)(3) of the CFPA, it is unlawful for "any person to knowingly or recklessly provide substantial assistance to a covered person or service provider in violation of the provisions of section 1031, or any rule or order issued thereunder, and notwithstanding any provision of this title, the provider of such substantial assistance shall be deemed to be in violation of that section to the same extent as the person to whom such assistance is provided." 12 U.S.C. § 5536(a)(3).

219.     The Order is an "order issued" under section 1031 of the CFPA.

220.     TULLC and TUI are each "a covered person or service provider."

221.     As described in Counts I and III, TUI violated § 1031 of the CFPA.

222.     As described in Counts I and III, TULLC violated § 1031 of the CFPA.

223.     Through its governance and other support of TULLC and TUI, and through its common enterprise activities with them, TransUnion has associated itself with their venture and

has participated in their marketing efforts as something that it wished to bring about and has sought by its actions to make succeed.

224.     As a party to the Order with actual knowledge of the Order's requirements, as the entity with ultimate responsibility to ensure TULLC and TUI complied with the Order, and through its governance and common enterprise activities with TULLC and TUI, TransUnion knew about or was reckless with respect to the conduct detailed in Count I and Count III.

225.     TransUnion violated § 1036(a)(3) of the CFPA by knowingly or recklessly providing substantial assistance to TULLC and TUI in connection with their violations of § 1031 of the CFPA. 12 U.S.C. § 5536(a)(3).

226.     TransUnion violated § 1036(a)(3) of the CFPA by knowingly or recklessly providing substantial assistance to TULLC and TUI in connection with their violations of the Order.  12 U.S.C. § 5536(a)(3).

## COUNT V: SUBSTANTIAL ASSISTANCE
## (TULLC)

227.     The Bureau incorporates the allegations set forth in Paragraphs 1–109; 124–179; and 190–216 of this Complaint.

228.     Under § 1036(a)(3) of the CFPA, it is unlawful for "any person to knowingly or recklessly provide substantial assistance to a covered person or service provider in violation of the provisions of section 1031, or any rule or order issued thereunder, and notwithstanding any provision of this title, the provider of such substantial assistance shall be deemed to be in violation of that section to the same extent as the person to whom such assistance is provided." 12 U.S.C. § 5536(a)(3).

229.     The Order is an "order issued" under section 1031 of the CFPA.

230.     TUI is "a covered person or service provider."

231.     As described in Counts I and III, TUI violated § 1031 of the CFPA.

232.     Through its governance and other support and common enterprise activities with TUI, which include TULLC's ability, as an NCRA, to advertise to consumers on annualcreditreport.com, and its collection and maintenance of shared consumer financial data, creation of consumer reports, and creation of other products for use by consumers, TULLC has associated itself with TUI's venture and has participated in its marketing efforts as something that it wished to bring about, and has sought by its actions to make succeed.

233.     As a party to the Order with actual knowledge of its content and through its common enterprise activities with TUI, TULLC knew about or was reckless with respect to the conduct detailed in Count I and Count III.

234.     TULLC violated § 1036(a)(3) of the CFPA by knowingly or recklessly providing substantial assistance to TUI in violation of § 1031 of the CFPA.  12 U.S.C. § 5536(a)(3).

235.     TULLC violated § 1036(a)(3) of the CFPA by knowingly or recklessly providing substantial assistance to TUI in connection with its violations of the Order.  12 U.S.C. § 5536(a)(3).

## COUNT VI: VIOLATION OF EFTA AND REGULATION E
## (CORPORATE DEFENDANTS)

236.     The Bureau incorporates the allegations set forth in Paragraphs 1–22 and 78–123 of this Complaint.

237.     Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), requires that a "preauthorized" electronic fund transfer from a consumer's account must be "authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made."

238.     Section 903(10) of EFTA, 15 U.S.C. § 1693a(10), provides that the term "preauthorized electronic fund transfer" means "an electronic fund transfer authorized in advance to recur at substantially regular intervals."

239.     Section 1005.3 of Regulation E, entitled "Coverage," states: "For purposes of §…1005.10(b)…, this part applies to any person, other than a person excluded from coverage of this part by section 1029 of the [CFPA]."  12 C.F.R. § 1005.3(a).

240.    Section 1005.10(b) of Regulation E provides that "[p]reauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer. The person that obtains the authorization shall provide a copy to the consumer." 12 C.F.R. § 1005.10(b).

241.    Section 1005.10 of the Official Interpretations to Regulation E clarify that "[t]he authorization process should evidence the consumer's identity and assent to the authorization." 12 C.F.R. part 1005, Supp. I., Sec. 1005.10, 10(b), cmt. 5. The Official Interpretations further clarify that "[a]n authorization is valid if it is readily identifiable as such and the terms of the preauthorized transfer are clear and readily understandable." 12 C.F.R. part 1005, Supp. I., Sec. 1005.10, 10(b), cmt. 6.

242.    Corporate Defendants are each a "person" within the meaning of Section 1005.3 of Regulation E, and not excluded from the Bureau's authority under Section 1029 of the CFPA. Corporate Defendants' monthly charge for TU Credit Monitoring is a "preauthorized electronic fund transfer" within the meaning of EFTA and Regulation E.

243.    Corporate Defendants' enrollment forms, including the Homepage Enrollment Form and the Affiliate Enrollment Forms, do not convey the terms of the preauthorized transfer in a clear and readily understandable way.

244.    In numerous instances, Corporate Defendants have debited consumers' bank accounts on a recurring basis without obtaining a written authorization signed or similarly authenticated from consumers for preauthorized electronic fund transfers from their accounts, thereby violating Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b). Thus, Corporate Defendants are each liable for these violations directly, through the TU Common Enterprise, and as principals or agents for one another.

245.    Further, in numerous instances, Corporate Defendants have debited consumers' bank accounts on a recurring basis without providing a copy of written authorization signed or

similarly authenticated by the consumer for preauthorized electronic fund transfers from the consumer's account, thereby violating Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b). Thus, Corporate Defendants are each liable for these violations directly, through the TU Common Enterprise, and as principals or agents for one another.

## COUNT VII: VIOLATION OF REGULATION V
## (CORPORATE DEFENDANTS)

246. The Bureau incorporates the allegations set forth in Paragraphs 1–22; 32–44; and 124–137 of this Complaint.

247. Under Regulation V, any communications, instructions, or permitted advertising or marketing on annualcreditreport.com must not "interfere with, detract from, contradict, or otherwise undermine the purpose" of the site, which is "to enable consumers to make a single request to obtain annual file disclosures from" the NCRAs, including Corporate Defendants. 12 C.F.R. §§ 1022.136(a), (g).

248. Examples of interfering, detracting, inconsistent or undermining communications include "materials that falsely represent, expressly or by implication, that a product or service offered ancillary to receipt of a file disclosure, such as a credit score or credit monitoring service, is free[.]" 12 C.F.R. § 1022.136(g)(3)(iii).

249. Corporate Defendants placed or caused to be placed advertisements on consumers' free file disclosures in a manner that interfered with, detracted from, contradicted, and undermined the purpose of annualcreditreport.com by falsely representing, expressly or by implication, that consumers' credit scores were part of their free annual file disclosure and by diverting consumers from their annual file disclosure into paid subscription products.

250. Thus, Corporate Defendants' advertisements on annualcreditreport.com violated Regulation V, 12 C.F.R. § 1022.136(g), and Corporate Defendants are each liable for these

violations directly, through the TU Common Enterprise, and as principals or agents for one another.

## COUNT VIII: VIOLATIONS OF THE CFPA BASED ON VIOLATIONS OF
## REGULATION V, EFTA, AND REGULATION E
## (CORPORATE DEFENDANTS)

251.    The Bureau incorporates the allegations set forth in Paragraphs 1–22; 32–44; 78–137; and 236–250 of this Complaint.

252.    The CFPA defines "Federal consumer financial law" to include most provisions of the FCRA and its implementing regulation, Regulation V, including those cited in Count VII, and EFTA and its implementing regulation, Regulation E, including those cited in Count VI. 12 U.S.C. §§ 5481(12)(C), (F), (14).

253.    TransUnion, TULLC, and TUI are covered persons under the CFPA. 12 U.S.C. § 5481(6).

254.    Under the CFPA, a covered person's violation of a Federal consumer financial law, which includes the enumerated consumer laws and rules thereunder, violates the CFPA. 12 U.S.C. §§ 5536(a)(1)(A), 5481(14).

255.    Corporate Defendants' violations of Regulation V, described in Count VII, are violations of § 1036(a)(1)(A) of the CFPA, 12 U.S.C. § 5536(a)(1)(A), and Corporate Defendants are each liable for these violations directly, through the TU Common Enterprise and as principals or agents for one another.

256.    Corporate Defendants' violations of EFTA and Regulation E, described in Count VI, are violations of § 1036(a)(1)(A) of the CFPA, 12 U.S.C. § 5536(a)(1)(A), and Corporate Defendants are each liable for these violations directly, through the TU Common Enterprise and as principals or agents for one another.

## DEMAND FOR RELIEF

Accordingly, the Bureau requests that the Court:

1.      permanently enjoin all Defendants from committing future violations of the CFPA, EFTA, Regulation E, Regulation V, or any provision of "Federal consumer financial law," as defined by 12 U.S.C. § 5481(14);

2.      grant additional injunctive relief against each of the Defendants as the Court deems just and proper;

3.      award damages or other monetary relief against Defendants, jointly and severally;

4.      order Defendants, jointly and severally, to refund money to consumers;

5.      order Defendants, jointly and severally, to pay restitution to consumers harmed by Defendants' unlawful conduct;

6.      order each Defendant to pay disgorgement or compensation for unjust enrichment;

7.      impose on Defendants civil money penalties under 12 U.S.C. § 5565(c);

8.      order Defendants, jointly and severally, to pay the Bureau's costs incurred in connection with prosecuting this action; and

9.      award additional relief as this Court deems just and proper.

Respectfully submitted,

Dated: April 12, 2022

Eric Halperin
*Enforcement Director*

David M. Rubenstein
*Deputy Enforcement Director*

Cynthia Gooen Lesser
*Assistant Deputy Enforcement Director*

s/ Jessica Rank Divine
Jessica Rank Divine
Tracy L. Hilmer
Mary K. Warren
*Enforcement Attorneys*

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone: (202) 435-7863 (Divine)
Telephone: (202) 435-7459 (Hilmer)
Telephone: (202) 435-7815 (Warren)

Email: jessica.divine@cfpb.gov
Email: tracy.hilmer@cfpb.gov
Email: mary.warren@cfpb.gov

*Attorneys for Plaintiff Consumer Financial Protection Bureau*