**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 1:22-cv-1880 |
| TRANSUNION, TRANS UNION LLC, TRANSUNION INTERACTIVE, INC., and JOHN T. DANAHER, | ) | District Judge Elaine E. Bucklo |
| Defendants. | ) | |

**TRANSUNION, TRANS UNION LLC, AND TRANSUNION INTERACTIVE, INC.'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT**

## TABLE OF CONTENTS

**Contents** **Page**


PRELIMINARY STATEMENT ........................................ 1

RELEVANT FACTUAL BACKGROUND ........................................ 3

I. TU's Business and Products ........................................ 3

II. The 2017 Consent Order ........................................ 4

III. The Bureau's Failure to Respond ........................................ 9

IV. This Lawsuit ........................................ 9

ARGUMENT ........................................ 10

I. Count I Should Be Dismissed for Failure to Plead (or Satisfy) a Condition Precedent ...... 11

II. Counts III-VIII Are Barred by Res Judicata. ........................................ 16

III. The Bureau's Claims Against TU Are Untimely. ........................................ 22

IV. The CFPB's Complaint Suffers from Two Significant Constitutional Defects. ........................................ 26

A. The CFPB's Funding Mechanism Violates the Appropriations Clause. ........................................ 26

B. The Consent Order Was Signed While an Unconstitutional Removal Restriction Was in Force. ........................................ 27

CONCLUSION ........................................ 29

APPENDIX 1 ........................................ 31

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*188 LLC v. Trinity Indus., Inc.*,
300 F.3d 730 (7th Cir. 2002) .......... 11

*4901 Corp. v. Town of Cicero*,
220 F.3d 522 (7th Cir. 2000) .......... 19

*Alam v. Miller Brewing Co.*,
709 F.3d 662 (7th Cir. 2013) .......... 13

*Allen v. McCurry*,
449 U.S. 90 (1980) .......... 16

*Alliance to End Repression v. City of Chicago*,
742 F.2d 1007 (7th Cir. 1984) .......... 12, 14

*Amin Ijbara Equity Corp. v. Vill. of Oak Lawn*,
860 F.3d 489 (7th Cir. 2017) .......... 10, 23

*Anderson v. Centers for New Horizons, Inc.*,
891 F. Supp. 2d 956 (N.D. Ill. 2012) .......... 11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 10

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*,
501 U.S. 104 (1991) .......... 16

*B & B Hardware, Inc. v. Hargis Indus., Inc.*,
575 U.S. 138 (2015) .......... 17

*Bolden v. Stroger*,
306 F. Supp. 2d 792 (N.D. Ill. 2004) .......... 14

*Brown v. Chrysler Fin. Servs.*,
218 F. App'x 536 (7th Cir. 2007) .......... 18

*Brownback v. King*,
141 S. Ct. 740 (2021) .......... 19

*Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*,
559 F.3d 671 (7th Cir. 2009) .......... 23

*Car Carriers, Inc. v. Ford Motor Co.*,
789 F.2d 589 (7th Cir. 1986) .......... 22

*Casey-Beich v. United Parcel Serv., Inc.*,
295 F. App'x 92 (7th Cir. 2008) .......... 23

*CFPB v. All Am. Check Cashing, Inc.*,
33 F.4th 218 (5th Cir. 2022) .......... 3, 26, 27

*CFPB v. Citizens Bank, N.A.*,
504 F. Supp. 3d 39 (D.R.I. 2020) .......... 23

*CFPB v. Howard*,
No. 8:17 Civ. 00161, 2018 WL 4847015 (C.D. Cal. May 3, 2018) .......... 24

*CFPB v. ITT Educ. Servs., Inc.*,
219 F. Supp. 3d 878 (S.D. Ind. 2015) .......... 23

*CFPB v. Nationwide Biweekly Admin., Inc.*,
No. 15-CV-02106, 2017 WL 3948396 (N.D. Cal. 2017) .......... 26

*CFPB v. NDG Fin. Corp.*,
No. 15-CV-5211, 2016 WL 7188792 (S.D.N.Y. 2016) .......... 25

*CFPB v. Ocwen Fin. Corp.*,
2019 U.S. Dist. Lexis 152336 (S.D. Fla. 2019) .......... 23

*CFPB v. Ocwen Fin. Corp.*,
30 F.4th 1079 (11th Cir. 2022) .......... 2, 19, 20, 21

*Clark & Leland Condominium, L.L.C. v. Northside Community Bank*,
110 F. Supp. 3d 866 (N.D. Ill. 2015) .......... 16

*Collins v. Yellen*,
141 S. Ct. 1761 (2021) .......... 28

*Donald v. City of Chicago*,
539 F. Supp. 3d 912 (N.D. Ill. 2021) .......... 11

*Fed. Trade Comm'n v. A1 Janitorial Supply Corp.*,
No. 17 C 7790, 2018 WL 7508265 (N.D. Ill. Sept. 21, 2018) .......... 12, 14

*Fenwick v. Chapman*,
34 U.S. 461 (1835) .......... 13

*Ferrell v. Pierce*,
743 F.2d 454 (7th Cir. 1984) .......... 11

*Fornalik v. Perryman*,
223 F.3d 523 (7th Cir. 2000) .......... 11

*Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*,
382 F.3d 743 (7th Cir. 2004) ........................................................................................ 20

*Gabelli v. S.E.C.*,
568 U.S. 442 (2013)....................................................................................................... 23

*Gaither Tool Co. v. Summit Tool Co.*,
No. 01 C 4096, 2012 WL 13218902 (N.D. Ill. Sept. 9, 2012)................................................. 15

*George H. Lee Co. v. Fed. Trade Comm'n*,
113 F.2d 583 (8th Cir. 1940) ........................................................................................ 16

*Gerace v. Andrews*,
227 F. Supp. 3d 946 (N.D. Ill. 2016) ........................................................................ 17, 18

*Golden v. Barenborg*,
No. 91 C 7359, 1992 WL 162977 (N.D. Ill. July 7, 1992) ............................................... 19, 22

*Grabianski v. Bally Total Fitness Holding Corp.*,
891 F. Supp. 2d 1036 (N.D. Ill. 2012) .............................................................................. 10

*Graham v. UPS*,
519 F. Supp. 2d 801 (N.D. Ill. 2007) ................................................................................ 23

*H.A.L. NY Holdings, LLC v. Guinan*,
958 F.3d 627 (7th Cir. 2020) ........................................................................................ 17

*Harper Plastics v. Amoco Chems. Corp.*,
657 F.2d 939 (7th Cir. 1981) ........................................................................................ 22

*Heritage Bank & Tr. Co. v. Abdnor*,
906 F.2d 292 (7th Cir. 1990) ........................................................................................ 12

*Highway J Citizens Grp. v. U.S. Dep't of Transp.*,
456 F.3d 734 (7th Cir. 2006) ............................................................................ 16, 17, 18, 22

*Indiana Port Comm'n v. Bethlehem Steel Corp.*,
835 F.2d 1207 (7th Cir. 1987) ........................................................................................ 3

*Interway, Inc. v. Alagna*,
407 N.E.2d 615 (Ill. App. Ct. 1980) ................................................................................ 13

*Jagla v. BMO Fin. Grp.*,
248 F. App'x 743 (7th Cir. 2007) .................................................................................... 22

*Jay E. Hayden Found. v. First Neighbor Bank, N.A.*,
610 F.3d 382 (7th Cir. 2010) ........................................................................................ 23

*King v. Allied Vision, Ltd.*,
65 F.3d 1051 (2d Cir. 1995) .................... 15

*Kronenberg v. Baker & McKenzie LLP*,
692 F. Supp. 2d 994 (N.D. Ill. 2010) .................... 13

*Lawrence v. Bd. of Election Comm'rs of City of Chi.*,
524 F. Supp. 2d 1011 (N.D. Ill. 2007) .................... 19

*Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*,
140 S. Ct. 1589 (2020) .................... 18

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
514 U.S. 52 (1995) .................... 12, 14

*Merck & Co. v. Reynolds*,
559 U.S. 633 (2010) .................... 23, 24

*Navajo Nation v. Wells Fargo*,
344 F. Supp. 3d 1292 (D.N.M. 2018) .................... 17

*Nelson v. Sotheby's Inc.*,
115 F. Supp. 2d 925 (N.D. Ill. 2000) .................... 23

*Oberstar v. FDIC*,
987 F.2d 494 (8th Cir. 1993) .................... 16

*Patricia P. v. Bd of Educ. of Oak Park*,
8 F. Supp. 2d 801 (N.D. Ill. 1998) .................... 17

*Perkins v. Bd. of Tr. of the Univ. of Ill.*,
116 F.3d 235 (7th Cir. 1997) .................... 22

*Prima Tek II, L.L.C. v. Klerk's Plastic Indus., B.V.*,
525 F.3d 533 (7th Cir. 2008) .................... 15

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
579 U.S. 115 (2016) .................... 25

*Ramon-Sepulveda v. I.N.S.*,
824 F.2d 749 (9th Cir. 1987) .................... 16

*Redfield v. Cont'l Cas. Corp.*,
818 F.2d 596 (7th Cir. 1987) .................... 13

*Rotkiske v. Klemm*,
140 S. Ct. 355 (2019) .................... 25

*Schering Corp. v. Ill. Antibiotics Co.*,
62 F.3d 903 (7th Cir. 1995) ........ 12

*SEC v. Fisher*,
No. 07 C 4483, 2008 WL 2062699 (N.D. Ill. May 13, 2008) ........ 24

*Seila Law LLC v. CFPB*,
140 S. Ct. 2183 (2020) ........ 3, 26, 28

*Shinseki v. Sanders*,
556 U.S. 396 (2013) ........ 28

*Stoller v. CMH Mfg. W., Inc.*,
No. 18 C 0047, 2020 WL 616464 (N.D. Ill. Feb. 10, 2020) ........ 13

*United States v. ITT Cont'l Baking Co.*,
420 U.S. 223 (1975) ........ 11

*United States v. Stauffer Chem. Co.*,
464 U.S. 165 (1984) ........ 16

*Utility Audit, Inc. v. Horace Mann Serv. Corp.*,
383 F.3d 683 (7th Cir. 2004) ........ 12

*Zero Zone, Inc. v. U.S. Dep't of Energy*,
832 F.3d 654 (7th Cir. 2016) ........ 28

**Statutes**

5 U.S.C. § 554 ........ 17

12 U.S.C. § 5491 ........ 28

12 U.S.C. § 5531 ........ 4

12 U.S.C. § 5536 ........ 4

12 U.S.C. § 5562 ........ 4

12 U.S.C. § 5563 ........ 17

12 U.S.C. § 5564 ........ 2, 23, 24

12 U.S.C. § 5565 ........ 17

15 U.S.C. § 1681 ........ 4, 23

15 U.S.C. § 1693 ........ 23

U.S. Const., art. I, § 9, cl. 7 ........................................................................................ 26

**Rules**

Fed. R. Civ. P. 9 ........................................................................................ 13

Fed. R. Civ. P. 12 ........................................................................................ 1

**Regulations**

12 C.F.R. § 1080.5 ........................................................................................ 4, 18

12 C.F.R. § 1090.104 ........................................................................................ 4

**Other Authorities**

17 Am. Jur. 2d, Contracts 320 (1964) ........................................................................................ 13

Restatement (Second) of Contracts § 226 (1981) ........................................................................................ 12

Restatement (Second) of Judgments § 83 (1982) ........................................................................................ 17

Defendants TransUnion, Trans Union LLC ("TULLC"), and TransUnion Interactive, Inc. ("TUI," collectively "TU") respectfully submit this memorandum of law in support of their motion to dismiss the complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

Perhaps more than any other litigant, the government, due to the awesome power it holds, should be required to honor its commitments. As the Director of the Consumer Financial Protection Bureau ("CFPB" or the "Bureau") has recognized, the CFPB, like every federal agency, should "mak[e] it clear to market participants what's expected of them" and "be clear on what the rules are whenever [it] can."[1]

This case presents an unfortunate example of the CFPB shirking that basic responsibility. In January 2017, the CFPB and TU entered into a Consent Order at the heart of this case. In that Consent Order, TU agreed to pay nearly $17 million (which it paid) and agreed to develop a detailed Compliance Plan to comply with the terms of the Consent Order. But the CFPB did not follow through on its end of the bargain, which was to provide TU with either a determination of non-objection to TU's plan for complying with the Consent Order and applicable law, or guidance as to what changes would need to be made. That is not just poor regulatory oversight, it is an abrogation of the explicit commitment that the CFPB made in the Consent Order.

As a result, the Bureau's Complaint here is flawed in multiple respects and should be dismissed for at least four different reasons, the first three of which are conceptually related. First, the Bureau's claim that TU violated the Consent Order (Count I) should be dismissed because the Bureau does not allege that the necessary condition precedent has been satisfied. Namely, the

[1] *Nominations of Gary Gensler and Rohit Chopra*, Hearing Before the S. Committee on Banking, Housing, and Urban Affairs, 117 Cong. 76 (2021) (Statement of Rohit Chopra); *Bringing Consumer Protection Back: A Semi-Annual Review of the Consumer Financial Protection Bureau*, Hybrid Hearing Before the H. Committee on Financial Services, 117 Cong. 57 (2021) (Statement of Rohit Chopra).

Bureau does not (and cannot) allege that it performed its obligation to provide TU with a determination of non-objection to TU's Compliance Plan or direction as to how TU should revise its proposed Compliance Plan in order to obtain the Bureau's non-objection. To be clear, TU has complied with the Consent Order and its Compliance Plan in good faith, and it will continue to comply with all applicable laws regardless of whether the CFPB meets its own obligations. This motion does not contend otherwise and is focused on whether the Bureau is required to fulfill its own obligations under the Consent Order if it wants to enforce it in court.

Second, the CFPB's other claims against TU (Counts III – VIII) should be dismissed because they are barred by the doctrine of res judicata.[2] Every one of those claims arises out of the same marketing practices relating to the same credit-related products that the Bureau investigated and then resolved with TU in the 2017 Consent Order. Under black-letter principles of res judicata, since these practices were or could have been addressed in the Consent Order itself, the Bureau is barred from litigating them again here. In fact, the Consent Order contemplates that disputes over those marketing practices will be resolved pursuant to the oversight scheme laid out in the Consent Order, not by statutory claims filed directly in court. *See, e.g.*, *CFPB v. Ocwen Fin. Corp.*, 30 F.4th 1079 (11th Cir. 2022).

Third, if any of the Bureau's claims survive the two arguments set forth above, they are time-barred in any event. Here, the facts forming the basis for each claim were known or reasonably should have been known by the Bureau at least as of the effective date of the Consent Order in January 2017. Because the Consumer Financial Protection Act ("CFPA") provides that its three-year statute of limitations starts to run "after the date of discovery," 12 U.S.C. § 5564(g)(1), the CFPB's claims were filed too late. The date of the Complaint's filing is outside

[2] Count II is directed only against Defendant John T. Danaher and will be addressed in a separate motion.

the three-year statute of limitations specified in the CFPA, even accounting for the parties' prior tolling agreements. And the CFPB is barred from challenging anything that occurred before February 4, 2018 no matter what.

Finally, while there are sufficient grounds for this Court to dismiss the Complaint without having to reach any constitutional questions, *see, e.g.*, *Indiana Port Comm'n v. Bethlehem Steel Corp.*, 835 F.2d 1207, 1210 (7th Cir. 1987), this action by the CFPB suffers from two constitutional defects. When Congress created the CFPB more than a decade ago, it was designed to be unaccountable to the political branches. By guaranteeing the Bureau a permanent stream of hundreds of millions of dollars per year from the Federal Reserve, Congress effectively insulated the CFPB from oversight, thereby stripping Congress of its ability to check the agency's power via the appropriations process. Judge Edith Jones of the United States Court of Appeals for the Fifth Circuit, joined by four of her colleagues, recently concluded that, as a consequence, the Bureau's funding structure violates the separation of powers. *See CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 18, 220-42 (5th Cir. 2022) (en banc) (Jones, J., concurring). Moreover, Count I (violation of the Consent Order) should be dismissed because the Consent Order was signed by the prior CFPB Director while an unconstitutional restriction on his removal was still in force. *See Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020).

## RELEVANT FACTUAL BACKGROUND

### I. TU's Business and Products

TULLC is a multinational information company that facilitates efficient markets and informed transactions between consumers and businesses.[3] It is the industry leader in capturing a broad range of data and using it in credit scoring so as to provide greater access to consumer credit

---

[3] Although the Complaint lists "TransUnion, LLC," the correct name is "Trans Union LLC."

to a wider population of consumers. TUI is a subsidiary of TULLC that provides consumers with credit scores, credit reports, credit monitoring, and identity theft protection products and services. Some of these products are free to the consumer, such as annual credit reports (provided weekly during the COVID-19 pandemic),[4] fraud alerts, and security freezes; others are not, including TransUnion Credit Monitoring ("TUCM"), which provides unlimited access to a consumer's credit report, among other features. TUI also provides an array of credit tools designed to help consumers manage their financial well-being. The Bureau has supervisory authority over TULLC, TUI, and their ultimate parent company, TransUnion. *See* 12 C.F.R. § 1090.104.

## II. The 2017 Consent Order

This lawsuit arises out of a CFPB examination and investigation of TUI and TULLC, the scope of which, as required by statute and regulation, was defined in the Bureau's Civil Investigative Demand's Notification of Purpose as follows:

> to determine whether consumer reporting agencies or other unnamed persons have been or are engaging in unlawful acts or practices relating to the advertising, marketing, sale, or provision of consumer reports, credit scores, credit monitoring products, or similar products or services, in violation of Sections 1031 and 1036 of the . . . Consumer Protection Act, 12 U.S.C. 5531 and 5536, the Fair Credit Reporting Act, 15 U.S.C. 1681 et seq., and its implementing regulation, or any other federal consumer financial law.

Ex. A[5] (the "2015 CID").[6] The CFPB investigation ultimately resulted in a Consent Order, entered into by the CFPB and TU on January 3, 2017. In its accompanying press release, the CFPB characterized the Consent Order as requiring TU to "[t]ruthfully represent the usefulness of credit

---

[4] Cathlin Tully, *Free weekly credit reports during COVID extended through December 2022*, FED TRADE COMM'N (Mar. 16, 2021), https://consumer.ftc.gov/consumer-alerts/2021/03/free-weekly-credit-reports-during-covid-extended-through-december-2022.

[5] All citations to "Ex." are to Exhibits to the Declaration of Valerie L. Hletko.

[6] 12 U.S.C. § 5562(c)(2) provides that the Bureau "shall" advise the recipient of a CID of "the nature of the conduct constituting the alleged violation which is under investigation and the provision of law applicable to such violation" (*i.e.*, the "Notification of Purpose"); *see also* 12 C.F.R. § 1080.5.

scores it sells," "[o]btain the express informed consent of consumers" before enrolling them in subscription credit monitoring products, and "[p]rovide an easy way [for consumers] to cancel products and services."[7]

Without admitting the truth of any of the Bureau's allegations, *see* Complaint Appendix ("Compl. App. A") ("Consent Order," ECF 1-1) ¶ 2, TU agreed to enter into the Consent Order. The Bureau found (although TU did not admit) that TU engaged in deceptive acts or practices in violation of the CFPA in connection with the "advertising, marketing, promotion, offering for sale, sale, or performance" of "any product or service" that TU "offered for sale directly to consumers," including TUCM, credit scores, credit reports, credit monitoring, or identity theft insurance protection. *Id.* ¶¶ 3(f), 25-27, 31, 36, 39. TU paid a civil penalty of $3 million, in addition to creating a $13.93 million fund to provide redress to consumers, for a total of almost $17 million. *Id.* ¶¶ 47, 52. TU also agreed to periodic reporting requirements. *Id.* ¶ 71. In exchange, the Bureau agreed to provide feedback on TU's proposed plan for complying with the Consent Order, in order to arrive at a Compliance Plan acceptable to the Bureau. *Id.* ¶¶ 42-43. The Bureau also released TU "from all potential liability for law violations that the Bureau has or might have asserted based on the practices described in Section IV of this Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date." *Id.* ¶ 77. As described in further detail below, the Consent Order is both prescriptive and remedial, establishing a comprehensive framework to govern TU's compliance, monitoring, and enforcement going forward.

Conduct Provisions. As part of the Consent Order's forward-looking structure, in Section

---

[7] *CFPB Orders TransUnion and Equifax to Pay for Deceiving Consumers in Marketing Credit Scores and Credit Products*, CFPB (Jan. 3, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-orders-transunion-and-equifax-pay-deceiving-consumers-marketing-credit-scores-and-credit-products/.

V, TU agreed to adopt standards governing the advertising, marketing, promotion, offering for sale, sale, or performance (*i.e.*, "marketing") of Credit-Related Products during the Consent Order's term. *Id.* ¶ 40. This term was to run for "five years from the Effective Date or five years from the most recent date that the Bureau initiates an action alleging any violation of the Consent Order," unless such action is "dismissed" or results in a determination that TU "did not violate any provision of the Consent Order[.]" *Id.* ¶ 79.

Section V of the Consent Order prescribes in broad and general language that TU may not misrepresent: (1) "[a]ny material fact about the cost or price of a Credit-Related Product"; (2) "[a]ny material fact about the timing or manner of any charge or bill"; or (3) "[a]ny other fact material to consumers, such as any material restrictions, limitations, or conditions of the product or service, or any material aspect of its performance, efficacy, nature, or central characteristics." *Id.* ¶ 40(a)(i)-(iii). It also prescribes that TU must:

- "[O]btain the express informed consent from the consumer" "[b]efore enrolling any consumer in a Credit-Related Product with a Negative Option feature,"[8] *id.* ¶ 40(b);
- "Clearly and prominently disclose the nature of" the VantageScore credit score, *id.*¶ 40(c)(i); and
- "Further develop and implement comprehensive policies and procedures for improving communication with consumers regarding Credit-Related Products," including "communications about the nature of the credit score, pricing structure, and any other material terms," *id.* ¶ 40(d)(i).

Section V also imposes on TU certain document collection, retention, and review obligations. *See id.* ¶ 40(d)(i)(1)-(3).

<u>Compliance Plan</u>. To implement these broad standards, Section VI provided a

[8] The Consent Order defines a Negative Option as "a category of commercial transactions in which a seller markets an offer for a trial period and the seller then interprets a customer's failure to take an affirmative action, either to reject an offer or cancel an agreement, as assent or continuing assent to be charged for goods or services." *Id.*¶ 3(j).

mechanism—the development of a Compliance Plan—that would prescribe how TU should perform the requirements of the Consent Order and federal law. That section, entitled "Compliance Plan," reads as follows:

> 41. Within 90 days of the Effective Date, Respondents must submit to the Assistant Deputy for Consumer Reporting for review and determination of non-objection a comprehensive compliance plan designed to ensure that Respondents' advertising practices comply with all applicable Federal consumer financial laws and the terms of this Consent Order (Compliance Plan). The Compliance Plan must include, at a minimum:
>
>     a. Detailed steps for addressing each action required by Section V of this Consent Order; and
>
>     b. Specific timeframes and deadlines for implementation of the steps described above.
>
> 42. The Assistant Deputy for Consumer Reporting will have the discretion to make a determination of non-objection to the Compliance Plan or direct Respondents to revise it. If the Assistant Deputy for Consumer Reporting directs Respondents to revise the Compliance Plan, the Respondents must make the revisions and resubmit the Compliance Plan to the Assistant Deputy for Consumer Reporting within 30 days.
>
> 43. After receiving notification that the Assistant Deputy for Consumer Reporting has made a determination of non-objection to the Compliance Plan, Respondents must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Compliance Plan.

Consent Order, Section VI.

The Compliance Plan was the mechanism for ensuring TU's compliance with the Consent Order, as well as applicable laws governing the products and practices at issue in the Consent Order. TU was required to submit a "comprehensive" Compliance Plan that had to be very specific, including "at a minimum . . . *[d]etailed* steps for addressing each action required by Section V of this Consent Order" (*i.e.*, the Conduct Provisions), as well as "*[s]pecific* timeframes and deadlines for implementation of the steps described[.]" *Id.* ¶ 41(a)-(b) (emphases added).

Under the plain terms of the Consent Order, once TU submitted the Compliance Plan to

the CFPB, the Bureau had two options: (1) it could "make a determination of non-objection to the Compliance Plan"; or (2) it could "direct [TU] to revise it." *Id.* ¶ 42. If the Bureau directed TU to revise its plan, TU was required to "make the revisions and resubmit the Compliance Plan to the [Bureau] within 30 days." *Id.* "After receiving notification that the [Bureau] ha[d] made a determination of non-objection to the Compliance Plan," TU was required to "implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Compliance Plan." *Id.* ¶ 43. The Compliance Plan thereby provided TU with certainty: if TU followed its Plan, the CFPB would be satisfied that it was in compliance with the Consent Order and with applicable federal consumer financial laws.

<u>Redress</u>. The Consent Order established a similar process with respect to how TU was to provide redress to consumers. As noted above, TU agreed to set aside $13.93 million for payments to "affected consumers" in accordance with what the Consent Order characterizes as a "Redress Plan." *Id.* ¶¶ 47-48, 50. As with the Compliance Plan, TU was required to submit to the CFPB a Redress Plan for payment of the reserved redress amounts. *Id.* ¶¶ 48-49. The Bureau was then required to make a determination of non-objection or to direct changes, which TU was obligated to accept and implement. *Id.* ¶ 48. The process set forth with respect to the development of the Redress Plan is nearly identical to the procedure specified in the Consent Order for TU's Compliance Plan. *Compare* Consent Order ¶ 48, *with id.* ¶¶ 41-43.

<u>Compliance Monitoring/Enforcement</u>. The Consent Order provides the Bureau the right to obtain reports relating to Consent Order compliance under penalty of perjury, documents, or sworn testimony, within 30 days. *See id.* ¶ 71. It also requires TU to permit CFPB representatives to interview any TU employee or affiliate who has agreed to such an interview. *Id.* ¶ 72. The CFPB was authorized to impose the maximum civil monetary penalties allowed under the CFPA

for Consent Order violations. *See* Consent Order ¶¶ 71-73, 82. The Consent Order also does not limit the Bureau's ability to use CIDs or other compulsory process to enforce the Consent Order. *Id.* ¶¶ 73, 77, 82.

### III. The Bureau's Failure to Respond

Following the issuance of the Consent Order, TU prepared and submitted to the CFPB both its proposed Compliance Plan and its proposed Redress Plan. *See* Ex. B ("Compliance Plan"). As contemplated by the Consent Order, the Bureau responded to TU's Redress Plan with a letter of non-objection. *See* Ex. C ("Revised Compliance Plan") at 9. But with respect to the Compliance Plan, the Bureau effectively went AWOL. It never responded to TU despite regular and repeated requests by TU that the CFPB either provide a determination of non-objection to the Compliance Plan or direct TU to revise it. Presumably for this reason, the words "Compliance Plan" and "non-objection" are completely missing from the Bureau's Complaint.

In October 2018, the CFPB informed TU that it intended to conduct an examination to assess compliance with the Consent Order. *See* Compl. ¶ 29. Having received no response to its requests for guidance or a determination of non-objection to its Compliance Plan, TU proactively submitted a revised Compliance Plan to the CFPB in August 2021 reflecting completion of the detailed steps TU had taken in the preceding years to ensure compliance with the Consent Order and applicable law. *See* Ex. C. As it had done with respect to TU's initial Compliance Plan, the Bureau ignored TU's second Compliance Plan.

### IV. This Lawsuit

In March 2020, at the Bureau's request, TU agreed to toll the running of any applicable unexpired statutes of limitation from March 24 to September 24, 2020. TU later agreed to the CFPB's requests for two extensions of that tolling agreement, from March 25 to September 25, 2021, and from September 27 to December 1, 2021. Also at the Bureau's request, TU agreed twice

to modify the Consent Order to extend its five-year term so that the Order would remain effective until April 22, 2022. *See* Compl. ¶ 23.

On April 12, 2022, just ten days before the Consent Order's term was to end, the Bureau commenced this action. *See* Compl. (ECF 1).[9] The Complaint asserts claims against TU for violation of the Consent Order (Count I), as well as the CFPA (Counts III-V & VIII), the EFTA and Regulation E (Count VI), and Regulation V (Count VII).

## ARGUMENT

In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In other words, the allegations "must provide more than labels, conclusions, or formulaic recitations of the elements of a cause of action, and allege enough to raise a right to relief above the speculative level." *Grabianski v. Bally Total Fitness Holding Corp.*, 891 F. Supp. 2d 1036, 1042 (N.D. Ill. 2012) (Bucklo, J.) (internal quotation marks and citations omitted).

When deciding a motion to dismiss, a court may consider "documents . . . attached to the complaint, documents . . . central to the complaint and . . . referred to in it, and information that is properly subject to judicial notice." *Amin Ijbara Equity Corp. v. Vill. of Oak Lawn*, 860 F.3d 489, 493 n.2 (7th Cir. 2017) (internal quotation marks and citation omitted) (alteration in original); *see*

[9] Within an hour of filing the Complaint, the CFPB issued press materials accusing TU no less than 15 times of using "digital dark patterns" (a loaded term that appears nowhere in the Complaint) and excoriating TU as "unwilling or incapable of operating its business lawfully." CFPB Charges TransUnion and Senior Executive John Danaher with Violating Law Enforcement Order, CFPB (Apr. 14, 2022), https://www.consumerfinance.gov/about-us/newsroom/cfpb-charges-transunion-and-senior-executive-john-danaher-with-violating-law-enforcement-order/. Those statements were not only false, but also inconsistent with the CFPB's Ombudsman's own guidance, not to mention basic ethical rules. *See* CFPB Ombudsman's Office, ANNUAL REPORT TO THE DIRECTOR 2015, at 22-23 (Nov. 16, 2015), https://files.consumerfinance.gov/f/201512_cfpb_report_ombudsman-office.pdf.

*also Anderson v. Centers for New Horizons, Inc.*, 891 F. Supp. 2d 956, 959 (N.D. Ill. 2012) (Bucklo, J.). Here, the Court may consider the Consent Order attached to the Complaint (ECF 1-1), as well as TU's Compliance Plan, which is incorporated in the Complaint by reference, because it is expressly referenced in the Consent Order. *See, e.g.*, *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002). It is also generally accepted that a court may take judicial notice of agency proceedings, including agency correspondence. *See, e.g.*, *Fornalik v. Perryman*, 223 F.3d 523, 529 (7th Cir. 2000); *Donald v. City of Chicago*, 539 F. Supp. 3d 912, 920 n.3 (N.D. Ill. 2021) (Bucklo, J.).

## I. Count I Should Be Dismissed for Failure to Plead (or Satisfy) a Condition Precedent.

As the very first paragraph of the Complaint acknowledges, the CFPB's claims here have their basis in the parties' 2017 Consent Order. Compl. ¶ 1. Appendix A to the Complaint makes clear that the Bureau's claims are all based on products and practices that are covered by that Consent Order. *See* Compl. App. A.

The Complaint, however, fails to mention, much less acknowledge, that the Consent Order included a number of specific steps that each party was supposed to take, including requiring the Bureau to provide a non-objection or to direct revisions to TU's Compliance Plan. According to the Consent Order, it was only "*after*" receiving a non-objection from the Bureau that TU was required to "implement and adhere" to the Compliance Plan. Consent Order ¶ 43 (emphasis added). Because the Bureau does not (and cannot) allege that it ever responded to TU's Compliance Plan, the Bureau cannot state a claim for alleged violations of the Consent Order.

While a consent order is not a commercial contract between private parties, its construction is a "matter of contract interpretation." *Ferrell v. Pierce*, 743 F.2d 454, 461 (7th Cir. 1984); *see also United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236-37 (1975). Accordingly, a consent

order, like a contract, "must be read as a whole" in order "to give effect to the mutual intent of the parties at the time the contract was made," and so as not to render any provision superfluous. *Alliance to End Repression v. City of Chicago*, 742 F.2d 1007, 1011, 1013 (7th Cir. 1984); *see also Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995); *Fed. Trade Comm'n v. A1 Janitorial Supply Corp.*, No. 17 C 7790, 2018 WL 7508265, at *2 (N.D. Ill. Sept. 21, 2018) (Lee, J.). Terms in a consent order are to be interpreted according to their plain meaning, and words must be viewed in context and construed so that the consent order is "rational and probable," not to mention internally consistent. *Utility Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 687 (7th Cir. 2004) (internal quotation marks and citation omitted). A party seeking to enforce a consent order must show that the "defendant had clear notice that what he was doing violated a court order." *Schering Corp. v. Ill. Antibiotics Co.*, 62 F.3d 903, 906 (7th Cir. 1995).

A condition precedent is a legal concept developed out of centuries of contract law which is a condition "'to be performed before some right dependent thereon accrues.'" *Heritage Bank & Tr. Co. v. Abdnor*, 906 F.2d 292, 297 (7th Cir. 1990) (quoting Black's Law Dictionary 265-66 (5th ed. 1979)). Consistent with its common-law lineage, the idea of a condition precedent is inherently flexible—a condition precedent "may be express, or it may be implied by law, from the nature of the transaction or the conduct of the parties, to have been tacitly understood between them as part of the agreement, though not expressly mentioned." *Id.* at 297-98 (internal quotation marks omitted). "No particular form of language is necessary to make an event a condition." Restatement (Second) of Contracts § 226 (1981). Rather, the parties' intent to make a contractual obligation conditional "may be manifested by the general nature of an agreement," or "by specific language," or both. *Id.*

Where, as here, a plaintiff's claim for relief is subject to a condition precedent, the

complaint must at least "allege generally that all conditions precedent have occurred or been performed." Fed. R. Civ. P. 9(c); *see also Alam v. Miller Brewing Co.*, 709 F.3d 662, 667 (7th Cir. 2013) (quoting Fed. R. Civ. P. 9(c)); *Redfield v. Cont'l Cas. Corp.*, 818 F.2d 596, 610 (7th Cir. 1987). When a plaintiff fails to allege a condition precedent, as this Court reasoned, that means that it cannot defeat a motion to dismiss by showing that "it is plausible, rather than merely speculative, that [it] is entitled to relief." *Kronenberg v. Baker & McKenzie LLP*, 692 F. Supp. 2d 994, 999 (N.D. Ill. 2010) (Bucklo, J.) (internal quotation marks and citation omitted).

The text and structure of the Consent Order demonstrate that the parties intended that the CFPB's determination of non-objection would be a condition precedent to enforcement of the Consent Order by the CFPB. Pursuant to the Consent Order, TU was to submit a Compliance Plan, which it did. *See* Consent Order ¶ 41; Exs. B, C. In response, the Bureau had two options. It could either: (1) provide a non-objection to TU's Compliance Plan; or (2) direct TU to make revisions and resubmit the Compliance Plan. Consent Order ¶ 42. It did neither, despite the fact that the Consent Order plainly called for the Bureau to provide a non-objection, "after" which TU would be required to "implement and adhere to" the Compliance Plan as directed. *Id.* ¶ 43.[10]

The Consent Order's use of the preposition "after" is critical since, according to the case law, "the word 'after' implies, as strongly as any word in the English language can do . . . a condition precedent." *Fenwick v. Chapman*, 34 U.S. 461, 470 (1835); *see also Stoller v. CMH Mfg. W., Inc.*, No. 18 C 0047, 2020 WL 616464, at *2 (N.D. Ill. Feb. 10, 2020) (Coleman, J.) (similar), *aff'd sub nom. Stoller v. CMH Mfg., Inc.*, No. 20-1227, 2021 WL 4975294 (7th Cir. Oct. 26, 2021); *Interway, Inc. v. Alagna*, 407 N.E.2d 615, 619 (Ill. App. Ct. 1980) ("after" typically "indicates that a promise is not to be performed except upon a condition") (quoting 17 Am. Jur.

[10] That is not to say that TU refrained from implementing the Compliance Plan. It did implement the plan, despite the lack of input from the CFPB.

2d, Contracts 320 at 749 (1964)). Put somewhat differently, the Consent Order explicitly contemplated that *both* TU and the Bureau would have to take certain reciprocal steps that were "inextricably intertwined" with respect to compliance with and enforcement of the Consent Order. *Bolden v. Stroger*, 306 F. Supp. 2d 792, 793 (N.D. Ill. 2004) (Bucklo, J.).

Doing nothing in response to TU's submission of its proposed Compliance Plan was *not* an option. To construe the Consent Order as allowing the Bureau to ignore TU's proposed Compliance Plan with no consequences to the CFPB is inconsistent with the plain language and structure of the Consent Order. This is particularly true here, since the Conduct Provisions in Section V of the Consent Order were quite general in nature, requiring (among other things) that TU refrain from making misrepresentations and improve communications with consumers about its Credit-Related Products, while the Compliance Plan was intended to contain "specific," "comprehensive," and "[d]etailed steps for addressing *each* action required by Section V" (*i.e.*, the Consent Order's Conduct Provisions). Consent Order ¶¶ 41, 43 (emphasis added). Without the Bureau's response to the Compliance Plan, TU would be in the position of deciding for itself how to comply with the Consent Order, thereby rendering Paragraph 42 of the Consent Order (requiring the CFPB "to make a determination of non-objection to the Compliance Plan or direct Respondents to revise it") completely superfluous. *See, e.g.*, *Mastrobuono*, 514 U.S. at 63; *Alliance to End Repression*, 742 F.2d at 1011, 1013; *A1 Janitorial Supply Corp.*, 2018 WL 7508265, at *2. Put somewhat differently, to the extent the CFPB had an issue with TU's compliance with the Consent Order, that dispute should have been tied to the specific actions TU agreed to take pursuant to the Compliance Plan that the CFPB *should have* reviewed and approved beforehand.

This reading of the Consent Order is consistent with the black-letter principle that enforcement of a consent order is appropriate only where it "leaves no uncertainty in the minds of

those to whom it is addressed" as to "precisely what acts are forbidden." *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995) (internal quotation marks and citations omitted); *see also Prima Tek II, L.L.C. v. Klerk's Plastic Indus., B.V.*, 525 F.3d 533, 542 (7th Cir. 2008) (enforcement of consent order requires violation of "unambiguous command") (citations omitted); *Gaither Tool Co. v. Summit Tool Co.*, No. 01 C 4096, 2012 WL 13218902, at *1 (N.D. Ill. Sept. 9, 2012) (Bucklo, J.) (same) (citations omitted). Without any response by the CFPB to the Compliance Plan, it was obviously impossible for TU to understand "precisely what acts [were] forbidden."

TU's interpretation of the structure and requirements of the Consent Order is also consistent with both common sense and the parties' actions. The Consent Order reflects an agreement between the Bureau and TU. For its part, the Bureau extracted significant concessions from TU, including $17 million in civil monetary penalties and redress, among other things. *See* Consent Order ¶¶ 40-47, 50, 52; Stipulation and Consent to the Issuance of a Consent Order ¶ 9. TU, in turn, received an important concession from the Bureau—a promise to provide guidance on whether its proposed, detailed Compliance Plan was satisfactory. It is easy to understand why TU would only agree to pay significant penalties, etc. in exchange for that promise. TU would not want to be in a position of implementing significant, costly, and complex changes to its business practices if it faced the risk that the Bureau would later claim they were not good enough, or that TU should instead have complied in some materially different way. What happened with respect to TU's Redress Plan only reinforces this conclusion. Although the provisions of the Consent Order concerning the Compliance and Redress Plans are practically identical, the Bureau responded to TU's Redress Plan with a non-objection, *see* Ex. C at 9, yet mysteriously failed to do so when it came to TU's Compliance Plan.

The CFPB's allegation that TU has "violated the Order since the day it went into effect,"

Compl. ¶ 2, further confirms that the CFPB's position in this lawsuit is irreconcilable with the parties' intent. Under the Consent Order, TU was not even required to submit its Compliance Plan to the CFPB for non-objection until months after the Consent Order's Effective Date. Consent Order ¶ 41. As a result, there is no way that in January 2017, the parties believed that TU could be violating the Consent Order from day one.

## II. Counts III-VIII Are Barred by Res Judicata.

Under the doctrine of res judicata, a final judgment on the merits "precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Highway J Citizens Grp. v. U.S. Dep't of Transp.*, 456 F.3d 734, 741 (7th Cir. 2006) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)). The United States Supreme Court has "long favored" application of res judicata to "determinations of administrative bodies that have attained finality." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107 (1991). Declining to do so would "impose unjustifiably upon those who have already shouldered their burdens, and drain the resources of an adjudicatory system with disputes resisting resolution." *Id.* at 107-08.

Dismissal pursuant to Rule 12(b)(6) is proper where "a defendant raises *res judicata* as a defense and it is clear from the complaint's face, and matters of which the district court may take judicial notice, that the plaintiff's claims are barred as a matter of law[.]" *Clark & Leland Condominium, L.L.C. v. Northside Community Bank*, 110 F. Supp. 3d 866, 868-69 (N.D. Ill. 2015) (Durkin, J.) (citation omitted) (alterations adopted). The government is not exempt from the doctrine of res judicata and claims brought by government regulators can be dismissed on that basis. *See, e.g.*, *United States v. Stauffer Chem. Co.*, 464 U.S. 165, 174 (1984) (estopping EPA from relitigating claim); *Oberstar v. FDIC*, 987 F.2d 494, 505 (8th Cir. 1993) (dismissing claim based on prior FDIC order); *Ramon-Sepulveda v. I.N.S.*, 824 F.2d 749, 750-51 (9th Cir. 1987) (applying res judicata against Immigration and Naturalization Service); *George H. Lee Co. v. Fed.*

*Trade Comm'n*, 113 F.2d 583, 585 (8th Cir. 1940) (applying res judicata against Federal Trade Commission); *see also Navajo Nation v. Wells Fargo*, 344 F. Supp. 3d 1292, 1305, 1308 (D.N.M. 2018) (CFPA claims barred by res judicata where plaintiff in privity with the CFPB filed claims under the CFPA "based on the same systemic practice . . . that was detailed in the CFPB Consent Order").

In order for res judicata to apply, three conditions must be met: (1) a final judgment on the merits; (2) identity of the parties; and (3) identity of the causes of action. *Highway J Citizens Grp.*, 456 F.3d at 741. When these three requirements have been satisfied, the consequences of the doctrine can be extremely significant: res judicata "will bar not only every matter that was actually determined in the first suit, but also every matter that might have been raised and determined in that suit." *Gerace v. Andrews*, 227 F. Supp. 3d 946, 950 (N.D. Ill. 2016) (Bucklo, J.) (citation omitted); *see also, e.g.*, *H.A.L. NY Holdings, LLC v. Guinan*, 958 F.3d 627, 632 (7th Cir. 2020) (similar).

All three conditions are satisfied here. The first element, or a final judgment on the merits, is satisfied because the Consent Order was issued pursuant to 12 U.S.C. §§ 5563 and 5565, which authorize the CFPB to conduct adjudication proceedings, including "determin[ing] a controversy by consent," 5 U.S.C. § 554(c)(2). The Consent Order, which includes findings of fact, conclusions of law, and a release, "is intended to be, and will be construed as, a final Consent Order issued under . . . § 5563." Consent Order ¶ 78. The Consent Order therefore constitutes "a valid and final adjudicative determination" entitled to "the same effects under the rules of res judicata . . . as a judgment of a court." *Patricia P. v. Bd of Educ. of Oak Park*, 8 F. Supp. 2d 801, 807 (N.D. Ill. 1998) (quoting Restatement (Second) of Judgments § 83 (1982)), *aff'd on other grounds*, 203 F.3d 462 (7th Cir. 2000); *see also, e.g.*, *B & B Hardware, Inc. v. Hargis Indus., Inc.*,

575 U.S. 138, 148 (2015).

The second element, or identity of parties, is also satisfied since the CFPB is the plaintiff in both actions and TransUnion, Trans Union LLC, and TransUnion Interactive, Inc. are respondents in the Consent Order and defendants in this action.

As for the third element, identity of the causes of action, the courts employ a "transactional" test to determine whether there is identity between claims for purposes of res judicata. *See, e.g.*, *Highway J Citizens Grp.*, 456 F.3d at 743. Under that test, res judicata provides finality as to "all grounds for, or defenses to, recovery that . . . arise from the same transaction, or *involve a common nucleus of operative facts*." *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1594-95 (2020) (emphasis added) (citations and quotation marks omitted) (alterations adopted); *see also, e.g.*, *Brown v. Chrysler Fin. Servs.*, 218 F. App'x 536, 539 (7th Cir. 2007). The fact that "different facts or evidence may be needed to prove the claims does not mean that they are not identical under the transactional test." *Gerace*, 227 F. Supp. 3d at 952.

Here, Counts III–VIII clearly "involve a common nucleus of operative facts" with the claims that were addressed in the CFPB's prior investigation, culminating in the findings in Section IV of the Consent Order—namely, TU's advertising, marketing, sale, or provision of its Credit-Related Products. *See generally* Appendix 1. There is no mystery about the scope of the prior investigation because the CFPA requires that the Bureau state in each CID's Notification of Purpose the "nature of the conduct" it is investigating and the "provisions of law applicable" to the potential violations at issue. 12 C.F.R. § 1080.5; *see also In re Accrediting Council for Indep. Colls. & Schs.*, 2015-MISC-ACICS-0001, 3 (Oct. 8, 2015) (Notification of Purpose identifies "the conduct of interest to the Bureau and the potentially applicable provisions of law"). The 2015 CID's Notification of Purpose described the scope of the Bureau's investigation to include TU's

"advertising, marketing, sale, or provision of consumer reports, credit scores, credit monitoring products, or similar products or services, in violation of" the CFPA, the Fair Credit Reporting Act ("FCRA") and its implementing regulation (Regulation V), and "any other federal consumer financial law," *see* Ex. A—all of which the Bureau now raises here.

The Bureau cannot seriously contend that products, practices, or federal consumer financial laws enumerated in the Notification of Purpose were not within the scope of its investigation of TU or otherwise excluded from what the Bureau reasonably could have known at the conclusion of that investigation. Res judicata "operates not only as a bar to the further litigation of matters decided in the prior action, but also to any issues which could have been raised" and of which the plaintiff "should have been aware." *Golden v. Barenborg*, 53 F.3d 866, 869-70 (7th Cir. 1995), *aff'g*, No. 91 C 7359, 1992 WL 162977 (N.D. Ill. July 7, 1992) (Bucklo, M.J.) (adopting result reached by then-Magistrate Judge Bucklo); *see also, e.g.*, *Brownback v. King*, 141 S. Ct. 740, 747 n.3 (2021); *4901 Corp. v. Town of Cicero*, 220 F.3d 522, 530 (7th Cir. 2000); *Lawrence v. Bd. of Election Comm'rs of City of Chi.*, 524 F. Supp. 2d 1011, 1019 (N.D. Ill. 2007) (Bucklo, J.) (same). The Bureau's Complaint does not include a single claim for a violation of federal law that was not, or could not have been, raised in the prior Consent Order. *See* Compl. App. A.

To the extent that the Bureau is suing TU for alleged violations based on the same practices, which allegedly continued after the Consent Order's Effective Date, a recent decision of the Court of Appeals for the Eleventh Circuit is directly on point. *Ocwen*, 30 F.4th at 1079. In *Ocwen*, the Bureau entered into a consent judgment in 2013 that "released Ocwen from liability for the conduct alleged in the CFPB's complaint and established a three-year period during which Ocwen had to comply with detailed servicing standards enforced through a specific monitoring and compliance regime." *Id.* at 1081. Shortly after the consent judgment's term expired, the Bureau brought suit

for alleged violations of federal law by Ocwen during that three-year term. *Id.*

Since the *Ocwen* consent order contained "injunction-like forward-facing standards [and] enforcement provisions," the court held that the CFPB's claims in that case were barred by res judicata. *Id.* at 1085-86. Focusing on three aspects of the consent judgment in that case, the Eleventh Circuit held that "the settlement agreement's extensive three-year servicing-standard, monitoring, and enforcement regime indicates that if [Ocwen] committed a legal violation covered by the standards [of the consent judgment], the parties intended for the CFPB to remedy that violation through the agreed-upon processes—not through a separate court proceeding." *Id.* at 1085. First, the consent order in *Ocwen* was forward-looking: it "remained operative for a three-year period . . . and required Ocwen to abide by specific servicing standards during that timeframe." *Id.* at 1082. Second, it "created a monitoring and enforcement regime to police Ocwen's compliance with the servicing standards." *Id.* And third, the Bureau released Ocwen "from all potential liability that has been or might have been asserted by the CFPB relating to the mortgage servicing practices described in the complaint." *Id.*

The *Ocwen* court rejected the Bureau's position that the release only covered "conduct that occurred prior to the filing of the [prior] action," reasoning that "fundamental principles of contract interpretation counsel against reading one provision of a contract in isolation." *Id.* at 1085. As the *Ocwen* court explained:

> If the CFPB could freely elect when to proceed through the strictures of the settlement agreement and when to go straight to court, Ocwen surely wouldn't have agreed to the (costly) three-year compliance-and-enforcement regime. As a formal matter, we agree that complying with the settlement agreement's servicing standards didn't eliminate Ocwen's responsibility to abide by the law more generally. But as a practical matter, the settlement agreement would be impossible to enforce if the CFPB could unilaterally decide when to invoke it and when to ignore it. Ocwen couldn't possibly have intended to get so little security from the parties' bargain.

*Id.*; *see also Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743,

758 (7th Cir. 2004) (res judicata applied because post-stipulation violations clearly related to pre-stipulation violations, had same factual basis, and were not separate and distinct causes of action).

These same principles apply here. As in *Ocwen*, the Bureau's Consent Order released TU from liability for the practices described in the Consent Order and established a forward-looking "standard, monitoring, and enforcement regime," providing the Bureau with potent "enforcement provisions." *Ocwen*, 30 F.4th at 1084-85. Specifically, as explained above, the Consent Order required TU to promptly submit a Compliance Plan to the Bureau, Consent Order ¶ 41, and to "implement and adhere," without qualification, to any changes deemed by the Bureau to be appropriate for a "determination of non-objection" to the Compliance Plan, *id.* ¶ 43. The Bureau was then empowered to enforce the provisions of the Consent Order, including the terms of the Compliance Plan, through the agreed-upon specialized monitoring and enforcement proceedings, including the Bureau's right to obtain reports relating to Consent Order compliance under penalty of perjury, or sworn testimony, within 30 days of a request. *See id.* ¶¶ 41, 71-72, 82.

While the consent order in *Ocwen* was structured differently so that all of the specifics are contained in the Consent Order as opposed to the Compliance Plan, that is a distinction merely with respect to timing. The CFPB and TU could have agreed to put all of the specific details for compliance in the Consent Order, but instead chose to do it later, pursuant to the Compliance Plan to be developed by TU and submitted to the CFPB for non-objection or direction regarding revisions. Certainly, as in *Ocwen*, TU "wouldn't have agreed to the (costly) [five]-year compliance-and-enforcement regime" if the Bureau did not have to respond in substance to TU's proposed Compliance Plan and "could freely elect when . . . to go straight to court." 30 F.4th at 1085. Indeed, no rational regulated entity would ever agree to this type of "Groundhog Day" enforcement loop, pursuant to which the Bureau can bring seriatim proceedings against the same

party on the same facts.[11] Rather, the parties agreed that in exchange for a number of concessions on the part of TU, including the payment of significant monetary penalties, *see, e.g.*, Consent Order ¶¶ 47, 50, 52, the Bureau would provide both clarity and certainty to TU by responding to TU's proposed Compliance Plan governing the marketing of TU's Credit-Related Products, and that any subsequent enforcement by the CFPB would be tied to the specific undertakings set forth in the Compliance Plan.

While Counts VI and VII are based on the EFTA and FCRA, which were not mentioned in the Consent Order, the 2015 CID's Notification of Purpose explicitly includes in its scope any violations of the CFPA, the FCRA and its implementing regulation, "or any other federal consumer financial law." Ex. A. A "party may not frustrate the doctrine of *res judicata* by cloaking the same cause of action in the language of a theory of recovery untried in the previous litigation." *Harper Plastics v. Amoco Chems. Corp.*, 657 F.2d 939, 945 (7th Cir. 1981); *see also Highway J Citizens Grp.*, 456 F.3d at 743-44; *Golden*, 1992 WL 162977, at *5. In other words, the doctrine of res judicata required the Bureau to first do its "legal and factual homework," *Jagla v. BMO Fin. Grp.*, 248 F. App'x 743, 745 (7th Cir. 2007) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 789 F.2d 589, 596 (7th Cir. 1986)), and to "join in a single suit all legal and remedial theories that concern a single transaction," *Perkins v. Bd. of Tr. of the Univ. of Ill.*, 116 F.3d 235, 236 (7th Cir. 1997).

## III. The Bureau's Claims Against TU Are Untimely.

The statute of limitations provision contained within the CFPA states that "[e]xcept as otherwise permitted by law or equity, no action may be brought under this title more than 3 years

[11] The Bureau waited to file its lawsuit until just ten days before the five-year term of the Consent Order expired, thereby potentially extending the Consent Order's term for *another* five years if this lawsuit succeeds. *See* Consent Order ¶ 79.

after the *date of discovery* of the violation to which an action relates."[12] 12 U.S.C. § 5564(g)(1) (emphasis added). The Supreme Court has held that where a discovery rule like this applies, the limitations period begins to run when the plaintiff "discovers or *a reasonably diligent plaintiff would have discovered* 'the facts constituting the violation,' . . . irrespective of whether the actual plaintiff undertook a reasonably diligent investigation." *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010) (emphasis added).

Although the date at which discovery should have occurred is often a fact-intensive question not amenable to a motion to dismiss, *see, e.g.*, *Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*, 559 F.3d 671, 674-75 (7th Cir. 2009), dismissal is appropriate where the limitations bar is apparent on the face of the complaint, *see, e.g.*, *Amin Ijbara Equity Corp.*, 860 F.3d at 492; *Graham v. UPS*, 519 F. Supp. 2d 801, 806 (N.D. Ill. 2007) (Bucklo, J.). Indeed, courts routinely dismiss claims at the motion to dismiss stage where, as here, the discovery rule applies. *See, e.g.*, *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 386-87 (7th Cir. 2010); *Casey-Beich v. United Parcel Serv., Inc.*, 295 F. App'x 92, 95 (7th Cir. 2008); *Nelson v. Sotheby's Inc.*, 115 F. Supp. 2d 925, 929-30 (N.D. Ill. 2000) (Bucklo, J.).

The Bureau alleges that TU has been violating the Consent Order (and federal consumer financial law) "since the day it went into effect." Compl. ¶ 2. The complete overlap between the

[12] We expect the Bureau will argue that the three-year limitations period in the CFPA applies to all of its claims, instead of the shorter periods (two-year statute of limitation / five-year statute of repose and one-year statute of limitation, respectively) applicable to the FCRA / Regulation V and the EFTA / Regulation E claims. *See* 15 U.S.C. §§ 1681p, 1693m(g); *see also, e.g.*, *CFPB v. Citizens Bank, N.A.*, 504 F. Supp. 3d 39, 49 (D.R.I. 2020); *CFPB v. Ocwen Fin. Corp.*, 2019 U.S. Dist. Lexis 152336, at *63-71 (S.D. Fla. Sept. 5, 2019). *But see CFPB v. ITT Educ. Servs.*, Inc., 219 F. Supp. 3d 878, 921-22 (S.D. Ind. 2015) (applying Truth in Lending Act's one-year limitation period to CFPB's claims). Since Count VIII alleges violations of the CFPA based on the same alleged violations of Regulation V, EFTA, and Regulation E that form the basis for Counts VI and VII, the question of which statute of limitation applies is not dispositive on this motion. However, to the extent that any of these claims survive this motion, TU reserves the right to argue that the shorter statutes of limitations should apply instead. *Gabelli v. S.E.C.*, 568 U.S. 442, 451-52 (2013); *ITT Educ. Servs.*, 219 F. Supp. 3d at 921-22.

products, practices, and potential violations of law in the 2015 CID's Notification of Purpose, the Consent Order, and the Complaint is readily apparent. *See, e.g.*, Compl. App. A. And the Complaint is devoid of any allegation that TU engaged in some new or different illegal practice within the three-year limitations period. To give just one example, the CFPB alleges that TU's Homepage Enrollment Form and the Affiliate Enrollment Form violate federal consumer financial laws, yet goes on to state that TU's Homepage Enrollment Form has been in use "[a]t least since the Order's Effective Date through the present," Compl. ¶ 80, and that TU's marketing affiliate "has used substantially similar versions of [this same] form from March 2017," *id.* ¶ 21.

If TU has "violated the Order since the day it went into effect," as the CFPB alleges, then obviously the CFPB could have discovered these alleged violations more than three years before this suit was filed. Under the Supreme Court's decision in *Merck*, that is all that is required to bar the Bureau's claims. *See* 559 U.S. at 653. Indeed, courts in this District have ruled that the combination of a multi-year limitations period, subpoena powers, and a "cadre of publicly employed investigators" weigh against setting a later accrual date for the statute of limitations when it is being applied to an agency like the CFPB. *SEC v. Fisher*, No. 07 C 4483, 2008 WL 2062699, at *6 (N.D. Ill. May 13, 2008) (Zagel, J.).

The explicit discovery rule language in the CFPA does not permit the Bureau to effectively sit on its hands, aware of a purportedly deceptive act or practice, but wait to bring suit years after-the-fact. The CFPA gives the Bureau "3 years after the *date of discovery of the violation* to which an action relates." 12 U.S.C. § 5564(g)(1) (emphasis added). That "violation," once discovered by the CFPB, is not somehow magically re-"discovered" every time it allegedly happens again, particularly since it is part of the same practice that the Bureau pointed to earlier. *But see, e.g.*, *CFPB v. Howard*, No. 8:17 Civ. 00161, 2018 WL 4847015, at *2-3 (C.D. Cal. May 3, 2018);

*CFPB v. NDG Fin. Corp.*, No. 15-CV-5211, 2016 WL 7188792, at *19-20 (S.D.N.Y. Dec. 2, 2016).

Congress could have said that the CFPB could not bring any action under the CFPA "more than 3 years after the date of the violation to which an action relates" or "more than 3 years after the date of discovery of the violation or the last occurrence of the violation to which an action relates, whichever is later." But that is not what Congress said. Congress said that the statute of limitations begins to run with the CFPB's "discovery" of a violation, which the Complaint pleads as practices that the Bureau was aware of outside the limitations period. "Atextual judicial supplementation" of statutes of limitations is "particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision." *Rotkiske v. Klemm*, 140 S. Ct. 355, 361 (2019); *see also Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 127 (2016) ("Congress does not . . . hide elephants in mouseholes") (internal quotation marks and citation omitted).

The case law concerning what statutes of limitations apply to cases brought by the CFPB and how to apply them is relatively sparse. There is scattered district court authority suggesting that the limitations period is re-started each and every time an individual consumer transaction occurs, *see, e.g.*, *NDG Fin. Corp.*, 2016 WL 7188792, but these cases simply assume that the limitations period for a single violation can start over and over again and fail to consider how that conclusion can be reconciled with the CFPA's statutory language. However, even if the Court were to conclude that the Bureau's claims are not completely time-barred, there can be no legitimate dispute that the CFPB's claims are barred to the extent that they are predicated on acts that occurred more than three years prior to the filing of the Complaint. *See, e.g.*, *CFPB v. Nationwide Biweekly Admin., Inc.*, No. 15-CV-02106, 2017 WL 3948396, at *10 (N.D. Cal. Sept.

8, 2017) (currently on appeal). Taking the parties' tolling agreement (and two extensions) into account, the Bureau is, at the very least, barred from asserting any claims based on alleged violations prior to February 4, 2018.

**IV. The CFPB's Complaint Suffers from Two Significant Constitutional Defects.**

Finally, to the extent the Court is inclined to reach constitutional questions, this action should be dismissed because the CFPB suffers from two critical constitutional defects. First, the CFPB's guarantee of permanent funding from the Federal Reserve violates the Appropriations Clause, as five members of the Fifth Circuit recently concluded in *All American*, 33 F.4th at 220 (en banc) (Jones, J., joined by Elrod, Duncan, Engelhardt, and Oldham, JJ., concurring). Second, the Supreme Court held in *Seila Law*, 140 S. Ct. at 2183, that restrictions on the removal of the CFPB's Director violate the separation of powers. *Id.* at 2211. Because the Consent Order was negotiated and signed by a Director who was unconstitutionally unaccountable to the President, the Court should dismiss Count I.

**A. The CFPB's Funding Mechanism Violates the Appropriations Clause.**

The Appropriations Clause provides that "[n]o money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const., art. I, § 9, cl. 7. As Judge Jones's concurrence in *All American* explains, the Appropriations Clause guarantees that Congress "assume[s] a supervisory role over the executive branch and its administrative functionaries." 33 F.4th at 225. Based on this structure, Judge Jones identified "[t]wo interconnected and axiomatic principles." *Id.* at 231. "First, the Constitution arms Congress with and mandates that it use potent fiscal powers designed to maintain the boundaries between the branches and preserve individual liberty from the encroachments of executive power." *Id.* Second, "for Congress's power of the purse to meaningfully restrain the executive, appropriations to the executive must be temporally bound." *Id.* at 232. "If Congress grants a perpetual source of funds to an executive branch agency,

the agency is no longer dependent and, as a result, no longer accountable." *Id.*

Applying these principles, Judge Jones determined that "[b]ecause the CFPB is a perpetually self-funded agency armed with vast executive authority, its structure defies congressional oversight and is incompatible with the Constitution." *Id.* As Judge Jones explained, "[t]he CFPB's budgetary independence makes it unaccountable to Congress and the people. An agency that wields vast amounts of executive, legislative, and adjudicatory power and is completely unaccountable to Congress is inimical to the Constitution's structural checks and balances." *Id.* Judge Jones reasoned that *Seila Law* did not cure the Appropriations Clause problem; it only made it worse. "The CFPB Director's newfound presidential subservience exacerbates the constitutional problems arising from the CFPB's budgetary independence because it more completely unites the powers of the purse and sword in the President's hands. The Appropriations Clause forbids that." *Id.* at 234. "Even after *Seila Law*, the CFPB's budgetary independence and resulting unaccountability to Congress subverts the separation of powers foundations of our government." *Id.* at 235.

Turning to the question of remedy, Judge Jones concluded that "All American is entitled to dismissal because the CFPB lacked authority to use the funds necessary to pursue the enforcement action against All American." *Id.* at 241. As Judge Jones elaborated, "[j]ust as a government actor cannot exercise power that the actor does not lawfully possess, so, too, a government actor cannot exercise even its lawful authority using money the actor cannot lawfully spend." *Id.* at 242. TU respectfully submits that the Court should adopt Judge Jones's analysis in *All American* and dismiss this action.

### B. The Consent Order Was Signed While an Unconstitutional Removal Restriction Was in Force.

In *Seila Law*, the Supreme Court invalidated statutory restrictions on the President's ability

to remove the CFPB Director, and held that the Constitution requires the Director to be removable at will 140 S. Ct. at 2192. Count I of the Complaint alleges that TU violated the Consent Order, which was signed while this unconstitutional removal restriction was still in force. Because the Consent Order was tainted by that constitutional violation, this Court should hold that the Consent Order is unenforceable and dismiss Count I.

When Congress created the CFPB, it provided that the CFPB would be led by a single Director who would serve a five-year term and be removable only for "inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(c)(3); *see also id.* §§ 5491(b)(1), (c)(1). In 2013, Richard Cordray was confirmed as the CFPB's first Director and, during his entire tenure, was insulated from presidential and congressional oversight. In 2017, just days before a new administration began, Director Cordray signed the Consent Order at issue in this case.

*Seila Law* makes the CFPB's constitutional violation indisputable, so the only remaining question is the appropriate remedy. As the Supreme Court recently clarified, not every action of an agency helmed by a single director removable only for cause is automatically void. *See Collins v. Yellen*, 141 S. Ct. 1761 (2021). Instead, the Court explained that a party seeking to invalidate the agency action must demonstrate that the constitutional violation would inflict some type of harm. *See id.* at 1789. Under settled principles of administrative law, a party may demonstrate prejudice by showing that the constitutional violation "could have affected the outcome"—not that it necessarily would have. *Zero Zone, Inc. v. U.S. Dep't of Energy*, 832 F.3d 654, 682 (7th Cir. 2016) (citation omitted). This is not a "particularly onerous requirement." *Shinseki v. Sanders*, 556 U.S. 396, 410 (2013). And here, there can be no doubt that the Consent Order could have (and likely would have) been different if Director Cordray were removable at will. Director Cordray was personally involved in the Consent Order; his own signature (not the signature of a

lower-level Bureau official) appears on the Consent Order; and he personally issued a public statement concerning TU's alleged conduct in the wake of the Consent Order. If Director Cordray were removable at will, the parties would have known, at the time of the Consent Order, that he was just 17 days away from being removed from office. Under such circumstances, the constitutional violation surely could have affected the outcome—TU may have chosen to await the appointment of a new Director before entering into the Consent Order, and that new Director may have negotiated a different deal.

## CONCLUSION

For the foregoing reasons, the Court should grant this motion and dismiss the Complaint with prejudice and order any such other and further relief as may be appropriate.

Dated: July 8, 2022

Respectfully Submitted,

By: /s/ Valerie L. Hletko

Roberta A. Kaplan*
*rkaplan@kaplanhecker.com*
Gabrielle E. Tenzer*
*gtenzer@kaplanhecker.com*
D. Brandon Trice*
*btrice@kaplanhecker.com*
Rebecca Sussman*
*rsussman@kaplanhecker.com*
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Tel.: (212) 763-0883

Valerie L. Hletko
*vhletko@kaplanhecker.com*
KAPLAN HECKER & FINK LLP
1050 K Street, NW, Suite 1040
Washington, DC 20001
Tel.: (212) 763-0883

Terri L. Mascherin
*tmascherin@jenner.com*
Megan B. Poetzel
*mpoetzel@jenner.com*
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel.: (312) 222-9350

*Attorneys for TransUnion, Trans Union LLC, and TransUnion Interactive, Inc.*

*Applications for admission *pro hac vice* pending

**APPENDIX 1**

| Compl. ¶¶ | Count | Consent Order Provision | Statute/Reg | Allegation |
|---|---|---|---|---|
| 32-44 | I (¶ 176), III (¶ 195), VII (¶ 246) VIII (¶ 251) | 40(a)(iii) | FCRA/Reg V, CFPA | Misrepresentations regarding the nature of TUCM; misimpression that it provides a stand-alone credit score rather than a monthly monitoring subscription product. |
| 45-55 | I (¶ 176), III (¶ 198) | 40(a)(i) & (iii) | CFPA | Misrepresentations about consumers' enrollment status in TUCM. |
| 56-77 | I (¶ 176), III (¶ 204) | 40(c) | CFPA | Misrepresentations about the nature of the credit score provided. |
| 78-91 | I (¶ 176), III (¶ 201), VI (¶ 236) VIII (¶ 251) | 40(a)(ii) | EFTA/Reg E, CFPA | Misrepresentations regarding the purpose for which payment info would be used. |
| 92-104 | I (¶ 176), III (¶ 207), VI (¶ 236) VIII (¶ 251) | 40(b)(i) | EFTA/Reg E, CFPA | Offered Negative Option enrollments to consumers without obtaining express informed consent. |
| 105-09 | I (¶ 176), III (¶ 207), VI (¶ 236) VIII (¶ 251) | 40(a)(i) | EFTA/Reg E, CFPA | Misrepresentations that TUCM was "free" or $1 in connection with Negative Option enrollments. |
| 110-23 | VI (¶ 236), VIII (¶ 251) | 40(a)(ii) | EFTA/Reg E, CFPA | Failed to obtain required authorization for recurring charges to consumers' accounts. |
| 124-137 | I (¶ 176), III (¶ 210), VII (¶ 246), VIII (¶ 251) | 40(a)(i) & (iii) | FCRA/Reg V, CFPA | Misrepresentations in connection with annual free file disclosure, including regarding nature of credit score option (*i.e.*, appeared free and not part of subscription product). |
| 138-55 | I (¶ 176), III (¶ 212) | 40(a)(iii) & (b)(ii) | CFPA | Made it difficult/confusing for consumers to cancel subscriptions for credit-related products. |

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2022, I caused a true and correct copy of the foregoing to be served upon counsel of record as of this date by electronic filing.

/s/ Valerie L. Hletko
One of the attorneys for TransUnion, Trans Union LLC, and TransUnion Interactive, Inc.