IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CONSUMER FINANCIAL PROTECTION BUREAU,

*Plaintiff*,

v.

TRANSUNION; TRANSUNION, LLC; TRANSUNION INTERACTIVE, INC.; and JOHN T. DANAHER,

*Defendants.*

Civil Action No. 1:22-cv-01880

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT JOHN T. DANAHER'S MOTION TO DISMISS THE COMPLAINT WITH PREJUDICE**

## TABLE OF CONTENTS


Preliminary Statement ........................................................................................................ 1

Background ........................................................................................................................ 3

Legal Standards .................................................................................................................. 7

Argument ............................................................................................................................ 8

I. Count II, the Only Count Against Danaher, Should Be Dismissed Because Consent Orders Are Only Enforceable Against Consenting Parties ........................................................ 8

II. Count II Should Be Dismissed To the Extent the CFPB Seeks Damages from Danaher ........................................................................................................................ 13

III. Danaher Never Knowingly or Recklessly Violated the Consent Order ..................... 14

A. Danaher Did Not Allegedly "Directly Participate" In a Knowing or Reckless Violation of the Consent Order ........................................................................................ 16

B. Danaher Did Not Knowingly Control the Alleged Violations of the Consent Order by Corporate Defendants ................................................................................................... 18

1. Danaher Had Neither the Obligation Nor the Authority to Control Corporate Defendants' Compliance with the Order ........................................................................ 18

2. This Court Cannot Plausibly Infer that Danaher Recklessly Disregarded Any Violation of the Consent Order ....................................................................................... 19

IV. The CFPB's Claim Against Danaher Is Time-Barred ............................................... 22

A. The CFPB Had Actual Knowledge of Facts that Would Have Prompted a Reasonably Diligent Plaintiff to Investigate in 2017 .................................................................... 24

B. The CFPB's Exercise of Any Diligence Would Have Led to Actual Knowledge of Corporate Defendants' Violations .................................................................................. 25

C. The CFPB Had Knowledge of All Facts Alleged Against Danaher Shortly After the Effective Date .................................................................................................................. 27

Conclusion ........................................................................................................................ 29

# TABLE OF AUTHORITIES

Page(s)

## Cases

*188 LLC v. Trinity Indus., Inc.*,
300 F.3d 730 (7th Cir. 2002) .... 4

*Altria Group, Inc. v. Good*,
555 U.S. 70 (2008).... 11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).... 7, 19

*Aslin v. Fin. Indus. Regulatory Auth., Inc.*,
704 F.3d 475 (7th Cir. 2013) .... 14

*Brownmark Films, LLC v. Comedy Partners*,
682 F.3d 687 (7th Cir. 2012) .... 3

*Burns v. United States*,
762 F. App'x 338 (Mem.) (7th Cir. 2019).... 22, 29

*CFPB v. 1st Alliance Lending, LLC*,
2022 WL 993582 (D. Conn. Mar. 31, 2022) .... 15, 20

*CFPB v. Consumer First Legal Grp., LLC*,
6 F.4th 694 (7th Cir. 2021) .... 20, 21

*CFPB v. Gordon*,
819 F.3d 1179 (9th Cir. 2016) .... 18

*CFPB v. Integrity Advance, LLC*,
No. 12-mc-206 (D. Kan.).... 14

*CFPB v. Mortg. L. Grp., LLP*,
196 F. Supp. 3d 920 (W.D. Wis. 2016) .... 15, 18

*CFPB v. NDG Fin. Corp.*,
2016 WL 7188792 (S.D.N.Y. 2016).... 23

*CFPB v. Ocwen Fin. Corp.*,
2019 U.S. Dist. LEXIS 152336 (S.D. Fla. Sept. 5, 2019) .... 23

*Chicago Bldg. Design, P.C. v. Mongolian House, Inc.*,
770 F.3d 610 (7th Cir. 2014) .... 23

*Cincinnati Life Ins. Co. v. Beyrer*,
722 F.3d 939 (7th Cir. 2013) ..... 3

*Donald v. City of Chi.*,
539 F. Supp. 3d 912 (N.D. Ill. 2021) ..... 4

*Fornalik v. Perryman,*
223 F.3d 523 (7th Cir. 2000) ..... 4

*FTC v. Swish Mktg.*,
2010 WL 653486 (N.D. Cal. Feb. 22, 2010) ..... 18, 20

*Gabelli v. SEC*,
568 U.S. 442 (2013) ..... 26

*George v. Kraft Foods Global, Inc.*,
674 F. Supp. 2d 1031 (N.D. Ill. 2009) ..... 4

*Koons Buick Pontiac GMC, Inc. v. Nigh*,
543 U.S. 50 (2004) ..... 10

*Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C v. City of Cleveland*,
478 U.S. 501 (1986) ..... 11

*May Dept. Stores Co. v. First Hartford Corp.*,
435 F. Supp. 849 (D. Conn. 1977) ..... 12

*Medlock v. Trs. Of Ind. Univ.*,
683 F.3d 880 (7th Cir. 2012) ..... 14

*Merck & Co. v. Reynolds*,
559 U.S. 633 (2010) ..... 23

*Mote v. Chelsea*,
252 F. Supp. 3d 642 (E.D. Mich. 2017) ..... 11

*Senne v. Vill. of Palatine, Illinois*,
784 F.3d 444 (7th Cir. 2015) ..... 11

*Sidney Hillman Health Ctr. v. Abbott Labs., Inc.*,
782 F.3d 922 (7th Cir. 2015) ..... 23

*Swanson v. Citibank, N.A.*,
614 F.3d 400 (7th Cir. 2010) ..... 7

*Thompson v. Illinois Dep't of Pro. Regul.*,
300 F.3d 750 (7th Cir. 2002) ..... 19

*Truhlar v. John Grace Branch No. 825 of the Nat'l Ass'n of Letter Carriers*,
2007 WL 1030237 (N.D. Ill. Mar. 30, 2007) ........ 4

*U.S. v. Cohen*,
2012 WL 505918 (C.D. Ill. 2012) ........ 4

*United States v. Armour & Co.*,
402 U.S. 673 (1971) ........ 11

*Virnich v. Vorwald*,
664 F.3d 206 (7th Cir. 2011) ........ 7

*Vyera Pharms., LLC v. Walgreen Co.*,
2020 WL 433894 (N.D.Ill. 2020) ........ 3

*W. Virginia v. Env't Prot. Agency*,
2022 WL 2347278 (U.S. June 30, 2022) ........ 12

*White v. JRHBW Realty, Inc.*,
2015 WL 854348 (N.D. Al. Feb. 27, 2015) ........ 12

**Statutes**

12 U.S.C. § 5481(14) ........ 8, 10

12 U.S.C. § 5511 ........ 26

12 U.S.C. § 5512 ........ 8, 12

12 U.S.C. § 5562 ........ 8

12 U.S.C. § 5563 ........ 8, 9, 10, 13

12 U.S.C. § 5564 ........ 8, 23

12 U.S.C. 5514 ........ 25

5 U.S.C. § 553 ........ 12

**Regulations**

77 Fed. Reg. 42874 ........ 25

Defendant John T. Danaher ("Danaher") respectfully submits this memorandum of law in support of his motion to dismiss with prejudice the complaint in this action (Dkt. No. 1 (the "Complaint")) pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

The Consumer Financial Protection Bureau (the "CFPB" or the "Bureau") brings this lawsuit against TransUnion Interactive, Inc. ("TUI"), Trans Union, LLC ("TULLC"), and TransUnion (or the "Company") (collectively, "Corporate Defendants") and Danaher for alleged violations of a consent order dated January 3, 2017 between the CFPB and Corporate Defendants (App'x A to Compl., Dkt. No. 1-1 ("Consent Order")). The Consent Order contains the CFPB's proposed "findings and conclusions" based on its investigation of certain of Corporate Defendants' business practices and contains various commitments (the "Conduct Provisions") Corporate Defendants agreed to take in order to settle any dispute as to whether Corporate Defendants were in violation of federal consumer protection laws and regulations. (*See id.*; App'x B to Compl., Dkt. No. 1-2 ("Stipulation").)

John Danaher is a retired TUI executive. He served as President of TUI from 2004 until April 1, 2021, when he began his transition into retirement. In this lawsuit, the Bureau claims Danaher violated the Consent Order, and therefore the Consumer Finance Protection Act of 2010 ("CFPA"), by not complying with certain provisions of the Consent Order. But Danaher is not a party to the Consent Order—which was a negotiated agreement between the CFPB and Corporate Defendants—and he has no legal obligations under the Consent Order, and receives no benefits under the Consent Order. The law, and decades of precedent, are clear that a *consent* order is binding and enforceable only against parties that *consent* to it. Danaher did not sign the Consent Order or the Stipulation to the Consent Order, never agreed to comply with the Consent Order, and was afforded none of the procedural safeguards under the CFPA that are required before the

Bureau can prescribe an order. To hold Danaher individually liable under a consent order that exclusively binds the CFPB and Corporate Defendants would contravene due process, the CFPA itself, and common sense.

Even if Danaher could theoretically violate a consent order to which he is not a party, the CFPB's threadbare allegations would fail to establish that Danaher in fact violated the Consent Order. The Complaint devotes 44 pages and 237 paragraphs exclusively to the alleged conduct of Corporate Defendants. Besides allegations of Danaher's position and his knowledge of the Consent Order, the Complaint includes only a single paragraph containing any factual allegations relating to Danaher. (*See* Compl. ¶ 171.) Of the twelve ways in which Corporate Defendants allegedly violated the Conduct Provisions (*see* Compl. ¶ 176(a)-(g)), the CFPB connects only one to Danaher's actions—that he recommended TUI cease using the so-called affirmative-selection checkbox in affiliate marketing, which the Bureau alleges was required to be used by the Consent Order. Yet that single allegation does not even support a claim that Danaher violated the Consent Order. The Complaint does not allege that Danaher knew (or recklessly disregarded) that the Consent Order's Conduct Provisions were in effect at the time of his instruction, that they applied to affiliate marketing, or that giving this instruction would otherwise violate the Consent Order. The Bureau does not even try to link Danaher to the other allegations where Corporate Defendants allegedly violated the Consent Order. (*See id.* ¶¶ 32–109; 124–165.) The CFPB merely alleges that Danaher was the President of TUI with knowledge of the Consent Order, and therefore is liable. But that is not the law. The CFPB does not plausibly allege that Danaher had the obligation or authority to control TUI's or other Corporate Defendants' compliance with the Consent Order. Nor does the CFPB plausibly allege that Danaher knew about Corporate Defendants' alleged misconduct, or that he should have known this alleged misconduct violated the Consent Order.

Moreover, even if Danaher could theoretically violate the Consent Order, and even if the Complaint alleged facts demonstrating that Danaher had violated the Consent Order, the only remedy available to the CFPB in that situation would be an order from the Court directing that Danaher comply with the Consent Order. The CFPB's authority would not extend to seeking penalties or damages from Danaher except and unless authorized by the Consent Order, and the Consent Order does not authorize the CFPB to seek damages from or penalties from any person or entity other than Corporate Defendants.

Lastly, even the CFPB's claim for specific performance would be time-barred by the CFPA's three-year statute of limitations. The CFPB had actual knowledge of the principal facts it alleges against Danaher—his title and his knowledge of the Consent Order—as well as how the Company planned to comply with the Conduct Provisions back in 2017, at which point a reasonably diligent plaintiff would have investigated and promptly discovered the conduct alleged in the Complaint that allegedly gives rise to the CFPB's claims. Under any interpretation of the CFPA, the statute of limitations began to run in 2017 and has long since expired.

For these reasons, the claim against Danaher should be dismissed with prejudice.

**BACKGROUND[1]**

On January 3, 2017 (the "Effective Date"), the CFPB issued the Consent Order against "Respondents" TUI, TULLC, and TransUnion related to their marketing of credit-related products

[1] The factual allegations of the Complaint are accepted as true only for purposes of this motion. *See* Cincinnati Life Ins. Co. v. Beyrer, 722 F.3d 939, 946 (7th Cir. 2013). The Court may also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Vyera Pharms., LLC v. Walgreen Co.*, 2020 WL 433894, at *3 (N.D.Ill. 2020) (citing *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013)). "In effect, the incorporation-by-reference doctrine provides that if a plaintiff mentions a document in his complaint, the defendant may then submit the document to the court without converting defendant's 12(b)(6) motion to a motion for summary judgment." *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). Accordingly, this Court may consider the Consent Order and the Stipulation, both attached to the Complaint, as well as the Company's May 2, 2017 compliance

between July 21, 2011 and January 3, 2017.[2] (Compl. ¶ 23; *see generally* App'x A.) According to the CFPB, "[t]he entire Order is binding on all three Corporate Defendants." (Compl. ¶ 27.) The Corporate Defendants stipulated to the issuance of the Consent Order on December 22, 2016. (*Id.* ¶ 28, *see generally* App'x B.)

Danaher was never served with a civil investigative demand, subpoena or other process prior to the issuance of the Consent Order. He did not sign the Order or Corporate Defendants' stipulation consenting to its entry—neither on his own behalf or as President of TUI. (*See* App'x A at 31; App'x B at 5.) He was not a "respondent" under the Order. (App'x A ¶ 3(n).)

Per the terms of the Consent Order, the CFPB and Corporate Defendants (but not Danaher) agreed that the Consent Order would be construed as a final order under 12 U.S.C. § 5563 (*id.* ¶ 78), and the Bureau can impose on Corporate Defendants (but not Danaher) the maximum amount of civil money penalties allowed under 12 U.S.C. § 5565(c) for violations of the Consent Order and enforce the Consent Order in federal district court by serving Corporate Defendants wherever they are found (*id.* ¶ 82). Similarly, the Corporate Defendants (but not Danaher) agreed that the Consent Order would be deemed an order under 12 U.S.C. § 5563(b)(4) and would be

---

progress report, which is incorporated in the Complaint by reference because they are expressly referenced in the Consent Order. *See, e.g.*, *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002). In any event, this Court may take judicial notice of agency proceedings, including agency correspondence. *See, e.g.*, *Fornalik v. Perryman,* 223 F.3d 523, 529 (7th Cir. 2000); *Donald v. City of Chi.*, 539 F. Supp. 3d 912, 920 n.3 (N.D. Ill. 2021) (Bucklo, J.); *Truhlar v. John Grace Branch No. 825 of the Nat'l Ass'n of Letter Carriers*, 2007 WL 1030237, at *8 (N.D. Ill. Mar. 30, 2007). This Court can also take notice of documents available on the CFPB's website, *see, e.g.*, *U.S. v. Cohen*, 2012 WL 505918, at *7 (C.D. Ill. 2012) (taking judicial notice of a "printout from a Department of State website"), and the Company's SEC filings, *see George v. Kraft Foods Global, Inc.*, 674 F. Supp. 2d 1031, 1044 (N.D. Ill. 2009). Danaher has submitted the compliance progress report, consistent with these decisions, under the Declaration of Jeffrey H. Knox ("Knox Decl.").

[2] Danaher joins Corporate Defendants' brief and refers the Court to Corporate Defendants' "Relevant Factual Background" section for a more fulsome description of the CFPB's investigation of Corporate Defendants and the Complaint. (*See* Corporate Defendants' Mem. In Supp. of Mot. To Dismiss, Dkt. No. 29 ("TU's Br."))

fully enforceable by the Bureau under 12 U.S.C. §§ 5563(d)(1) and 5565 (App'x B ¶ 3), and expressly waived Corporate Defendants' (but not Danaher's) rights to, *inter alia*, service of the Consent Order, all hearings, post-hearing procedures, and "any other procedural right available" under 12 U.S.C. § 5563 (*id.* ¶ 9).

The Consent Order lists the CFPB's proposed "findings and conclusions" that Corporate Defendants (but not Danaher) allegedly violated the CFPA by deceptively marketing credit scores and credit-related products to consumers. Corporate Defendants neither admitted nor denied the Bureau's findings of fact or conclusions of law (except to establish jurisdiction), but agreed to pay a $3 million civil penalty and provide $13.93 million in redress to affected consumers. (Compl. ¶ 24; App'x A ¶¶ 2, 47, 52; *see* App'x B ¶ 2.)

The Bureau and Corporate Defendants (but not Danaher) also negotiated the Conduct Provisions—certain forward-looking requirements—into the Consent Order. The Conduct Provisions are found in Section V of the Consent Order. Section VI, "Compliance Plan," outlines the three-step process for Corporate Defendants (but not Danaher) to implement the Conduct Provisions:

> (1) "[Corporate Defendants] must submit to the Assistant Deputy for Consumer Reporting for review and determination of non-objection a comprehensive compliance plan designed to ensure that [Corporate Defendants]' advertising practices comply with all applicable Federal consumer financial laws and the terms of this Consent Order (Compliance Plan)" that must include "[d]etailed steps for addressing each action required by Section V" and "[s]pecific timeframes and deadlines for implementation of th[ose] steps" (App'x A ¶ 41);
>
> (2) the CFPB may direct Corporate Defendants to revise the plan or "make a determination of non-objection" (*id.* ¶ 42); and
>
> (3) "[a]fter receiving notification that the Assistant Deputy for Consumer Reporting has made a determination of non-objection to the Compliance Plan, [Corporate Defendants] must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Compliance Plan, (*id.* ¶ 43).

The Consent Order also requires Corporate Defendants (but not Danaher) to submit accurate written compliance reports that describe "in detail" how they have complied with the Consent Order and attach each "Order Acknowledgement"—a signed and dated acknowledgement of receipt of the Consent Order by all board members, executive officers, and others with responsibilities related to the subject matter of the Consent Order. Danaher signed and submitted an Order Acknowledgement, which confirmed his receipt of the Order[3]; by signing the Order Acknowledgment, Danaher did not agree to anything and it did not require any other action from him.

The Consent Order also requires the TransUnion Board (but not Danaher) to undertake certain enumerated steps to ensure compliance with the Consent Order. (*Id.* ¶¶ 44–46.)

In addition to the substantive forward-looking Conduct Provisions, Corporate Defendants (but not Danaher) also agreed to cooperate with the Bureau in the future. Specifically, Section XVI of the Consent Order, "Compliance Monitoring," requires Corporate Defendants to submit additional compliance reports and other requested information, provide sworn testimony, or produce documents within 30 days of receipt of a written request from the Bureau. (*Id.* ¶ 71.) Corporate Defendants are also required to permit the Bureau to interview any employee or affiliated person. (*Id.* ¶ 72.)

Corporate Defendants submitted an array of plans and status updates to the CFPB in the months following the Consent Order, as required by its terms. Nearly a year later, in October 2018, the Bureau began an investigation into whether the Company was in compliance with the Consent Order. (Compl. ¶ 29.) After letters back and forth, the CFPB filed the Complaint against Corporate Defendants and Danaher on April 12, 2022. (*Id.* ¶¶ 1, 29–31.) The CFPB asserts only one claim

---

[3] *See* Ex. A to Knox Decl. at 7 (listing Danaher's February 2, 2017 Order Acknowledgment).

against Danaher: Count II of the Complaint alleges that Danaher "violated the [Consent] Order," and therefore violated § 1036(a)(1)(A) of the Consumer Financial Protection Act, 12 U.S.C. § 5536(a)(1)(A). (Compl. ¶¶ 187, 189.)

## LEGAL STANDARDS

The Federal Rules of Civil Procedure "demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Rather, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (citing *Twombly*, 550 U.S. at 570).

While the court "must construe all of the plaintiff's factual allegations as true, and must draw all reasonable inferences in the plaintiff's favor," *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011), this tenet "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. 555, 557). "[A]bstract recitations of the elements of a cause of action or conclusory legal statements' do nothing to distinguish the particular case that is before the court from every other hypothetically possible case in that field of law. Such statements therefore do not add to the notice that Rule 8 demands." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010) (quoting *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)).

## ARGUMENT

### I. Count II, the Only Count Against Danaher, Should Be Dismissed Because Consent Orders Are Only Enforceable Against Consenting Parties

The CFPB's sole claim against Danaher rests upon the unprecedented and fundamentally flawed legal theory that the Consent Order is binding on, and has the force of federal law against, a non-consenting person or entity. It is not, and it does not. There is no precedent for the proposition that an administrative consent order has the force of federal law against persons or entities not party to the consent decree at issue. Doing so would violate the CFPA and fundamental principles of due process.

The CFPA grants the Bureau the litigation authority to commence a civil action against any person who violates "[f]ederal consumer financial law." 12 U.S.C. § 5564(a). "Federal consumer financial law" is defined to include any provision of the CFPA and "any rule or order *prescribed by the Bureau under this title*." *Id.* § 5481(14) (emphasis added). One type of order the CFPB may prescribe is a cease-and-desist order under § 5563. In fact, the CFPB and Corporate Defendants agreed that the Consent Order "will be construed as [] a final Consent Order issued under . . . 12 U.S.C. § 5563." (App'x A ¶ 78; *see* App'x B ¶ 3.)

However, the CFPA is clear that consent orders may be "prescribed under this title" only against consenting parties and those afforded specified procedural safeguards. The CFPA sets forth the detailed process and requirements the CFPB must satisfy before it can "prescribe" and enforce an order against a person or entity.[4] *See generally* 12 U.S.C. § 5563.

1. First, the CFPB must issue and serve upon a covered person or service provider a notice of charges. *See id.* § 5563(b)(1)(A). The notice must

---

[4] Corporate Defendants (but not Danaher) agreed the Consent Order will be deemed an order issued under § 5563. (Compl. ¶ 28 (quoting App'x B).) The Consent Order is plainly not an order issued under other sections of the CFPA. *See, e.g.*, 12 U.S.C. §§ 5512 (order to gather information); 5562 (order to comply with a subpoena).

contain a "statement of the facts constituting the alleged violation" and must "fix a time and place" for "a hearing . . . to determine whether an order to cease and desist should issue against the covered person or service provider." *See id.* § 5563(b)(1)(B).

2. Second, the CFPB must obtain the covered person's consent either by record at the hearing or by implied consent through failure to appear. *See id.* § 5563(b)(1)(C)–(D). Upon consent, the CFPB may issue and serve upon "the covered person or service provider" an order to cease and desist from a violation or practice. *See id.* § 5563(b)(1)(D).

3. Third, and critically, § 5563 provides authority to the CFPB in an order to "require ***the*** covered person or service provider to cease and desist from the subject activity, and to take affirmative action to correct the conditions resulting from any such violation." *See id.* (emphasis added).

In other words, nowhere in the statutory scheme did Congress give the CFPB authority to prescribe an order that imposes any requirements or affirmative actions on a covered person or service provider who has neither consented to the order nor been provided the other procedural safeguards of § 5563. This is entirely logical: a CFPB order can only have the force of federal law against ***the*** person or entity that has either knowingly consented to that outcome or after such an order has been issued by a legally competent authority after notice and a fair hearing with procedural protections.

Danaher was not a party to the Consent Order and never agreed to the terms of the Consent Order. He was never party to any adjudicative or other legal process resulting in the issuance of the Consent Order or any other order. Unlike Corporate Defendants, he did not stipulate that the Consent Order "will be deemed an 'order issued with the consent of the person concerned' under 12 U.S.C. § 5563(b)(4)." (App'x B ¶ 3.) He was never served notice of charges, he was never provided a hearing, and he never consented to the issuance of an order.

The CFPB therefore did not have and presently does not have any statutory authority to impose any affirmative actions or obligations on Danaher under the Consent Order.

Yet that is exactly what the CFPB attempts to do here. Directly contrary to the explicit and unambiguous language of § 5563, the CFPB now claims that Danaher had "personal legal obligations . . . to ensure Corporate Defendants' compliance with the [Consent] Order," and his failure to do so subjects him to civil liability under the CFPA. (*See* Compl. ¶ 170.) There is no statutory or other legal support for this theory.

The CFPB alleges in the Complaint that because "[f]ederal consumer financial law" is defined to include an "order prescribed by the Bureau," *see* 12 U.S.C. § 5481(14)), Danaher therefore violated federal consumer financial law by violating the Consent Order. This interpretation of Danaher's duty leads to an anomalous result. It cannot be that one person's consent to an order somehow gives the CFPB the authority to impose the consenting party's obligations on the public at large or even on a consenting party's officer or employee with knowledge of that consent order's obligation. The Consent Order must be "prescribed" in accordance with the CFPB's statutory authority under § 5563, and the statute is clear that orders may be "prescribed" only against those who are availed of process or give consent under § 5563. *See* 12 U.S.C. § 5563(b)(1)(D) ("in the event of consent . . . the Bureau finds that any violation specified in the notice of charges has been established, the Bureau may issue and serve . . . an order to cease and desist from the violation or practice.").

The CFPB's theory would ignore Congress' clear statement that the CFPB cannot impose any consent order requirements on a person absent procedural protections by holding that same person liable under federal law for failing to satisfy the order's requirements. The incorporation of consent orders into federal consumer law must be interpreted within the context of the procedural requirements to issue a consent order under § 5563, and yet the CFPB's interpretation does exactly the opposite. *See* *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60 (2004) ("Statutory

construction is a 'holistic endeavor'" and a "provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . ."); Senne v. Vill. of Palatine, Illinois, 784 F.3d 444, 447 (7th Cir. 2015) (noting that courts must interpret statutes to "avoid absurd results").

Courts universally hold that consent decrees are binding only on the parties to those consent decrees. *See* Altria Group, Inc. v. Good, 555 U.S. 70, 89 n.13 (2008) ("[A] consent order is in any event only binding on the parties to the agreement."); Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C v. City of Cleveland, 478 U.S. 501, 529 (1986) ("And, of course, a court may not enter a consent decree that imposes obligations on a party that did not consent to the decree."); United States v. Armour & Co., 402 U.S. 673, 682 (1971) (explaining a party to a consent decree has "waived his right to litigate the issues raised, a right guaranteed to him by the Due Process Clause"). These decisions reflect the fundamental due process consideration that a consent order results from the "parties' acquiescence, not rules of law," and therefore "only the parties who agree can be bound by it . . . and *a fortiori* may not impose duties or obligations on a third party, without that party's agreement." *See* Mote v. Chelsea, 252 F. Supp. 3d 642, 657 (E.D. Mich. 2017) (quoting Firefighters, 478 U.S. at 529).

The Supreme Court spoke on the effect of consent orders 50 years ago:

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. *Thus the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve.*

Armour & Co., 402 U.S. at 681–82 (emphasis added).

Two other courts have articulated and upheld this basic principle in CFPB- and FTC-related cases, observing that a consent order, which results from the acquiescence of two parties, is not enforceable beyond the consenting parties. *See* *White v. JRHBW Realty, Inc.*, 2015 WL 854348, at *2 (N.D. Al. Feb. 27, 2015) (explaining a CFPB consent order is "certainly not binding" for the purposes of the suit, particularly because "the Order was based on a stipulation in which the Respondents admitted no wrongdoing"); *May Dept. Stores Co. v. First Hartford Corp.*, 435 F. Supp. 849, 852 (D. Conn. 1977) (explaining that an FTC "consent order . . . being the product of compromise and negotiation between two parties has only the attributes of a contract," and "[u]nlike legislation, it is not the expression of broad and conscious policymaking; nor does it have the imprimatur of a neutral decision maker as does a judicial decree").

Treating a consent order issued by the CFPB against certain respondents pursuant to § 5536 as binding "[f]ederal consumer financial law" as to a non-consenting third party like Danaher would be a dramatic and unjustified expansion of the CFPB's authority. Simply, authorizing the CFPB to enforce a Consent Order against a non-consenting party would extend the CFPB's authority beyond its statutory mandate and translate the CFPB's authority beyond that recognized for any other agency. *See* 12 U.S.C. § 5512 (setting forth the steps the Bureau must take before prescribing a rule); *see also* *W. Virginia v. Env't Prot. Agency*, 2022 WL 2347278, at *12 (U.S. June 30, 2022) ("Agencies have only those powers given to them by Congress . . . .). It would, in effect, transform a consent order applicable to only consenting parties into an agency "rule" binding on the public without going through the required "notice and comment" process. *See* 5 U.S.C. § 553 (agency rulemaking).

## II. Count II Should Be Dismissed To the Extent the CFPB Seeks Damages from Danaher

Even if the Consent Order were somehow enforceable against Danaher (it is not, for the reasons set forth above), the Court would be authorized to enforce only the terms of the Consent Order itself, not to order Danaher to pay damages. Indeed, the CFPA expressly provides "[s]pecial rules for enforcement of orders" under § 5563, and enforcement is limited to specific enforcement of the relevant orders:

> (1) In general - The Bureau may in its discretion apply to the United States district court . . . for the enforcement of any effective and outstanding notice or order issued under this section, and such court shall have jurisdiction and *power to order and require compliance* herewith.
>
> (2) Exception - Except as otherwise provided in this subsection, *no court shall have jurisdiction to affect* by injunction or otherwise the issuance or *enforcement of any* notice or *order* or to review, modify, suspend, terminate, or set aside any such notice or order.

12 U.S.C. § 5563(d) (emphasis added). Accordingly, without more, the CFPB could, at most, ask this Court to order compliance with the Consent Order.

The Consent Order does not (and could not, absent Danaher's consent) authorize the CFPB to seek money damages or any penalty from Danaher. Nevertheless, the CFPB seeks an array of damages against Danaher in its Demand for Relief. (Compl. at 53 (seeking "damages or other monetary relief," refunds, restitution, disgorgement, civil money penalties, and costs).) Corporate Defendants agreed that "the Bureau may impose the maximum amount of civil money penalties allowed under section 1055(c) of the CFPA, 12 U.S.C. § 5565(c)" for violations of the Consent Order. (App'x A ¶ 82.) Danaher did not agree to these terms, but in any event, this paragraph is clearly limited to Corporate Defendants as "Respondents" to the Consent Order because "[i]n connection with *any attempt* by the Bureau to enforce this Consent Order in federal district court, the Bureau may serve *Respondents* wherever *Respondents* may be found . . . ." (*Id*. (emphasis

added).) The Consent Order references Corporate Defendants' executives and officers elsewhere, but clearly contemplates that the CFPB may enforce this Order only against *Respondents* and only *Respondents* may be held liable for civil money penalties under the Consent Order.

In light of the plain text of the Consent Order and the express limitation of § 5563(d), no claim for money damages lies against Danaher. At most, even if Danaher was somehow bound by a consent order to which he did not consent, this Court would only have authority to order Danaher to comply with the Conduct Provisions. Danaher is a former officer with no control over Corporate Defendants' current procedures or policies, so a court-ordered remedy of compliance with the Consent Order would be moot.[5]

## III. Danaher Never Knowingly or Recklessly Violated the Consent Order

As noted, the CFPB's sole count against Danaher alleges that he violated the Consent Order. (Compl. ¶¶ 180–89 (Count II).) Even if Danaher can be held liable for a consent order to which he did not consent (which he cannot), to sustain a claim that Danaher violated the Consent Order, the Bureau would need to allege, at a minimum, that Danaher "(1) participated directly in the illegal practices or acts or had the authority to control them; and (2) knew or should have known about the illegal practices."[6] *CFPB v. Mortg. L. Grp., LLP*, 196 F. Supp. 3d 920, 944 (W.D.

[5] As this Circuit has repeatedly found, "federal courts lose subject matter jurisdiction [] when a justiciable controversy ceases to exist between the parties." *Aslin v. Fin. Indus. Regulatory Auth., Inc.*, 704 F.3d 475, 477 (7th Cir. 2013) (agreeing with district court's dismissal, but on subject matter jurisdiction grounds, and noting that "[m]ootness commonly arises where a federal court becomes unable to award meaningful relief in the case"); *see also* *Medlock v. Trs. Of Ind. Univ.*, 683 F.3d 880, 882 (7th Cir. 2012) (explaining that a court "must, on its own, dismiss a case as moot when it cannot give the petitioner any effective relief").

[6] The CFPB styles Count II as if Danaher personally violated the Consent Order. As the Bureau itself has contended, to enforce the Consent Order against Danaher under § 5563(d) the CFPB would need to establish "(1) the Bureau, pursuant to its statutory authority, issued and served against Respondents the Bureau Final Order, (2) the Bureau Final Order is 'effective and outstanding,' and (3) Respondents have failed to comply with the Bureau Final Order." Mem. In Supp. of CFPB's Pet. To Enforce, *CFPB v. Integrity Advance, LLC*, No. 12-mc-206 (D. Kan.) (Dkt. No. 2) (filed May 19, 2021). Here, as explained in Part I, the CFPB did not issue or serve a final order against Danaher pursuant to its statutory authority. Danaher is not a respondent to the Consent Order. Thus, any claim that Danaher personally violated the Consent Order should be

Wis. 2016); *see CFPB v. 1st Alliance Lending, LLC*, 2022 WL 993582, at *6–7 (D. Conn. Mar. 31, 2022) (same). Assuming that a non-consenting party's violation of a consent order violates federal consumer financial law (which it does not), the Bureau would still be required to allege both that Danaher engaged in or controlled conduct that allegedly violated the Consent Order and that Danaher knew or should have known that such conduct violated the Consent Order.

The CFPB claims that Danaher himself violated the Consent Order by failing to ensure that TUI complied with the Consent Order. (Compl. ¶ 187.) The Complaint only connects Danaher's conduct to Corporate Defendants' failure to use a checkbox for affiliate marketing. (*See id.* ¶ 171.) Thus, Danaher allegedly participated in only a portion of one out of twelve of Corporate Defendants' alleged violations; his responsibility for TUI's other alleged violation of paragraph 40(b)(i) and the other eleven alleged violations of paragraph 40 rests solely on general, conclusory allegations about his "authority to control" Corporate Defendants.

Neither of these theories—direct participation nor authority to control—is sustained by the allegations of the Complaint. As to the first theory, the CFPB fails to allege that Danaher's instruction to TUI about affiliates violated the Consent Order, or that Danaher had the requisite knowledge of the same. As to the second theory, the CFPB fails to allege that Danaher (1) was responsible for or had control over Corporate Defendants' alleged violations of the Consent Order; or (2) knew that such conduct by Corporate Defendants violated the Consent Order. Simply, the allegations do not show that Danaher was personally responsible for compliance with the Consent Order or that he knew or should have known that his conduct violated the Consent Order.

---

dismissed. In an attempt to sidestep the clear limitation that it cannot enforce the Consent Order against Danaher, the CFPB appears to invoke the standard for individual liability for an unfair, abusive, or deceptive act or practice under the CFPA. Accordingly, for the purposes of this motion only, Danaher addresses Count II under that framework.

### A. Danaher Did Not Allegedly "Directly Participate" In a Knowing or Reckless Violation of the Consent Order

Count II fails under the CFPB's first theory. The CFPB alleges that Danaher took two "direct" actions: (1) "Danaher, along with others . . . created a plan to delay or avoid implementation of the requirements of Paragraph 40 of the Order," and (2) "shortly after the Effective Date . . . Danaher instructed TUI to cease using the checkbox in Affiliate marketing." (Compl. ¶ 171.) Neither allegation amounts to Danaher's "direct participation" in an alleged violation of the Consent Order. The CFPB fails to allege that either action violated the Consent Order, or that Danaher had the requisite knowledge of any wrongdoing.

*First*, the CFPB provides no context for Danaher's supposed "plan" to delay or avoid implementing the requirements of paragraph 40, whether this plan was put into action, and which (if any) of Corporate Defendants' alleged violations were caused by this "plan." There is simply no factual basis to connect Danaher's alleged plan to any alleged violation of the Consent Order.

*Second*, with respect to "Affiliate marketing," the Consent Order does not state that the Conduct Provisions extend to affiliates. (*See* App'x A ¶ 40.) Paragraph 40(b) expressly applies to "any Credit-Related Product," a defined term in the Consent Order. The CFPB alleges that Corporate Defendants place advertisements for "Credit-Related Products" on websites operated by third party marketing affiliates, which in turn offer the products to consumers. (Compl. ¶¶ 18, 20.) But the definition of "Credit-Related Product" is "any product or service *Respondents* offer for sale *directly to consumers*, including but not limited to the TUCM Product, credit scores, credit reports, credit monitoring, or identity theft insurance or protection." (App'x A ¶ 3(f) (emphasis added).) Plainly, this negotiated-over definition does not include subscriptions that are offered to consumers *not* directly by Corporate Defendants, but through affiliates. If the parties intended for

this term in paragraph 40 to cover affiliates, it would have said so.[7] Elsewhere, the Consent Order expressly references "affiliates," but nowhere are affiliates mentioned in paragraph 40 or the defined terms used therein. (*Compare* App'x 1 ¶¶ 61, 65, 66, 68(c), 72, 77 *with* ¶ 40).

Thus, the CFPB fails to plausibly allege that any of Danaher's "direct participation" violated the Consent Order. In any event, the facts alleged about Danaher's participation permit this Court to infer, at most, that he participated in TUI's negative option enrollments through affiliates; they provide no connection to Corporate Defendants' other alleged violations.

The CFPB also fails to allege the knowledge requirement with respect to Danaher's alleged direct participation: that Danaher "knew or should have known" that TUI's affiliate enrollments without a checkbox violated the Consent Order. Because the text of the Consent Order does not state that paragraph 40(b)(i)'s requirement applies to affiliates, the CFPB's allegation that Danaher knew of the Consent Order does not allow this Court to infer that Danaher knew or recklessly disregarded that the checkbox was necessary for affiliate enrollments.

Moreover, as explained below, Danaher's "actual knowledge" of the Consent Order would support an understanding that no checkbox was necessary until after the CFPB determined not to object to the Company's compliance plan. (*See infra* Part III(B)(2); App'x A ¶¶ 41-43.) The Company's initial compliance plan was not due until April 3, 2017 (*id.* ¶ 41 (90 days from Effective Date)); yet Danaher's recommendation to TUI about affiliates must have occurred in March 2017, when Corporate Defendants allegedly began enrolling consumers through affiliates without a checkbox (*see* Compl. ¶ 99). Accordingly, Danaher could not have had the requisite knowledge about whether the Bureau had "non-objected" to the compliance plan, and thus,

[7] Indeed, in a consent order issued against Equifax, another major credit reporting agency, the CFPB expressly included "Affiliated Marketers" in its definition of a "Credit-Related Product." *See* https://files.consumerfinance.gov/f/documents/201701_cfpb_Equifax-consent-order.pdf.

whether a checkbox was required, at the time he instructed that the checkbox be taken away for affiliates. Thus, the CFPB has failed to allege that Danaher "directly participated" in any alleged Consent Order violation while knowing or recklessly disregarding that they were violations.

### B. Danaher Did Not Knowingly Control the Alleged Violations of the Consent Order by Corporate Defendants

Count II also fails under the CFPB's second theory. Danaher's liability for nearly all of Corporate Defendants' alleged Consent Order violations rests solely on his alleged "authority to control" Corporate Defendants' underlying conduct. To sustain a claim under this theory, the CFPB must allege that he both (1) had the authority to control Corporate Defendants' alleged Consent Order violations and (2) knew or should have known about Corporate Defendants' allegedly wrongful practices. The Complaint fails to allege either prong of this test.

#### 1. Danaher Had Neither the Obligation Nor the Authority to Control Corporate Defendants' Compliance with the Order

The CFPB alleges Danaher's supposed "authority to control" any Consent Order violations in only the most general terms. (*See* Compl. ¶¶ 5, 166, 185.) This is insufficient. *See FTC v. Swish Mktg.*, 2010 WL 653486, at *5 (N.D. Cal. Feb. 22, 2010) (finding that the FTC's assertions of an individual's authority to control alleged corporate misconduct based on his position as CEO were "untethered to virtually any supportive facts" and "d[id] not support an inference of [his] involvement" in the underlying corporate misconduct).[8]

Moreover, Danaher's alleged liability arises out of TUI's marketing only vis-à-vis the Consent Order. Although the CFPB alleges "Danaher had the authority and obligation to ensure

[8] The common law standard for individual liability for an unlawful, deceptive, or abusive act or practice under the CFPA borrows from the standard for individual liability under the FTCA. *See CFPB v. Mortg. Law Grp., LLP*, 196 F. Supp. 3d 920, 944 (W.D. Wis. 2016); *see also CFPB v. Gordon*, 819 F.3d 1179, 1193 n.8 (9th Cir. 2016). To the extent the CFPB can hold Danaher liable for any Consent Order violation, it must, at a minimum, satisfy this test.

Corporate Defendants complied with the Order," the Consent Order itself belies this legal conclusion. *See Thompson v. Illinois Dep't of Pro. Regul.*, 300 F.3d 750, 753 (7th Cir. 2002) (noting that the plaintiff "cannot prevent the defense from suggesting [that the facts alleged] demonstrate the plaintiff is not entitled to relief"). This responsibility falls on *TransUnion*—not on TUI, and certainly not on any individual. The Consent Order vests "the ultimate responsibility . . . for ensuring that Respondents comply with Federal consumer financial law and this Consent Order" in *TransUnion*'s board. (App'x A at ¶¶ 44-45; Compl. ¶ 27.) Moreover, the CFPB alleges that a *TransUnion* Board committee oversees Legal and Compliance for TUI and TULLC; and that TULLC in turn provides "compliance and legal services" to TUI. (*See id.* ¶¶ 12, 15.) Plainly, Danaher did *not* oversee nor have the authority or obligation to control Corporate Defendants' compliance with the Consent Order—neither by the terms of the Consent Order, nor by virtue of his position as President of TUI within the greater "TransUnion enterprise."

2. This Court Cannot Plausibly Infer that Danaher Recklessly Disregarded Any Violation of the Consent Order

Even if Danaher had had the authority to control the alleged violations of the Consent Order, the CFPB fails to plausibly allege that Danaher knew (or recklessly disregarded) that anyone violated paragraph 40 of the Consent Order. The CFPB fails to allege the factual predicate to give rise to an inference (1) that Danaher knew about Corporate Defendants' actions or inactions that allegedly violated paragraph 40; and (2) that Danaher knew that paragraph 40 was in effect.

Nowhere does the CFPB allege Danaher's knowledge of the conduct underlying the dozen or so "misrepresentations," "deceptive actions," and other Consent Order violations allegedly committed by Corporate Defendants. The CFPB's "formulaic recitation of the element[]"—that Danaher "has had actual knowledge of, or recklessly disregarded, TUI's violations of the Order," (Compl. ¶ 169)—"will not do." *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

The CFPB attempts to collapse the elements of individual liability into one fact: Danaher's position.

Other courts have dismissed similar claims against individuals for failing to allege a connection between the individual's management authority and the underlying misconduct. *See* *1st Alliance Lending, LLC*, 2022 WL 993582, at *9; *Swish Mktg.*, 2010 WL 653486, at *6 (concluding that the FTC failed to suggest an individual defendant's knowledge, even though the FTC alleged consumers filed complaints with defendants).

For example, in *1st Alliance*, certain sales employees presented themselves to customers as licensed mortgage-loan originators, when in fact they were unlicensed. *See* 2022 WL 993582, at *7. The CFPB alleged that three individual defendants, the CEO and two departmental presidents, were responsible for 1st Alliance's violations because they were responsible for, and approved, the particular duties assigned to the unlicensed sales employees and the specific functions they performed. *See* *id.* at 1. Notwithstanding allegations of the individuals' responsibility over the specific conduct at issue, the court held that the allegations did not support a plausible inference that the individual defendants knew of the sales employees' alleged misrepresentations. *See* *id.* at *8–9. Here, the CFPB alleges far less detail about Danaher's responsibilities than it did about the individuals in *1st Alliance*; in both cases, the CFPB fails to allege a plausible link between the individual's authority and the underlying conduct at issue. Thus, like the District of Connecticut, this Court should dismiss the CFPB's claim.

Furthermore, the CFPB must not only allege that Danaher had knowledge of the underlying actions—which it does not—but also that he knew that those actions violated the Consent Order. *See* *CFPB v. Consumer First Legal Grp., LLC*, 6 F.4th 694, 712 (7th Cir. 2021) (finding that the CFPB did not show individual defendants "should have been aware of an unjustifiably high or

obvious risk of violating [the law at issue]"). The scope of the CFPB's claim against Danaher is limited to violations of Conduct Provisions; not any other term of the Consent Order. (*See* Compl. ¶¶ 168, 170, 187.) However, the CFPB fails to allege that Danaher knew or recklessly disregarded that the Conduct Provisions were in effect; and the CFPB failed to uphold its obligations to effectuate Corporate Defendants' plan to comply with the Conduct Provisions.

As explained at length in the Company's moving brief, the CFPB failed to satisfy the condition precedent to enforcing the Consent Order. Danaher joins those arguments and refers the Court to the Company's brief. (*See* TU's Br.) Even if the CFPB could enforce the Consent Order, its terms require Corporate Defendants to take steps in furtherance of the Conduct Provisions only "after receiving . . . non-objection to the Compliance Plan." (App'x A ¶ 43.)

Irrespective of the proper legal interpretation of the Compliance Plan section of the Consent Order, Danaher's knowledge of its meaning is based on a single alleged fact: he had actual knowledge of the Consent Order. Even if this Court ultimately determines that the Consent Order is enforceable, or that TransUnion's compliance with the Conduct Provisions was required as of the Effective Date (notwithstanding the fact that Corporate Defendants never received the CFPB's non-objection to the compliance plan), where the "question" of the wrongfulness of an individual's conduct is "a legitimate one," it is "a step too far to say that they were reckless." *Consumer First Legal Grp.*, 6 F 4th at 712.

Turning to the plain language of the Consent Order, Danaher's knowledge of the words on the page does not support an inference that he knew Corporate Defendants were required to implement the Conduct Provisions. On the contrary, the Consent Order expressly states that only "[a]fter receiving . . . a determination of non-objection to the Compliance Plan" must Respondents implement the steps to address the Conduct Provisions. (App'x A ¶¶ 41-43.) Thus, contrary to the

CFPB's assertions, Danaher could not have possibly known he was violating the Consent Order as of the Effective Date. Based on the facts before this Court, Danaher's knowledge or reckless disregard of the wrongful nature of his alleged failure to ensure Corporate Defendants implemented the Conduct Provisions could not have arisen until after he knew Corporate Defendants had received a determination of non-objection from the Bureau. It would be implausible for this Court to infer that Danaher's knowledge of the Consent Order and a reading of the plain language therein, without more, informed him that Corporate Defendants' alleged failure to implement the Conduct Provisions violated the Consent Order.

* * * * *

Whether the CFPB's theory of the case is that Danaher directly participated in Corporate Defendants' alleged violation of paragraph 40(b)(i) that he or merely had the authority to control all twelve of Corporate Defendants' alleged violations of the Conduct Provisions, the CFPB's claim hinges on the facts that the Conduct Provisions of paragraph 40 were in effect, and that Danaher knew this to be the case. The CFPB fails to allege either fact, relying instead on conclusory statements and allegations that consist entirely of legal conclusions. This Court should dismiss the CFPB's claim against Danaher.

## IV. The CFPB's Claim Against Danaher Is Time-Barred

Even at this stage of litigation, "[a] district court may dismiss under Rule 12(b)(6) something that is indisputably time-barred." *Burns v. United States*, 762 F. App'x 338, 339 (Mem.) (7th Cir. 2019) (internal citations omitted). While "a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations," "if a plaintiff alleges facts sufficient to establish a statute of limitations defense, the district court may dismiss the complaint on that ground." *Sidney Hillman Health Ctr. v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015) (internal citations omitted).

The CFPA provides the Bureau three years from "the date of discovery of the violation to which an action relates" to bring an enforcement action. 12 U.S.C. § 5564(g)(1). Under this rule, the statute of limitations begins to run when the CFPB "discovers" the alleged violations; that is when it "obtains actual knowledge of the facts giving rise to the action *or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge.*'" *CFPB v. NDG Fin. Corp.*, 2016 WL 7188792, at *19 (S.D.N.Y. 2016) (emphasis added) (quoting *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1042 (2d Cir. 1992)); *see also CFPB v. Ocwen Fin. Corp.*, 2019 U.S. Dist. LEXIS 152336, at *65 (S.D. Fla. Sept. 5, 2019) (same). In other words, the statute of limitations begins to run "when the facts would have prompted a reasonably diligent plaintiff to begin investigating." *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010) (explaining inquiry notice); *see Chicago Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 616 (7th Cir. 2014) (noting that inquiry notice is "the time at which a reasonable plaintiff can be expected to start investigating a possible violation of his rights").

The CFPB filed this action on April 12, 2022, more than five years after issuing the Consent Order, which itself involved the Company's conduct dating back to July 2011. The Consent Order itself makes clear that the CFPB should have investigated compliance with the Consent Order in 2017. In light of the sweeping breadth of CFPB's investigatory authority, the enhanced access Corporate Defendants agreed to provide, CFPB's actual protracted investigation into the Company, and the public nature of Corporate Defendants' alleged conduct, it is clear that any investigation would have led to the CFPB's knowledge of Danaher's alleged violations long before April 2019. Accordingly, this Court should dismiss Count II as time-barred.

### A. The CFPB Had Actual Knowledge of Facts that Would Have Prompted a Reasonably Diligent Plaintiff to Investigate in 2017

As the Complaint and the Consent Order demonstrate, since at least the Order's Effective Date of January 3, 2017, the CFPB has been well aware of TransUnion's marketing practices dating back to July 21, 2011 (*see* Compl. ¶ 23, App'x A ¶ 3(m)), including its VantageScore disclosure, which has remained "essentially unchanged from prior to the Order" (Compl. ¶ 74), as well as its use of negative option enrollment. (*See* App'x A ¶¶ 11-39.) Thus, the CFPB had actual knowledge of these practices *prior to* issuing the Consent Order. The marketing practices that led to the Consent Order would have prompted a reasonably diligent plaintiff to investigate Corporate Defendants' compliance with the Consent Order as soon as it went into effect.

If the Consent Order itself did not prompt an investigation, surely any issues with Corporate Defendants' planned or actual compliance would have prompted a reasonably diligent plaintiff to begin investigating. The Consent Order requires Corporate Defendants to submit a compliance plan to the CFPB that includes "detailed steps" for addressing the Conduct Provisions and "[s]pecific timeframes and deadlines for implementation of the steps." (*Id.* ¶ 41.) Thus, the CFPB had actual knowledge of Corporate Defendants' plan for implementing the Conduct Provisions in 2017.[9] The Consent Order also requires Corporate Defendants to submit "accurate written compliance progress report[s]" that "[d]escribe[] in detail the manner and form in which Respondents have complied with this Order." (*Id.* ¶ 64.) The compliance progress report similarly gave the CFPB actual knowledge of Corporate Defendants' compliance (or, as alleged, lack

[9] As noted in the Company's brief and in the Company's compliance progress report itself, the CFPB granted TransUnion an extension to June 30, 2017 to submit its compliance plan, at which point the CFPB had actual knowledge of TransUnion's interpretation of the Consent Order. (*See* Ex. A to Knox Decl. at 1; TU's Br.)

thereof). Either way, the CFPB knew of facts that would have prompted an investigation into Corporate Defendants' compliance with the Consent Order.

### B. The CFPB's Exercise of Any Diligence Would Have Led to Actual Knowledge of Corporate Defendants' Violations

As alleged, "Corporate Defendants have violated the Order since the day it went into effect." (Compl. ¶ 2.) The CFPB's allegations about Corporate Defendants' various actions and inactions that allegedly violated the Consent Order likewise reveal that all alleged misconduct occurred as of the Effective Date, or shortly thereafter. (*See id.* ¶¶ 32-109, 124-157.) If the CFPB had been at all diligent, there is no question that it would have, and should have, discovered these alleged violations shortly after they first occurred.

As the Complaint makes clear, Corporate Defendants' conduct was not concealed or difficult to discover. As alleged, nearly all conduct occurred on publicly available websites such as TransUnion.com, the Company's homepage enrollment form, or its landing page (*see, e.g.*, Compl.¶¶ 35-37, 69, 80, 85, 96, 140-141, 153), annualcreditreport.com and other "popular websites" (*see, e.g.*, *id.* ¶¶ 96, 126), and through affiliate enrollments (*see e.g.*, *id.* ¶¶ 96, 106). These websites are publicly available and accessible by anyone with an internet connection, and certainly by the CFPB, which is specifically tasked to supervise "larger participants" in the consumer financial products or services market.

The Bureau has sweeping investigative authority to supervise "consumer reporting agencies" like TransUnion, which are "subject to review of compliance systems and procedures, on-site examinations, discussions with relevant personnel, and they will be required to produce relevant reports."[10] For context, TransUnion is one of "three big nationwide providers of consumer

[10] https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-to-superivse-credit-reporting/; *see* 12 U.S.C. 5514(a)(1)(B); 77 Fed. Reg. 42874.

reports," along with Equifax and Experian.[11] The CFPB's supervision of TransUnion is, as intended by the CFPB, extremely thorough and a "continuous cycle."[12] In sum, even in the absence of a consent order, the CFPB has the tools to carefully supervise and monitor TransUnion, one of only three major consumer reporting agencies. The Bureau could have investigated and discovered Corporate Defendants' alleged violations in its ordinary course of business.[13]

Beyond the CFPB's general supervisory mandate, the Consent Order specifically requires that the Bureau play an active role in Corporate Defendants' implementation of the Consent Order. Corporate Defendants were required to submit two detailed plans to the CFPB: a compliance plan describing how they would address each Conduct Provision and a redress plan for how to they would provide redress to affected consumers. (*See* App'x A ¶¶ 41-43, 48-49.) The Consent Order requires the CFPB to review and approve how Corporate Defendants would fulfill two major requirements of the Consent Order—the Conduct Provisions and redress—by providing a determination of non-objection before, at which point Corporate Defendants would implement each plan. (*Id.* ¶¶ 43, 48.) Surely this review would have tipped off the CFPB to any violations.

The Consent Order also provides the CFPB enhanced access to Corporate Defendants to monitor their compliance with the Consent Order beyond the initial implementation of the compliance plan and redress plan. Corporate Defendants were required to submit written

---

[11] https://www.consumerfinance.gov/consumer-tools/credit-reports-and-scores/consumer-reporting-companies/companies-list/#:~:text=There%20are%20three%20big%20nationwide,and%20other%20inquiries%20and%20information.

[12] *See* CFPB Supervision and Enforcement Manual, at 10, available at https://files.consumerfinance.gov/f/documents/cfpb_supervision-and-examination-manual.pdf.

[13] Indeed, the CFPB's very purpose is to ensure that markets for financial products and services are fair, transparent, and competitive. One of its principal objectives is to protect consumers from unfair, deceptive, or abusive acts and practices. *See* 12 U.S.C. § 5511. Like the SEC, the CFPB's "very purpose is to root it out, and it has many legal tools at hand to aid in that pursuit." *See* *Gabelli v. SEC*, 568 U.S. 442, 451 (2013).

compliance progress reports that describe how they have complied with the Order. (*See* id. ¶ 64.) The Consent Order requires Corporate Defendants to create and retain all records necessary to demonstrate compliance with the Order. (*See* id. ¶ 68.) The CFPB has easy access to these records beyond the CFPB's general supervisory tools because the Consent Order requires Corporate Defendants to provide compliance reports, other requested information, sworn testimony, and documents to the CFPB within 30 days of the receipt of a written request from the Bureau and permit the CFPB to interview any employee or other affiliated person. (*See* id. ¶¶ 71-72.) Why? So the CFPB can monitor Corporate Defendants' compliance with the Consent Order. If there were any doubt, this Court need look no further than the title of Section XVI of the Consent Order: "Compliance Monitoring." (*Id.* at 27.)

In sum, the CFPB was required to monitor Corporate Defendants' compliance with the Consent Order and had a wide array of tools at its disposal to do so. Any reasonable investigation would have revealed Corporate Defendants' alleged misconduct. The CFPB's failure to do so until years after the Consent Order's Effective Date is manifestly unreasonable.

### C. The CFPB Had Knowledge of All Facts Alleged Against Danaher Shortly After the Effective Date

With respect to Danaher, the CFPB alleges a small number of facts that it contends amount to a claim. The CFPB had actual knowledge of all facts alleged in 2017.

The two key allegations against Danaher are his title and his knowledge of the Consent Order. (*See* Compl. ¶¶ 166-67, 170, 184-85.) The Consent Order required Corporate Defendants to submit "Order Acknowledgements" with its first compliance progress report, due four months after the Effective Date. (App'x A ¶ 64(b).) An Order Acknowledgement is a signed and dated statement acknowledging receipt of the Consent Order. (*See* id. ¶ 67.) As an executive officer of TUI, Danaher completed an Order Acknowledgement, and the Company sent a record of this

acknowledgement to the CFPB. (*See id.* ¶ 65; *see also* Ex. A to Knox Decl. at 7.) Accordingly, the CFPB had actual knowledge of Danaher's position as an executive and his knowledge of the Consent Order as of May 3, 2017.[14]

The remainder of the CFPB's claim against Danaher consists of conclusory allegations about his failure to ensure Corporate Defendants' compliance with the Consent Order. As explained above, the CFPB alleges that Corporate Defendants engaged in conduct beginning on the Effective Date or shortly thereafter that allegedly violated the Consent Order. Assuming, as the CFPB contends, that Corporate Defendants were required to comply with the Conduct Provisions as of the Effective Date, Danaher's failure to ensure compliance likewise began on day one. Indeed, the CFPB alleges as much: "From at least the Effective Date through the present, Danaher has had actual knowledge of, or recklessly disregarded, TUI's violations of the Order." (Compl. ¶ 169.)

Similarly, Danaher's alleged "plan" to delay compliance and his checkbox instruction occurred "shortly after the Effective Date." (Compl. ¶ 171.) Based on the CFPB's allegations about Corporate Defendants' use of a negative option in affiliate marketing since March 2017 (*see id.* ¶ 99), Danaher's plan and instruction must have occurred, at the latest, in March 2017. As to both Danaher's and Corporate Defendants' actions, as explained above, the CFPB should have started an investigation, at the latest, in 2017, and would have discovered all facts alleged long before April 2019. Against the backdrop of the CFPB's oversight authority, enhanced access to

---

[14] Danaher's position has also been disclosed in TransUnion's public filings since 2014. *See, e.g.*, TransUnion February 27, 2014 Form 10-K, available at https://www.sec.gov/Archives/edgar/data/0001552033/000155203314000018/transunion-20131231x10k.htm ("John T. Danaher joined the Company in November 2002. Since August 2013, he has served as the Executive Vice President of the Interactive segment. He has served as President of TransUnion Interactive, the consumer subsidiary of TransUnion, since 2004 and manages the day-to-day operations as well as strategic direction of the business.")

TransUnion, and role in enforcing and monitoring compliance with the Consent Order, no reasonable person could find otherwise.

The facts alleged in the Complaint and the Consent Order itself render the CFPB's claim against Danaher "indisputably time-barred." *See* Burns, 762 F. App'x at 339. Thus, this Court should dismiss the Count II on that ground.

**CONCLUSION**

For these reasons, Danaher respectfully submits that the Court should dismiss the claims against him with prejudice.

Dated: July 8, 2022

By: /s/ *Jeffery H. Knox*

Jeffery H. Knox (*pro hac vice pending*)
Abram J. Ellis (*pro hac vice pending*)
Nicole A. Palmadesso (*pro hac vice pending*)
SIMPSON THACHER & BARTLETT LLP
900 G Street, NW
Washington, DC 20001
jeffery.knox@stblaw.com
aellis@stblaw.com
nicole.palmadesso@stblaw.com
Telephone: (202) 636-5500
Facsimile: (202) 636-5502

Ronald S. Safer
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison Street, Suite 2900
Chicago, IL 60602
rsafer@rshc-law.com
Telephone: (312) 471-8736
Facsimile: (312) 471-8701

*Counsel for Defendant John T. Danaher*