IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Consumer Financial Protection Bureau,<br><br>Plaintiff,<br><br>v.<br><br>TransUnion, TransUnion, LLC, TransUnion Interactive, Inc., and John T. Danaher,<br><br>Defendants. | Case No. 1:22-cv-1880<br><br>Honorable Judge Elaine E. Bucklo |

**PLAINTIFF'S BRIEF IN OPPOSITION TO THE MOTION OF DEFENDANTS TRANSUNION, TRANSUNION, LLC, AND TRANSUNION INTERACTIVE, INC. TO DISMISS THE COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iii

PRELIMINARY STATEMENT .......... 1

THE BUREAU'S COMPLAINT .......... 3

1. The Order .......... 3
2. The Bureau's Claims .......... 5

STANDARD OF REVIEW .......... 6

ARGUMENT .......... 7

I. TU's Compliance with the Order is not Subject to a Condition Precedent .......... 7

A. The Court Should Apply Relevant Principles of Contract Interpretation to the Order 7

B. The Order is Unambiguous and was Binding on TU on the Date It was Issued .......... 9

1. The Order was Effective on January 3, 2017 .......... 10
2. The Order's Conduct Provisions were Detailed and Self-Executing .......... 11
3. TU's Invention of a Condition Precedent in Section VI is Not Supported By the Clear Language of the Order .......... 12

C. TU Knew, Both During Negotiations of the Order and After the Order was Issued, that TU's Compliance with the Order was Not Tied to Non-Objection .......... 15

II. The Bureau's Claims are Timely .......... 16

A. The Complaint Alleges that TU was Violating the Law Through the Date of the Complaint, Therefore Clearly Within the Limitations Period .......... 17

B. There is No Basis to Import a Constructive Discovery Rule into Section 5564(g)(1), but TU's Argument Would Fail in Any Event .......... 19

III. Res Judicata Does Not Bar the Bureau's Claims .......... 21

IV. TU's Constitutional Arguments are Meritless .......... 26

A. The Bureau's Method of Funding is Constitutional and Provides No Reason to Dismiss this Action .......... 26

B. TU's Challenge Based on the Removal Provision is Not Only Waived but is Also Meritless .......... 29

CONCLUSION .......... 29

TABLE OF AUTHORITIES

**Cases**

*AAR Intern., Inc. v. Vacances Heliades S.A.*,
202 F. Supp. 2d 788 (N.D. Ill. 2002) ........ 8

*Alliance to End Repression v. City of Chicago*,
742 F.2d 1007 (7th Cir. 1984) ........ 8

*Allison W. v. Oak Park and River Forest High School Dist.*,
193 F. Supp. 3d 894 (N.D. Ill. 2016) ........ 22

*Anheuser-Busch, Inc. v. Local Union No. 744*,
280 F.3d 1133 (7th Cir. 2002) ........ 9

*Badaracco v. C.I.R.*,
464 U.S. 386 (1984) ........ 17

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544, 555 (2007) ........ 6

*Boulevard Bank Nat'l Assoc. v. Philips Medical Sys. Intern. B.V.*,
15 F.3d 1419 (7th Cir. 1994) ........ 8

*Boulevard Bank Nat'l Assoc. v. Philips Medical Sys. Intern. B.V.,*
811 F. Supp. 357 (N.D.Ill.1993) ........ 8

*Brown v. Chrysler Fin. Servs.*,
218 Fed. App'x 536 (7th Cir. 2007) ........ 22

*Brownback v. King*,
141 S. Ct. 740 (2021) ........ 22

*Calcutt v. FDIC*,
37 F.4th 293 (6th Cir. 2022) ........ 29

*Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*,
559 F.3d 671 (7th Cir. 2009) ........ 16

*CFPB v. All American Check Cashing, Inc.*,
33 F.4th 218 (5th Cir. 2022) ........ 27, 28

*CFPB v. Chou Team Realty LLC*,
No. 20-cv-0043(SB)(ADS), 2021 WL 4077110 (C.D. Cal. Aug. 10, 2021) ........ 20

*CFPB v. Fair Collections & Outsourcing, Inc.*,
No. 8:19-cv-02817, 2020 WL 7043847 (D. Md. Nov. 30, 2020) ............ 27

*CFPB v. Howard*,
No. 17-cv-161(JLS), 2017 WL 10378953 (C.D. Cal. May 30, 2017) ............ 18

*CFPB v. Howard*,
No. 17-cv-161(JLS), 2018 WL 4847015 (C.D. Cal. May 3, 2018) ............ 18, 19

*CFPB v. Nat'l Collegiate Master Student Loan Trust*,
No. 17-cv-1323(SB), 2021 WL 5936404 (D. Del. Dec. 13, 2021) ............ 21

*CFPB v. Nationwide Biweekly Admin., Inc.*,
No. 15-cv-2106, 2017 WL 3948396 (N.D. Cal. Sept. 8, 2017) ............ 17

*CFPB v. NDG Fin. Corp.*,
No. 15-cv-5211, 2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016) ............ 17, 19

*CFPB v. Ocwen Fin. Corp.,*
30 F.4th 1079 (11th Cir. 2022) ............ 24, 25

*CFPB v. Ocwen Fin. Corp.*,
No. 13-cv-02025 (D.D.C. Feb. 26, 2014) ............ 25

*Cheli v. Taylorville Comm. Sch. District*,
986 F.3d 1035 (7th Cir. 2021) ............ 8, 13

*Cincinnati Soap Co. v. United States*,
301 U.S. 308 (1937) ............ 27

*Collins v. Yellen,*
141 S. Ct. 1761 (2021) ............ 28, 29

*Curia v. Nelson*,
587 F.3d 824 (7th Cir. 2009) ............ 8

*E.E.O.C. v. Concentra Health Servs., Inc.,*
496 F.3d 773 (7th Cir. 2007) ............ 6

*Firefighters Local Union No. 1784 v. Stotts,*
467 U.S. 561 (1984) ............ 8

*Friends of Milwaukee's Rivers v. Lake Mich. Fed.*,
382 F.3d 743 (7th Cir. 2004) ............ 24

*FTC v. A1 Janitorial Supply Corp.*,
No. 17 C 7790, 2018 WL 7508265 (N.D. Ill. Sept. 21, 2018) .................................................. 7, 9

*Golden v. Barenborg*,
53 F.3d 866 (7th Cir. 1995)................................................................................................ 22

*Grun v. Pneumo Abex Corp.*,
163 F.3d 411 (7th Cir. 1998)................................................................................................. 9

*H.A.L. NY Holdings, LLC v. Guinan*,
958 F.3d 627 (7th Cir. 2020)................................................................................................ 22

*Highway J Citizens Grp.*, *v. U.S. Dep't of Transp.*,
456 F.3d 734 (7th Cir. 2006).......................................................................................... 21, 22

*Jagla v. BMO Fin. Grp.*,
248 F. App'x 743 (7th Cir. 2007) .............................................................................. 22, 23, 24

*Lawlor v. Nat'l Screen Serv. Corp.*,
349 U.S. 322 (1955) ............................................................................................................. 22

*Lawrence v. Bd. of Elec. Comm'rs of City of Chicago*,
524 F. Supp. 2d 1011 (N.D. Ill. 2007) ................................................................................ 22

*Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*,
140 S.Ct. 1589 (2020) ..................................................................................................... 22, 23

*Massenburg v. Winnebago Cnty.*,
No. 19-cv-50039, 2020 WL 1042153 (N.D. Ill. Mar. 4, 2020)............................................. 22

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
514 U.S. 52 (1995) ................................................................................................................. 9

*Me. Cmty. Health Options v. United States*,
140 S. Ct. 1308 (2020) ......................................................................................................... 28

*Merck & Co. v. Reynolds*,
559 U.S. 633 (2010) ............................................................................................................. 17

*Navarro v. F.D.I.C.*,
371 F.3d 979 (7th Cir. 2004)................................................................................................... 8

*Okoro v. Bohman*,
164 F.3d 1059 (7th Cir. 1999).............................................................................................. 22

*OPM v. Richmond*,
496 U.S. 414 (1990) ........................................................................................................ 27

*Perkins v. Board of Trustees of the Univ. of Illinois*,
116 F.3d 235 (7th Cir. 1997)........................................................................................... 24

*PHH Corp. v. CFPB*,
881 F.3d 75 (D.C. Cir. 2018) .......................................................................................... 27

*Rekhi v. Wildwood Indus., Inc.*,
61 F.3d 1313 (7th Cir. 1995)........................................................................................... 21

*Saccameno v. Ocwen Loan Svg., LLC*,
372 F. Supp. 3d 609 (N.D. Ill. 2019) ............................................................................. 25

*SEC v. Fisher*,
No. 07-cv-4483, 2008 WL 2062699 (N.D. Ill. May 13, 2008)................................................ 19

*Seila Law LLC v. CFPB*,
140 S. Ct. 2183 (2020) ............................................................................................. 27, 29

*Shachter v. City of Chicago*,
No. 18-cv-5504, 2019 WL 4750083 (N.D. Ill. Sept. 30, 2019) ............................................ 30

*Sidney Hillman Health Ctr. v. Abbot Labs*, *Inc.*,
782 F.3d 922 (7th Cir. 2015)........................................................................................... 16

*Spearman v. Elizondo*,
230 F. Supp. 3d 888 (N.D. Ill. 2016) ............................................................................... 6

*U.S. ex rel. Air Control Techs, Inc. v. Pre Con Indus., Inc.*,
720 F.3d 1174 (9th Cir. 2013)......................................................................................... 18

*United States v. Armour & Co.*,
402 U.S. 673 (1971) .......................................................................................................... 8

*United States v. Kivanc*,
714 F.3d 782 (4th Cir. 2013)........................................................................................... 18

*Venture Assoc. Corp. v. Zenith Data Sys. Corp.*,
987 F.2d 429 (7th Cir. 1993)........................................................................................... 20

*White v. Roughton*,
689 F.2d 118 (7th Cir. 1982)............................................................................................. 9

**Statutes**

12 U.S.C. § 16 ........ 27
12 U.S.C. § 243 ........ 27
12 U.S.C. § 1755 ........ 27
12 U.S.C. § 1815 ........ 28
12 U.S.C. § 1818 ........ 27
12 U.S.C. § 1820 ........ 27
12 U.S.C. § 5491 ........ 29
12 U.S.C. § 5497 ........ 27
12 U.S.C. § 5561 ........ 17
12 U.S.C. § 5562 ........ 20
12 U.S.C. § 5563 ........ 4, 10
12 U.S.C. § 5564 ........ 17, 18, 19, 20
12 U.S.C. § 5565 ........ 4, 10
U.S. CONST. art. I, § 8, cl. 12 ........ 28
U.S. CONST. art. I, § 9, cl. 7 ........ 26

**Rules**

Fed. R. Civ. P. 12(b)(6) ........ 6
Fed. R. Civ. P. 12(d) ........ 15
Fed. R. Civ. P. 15(a)(2) ........ 30

**Regulations**

12 C.F.R. ch. I ........ 28
12 C.F.R. ch. II ........ 28
12 C.F.R. ch. III ........ 28

**Other Authorities**

*Black's Law Dictionary* (11th ed. 2019) ........ 10
Restatement 2d of Contracts § 203(a) (1981) ........ 9

Plaintiff Consumer Financial Protection Bureau (CFPB or Bureau) respectfully submits this opposition to the motion of TransUnion, TransUnion, LLC (TULLC) and TransUnion Interactive, Inc. (TUI) (collectively TU), to dismiss the Complaint (Motion).

**PRELIMINARY STATEMENT**

This is the second time in less than six years that the Bureau has charged TU with deceptively marketing its products to consumers—an action that proved necessary because TU refused to change its behavior after the Bureau's first enforcement action. In 2017, following an investigation and extensive negotiations between the parties, the Bureau issued a Consent Order (Order) that prohibited TU from continuing to engage in deceptive marketing of credit scores, credit reports, and credit monitoring to consumers. The Order also assessed penalties against TU, required TU to pay redress to harmed consumers, and required TU to implement specific changes to its marketing practices.

TU decided to violate the Order almost immediately after it was issued, including by continuing to engage in the deceptive conduct specifically prohibited by the Order. Not only that, but TU decided to engage in other deceptive and illegal marketing and sales conduct. As a result, TU has enrolled millions of consumers into products by using marketing materials that violated the Order, the Consumer Financial Protection Act (CFPA), and other Federal consumer financial laws. Since the Order was issued, thousands of consumers have complained that they were deceived by TU's marketing, just as they did prior to the Order.

TU tries to blame the Bureau for its violations. But surely, TU could not have reasonably believed after the issuance of an Order that expressly prohibited TU from engaging in deceptive marketing that it could continue engaging in the *very same practices* that the Bureau found deceptive until the Bureau took some further step. The Order *was* the step. TU also attempts to

litigate affirmative defenses and cites extraneous documents and factual assertions that are not properly considered on a motion to dismiss. TU raises these issues to make this case seem far more complicated than it is and to obscure its decision to choose profit over compliance, at the expense of consumers.

In fact, the issues are straightforward. As alleged in the Complaint, TU has violated the law and the Order for years. The Court should reject TU's arguments for the following reasons:

*First*, the Order was effective and binding on TU as of January 3, 2017 (Effective Date). TU tries to explain away its noncompliance by arguing that the Order was too general for it to implement and that the Order was subject to a condition precedent: the Bureau's non-objection to TU's Compliance Plan (Compliance Plan). But the Order is clear and unambiguous, and TU's arguments regarding a condition precedent misapply settled principles of contract interpretation. And regardless, TU understood the Order quite well; for example, it actually began partially implementing the Order almost immediately, but then soon stopped when it noticed that compliance with the Order was decreasing the company's revenue.

*Second*, the Bureau's action is timely. Indeed, the Complaint's allegations describe conduct that continued through the date of the Complaint (and may be continuing today) and is therefore clearly within the limitations period. TU suggests the Court should nonetheless restrict the Bureau's ability to bring *any* claims against TU because the Bureau knew about TU's deceptive marketing practices when it issued the Order. This argument relies on extrinsic evidence, and on that basis alone should be rejected. But the argument is also absurd. The Bureau could not have "discovered" in 2017 that TU would persist in violating the law through 2022. TU's nonsensical argument would restrict the Bureau's ability to pursue recidivists, like TU, who ignore the Bureau's orders and the law.

*Third*, the Bureau's claims are not barred by *res judicata*. Consistent with TU's arguments regarding the statute of limitations, TU cynically seeks to use the Order that it refused to respect as a shield to bar the Bureau from ever bringing similar claims against TU again, even if TU continues violating the law indefinitely. TU appears to suggest that if a company is caught violating the law once and settles, it is then free to forever violate the law thereafter. But contrary to TU's argument that the Order is a permanent get-out-of-jail-free card, the Order does not in any way restrict the Bureau's authority to pursue TU's post-January 3, 2017 violations of Federal consumer financial law and the Order.

*Finally*, TU's constitutional arguments lack merit. The Bureau's statutory method of funding is fully consistent with the Appropriations Clause, as every court to decide the issue has held. And TU's argument based on an inoperative removal restriction in the Bureau's statute is both expressly waived and irrelevant to this case.

## THE BUREAU'S COMPLAINT

The Bureau alleges that TU violated the Order, the CFPA, the Electronic Fund Transfer Act (EFTA), the EFTA's implementing regulation, Regulation E, and Regulation V, which implements the Fair Credit Reporting Act, by engaging in deceptive marketing to consumers and failing to obtain consumers' authorization before making recurring withdrawals from their bank accounts.

### 1. The Order

In 2017, following an investigation, the Bureau found that TU had engaged in deceptive acts and practices between 2011 and 2017 in violation of the CFPA in connection with TU's marketing and sale of credit scores, credit reports, and credit-monitoring to consumers. Compl. ¶ 1. The Bureau and TU mutually agreed to resolve those findings without litigation through the Order, which required TU to cease engaging in deceptive conduct, adopt specific marketing

practices, and pay restitution of $13.9 million to 700,000 consumers and a civil penalty of $3 million. *Id*.; Order Sections V, VIII, IX.[1] TU stipulated to the entry of the Order and specifically acknowledged that "the Order will become a final order, *effective upon issuance*, and will be fully enforceable by the Bureau under 12 U.S.C. §§ 5563(d)(1) and 5565. Stipulation ¶ 3 (emphasis added).[2] The Order was issued, and therefore became effective, on January 3, 2017. *See id*.; Order ¶ 3(h).

In the Order, the Bureau found TU had been engaging in deceptive marketing in two ways. First, TU falsely represented to consumers that the credit scores TU marketed and sold to consumers were the same scores lenders typically use to determine creditworthiness when, in reality, the scores TU sold to consumers were not likely to be used to determine creditworthiness. Order ¶¶ 11-31; Compl. ¶ 23. Second, TU falsely represented to consumers that scores and reports were "free" or "$1" when, in reality, a consumer who signed up was automatically enrolled an indefinite paid monthly subscription for credit monitoring. Order ¶¶ 32-39; Compl. ¶ 23. The Bureau found that these practices violated the CFPA's prohibition on deceptive acts and practices. Order ¶¶ 11-39.

The Order expressly prohibits TU, its officers and its agents from continuing to violate the CFPA (including the CFPA's prohibition on deceptive acts and practices). Order ¶ 40 (introduction). And the Order makes clear that "[n]othing in this [Order] or the accompanying Stipulation may be construed as allowing [TU], [its] Boards, officers, or employees to violate any law, rule, or regulation." *Id*. ¶ 85. The Order also sets forth specific affirmative actions in Section V, Paragraph 40 (Conduct Provisions) that TU is required to take in connection with its

[1] The Order is attached to the Complaint as Appendix A.

[2] The Stipulation is attached to the Complaint as Appendix B.

marketing practices. *Id.* ¶ 40. The purpose of Paragraph 40 was to prescribe specific ways in which TU must engage in marketing to stop its deceptive conduct. Section VI of the Order separately required TU to submit a Compliance Plan reporting how it was complying with the Order. *Id.* ¶ 41. The Bureau would then have the discretion to non-object to the plan or direct TU to revise it, *id.* ¶ 42, after which TU would also be required to comply with the measures set forth in the Compliance Plan, *id.* ¶ 43. The Order also contains requirements relating to distribution and acknowledgement of the Order, *id.* ¶¶ 65-67, recordkeeping, *id.* ¶ 68, and compliance monitoring, *id.* ¶¶ 41-43, 71-73.

The Bureau and TU agreed to extend the term of the Order twice, through April 22, 2022. Because the Bureau filed this action before the Order expired, TU remains bound by the Order today. *See id.* ¶ 79.

2. The Bureau's Claims

Count I of the Complaint alleges that TU violated the Order, a Federal consumer financial law, since the day it went into effect. Compl. ¶¶ 2, 172-79. Specifically, TU violated the Order by failing to implement, or fully implement, the Order's core requirements, including: (i) ensuring that consumers were not misled about the nature and terms of TU's credit-monitoring product; (ii) adding a checkbox to TU's trial offer subscription products to ensure that consumers consented to enrolling in such products; and (iii) providing a way for consumers to immediately and easily cancel their subscriptions and obtain refunds instead of facing roadblocks. *Id.* Not only did TU disregard the Order and continue engaging in the same deceptive acts that necessitated it, but TU also engaged in numerous other misleading tactics to cause consumers to enroll in their subscription products and prevent them from canceling. *Id.* ¶ 3. Count II alleges that Defendant Danaher, the former TUI President, also violated the Order. Compl. ¶¶ 180-189. Count III alleges that TU's violations were deceptive acts and practices in

violation of the CFPA. Compl. ¶¶ 190-216. Counts IV and V allege that Defendants TransUnion and TULLC substantially assisted the violations of Defendant TUI. Compl. ¶¶ 217-35.

Counts VI and VII allege that TU engaged in additional violations of law. Specifically, TU violated the EFTA and Regulation E by failing to properly obtain consumers' authorization to make recurring withdrawals from their bank accounts. Compl. ¶¶ 4, 236-45. In addition, TU placed misleading advertisements on annualcreditreport.com, the website where consumers obtain their federally-mandated free credit reports, and diverted consumers seeking their free reports into indefinite paid subscriptions for credit monitoring. Compl. ¶¶ 4, 246-50. Finally, Count VIII alleges that TU's violations of the foregoing laws were also violations of the CFPA. Compl. ¶¶ 251-56.

## STANDARD OF REVIEW

TU brings its Motion under Fed. R. Civ. P. 12(b)(6). "To survive a Rule 12(b)(6) motion, a complaint need only surmount what the Seventh Circuit has described as 'two easy-to-clear hurdles.'" *Spearman v. Elizondo*, 230 F. Supp. 3d 888, 892 (N.D. Ill. 2016) (Bucklo, J.). Each claim must (1) be sufficiently detailed to "give the defendant 'fair notice of what the ... claim is and the grounds upon which it rests,'" and (2) include allegations that "plausibly suggest the plaintiff has a right to relief" beyond a "speculative level." *E.E.O.C. v. Concentra Health Servs., Inc.,* 496 F.3d 773, 776 (7th Cir. 2007) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 596 n. 14 (2007)). The Complaint easily clears those hurdles. TU doesn't contest the first, and to the extent it disagrees about the second, it is wrong. As discussed below, the Complaint plausibly asserts claims that entitle the Bureau to the relief it seeks, and thus the Motion must be denied.

# ARGUMENT

## I. TU's Compliance with the Order is not Subject to a Condition Precedent

To excuse its years-long noncompliance with the Order, TU is now attempting to rewrite it: TU argues that the Bureau's discretionary option to non-object or direct revisions to TU's Compliance Plan—found in one paragraph of the Order—furnishes a condition precedent to TU's compliance with all of the Order. Memorandum in support of Motion, ECF No. 29, (Br.) 11-16.[3] But the Order unambiguously states that it was effective on January 3, 2017 and TU stipulated that it was effective on that date. The reading that TU now asks the Court to adopt is not supported by the text or structure of the Order and conflicts with every single principle of contract interpretation cited in TU's brief. Moreover, TU omits provisions of the Order that directly conflict with its theory. A proper analysis of the Order shows that it required TU to comply with the Conduct Provisions regardless of when TU submitted a Compliance Plan and whether the Bureau responded to the Compliance Plan.

### A. The Court Should Apply Relevant Principles of Contract Interpretation to the Order

In proposing its construction of the Order, TU ignores or misapplies relevant principles of contract interpretation, which apply regardless of what law governs the Order. *See FTC v. A1 Janitorial Supply Corp.*, No. 17 C 7790, 2018 WL 7508265, at *2, n.2 (N.D. Ill. Sept. 21, 2018) (declining to decide whether federal common law or state law governed the decree because the rules material to interpreting it are the same under each).

[3] As TU concedes, TU's arguments regarding an alleged condition precedent in the Order, Br. 11-16, do not impact the majority of the Bureau's claims, which are based in whole or in part on TU's violations of other laws. Accordingly, even if the Court were to accept any of TU's arguments regarding the existence of a condition precedent (though it should not), that would only affect Count I.

First, "conditions precedent are generally disfavored," *Navarro v. F.D.I.C.*, 371 F.3d 979, 981 (7th Cir. 2004), a principle that TU ignores. "[A] condition precedent ... will not be found unless the intent to create such a condition is apparent from the face of the agreement," and the intent to create a condition precedent is a "question of law where the language in the instrument is unambiguous." *AAR Intern., Inc. v. Vacances Heliades S.A.*, 202 F. Supp. 2d 788, 800 (N.D.Ill. 2002) (Bucklo, J.) (citations omitted); *see Boulevard Bank Nat'l Assoc. v. Philips Medical Sys. Intern. B.V.,* 811 F. Supp. 357, 365 (N.D. Ill.1993), *aff'd,* 15 F.3d 1419 (7th Cir. 1994) ("contracts will not be construed as having conditions precedent unless required to do so by plain, unambiguous language").

Second, "the 'scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.'" *Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 574 (1984), citing *United States v. Armour & Co*., 402 U.S. 673, 681-82 (1971). "In searching for an answer we are of course not confined to the language of [one paragraph]. The relevant 'four corners' are those of the decree, not of one provision of the decree. Like any document, a consent decree must be read as a whole." *Alliance to End Repression v. City of Chicago*, 742 F.2d 1007, 1011 (7th Cir. 1984) (citations omitted). Further, as the Seventh Circuit has explained:

> In construing contracts, to determine their intent, it is long established that a construction should be adopted, if possible, which ascribes meaning to every clause, phrase and word used; which requires nothing to be rejected as meaningless, or surplusage; which avoids the necessity of supplying any word or phrase that is not expressed; and which harmonizes all the various parts so that no provision is deemed conflicting with, or repugnant to, or neutralizing of any other.

*Cheli v. Taylorville Comm. Sch. District*, 986 F.3d 1035, 1041-42 (7th Cir. 2021), citing *Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir. 2009) (applying Illinois law); *see Mastrobuono v. Shearson*

*Lehman Hutton, Inc.,* 514 U.S. 52, 63-64 (1995); *A1 Janitorial Supply*, 2018 WL 7508265, at *2; Restatement 2d of Contracts § 203(a) (1981). Thus, the existence or nonexistence of a condition precedent to the Effective Date must be determined by considering the Order as a whole, not, as TU does, by focusing solely on the section relating to the Compliance Plan.

Third, extrinsic evidence cannot be used to interpret a facially unambiguous consent decree that contains an integration clause, like the Order. *See* Order ¶ 83. TU's attempt to do just that with the Compliance Plan (and its Revised Compliance Plan) flouts that principle, which "supports the law's general policy of upholding the integrity of written contracts and favoring written terms over extrinsic evidence" and disfavors "indulg[ing] in judicial activism" in contract interpretation. *Grun v. Pneumo Abex Corp*., 163 F.3d 411, 420 (7th Cir. 1998) (rejecting lower court's reliance on *White v. Roughton*, 689 F.2d 118, 120 (7th Cir. 1982), for the proposition that "a court can properly disregard even unambiguous language when it is convinced that the parties meant something different from what they said.") (citations and quotations omitted); *see Anheuser-Busch, Inc. v. Local Union No. 744*, 280 F.3d 1133, 1141 (7th Cir. 2002) ("Carefully written, well-reasoned, and thoroughly negotiated contracts are presumptively complete, and the added presence of a merger clause is further strong evidence that the parties intended the writing to be the complete and exclusive agreement between them.") (quotation omitted).

**B. The Order is Unambiguous and was Binding on TU on the Date It was Issued**

Applying the foregoing precepts, when the Order is construed as a whole, it imposed an obligation on TU to comply with the Conduct Provisions immediately upon the Effective Date. TU's compliance was *not* conditioned upon anything, including a Bureau response to TU's Compliance Plan.

1. The Order was Effective on January 3, 2017

TU's argument that it was not required to respect the Order absent further action from the Bureau ignores the Order's express language mandating that its Effective Date is January 3, 2017, Order ¶ 3(h). "Effective Date" means the "date on which a statute, contract, insurance policy, or other such instrument becomes enforceable or otherwise takes effect." *Effective Date*, *Black's Law Dictionary* (11th ed. 2019). In addition, in its stipulation to the entry of the Order, TU stipulated that "the Order will become a final order, *effective upon issuance*, and will be fully enforceable by the Bureau under 12 U.S.C. §§ 5563(d)(1) and 5565." Stipulation ¶ 3 (emphasis added); Order ¶ 3(h) (defining "Effective Date" as "the date on which the [Order] is issued"). In addition, the Conduct Provisions section of the Order, Section V, begins by noting that "It is ordered" that TU abide by the provisions that follow, without any delayed temporal reference. Order 12. Nowhere does the Order state that the Effective Date for the Conduct Provisions is stayed or held in abeyance for purposes of preparing a Compliance Plan or receiving non-objection to it.

If the parties had intended for TU to delay its compliance with the Conduct Provisions until a date after the Effective Date, the Order would have stated that explicitly. Indeed, a handful of Order provisions did just that. The most pertinent example is in Paragraph 40(b)(ii) of the Conduct Provisions, the timing of which, unlike all the other Conduct Provisions, is tied to a "reasonable time *after* the Effective Date as set forth in the Compliance Plan[.]" *Id.* ¶ 40(b)(ii) (emphasis added).[4] In other words, TU did not have to comply with 40(b)(ii) immediately, but was required to do so within a reasonable time after the Effective Date, and then identify the date

[4] *See also, e.g., id.* ¶ 53 (requiring the payment of the penalty "within 10 days of the Effective Date."); *id.* ¶ 47-48 (setting deadlines related to redress as within "10 days of the Effective Date" and "90 days of the Effective Date," respectively).

that it began complying when it submitted its Compliance Plan. To read into all of the Conduct Provisions a delayed effective date would render the more specific effective date in Paragraph 40(b)(ii) surplusage, when its inclusion was clearly intentional and understood by the parties to be an exception to the Effective Date governing the other Conduct Provisions.

2. The Order's Conduct Provisions were Detailed and Self-Executing

TU contends that it needed further input from the Bureau before implementing the Conduct Provisions—which TU negotiated and agreed to—because the provisions were "quite general in nature." Br. 14. But TU's claim that the Conduct Provisions are too general is inaccurate. TU proffers severely cropped quotes from the Conduct Provisions to make them appear vague, Br. 6; a review of Section V shows the specificity that TU omits.

For example, the Order explicitly spells out how TU must comply with the requirement to obtain "express informed consent" from consumers before enrolling consumers in trial offers of Credit-Related Products (as defined in the Order):

> 1. For all Internet offers: a checkbox on the final order page that consumers must affirmatively check to select the Negative Option [trial] feature (*i.e.*, it cannot be pre-checked), and which clearly and conspicuously [a defined, explained term in the Order, *see* Order ¶ 3(c)] states that the consumer agrees to be billed for the product before the trial period expires;
> 2. Immediately adjacent to the affirmative selection checkbox, [TU] must clearly and conspicuously disclose: (i) if applicable, the amount the consumer will be charged on a recurring (*e.g.*, monthly) basis if the product or service is not canceled before the expiration of the trial period; and (ii) the date when the trial period expires and the amount the consumer will be billed; and
> 3. The disclosure must not contain any information related to the benefits of the product.

Order ¶ 40(b)(i). In addition, the required disclosures regarding the nature of the credit score offered contain specific instructions, including the font size and actual wording of the label accompanying the disclosure. *Id.* ¶ 40(c). Further, the Conduct Provisions set forth specific types

of information that TU is prohibited from misrepresenting, expressly or impliedly, such as "the purpose for which a consumer's credit card or payment information will be used" and "the deadline (by date or frequency) by which the consumer must act in order to stop any charges." *Id.* ¶ 40(a)(ii).

Additionally, TU's argument that it was "obviously impossible" to implement the Conduct Provisions without the Bureau's input, Br. 15, is belied by TU's *actual* partial implementation of certain requirements long before it submitted its Compliance Plan. For example, the Complaint alleges that TU either implemented or partially implemented the checkbox requirement set forth in Paragraph 40(b)(i) as well as the cancellation feature required by Paragraph 40(b)(ii) shortly after the Effective Date. Compl. ¶¶ 99-104, 141, 171.[5] Indeed, TU was using the checkbox for several months before Defendant Danaher determined in March 2017 that it was causing TUI to lose revenue and directed TUI to stop using it. *Id.* ¶ 171. TU was not unsure of how to implement the Conduct Provisions; it did not want to.

3. <u>TU's Invention of a Condition Precedent in Section VI is Not Supported By the Clear Language of the Order</u>

TU's argument that the Bureau was required to non-object to TU's Compliance Plan before TU was required to comply with the Order misreads Paragraphs 42 and 43 of the Order, which provide that the Bureau "will have the discretion to make a determination of non-objection to the Compliance Plan or direct [TU] to revise it," Order ¶ 42, and that TU must "implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Compliance Plan" after receiving the Bureau's non-objection, *id.* ¶ 43.

[5] As discussed above, the cancellation feature is the only Conduct Provision that permits TU to delay its compliance until after the Effective Date, permitting TU to implement it "[w]ithin a reasonable time after the Effective Date, as set forth in the Compliance Plan." Order ¶ 40(b)(ii). TU's partial implementation of this provision shortly after the Effective Date suggests that TU did not understand "as set forth in the Compliance Plan" to mean that TU could do nothing until it submitted the Plan.

TU posits that Paragraph 42 sets forth a condition precedent that the Bureau must allege that it fulfilled in order to state a claim for violating the Order. Br. 11-13. But TU's misguided interpretation of Paragraph 42—"Doing nothing in response to TU's submission of its proposed Compliance Plan was *not* an option", Br. 14 (emphasis in original)—would write a portion of that Paragraph out of the Order. The first sentence of Paragraph 42 reads: "The Assistant Deputy for Consumer Reporting will *have the discretion to* make a determination of non-objection to the Compliance Plan or direct Respondents to revise it." Order 17 (emphasis added). Ignoring the express language, TU claims that this sentence means that "The Bureau had two options. It could either: (1) provide a non-objection to TU's Compliance Plan; or (2) direct TU to make revisions and resubmit the Compliance Plan." Br. 13. But the sentence gives the Assistant Deputy discretion not to make any determination at all. Were it otherwise, the words "have the discretion to" would be surplusage and meaningless. *See supra* at 7-9.

Nor can the correct reading of Paragraph 42—that the Bureau had the discretion not to respond at all to the Compliance Plan—be deemed "conflicting with, or repugnant to, or neutralizing of any other" part of the Order. *See Cheli,* 986 F.3d at 1042. TU pleads utter ignorance of how to comply with the Order absent a Bureau non-objection or Bureau revisions to its Compliance Plan, Br. 14 ("Without the Bureau's response to the Compliance Plan, TU would be in the position of deciding for itself how to comply with the Consent Order . . ."), Br. 15 ("Without any response by the CFPB to the Compliance Plan," it was "obviously impossible" for TU to understand "precisely what acts [were] forbidden"). But as set forth above, the Order, including the Conduct Provisions, is clear on its face and required no such gloss.

TU also focuses heavily on the word "after" in Paragraph 43, Br. 13, but that Paragraph does not say that "after non-objection, TU must comply with the Conduct Provisions." Instead,

Paragraph 43 says only that after receiving notification of non-objection, "[TU] must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined *in the Compliance Plan*." Order ¶ 43 (emphasis added). Thus, the only effect of the absence of a non-objection is that TU was not obligated to adhere to the specific program set forth in the Compliance Plan. In other words, TU could comply with the Order in some other manner that comported with the requirements set forth in the Order. Paragraph 43 does not limit TU's obligations to comply with the Order or the Bureau's ability to enforce it.

TU's position would lead to an absurd result: if TU had no obligation to obey the Conduct Provisions until a Compliance Plan was non-objected to, TU could deliberately avoid compliance with the Order indefinitely by submitting and resubmitting inadequate Compliance Plans. That would delay compliance with the Conduct Provisions and would render the Order's Effective Date a nullity as to them.

TU's observation that the Bureau non-objected to the Redress Plan but not the Compliance Plan, Br. 15, does not support its reading of the Order. Unlike the Section V Conduct Provisions, Section VIII's order to TU to pay redress to consumers is not self-executing. It requires TU only "to reserve or deposit into a segregated deposit account $13,930,000 for the purpose of providing redress to Affected Consumers." Order ¶ 47. Before TU could begin paying redress to consumers from that account, Section VIII required approval by the Bureau of, among other things, "the methodology used to determine the population of Affected Consumers and the appropriate redress for each Affected Consumer, [and] the manner and form in which redress payments will be distributed." Order ¶ 49(a). Non-objection to the Redress Plan was necessary in order to get money to consumers; there is no similar provision about non-objection to the Compliance Plan relating to the Conduct Provisions.

### C. TU Knew, Both During Negotiations of the Order and After the Order was Issued, that TU's Compliance with the Order was Not Tied to Non-Objection

TU's protestation that its earnest efforts to comply with the Order were stymied by the Bureau's inaction is a red herring. TU has long known that the Bureau would not permit TU to delay its compliance until after receiving the Bureau's non-objection. Specifically, if the Court were to find the Order ambiguous (though it is not), the Bureau would seek to introduce extrinsic evidence reflecting that TU knew its compliance with the Conduct Provisions was not contingent on the Bureau's non-objection and that the Bureau warned TU multiple times that it was violating the Order.

First, during the negotiation of the draft Order, TU attempted to revise the Order to permit TU to delay compliance with it until the Bureau non-objected to the Compliance Plan. The Bureau expressly rejected TU's proposal and the final Order does not contain it. Therefore, TU knew perfectly well that the Bureau would not consider compliance with the Conduct Provisions contingent upon non-objection to the Compliance Plan. However, that analysis cannot take place at the motion to dismiss phase without converting the motion to one for summary judgment, *see* Fed. R. Civ. P. 12(d), which TU has not requested, so even if the Court were to find the Order ambiguous, the Motion must be denied.

Second, TU claims it hardly heard a word from the Bureau before the Bureau filed this lawsuit. *See*, *e.g.*, Br. 9 (contending that the Bureau "effectively went AWOL" after January 3, 2017). But less than two years into the Order's five-year term, the Bureau commenced an examination of TU's compliance with the Order. Compl. ¶ 29. Even if TU had not already been on notice of the Bureau's position that TU's compliance with the Order was not tied to the Bureau's non-objection (which TU was), the fact that the Bureau was examining *whether TU was complying with the Order* clearly put TU on notice in 2018 that the Bureau expected TU

already to be compliant. Indeed, the Complaint alleges that TU made some changes to its marketing materials during the time of the Bureau's examination in an attempt to obey two of the provisions that TU had not yet implemented. *See* Compl. ¶ 97 (TU enrollment forms on annualcreditreport.com lacked the required checkbox until January 2019, during the time period of the Bureau's examination); *id.* ¶ 65 (TU changed certain marketing materials around April 2019, during the time period of the Bureau's examination). Further, because TU was still not fully compliant after the Bureau's examination, the Bureau told TU *on three separate occasions* between 2019 and 2021, while the Bureau was investigating the extent of TU's violations, that it was violating the Order and other Federal consumer financial laws. *Id.* ¶¶ 29-31.

In short, TU's failure to comply with the Order despite repeated warnings was not because the Bureau was "AWOL" or abrogated any alleged responsibilities. Rather, the Complaint reflects that the Bureau engaged in appropriate regulatory oversight of TU over the last five years, and yet TU still refused to respect the Order.

## II. The Bureau's Claims are Timely

TU asserts that the Bureau's claims are untimely, Br. 22-26, but that is neither true nor a basis for dismissing the Complaint. "Dismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009). "As long as there is a conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense," dismissal is inappropriate. *Sidney Hillman Health Ctr. v. Abbot Labs*, *Inc.*, 782 F.3d 922, 928 (7th Cir. 2015). Thus, a motion to dismiss a claim as untimely should only be granted where "it is clear from the face of the [] complaint that it is hopelessly time-barred." *Cancer Found.,* 559 F.3d at 675. And because the Bureau is a government entity, the Court must strictly construe the applicable limitations period in favor of

the Bureau. *See Badaracco v. C.I.R.*, 464 U.S. 386, 391-92 (1984). Based on the applicable case law and the allegations of the Complaint, the Bureau's claims are timely.

### A. The Complaint Alleges that TU was Violating the Law Through the Date of the Complaint, Therefore Clearly Within the Limitations Period

The CFPA provides that "[e]xcept as otherwise permitted by law or equity, no action may be brought under this title more than 3 years after the date of discovery of the violation to which an action relates." 12 U.S.C. § 5564(g)(1).[6] According to its plain text, then, the CFPA's statute of limitations runs from actual discovery of the violation, not when the Bureau could have or should have discovered a violation. The Bureau does not "discover" a violation until it discovers facts suggesting all necessary elements of a violation. *See CFPB v. Nationwide Biweekly Admin., Inc.*, No. 15-cv-2106, 2017 WL 3948396, *10 (N.D. Cal. Sept. 8, 2017) (currently on appeal) (*citing Merck & Co. v. Reynolds*, 559 U.S. 633, 648-49 (2010)).[7] A "violation" is "*any act or omission* that, if proved, would constitute a violation of any provision of Federal consumer financial law." 12 U.S.C. § 5561(5) (emphasis added).

When the Bureau's claims are based on discrete violations of law made in repeated transactions with consumers over a period of time, as they are here, each act or omission is a new and separate violation under the CFPA, and the limitations period runs separately for each new violation. *See CFPB v. NDG Fin. Corp.*, No. 15-cv-5211, 2016 WL 7188792, *19-20 (S.D.N.Y. Dec. 2, 2016); *CFPB v. Howard*, No. 17-cv-161(JLS), 2018 WL 4847015, *3 (C.D. Cal. May 3,

[6] TU attempts to preserve certain future arguments regarding the statute of limitations; namely, that it intends to contest any Bureau argument that Section 5564(g)(1) applies to the Bureau's claims alleging violations of the EFTA, Regulation E, and Regulation V. Br. 23, n.12. TU has not properly raised the issue in the Motion, so the Bureau will not argue the point here, although the Bureau is not subject to the statutes of limitation set forth in FCRA and the EFTA, which apply to private plaintiffs.

[7] The court in *Nationwide Biweekly* suggested that a "reasonably diligent plaintiff" standard would apply to Section 5564(g)(1) instead of an actual discovery standard, but the court did not actually apply that standard to the case. *Id*.

2018) (citing *United States v. Kivanc*, 714 F.3d 782, 790 (4th Cir. 2013)). Thus, at the pleading stage, if a Complaint alleges that some violations occurred within the limitations period, then the Bureau necessarily could not have discovered them outside the limitations period, and the Complaint should not be dismissed. *See CFPB v. Howard*, No. 17-cv-161(JLS), 2017 WL 10378953, *7 (C.D. Cal. May 30, 2017) (citing *U.S. ex rel. Air Control Techs, Inc. v. Pre Con Indus., Inc.*, 720 F.3d 1174, 1178 (9th Cir. 2013)); *see also Howard*, 2018 WL 4847015 at *3.

Here, the Complaint is replete with allegations that TU continued to violate the law through the filing of the of the Complaint, within any potential limitations period. *See, e.g.*, Compl. ¶¶ 35, 37, 64, 66, 80, 99, 139, 141, 149. And in many other instances, the Complaint reflects conduct that occurred between 2019 and 2022, within any interpretation of the limitations period. Compl. ¶¶ 21, 49, 65, 74, 97 (allegations of conduct in 2019); Compl. ¶¶ 21, 49, 98, 100, 127 (allegations of conduct in 2020); Compl. ¶¶ 21, 102, 153, 164 (allegations of conduct in 2021). The Bureau could not have discovered these violations before they occurred; thus, any "discovery" of them would also fall within the limitations period. Accordingly, the Complaint is far from "hopelessly time-barred," and the Court may end its inquiry here.

TU resists this conclusion, *see* Br. 24-25, suggesting that if the Bureau discovered any instance of its violations more than three years before filing this suit, the Bureau would be time-barred from pursuing *any* instance of similar violations, including those that occurred less than three years before the Complaint was filed (and thus could not have been discovered by the Bureau more than three years ago). Nothing in Section 5564(g)(1) supports this extraordinary estoppel theory, which would effectively prevent the Bureau from enforcing the law against recidivists who repeatedly and continuously violate it. Indeed, one of the cases TU cites, *see* Br. 24, expressly rejected a similar argument, with good reason. In *Howard*, the defendants asserted

that the Bureau's filing of a different lawsuit against their business partner five years before the Bureau's lawsuit against defendants reflected that the Bureau discovered their mutual unlawful scheme more than three years before the filing of the complaint; defendants claimed the Bureau's complaint was therefore time-barred. 2018 WL 4847015 at *3. The court held that, regardless of when the Bureau discovered the scheme, the Bureau's complaint was not time-barred because it alleged that defendants continued engaging in the scheme and violating the law within three years of the filing of the Bureau's complaint. *Id.*; *see NDG Fin. Corp.*, 2016 WL 7188792, at *19-20 (violations that occurred within the limitations period are timely regardless of whether the Bureau discovered similar violations before the limitations period).

**B. There is No Basis to Import a Constructive Discovery Rule into Section 5564(g)(1), but TU's Argument Would Fail in Any Event**

TU's limitations argument also fails to the extent it relies on improperly reading a constructive discovery rule into Section 5564(g)(1). As discussed in the Bureau's response to Danaher's motion to dismiss,[8] there is no basis for the Court to read a constructive discovery provision into Section 5564(g)(1), which provides for a 3-year statute of limitations that runs from the date of actual discovery of the violation. TU incorrectly suggests that *SEC v. Fisher*, No. 07-cv-4483, 2008 WL 2062699 (N.D. Ill. May 13, 2008) weighs in favor of a constructive discovery rule here. But *Fisher* involved a court implying a constructive discovery rule in a statute that had no discovery provision at all. *Id*. at *3-6. In contrast, Section 5564(g)(1) is a discovery rule tied to actual discovery that Congress expressly included in the CFPA. If the Court reaches this issue, which it need not do at this stage, it should adopt the reasoning of a recent opinion of another court that considered—and expressly rejected—TU's argument here.

[8] Plaintiff's Brief in Opposition to Defendant Danaher's Motion to Dismiss the Complaint, filed Aug. 12, 2022, at 26-30.

*See CFPB v. Chou Team Realty LLC*, No. 20-cv-0043(SB)(ADS), 2021 WL 4077110, at *5 (C.D. Cal. Aug. 10, 2021) ("there is no 'constructive discovery' rule set forth in [Section 5564(g)(1)]—and [Defendant] has not shown that the Court is free to engraft one onto it").

The Court need not, however, resolve this issue now because TU has not shown even under a constructive-discovery standard that the Bureau's claims would be time-barred. TU argues that the Court should exclude instances of violations that the Bureau discovered or could have discovered before February 4, 2018, which it calculates as the start of any potential limitations period,[9] asserting that the Bureau should have known about TU's practices because of its prior investigation, and cites the Order and extrinsic evidence. Specifically, TU claims that the Order itself is evidence that the Bureau knew about TU's deceptive marketing practices in 2017. But it makes no sense that the Order could be deemed the Bureau's discovery of TU's post-January 3, 2017 violations when the Order expressly *prohibit*s TU from engaging in deceptive marketing as of January 3, 2017.

TU turns to extrinsic evidence, asking the Court to consider an extraneous document attached to the Motion, a 2015 Civil Investigative Demand (2015 CID),[10] without seeking conversion of the Motion to one for summary judgment under Rule 12(d). Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings only if they are referred to in the plaintiff's complaint and are central to its claim. *See Venture Assoc. Corp. v. Zenith Data Sys. Corp*., 987 F.2d 429, 431 (7th Cir. 1993). Here, the 2015 CID was not referred to in the Bureau's Complaint and is not central or even relevant to the Bureau's claims, which rest on the text of the Order and the acts, practices, and omissions of TU over a multi-year

---

[9] TU concedes that the parties entered into several tolling agreements. For purposes of the Motion only, the Bureau will not contest this date here.

[10] A Civil Investigative Demand is an investigative tool used by the Bureau to collect information from a person who may have information relevant to a possible violation. *See* 12 U.S.C. § 5562(c).

period. TU does not identify a basis to consider the 2015 CID on a motion to dismiss, and for that reason alone the Court should exercise its discretion to exclude it. *See CFPB v. Nat'l Collegiate Master Student Loan Trust*, No. 17-cv-1323(SB), 2021 WL 5936404, *3-4 (D. Del. Dec. 13, 2021) (declining to consider CID attached to defendants' motion to dismiss).

Even if the Court were to consider the 2015 CID, it does not establish the Bureau's discovery of anything pertinent to this case. The 2015 CID was issued in connection with the investigation that preceded the Order. When the Bureau resolved its prior investigation of TU with the Order, which prohibited TU from engaging in deceptive marketing, the Bureau was not on notice that TU would *continue* violating the law, including specific provisions of the Order itself. In addition, as another court recently observed in similar circumstances, the CID "would have been pointless if the agency already knew" about the conduct it was asking about. *Id.*

**III. Res Judicata Does Not Bar the Bureau's Claims**

TU next invokes the doctrine of *res judicata* to argue that the Order precludes the Bureau from bringing claims against TU for conduct that occurred after the Bureau issued the Order. TU essentially argues that the Bureau is forever estopped from bringing any other charges against TU for deceptive marketing even if TU continues violating Federal consumer financial laws, including the Order. But TU offers no basis to extend the doctrine of *res judicata* in this extraordinary manner.

*Res judicata* bars the filing of claims which were raised or could have been raised in an earlier proceeding. *Rekhi v. Wildwood Indus., Inc.*, 61 F.3d 1313, 1320 (7th Cir. 1995) (citations omitted). A party asserting *res judicata* must establish three requirements: (1) a final judgment on the merits; (2) identity of the parties; and (3) identity of the causes of action. *Highway J Citizens Grp.*, *v. U.S. Dep't of Transp.*, 456 F.3d 734, 741 (7th Cir. 2006). The third prong, "identity of the causes of action," requires a party to show that the claims arise from the "same

incident, events, transaction, circumstances, or other factual nebula" as the prior action. *Okoro v. Bohman*, 164 F.3d 1059, 1062 (7th Cir. 1999). As a result, *res judicata* generally "does not bar claims that are predicated on events that postdate the filing of the initial complaint" in the prior action. *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S.Ct. 1589, 1596 (2020); *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 327-28 (1955) (res judicata cannot extinguish claims that did not exist at time of prior action). This is because when a plaintiff files a lawsuit, the plaintiff does not have knowledge of events that happen after the lawsuit is filed, and therefore could not have pled those facts in the earlier proceeding. *See Jagla v. BMO Fin. Grp.*, 248 F. App'x 743, 745 (7th Cir. 2007).[11]

*Res judicata* is an affirmative defense. Thus, dismissal is proper only where the facts alleged in the complaint set forth all of the necessary elements of *res judicata*. *Allison W. v. Oak Park and River Forest High School Dist.*, 193 F. Supp. 3d 894, 899 (N.D. Ill. 2016); *see Massenburg v. Winnebago Cnty.*, No. 19-cv-50039, 2020 WL 1042153, at *2 (N.D. Ill. Mar. 4, 2020) ("[*R*]*es judicata* may provide grounds for dismissal for failure to state a claim where a plaintiff has pleaded [himself] out of court by establishing the facts that prove the defense.") (quotations omitted).

Here, TU has fallen far short of showing that *res judicata* bars the Complaint on its face. In an attempt to show an "identity of the causes of action," TU contends that "the Bureau's

[11] Many of the cases cited by TU in support of its *res judicata* arguments involve instances where the facts supporting both claims occurred at the same or a similar time and are therefore distinguishable from this case. *See, e.g.*, *Brown v. Chrysler Fin. Servs.*, 218 Fed. App'x 536, 539 (7th Cir. 2007) (both claims arose from the same repossession of car); *Brownback v. King*, 141 S. Ct. 740, 746-47 (2021) (both claims arose from the same violent encounter with federal agents); *Golden v. Barenborg*, 53 F.3d 866, 869 (7th Cir. 1995) (both claims arose from the same sale of home); *H.A.L. NY Holdings, LLC v. Guinan*, 958 F.3d 627, 630 (7th Cir. 2020) (both claims arose from the same liquidation of the same brokerage account); *Highway J Citizens Corp.*, 456 F.3d at 741-42 (both claims involved the same highway project); *Lawrence v. Bd. of Elec. Comm'rs of City of Chicago*, 524 F. Supp. 2d 1011, 1014-15 (N.D. Ill. 2007) (Bucklo, J.) (both claims involved the same decision to remove plaintiff from an election ballot).

Complaint does not include a single claim for a violation of federal law that was not, or could not have been, raised in the prior [Order].” Br. 19. But the Bureau could not have raised any of the allegations in the Complaint when it issued the Order on January 3, 2017 *because those violations had not occurred yet*. *See Lucky Brand*, 140 S. Ct. at 1596. It does not matter whether the Complaint’s allegations involve conduct by TU that is similar to the conduct identified in the Order; that merely reflects that TU continued engaging in the same deceptive conduct, which the Bureau could not have discovered before it occurred. *See Jagla*, 248 F. App’x at 745.

TU fares no better with the extrinsic evidence it cites: the 2015 CID. As discussed above, the Court should disregard this evidence. *See supra* at 20-21. TU contends that because the subject matter of the Complaint, the Order, and the 2015 CID, are similar in nature—deceptive marketing by TU—the Complaint is barred by *res judicata* even though all of the allegations in the Complaint occurred after the Order was issued. TU’s argument would be an unprecedented extension of *res judicata*: as long as TU continued engaging in very similar kinds of unlawful conduct as before the Order, the Bureau would be unable to enforce the law against TU in the future. Not surprisingly, none of the cases TU cites supports this extraordinary proposition; indeed, two cases TU cites expressly rejected similar arguments.

In *Jagla*, Br. 22, a plaintiff asserted that his job applications between 1996 and 2005 were denied because defendant was unlawfully discriminating against him. 248 F. App’x at 745. Defendants alleged that *res judicata* barred plaintiff’s claims due to his earlier lawsuit alleging claims related to several of the same job applications. *Id*. Because the new lawsuit alleged claims related to a 2005 job application that was denied after the date the plaintiff filed his earlier lawsuit, the court held that plaintiff’s claims about that last application were not barred because it “constitute[d] the factual basis for a new claim that he could not have raised at the time he filed”

the earlier lawsuit. *Id*. Here, the Bureau did not have the factual basis for TU's post-January 3, 2017 violations when the Order was issued.

Another case that TU cites, *Perkins v. Board of Trustees of the University of Illinois*, Br. 22, also rejected an argument similar to TU's. 116 F.3d 235, 237 (7th Cir. 1997). In *Perkins*, plaintiff alleged that his employer's refusal to allow him to take a civil service exam in 1995 was discriminatory. The district court held that his complaint was barred by *res judicata* because of a prior action in which he alleged similar misconduct by his employer in connection with a 1993 civil service examination. *Id*. The Seventh Circuit reversed, noting that "[t]he district court's approach implies that, having prevailed against a challenge to one civil service exam, the University could discriminate against Perkins with impunity for the rest of his life. That cannot be right." *Id*. at 237. The Court should reject TU's arguments for the same reason: an Order issued in 2017 does not permit TU to engage in deceptive marketing, with impunity, for the rest of time.

Further, TU finds no support in *CFPB v. Ocwen Fin. Corp.,* 30 F.4th 1079 (11th Cir. 2022).[12] In that case, the court interpreted a February 26, 2014 stipulated judgment between the Bureau, 49 State Attorneys General (the States), and Ocwen Financial Corporation (the Ocwen Stipulated Judgment), in which the parties agreed to a detailed enforcement framework for addressing certain of defendant's violations of mortgage servicing standards for three years after

[12] Another case TU cites is *Friends of Milwaukee's Rivers v. Lake Mich. Fed.*, 382 F.3d 743 (7th Cir. 2004). Br. 20-21. TU claims that the Seventh Circuit held *res judicata* applied to bar the suit but the court actually held that *res judicata* did *not* apply, and the court reversed and remanded to the district court. That case differs significantly from this one anyway. Among other things, it involved a settlement agreement concerning wastewater remediation where the agreement expressly contemplated that the defendant would continue violating the law for several years during the remediation.

the settlement. No. 13-cv-02025 (RMC), ECF No. 12 (D.D.C. Feb. 26, 2014).[13] Specifically, the Ocwen Stipulated Judgment contained a 15-page section titled "Enforcement Terms" with 18 pages of exhibits that set forth the manner in which the States and the Bureau would monitor and enforce the judgment. Significantly, those terms provided Ocwen with the opportunity to cure a violation, *see* Ocwen Stipulated Judgment at D-10, and limited the relief that the Bureau and the States could seek in an enforcement action for certain violations, *id*. at D-14.

In *Ocwen,* the court's holding hinged exclusively on the detailed Enforcement Terms set forth in the Ocwen Stipulated Judgment. *See Ocwen*, 30 F.4th at 1085. Because the *res judicata* effect of a settlement is controlled by the terms of a settlement agreement, the court held that the Bureau was bound by the detailed terms for addressing the kind of violations covered by the Enforcement Terms provision. *Id.* at 1083. Notably, the court also held that the Ocwen Stipulated Judgment did not "eliminate Ocwen's responsibility to abide by the law more generally," and did not, as Ocwen argued it should have, extinguish the Bureau's ability to sue Ocwen for alleged violations not specifically covered by the Enforcement Terms, because that "would require us to conclude that CFPB agreed to let Ocwen violate the law." *Id*. at 1086.

Here, nothing in the Order is remotely like the Enforcement Terms in the Ocwen Stipulated Judgment. The Order does not limit the manner in which the Bureau can address future violations of law; indeed, the only references in the Order to future Bureau enforcement actions expressly preserve or reflect the Bureau's right to bring one. Order ¶¶ 76, 77, 79, 82; *see*

---

[13] Though TU quotes extensively from the opinion in *Ocwen*, TU does not attach or cite to the Ocwen Stipulated Judgment. The document is available on the Bureau's website: https://files.consumerfinance.gov/f/201403_cfpb_entered-judgment-with-exhibits_ocwen.pdf. The Court may take judicial notice of this document. *See Saccameno v. Ocwen Loan Svg., LLC*, 372 F. Supp. 3d 609 (N.D. Ill. 2019) (reflecting that district court took judicial notice of the same Ocwen Stipulated Judgment during a trial). As is clear from the face of the lengthy agreement, it is much different than the Order between the Bureau and TU.

*also* Stipulation ¶¶ 3, 5, 6. And contrary to TU's arguments, the monitoring provisions in the Order are not at all comparable to the Enforcement Terms in the Ocwen Stipulated Judgment. The monitoring provisions require TU to preserve records, provide information to the Bureau on request, make TU employees available for interviews, provide updates on its compliance with the Order, and submit a Compliance Plan, among other things. *See, e.g.,* Order ¶¶ 42, 68, 71, 72. These provisions do not limit, or even mention, the manner in which the Bureau can address future violations of law or the Order. Thus, the Order in no way restrains the Bureau's authority to bring this enforcement action against TU, and *res judicata* cannot bar it.

TU makes a final plea that "no rational entity would ever agree to this type of 'Groundhog Day' enforcement loop[.]" Br. 21. The Bureau agrees that it does indeed feel like Groundhog Day to be in this position again, seeking to hold TU accountable for its deceptive marketing of Credit-Related Products. But that is because of TU's utter refusal to respect the Order and the law. The Bureau's use of its enforcement authority to force TU to do so is proper, consistent with the Order, and certainly not barred by *res judicata*.

## IV. TU's Constitutional Arguments are Meritless

In a last attempt to escape liability for its violations, TU offers two arguments that the U.S. Constitution bars this action in whole or in part. Both arguments fail.

### A. The Bureau's Method of Funding is Constitutional and Provides No Reason to Dismiss this Action

TU's claim that the Bureau's funding violates the Appropriations Clause, Br. 26, is contrary to Supreme Court precedent and has been rejected by every court to decide the issue. Nor would it provide any grounds for dismissing this action in any event.

The Appropriations Clause states that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. CONST. art. I, § 9, cl. 7. This

"straightforward and explicit command," the Supreme Court has held, "means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *OPM v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)). "[I]n other words, the payment of money from the Treasury must be authorized by a statute." *Id.*

The Bureau's spending is so authorized: the CFPA permits the Bureau to draw up to a capped amount of money each year from the combined earnings of the Federal Reserve System to carry out its statutory responsibilities. 12 U.S.C. § 5497(a)-(c). The Bureau's statutory funding mechanism thus clearly complies with the Appropriations Clause's "straightforward and explicit command," *Richmond*, 496 U.S. at 424. Indeed, every court to have decided the issue has so held. *See, e.g.*, *PHH Corp. v. CFPB*, 881 F.3d 75, 95-96 (D.C. Cir. 2018) (en banc), *abrogated on other grounds, Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020); *CFPB v. Fair Collections & Outsourcing, Inc.*, No. 8:19-cv-02817, 2020 WL 7043847, at *7-9 (D. Md. Nov. 30, 2020) (collecting cases). Nor is there any material difference between the Bureau's funding and that of numerous other agencies that Congress has chosen to fund through appropriations in their enabling statutes rather than annual spending bills. *See, e.g.*, 12 U.S.C. § 16 (Office of Comptroller of Currency); *id.* § 243 (Federal Reserve Board); *id.* § 1755 (National Credit Union Administration); *id.* §§ 1815(d), 1820(e) (FDIC).

TU does not even mention the above precedent from the Supreme Court and other courts. It relies solely on a Fifth Circuit concurrence. *See CFPB v. All American Check Cashing, Inc.*, 33 F.4th 218, 220 (5th Cir. 2022) (en banc) (Jones, J., concurring). But that concurrence, which did not garner a majority, is neither controlling nor persuasive. Its view that the Constitution imposes some indeterminate time limit on general appropriations, *id.* at 238, finds no support in

constitutional text. To the contrary, when the Framers wanted to impose temporal limitations on appropriations, they did so expressly. *See* U.S. CONST. art. I, § 8, cl. 12 (providing that "no Appropriation of Money [for the Army] shall be for a longer Term than two Years"). The Bureau is aware of no case holding that non-Army appropriations must be time-limited.

The concurrence also erred to the extent its analysis turned on the Bureau's particular statutory functions. *See All American*, 33 F.4th at 235-36. That inquiry conflicts with the analysis in *Collins v. Yellen*, which held that the constitutionality of a removal provision does not depend on a judicial assessment of "the relative importance of the regulatory and enforcement authority of disparate agencies." 141 S. Ct. 1761, 1785 (2021). After all, "[c]ourts are not well-suited" to make that assessment. *Id.* And in fact, the *All American* concurrence, in comparing the Bureau to other, similarly funded agencies, *see* 33 F.4th at 235-37, failed to appreciate the significant powers that those other agencies exercise, including conducting administrative adjudications and imposing civil penalties, 12 U.S.C. § 1818(b), (i) (OCC, FDIC, Board), and issuing regulations, *see* 12 C.F.R. ch. I (OCC rules); ch. II (Board rules); ch. III (FDIC rules).

Even if TU's funding argument had any validity, it still would not warrant dismissal. That is because Congress has the power to authorize the Executive to take action even absent an appropriation. Congress can, for instance, "authorize agencies to enter into contracts and incur obligations in advance of appropriations." *Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1319 (2020) (quotation marks omitted). Just as the Supreme Court held in *Collins* that an invalid removal restriction does not deprive an agency of its authority to act, 141 S. Ct. at 1787-88 & n.23, any defect in the Bureau's funding authorization would not deprive it of the power to carry out the responsibilities given it by Congress to enforce the law, including issuing the Order.

**B. TU's Challenge Based on the Removal Provision is Not Only Waived but is Also Meritless**

TU next improperly seeks to collaterally attack the Order it agreed to in 2017. It claims the Order is "unenforceable" because an invalid provision in the CFPA purported to limit the grounds on which the Bureau Director could be removed from office. Br. 27-29. *See* 12 U.S.C. § 5491(c)(3); *Seila Law LLC*, 140 S. Ct. 2183 (2020) (holding provision inoperative). But when it consented to the Order, TU expressly waived "[t]he right to seek any … judicial review of the [Order]" as well as "[a]ny other right to challenge or contest the validity of the [Order]." Stipulation ¶ 9(d), (f). Having done so, and thereby received the benefit of its bargain resolving the Bureau's earlier claims against it, TU cannot now contest the validity of the Order.

If that were somehow not enough, TU is also wrong on the merits. *Collins* makes clear that the invalid removal provision in no way vitiated the Bureau's ability to issue the Order. *See* 141 S. Ct. at 1787-88 & n.23 ("the unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office"). Nor has TU shown that the removal provision caused it any harm that might possibly justify invalidating the Order. *Cf. id.* at 1788-89 (holding that a party may be entitled to relief only if it can show that an invalid removal restriction "inflicted harm"). TU's bare speculation, Br. 29, that it or the Bureau might have acted differently in some unspecified way in the absence of the removal provision is not enough to make the showing required by *Collins*. *See Calcutt v. FDIC*, 37 F.4th 293, 316-17 (6th Cir. 2022) (holding that *Collins* requires "a more concrete showing" of harm than merely "assert[ing] a possibility that an agency with different personnel might have acted differently").

**CONCLUSION**

For the foregoing reasons, the Court should deny the Motion. In the event that the Court grants any part of it, the Bureau should be given leave to file an amended Complaint. *See, e.g.*,

*Shachter v. City of Chicago*, No. 18-cv-5504, 2019 WL 4750083, *5 (N.D. Ill. Sept. 30, 2019) ("Under Federal Rule of Civil Procedure 15(a)(2), the court should 'freely give leave' to a plaintiff to amend his complaint 'when justice so requires.'").

Respectfully submitted,

Dated: August 12, 2022

Eric Halperin
*Enforcement Director*

David M. Rubenstein
*Deputy Enforcement Director*

Cynthia Gooen Lesser
*Assistant Deputy Enforcement Director*

s/ Jessica Rank Divine
Jessica Rank Divine
Tracy L. Hilmer
Mary K. Warren
Alisha Marie Nair
*Enforcement Attorneys*

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone: (202) 435-7863 (Divine)
Telephone: (202) 435-7459 (Hilmer)
Telephone: (202) 435-7815 (Warren)
Telephone: (202) 718-0339 (Nair)

Email: jessica.divine@cfpb.gov
Email: tracy.hilmer@cfpb.gov
Email: mary.warren@cfpb.gov
Email: alishamarie.nair@cfpb.gov

*Attorneys for Plaintiff Consumer Financial Protection Bureau*