IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Consumer Financial Protection Bureau,

Plaintiff,

v.

TransUnion, TransUnion, LLC, TransUnion Interactive, Inc., and John T. Danaher,

Defendants.

Case No. 1:22-cv-1880

Honorable Judge Elaine E. Bucklo

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT DANAHER'S MOTION TO DISMISS THE COMPLAINT**

TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

PRELIMINARY STATEMENT ........ 1

STANDARD OF REVIEW ........ 3

ARGUMENT ........ 3

I. Count II States a Claim that Danaher Violated the Order ........ 3

A. The Complaint Alleges Danaher's Individual Liability for TUI's Violations ........ 4

1. The Complaint Alleges Danaher's Direct Participation in TUI's Violations of the Order ........ 4

2. The Complaint Alleges That Danaher Had Authority to Control TUI's Compliance with the Order ........ 7

3. The Complaint Alleges that Danaher Knew or Should Have Known that TUI was Violating the Order ........ 9

B. Count II Alleges that Danaher Committed Acts and Omissions in Violation of the Order, which is a Separate and Independent Basis of Liability ........ 14

II. The Bureau's Enforcement Action Against Danaher is Proper ........ 15

A. The Bureau May Enforce the Order Against Danaher ........ 15

B. The Court May Award Broad Relief for Danaher's Order Violations ........ 18

III. The Bureau's Claims Against Danaher are Timely ........ 20

A. The Complaint Alleges That Danaher's Violations Continued Until Less Than Three Months Before the Bureau Filed this Lawsuit—Conduct Clearly Within the Limitations Period ........ 21

B. There is No Basis in the Complaint to Conclude that the Bureau Discovered Any of Danaher's Violations More Than Three Years Before Filing Suit ........ 22

1. Danaher's Statute of Limitations Argument Relies on Extrinsic Material that Cannot Be Considered on a Motion to Dismiss ........ 23

2. There is No Factual Basis to Conclude that the Bureau Discovered Danaher's Violations Before April 12, 2019, Three Years Before the Complaint was Filed ........ 26

CONCLUSION ........ 30

# TABLE OF AUTHORITIES

**Cases**

*188 LLC v. Trinity Indus., Inc.*,
300 F.3d 730 (7th Cir. 2002) ........ 24, 25

*Badaracco v. C.I.R.*,
464 U.S. 386 (1984) ........ 20

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 3

*Brunswick Corp. v. Chrysler Corp.*,
408 F.2d 335 (7th Cir. 1969) ........ 16

*Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*,
559 F.3d 671 (7th Cir. 2009) ........ 20, 23

*Carlson v. Bremen High Sch. Dist. 228*,
423 F. Supp. 2d 823 (N.D. Ill. 2006) ........ 25

*CFPB v. 1st Alliance Lending, LLC*,
No. 21-cv-55(RNC), 2022 WL 993582 (D. Conn. Mar. 31, 2022) ........ 13

*CFPB v. Chou Team Realty LLC*,
No. 20-cv-0043(SB)(ADS), 2021 WL 4077110 (C.D. Cal. Aug. 10, 2021) ........ 28

*CFPB v. Consumer First Legal Grp., LLC,*
6 F.4th 694 (7th Cir. 2021) ........ 10, 11

*CFPB v. Howard*,
No. 17-cv-161(JLS), 2017 WL 10378953 (C.D. Cal. May 30, 2017) ........ 22

*CFPB v. Howard*,
No. 17-cv-161(JLS), 2018 WL 4847015 (C.D. Cal. May 3, 2018) ........ 21, 22

*CFPB v. Mortg. L. Grp., LLP*,
196 F. Supp. 3d 920 (W.D. Wis. 2016) ........ 4, 11

*CFPB v. Nat'l Collegiate Master Student Loan Tr.*,
No. 17-cv-1323(SB), 2021 WL 5936404 (D. Del. Dec. 13, 2021) ........ 23

*CFPB v. Nat'l Collegiate Master Student Loan Tr.*,
No. 17-cv-1323(SB), 2022 WL 548123 (D. Del. Feb 11, 2022) ........ 23

*CFPB v. Nationwide Biweekly Admin., Inc.*,
No. 15-cv-2106, 2017 WL 3948396 (N.D. Cal. Sept. 8, 2017) .......................................... 21, 29

*CFPB v. NDG Fin. Corp.*,
No. 15-cv-5211, 2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016) .......................................... 21, 28

*CFPB v. Ocwen Fin. Corp.*,
2019 U.S. Dist. LEXIS 152336 (S.D. Fla. Sept. 5, 2019)........................................................ 28

*Cheff v. Schnackenberg*,
384 U.S. 373 (1966) ................................................................................................................ 15

*Cheli v. Taylorsville Comm. Sch. Dist.*,
986 F.3d 1035 (7th Cir. 2021)..................................................................................................... 6

*Colonial Williamsburg Found. v. Kittinger Co.*,
38 F.3d 133 (4th Cir. 1994)....................................................................................................... 16

*Connolly v. J.T. Ventures*,
851 F.2d 930 (7th Cir. 1988)..................................................................................................... 16

*Curia v. Nelson*,
587 F.3d 824 (7th Cir. 2009)....................................................................................................... 6

*E.E.O.C. v. Concentra Health Services, Inc.,*
496 F.3d 773 (7th Cir. 2007)....................................................................................................... 3

*E.E.O.C. v. Supervalu, Inc.*,
674 F. Supp. 2d 1007 (N.D. Ill. 2009) ...................................................................................... 25

*FTC v. Amy Travel Serv., Inc.*,
875 F.2d 564 (7th Cir. 1989).................................................................................................. 8, 10

*FTC v. Bay Area Bus. Council, Inc.*,
423 F.3d 627 (7th Cir. 2005)..................................................................................................... 10

*FTC v. Credit Bureau Center, LLC*,
937 F.3d 764 (7th Cir. 2019)............................................................................................... passim

*FTC v. Lanier Law, LLC*,
194 F. Supp. 3d 1238 (M.D. Fla. 2016) .................................................................................... 11

*FTC v. LeanSpa, LLC*,
920 F. Supp. 2d 270 (D. Conn. 2013) ........................................................................................ 9

*FTC v. Mandel Bros, Inc.*,
359 U.S. 385 (1959) .......... 15

*FTC v. QT, Inc.*,
No. 03-cv-3578(IHL), 2005 WL 2240874 (N.D. Ill. Sept. 14, 2005) .......... 10, 12

*FTC v. Swish Mktg.*,
No. 09-cv-3814(RS), 2010 WL 653486 (N.D. Cal. Feb. 22, 2010) .......... 8

*FTC v. World Media Brokers, Inc.*,
415 F.3d 758 (7th Cir. 2005) .......... 10, 11, 12

*Fuji Photo Film Co. v. Int'l Trade Comm'n*,
474 F.3d 1281 (Fed. Cir. 2007) .......... 17

*Gabelli v. SEC*,
568 U.S. 442 (2013) .......... 27, 28

*Grun v. Pneumo Abex Corp.*,
163 F.3d 411 (7th Cir. 1998) .......... 7

*In re Holland Furnace Co.*,
341 F.2d 548 (7th Cir. 1965) .......... 15, 17

*Korte v. Sebelius*,
735 F.3d 654 (7th Cir. 2013) .......... 15

*Mandel Bros, Inc v. FTC*,
254 F.2d 18 (7th Cir. 1958) .......... 15

*Merck & Co. v. Reynolds*,
559 U.S. 633 (2010) .......... 21, 27

*Microsystems Software, Inc. v. Scandinavia Online AB*,
226 F.3d 35 (1st Cir. 2000) .......... 17

*New Mexico ex rel. Balderas v. Real Estate Law Center, P.C.*,
401 F. Supp. 3d 1229 (D. N.M. 2019) .......... 11

*Reich v. Sea Sprite Boat Co.*,
50 F.3d 413 (7th Cir. 1995) .......... 15, 16, 18

*Shachter v. City of Chicago*,
No. 18-cv-5504, 2019 WL 4750083 (N.D. Ill. Sept. 30, 2019) .......... 30

*Sidney Hillman Health Ctr. v. Abbot Labs*, Inc.,
782 F.3d 922 (7th Cir. 2015)........................................................................................20

*Spearman v. Elizondo*,
230 F. Supp. 3d 888 (N.D. Ill. 2016) ........................................................................3

*Travel All Over the World, Inc. v. Kingdom of Saudi Arabia,*
73 F.3d 1423 (7th Cir. 1996)........................................................................................25

*U.S. ex rel. Air Control Techs, Inc. v. Pre Con Indus., Inc.*,
720 F.3d 1174 (9th Cir. 2013)......................................................................................22

*United States v. Kivanc*,
714 F.3d 782 (4th Cir. 2013)........................................................................................21

*United States v. MyLife.com, Inc.*,
499 F. Supp. 3d 751 (C.D. Cal. 2020).........................................................................8

*United States v. Seetapun*,
750 F.2d 601 (7th Cir. 1984)........................................................................................16

*Venture Assocs. Grp. v. Zenith Data Sys. Corp.*,
987 F.2d 429 (7th Cir. 1993)..................................................................................23, 24

*Wikoff v. Vanderveld*,
897 F.2d 232 (7th Cir.1990)..........................................................................................7

*Wilson v. United States*,
221 U.S. 361 (1911) ...............................................................................................15, 18

*Young v. Lepone*,
305 F.3d 1 (1st Cir. 2002) ...........................................................................................27

**Statutes**

12 U.S.C. § 5481.........................................................................................14, 15, 19

12 U.S.C. § 5536..............................................................................................14, 15

12 U.S.C. § 5561.....................................................................................................21

12 U.S.C. § 5563.....................................................................................................20

12 U.S.C. § 5564..............................................................................................passim

12 U.S.C. § 5565...................................................................................10, 17, 18, 19

15 U.S.C. § 77.........................................................................................................26

15 U.S.C. § 8401.....................................................................................................11

15 U.S.C. § 8403 ........ 11

15 U.S.C. § 8405 ........ 11

21 U.S.C. § 335 ........ 26

**Rules**

Fed. R. Civ. P. 12(b)(6) ........ 3

Fed. R. Civ. P. 15(a)(2) ........ 30

Fed. R. Civ. P. 65(d) ........ 16

Plaintiff Consumer Financial Protection Bureau (CFPB or Bureau) respectfully submits this opposition to the motion of John T. Danaher to dismiss the Complaint (Motion).

## PRELIMINARY STATEMENT

In his Motion, Danaher seeks to avoid responsibility for the extensive violations of law at TransUnion Interactive, Inc. (TUI), the company he led for nearly two decades, by claiming that: (1) he did not actually violate the law when he directed his company to stop complying with the January 3, 2017 Consent Order (Order) issued by the Bureau; (2) the Bureau cannot enforce the Order against him, even though the Order bound him as an officer of TUI; and (3) the Bureau is actually to blame because it did not catch him earlier. These arguments are without merit.

From 2004 until less than three months before the Bureau filed this lawsuit, Danaher was a senior executive at TUI, the entity responsible for marketing credit scores, credit reports, and credit-monitoring to consumers on behalf of its parent company, TransUnion, which together with TUI and TransUnion LLC (collectively, TU) were the respondents of the Order.[1] As the leader of TUI, Danaher had ultimate authority over the manner in which TU marketed its products to consumers. On January 3, 2017, while Danaher was President of TUI, the Bureau issued the Order, which prohibited TUI, its parent companies, and others including officers like Danaher, from continuing to engage in deceptive marketing of credit scores, credit reports, and credit-monitoring to consumers. The Order's allegations of deceptive marketing covered the time period of 2011-2017; Danaher was President of TUI and responsible for TUI's marketing that entire time. The Order bound Danaher, as an officer of TUI, to abide by certain conduct provisions and to cease engaging in deceptive marketing.

---

[1] The Complaint alleges that TransUnion, TransUnion, LLC, and TransUnion Interactive, Inc. have engaged in a common enterprise and acted as each other's agents, and therefore the acts of one are attributable to the rest. Compl. ¶ 15.

Danaher violated the Order. He determined that complying with the Order would reduce TUI's revenue, and he and other senior executives of TU decided to delay or avoid implementation of the Order to minimize its financial impact. In particular, Danaher determined that an enrollment form "checkbox" that TUI had begun implementing to comply with the Order was causing TUI to lose revenue, and he directed TUI to stop using it. Since the Order was issued, TUI has implemented half-measures at best as to some Order requirements and fully disregarded others. TUI has also continued engaging in deceptive marketing practices. As a result, TUI has enrolled millions of consumers into products by using marketing materials that violated the Order, the Consumer Financial Protection Act (CFPA), and other Federal consumer financial laws. Thousands of consumers have complained that they were deceived by TU's marketing, just as they did prior to the Order.

Danaher's arguments fail for three reasons:

*First*, the Complaint plausibly alleges that Danaher violated the Order. As the President of TUI who had notice of the Order, Danaher was bound to comply with it and, indeed, was in the best position of anyone at TU to do so because he actually controlled TUI's marketing. But instead of causing TUI to comply with the Order, he actively thwarted TUI's compliance. He both meets the standard for individual liability for TUI's violation and is also personally liable under Section 1036(a)(1)(A) of the CFPA, as set forth in Count II of the Complaint.

*Second*, the Bureau's enforcement action against Danaher is proper. It is well-settled that a command to a company is a command to its officers; thus, Danaher is bound by the Order as the President of TUI even if he was not a signatory to it. And the enforcement mechanism that the Bureau has used to bring this action does not limit the Bureau's remedies, as Danaher suggests.

*Third*, the Bureau's claims against Danaher are timely. The Bureau alleges that Danaher failed to implement the Order from its issuance on January 3, 2017 (Effective Date) until his departure from TUI until February 1, 2022, while he was President and subsequently Executive Vice President of TUI. The Complaint thus alleges ongoing conduct well into even the strictest interpretation of the claim's limitations period. Moreover, here is no legal or factual basis for Danaher's arguments that the Bureau discovered or should have discovered his violations earlier.

The Court should therefore deny Danaher's motion.

## STANDARD OF REVIEW

Danaher brings his Motion under Fed. R. Civ. P. 12(b)(6). "To survive a Rule 12(b)(6) motion, a complaint need only surmount what the Seventh Circuit has described as 'two easy-to-clear hurdles.'" *Spearman v. Elizondo*, 230 F. Supp. 3d 888, 892 (N.D. Ill. 2016) (Bucklo, J.). Each claim must (1) be sufficiently detailed to "give the defendant 'fair notice of what the ... claim is and the grounds upon which it rests,'" and (2) include allegations that "plausibly suggest the plaintiff has a right to relief" beyond a "speculative level." *E.E.O.C. v. Concentra Health Services, Inc.,* 496 F.3d 773, 776 (7th Cir. 2007) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 569 n. 14 (2007)). The Complaint easily clears those hurdles.

## ARGUMENT

### I. Count II States a Claim that Danaher Violated the Order

Danaher contends the Bureau has failed adequately to allege that he violated the Order, Memorandum in Support of Motion, ECF No. 33 (Br.) 14-22. His arguments should be rejected because they rest on erroneous interpretations of the Order, disregard allegations in the Complaint, and rely on extraneous documents and facts that cannot be considered in the context of a motion to dismiss. Moreover, not only are Danaher's arguments about his individual liability

for TUI's violations incorrect, his focus on them ignores an entirely separate basis for his liability alleged in the Complaint–namely, his personal liability for his acts and omissions.

**A. The Complaint Alleges Danaher's Individual Liability for TUI's Violations**

As Danaher concedes, the Complaint states a claim that Danaher is individually liable for TUI's violations if it alleges that he "(1) participated directly in the illegal practices or acts or had the authority to control them; and (2) knew or should have known about the illegal practices." Br. 14 (citing *CFPB v. Mortg. L. Grp., LLP*, 196 F. Supp. 3d 920, 944 (W.D. Wis. 2016)); *accord FTC v. Credit Bureau Center, LLC*, 937 F.3d 764, 769 (7th Cir. 2019). The Complaint does so. In particular, though the Complaint need only allege that Danaher participated in TUI's Order violations *or* that he had authority to control them, the Complaint plausibly alleges both bases. And the Complaint also plausibly alleges that Danaher knew or should have known about TUI's Order violations.

1. The Complaint Alleges Danaher's Direct Participation in TUI's Violations of the Order

The Order's Conduct Provisions, set forth in Section V, Paragraph 40 (Conduct Provisions), explicitly apply not just to TU (including TUI) but also to its "officers, agents, servants, employees, and attorneys who have actual notice of this Order, whether acting directly or indirectly." Order ¶¶ 12, 14, 15. The Complaint alleges that Danaher, an officer of TUI, participated in TUI's violations. As President of TUI, Danaher determined that complying with the Order would reduce TUI's revenue. Compl. ¶¶ 170-71. To prevent the loss of revenue from occurring, he, along with others, created a plan to delay or avoid implementation of the Conduct Provisions. *Id*. As a result of Danaher's omissions and failures to act, much of Paragraph 40 was simply never implemented, leading to TU's many Order violations, which are set forth in Count I of the Complaint. *See id*. ¶¶ 170, 176. Danaher's refusal to comply with the Order, despite his

obligations as an officer of TUI under Paragraph 40, led to millions of consumer enrollments by means of marketing practices that violated the Order, and forms the basis of Count II.

The Complaint further alleges that, in addition to his failure to implement the Order, Danaher also specifically directed TUI to commit Order violations. In early 2017, TUI had begun implementing the Order by using enrollment forms that contained the affirmative selection checkbox required by Paragraph 40(b)(i). *See* Compl. ¶¶ 99, 171. The checkbox requirement was a key feature of the Order: its purpose was to address TU's deceptive use of trial offers by requiring TU to obtain consumers' express informed consent through a checkbox, accompanied by clear disclosures about price, before consumers could be enrolled into a trial offer that would automatically convert to an indefinite paid monthly subscription. *See* Order ¶¶ 32-39; 40(b)(i). Danaher monitored the effect of the checkbox on enrollment figures and determined that the checkbox was causing fewer consumers to enroll in, and pay for, certain products. Compl. ¶ 171. By March 2017, Danaher had seen enough, and he directed TUI to cease using the checkbox. *Id*. TUI complied, leading to millions of consumer enrollments that violated the Order over the next five years. *See id*. ¶¶ 99-104.

Danaher claims that his elimination of the checkbox did not violate the Order because it only concerned materials used by TUI's marketing affiliates and not advertisements TUI places on websites itself. Br. 16-18. But as set forth in the Complaint, TUI controls the marketing affiliates. Compl. ¶ 20. Specifically, the affiliates are TUI's agents who place advertisements for TU products on TUI's behalf; TUI reviews, approves, and otherwise controls the content of all marketing materials, including enrollment forms and order processes used by marketing affiliates. *Id.* ¶ 20. Consumers who sign up through marketing affiliates' advertisements enter into a transaction with TUI, are enrolled in the products by TUI, and are charged each month

indefinitely by TUI until they cancel, which they also must do by contacting TUI. *Id.* ¶¶ 16-22. In other words, consumers are enrolling into the same product provided by TUI regardless of whether TUI or the marketing affiliate is placing the advertisement.

For these reasons, the broad language of Paragraph 40(b) imposes the checkbox requirement on TUI's agents marketing on TUI's behalf; specifically, it includes all of TUI's "officers, *agents*, servants, employees, and attorneys who have actual notice of the Order, *whether acting directly or indirectly*, in connection with the advertising, marketing, promotion, offering for sale, sale, or performance of any Credit-Related Product." Order ¶ 40(b) (emphasis added). Because marketing affiliates are agents acting directly and indirectly on TUI's behalf, the Order requires that their marketing materials include the checkbox.

Seeking to avoid the broad applicability of Paragraph 40(b), Danaher asks the Court to adopt a tortured reading of the Order's definition of "Credit-Related Products," asserting that because that definition includes "any product or service [TUI] offer[s] for sale directly to consumers," it only applies when TUI places the advertisement on a website itself. Br. 16-17. Danaher's reading is only possible when one completely ignores the rest of the Order. Indeed, the Order explains that Credit-Related Products are offered by TUI through various channels, including "advertisements *on TUI's marketing affiliate websites*." Order ¶ 10 (emphasis added). And Paragraph 40(b) expressly includes Credit-Related Products that TUI offers "directly *and indirectly*" and through agents. Order ¶ 40(b) (emphasis added). Because the Order must be read in a manner that "requires nothing to be rejected as meaningless, or surplusage," *Cheli v. Taylorsville Comm. Sch. Dist.*, 986 F.3d 1035, 1041-42 (7th Cir. 2021) (citing *Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir. 2009)), the Court should reject Danaher's arguments and find that the checkbox requirement applies to TUI's agents that market on TUI's behalf, including

marketing affiliates.[2] Accordingly, when Danaher directed TUI to cease using the checkbox on enrollment forms used on marketing affiliates' websites, Danaher directed that TUI violate the Order.

2. The Complaint Alleges That Danaher Had Authority to Control TUI's Compliance with the Order

The Complaint alleges that Danaher was the President of TUI from 2004 through April 1, 2021 and was the Executive Vice President from April 2, 2021 until his departure from TUI on February 1, 2022. Compl. ¶ 14. In that capacity, he had authority to control, and did in fact control, TUI's marketing to consumers and compliance with the Order. Compl. ¶¶ 5, 166, 170-71. For example, the Complaint alleges that Danaher was monitoring the effect of TUI's compliance with the Order on TUI's revenue. Compl. ¶ 171. After determining that compliance with Paragraph 40(b)(i)'s checkbox requirement was decreasing TUI's revenue, Danaher directed TUI to cease complying with that requirement. Compl. ¶ 171. This direction was significant for two reasons. First, it caused TUI to violate the Order millions of times over the next five years. Second, it illustrates the extent of Danaher's authority to control TUI's marketing activity and its compliance with the Order. In addition to this specific act, the Complaint also alleges that Danaher and others created a plan to delay or avoid implementation of the Order. Compl. ¶¶ 170-71. Contrary to Danaher's argument that this allegation lacks "context," Br. 16, the Complaint alleges that Danaher determined that TUI's early efforts to

[2] Danaher suggests the Court should look to the language of a different order that the Bureau issued to another party because it included a reference to affiliate marketers in a definition of Credit-Related Products. Br. 17, n.1. The inclusion of that language in a different order has no effect on TU's Order, nor does it undermine the language in the Order extending the Conduct Provisions to TU's marketing through agents. Because the Order is clear, there is no reason for the Court to look to extrinsic evidence to understand what the Order meant. *Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 420 (7th Cir. 1998) ("[I]f the language of the contract provides an answer, then the inquiry is over; parol evidence is neither necessary nor admissible.) (quoting *Wikoff v. Vanderveld*, 897 F.2d 232, 238 (7th Cir.1990)).

comply with the Order would result in reduced revenue. Compl. ¶ 171. The Complaint alleges that Danaher had the authority to cause TUI to comply with the Order, but he chose to exercise his authority to cause TUI to violate the Order.

Notwithstanding all of those allegations, Danaher mistakenly contends that the Bureau's claims fail because they rest solely on his title as President of TUI. Danaher's contention fails for two independent reasons. First, the clear weight of authority supports the conclusion that an individual's role as the director or president of a company can be sufficient to allege authority to control. *Compare United States v. MyLife.com, Inc.*, 499 F. Supp. 3d 751, 754-55 (C.D. Cal. 2020) (collecting cases holding that "[a]n individual's status as a corporate officer and/or the authority of that individual to sign documents on behalf of a corporate defendant is sufficient to show the requisite control") *with FTC v. Swish Mktg.*, No. 09-cv-3814(RS), 2010 WL 653486, *5 (N.D. Cal. Feb. 22, 2010) (holding that an executive's title alone was insufficient to establish "authority to control"); *see also FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989) *overruled on other grounds by Credit Bureau Ctr.,* 937 F.3d at 767 ("Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, *including assuming the duties of a corporate officer*.") (emphasis added).

Second, the Bureau alleges far more than just Danaher's title; indeed, the Complaint gives a clear example of Danaher's actual control over, and participation in, the violations: Danaher's express direction to cease use of the checkbox, which TUI followed.[3] Compl. ¶¶ 99, 171. This is more than enough at the pleading stage to establish that Danaher had authority to control, or participated directly in, the violations. *See FTC v. LeanSpa, LLC*, 920 F. Supp. 2d

[3] As set forth in Section I.A.1, *supra*, TUI's failure to use a checkbox in Affiliate marketing is a violation of the Order. But even if the Court were to disagree that the conduct itself was a violation of the Order, Danaher's ability to direct TUI to change its marketing disclosures, affecting millions of enrollments over at least five years, demonstrates that Danaher had broad authority to control TUI's marketing.

270, 278 (D. Conn. 2013) (allegations that officer of marketing company had authority to control marketing practices and was involved in discussions regarding certain marketing practices at issue in the litigation was sufficient to establish authority to control).

Danaher attempts to deflect responsibility by pointing to language in the Order that vests "ultimate responsibility" for complying with the Order in the Board of Directors of TUI's parent. Br. 19. Specifically, the Order provides that "[a]lthough this [Order] requires Respondents to submit certain documents for the review or non-objection by the [Bureau], the Board will have the ultimate responsibility for proper and sound management of Respondents and for ensuring that Respondents comply with Federal consumer financial law and this [Order]." Order ¶ 45. But Danaher cannot blame his non-compliance on the TransUnion Board; his argument ignores Paragraph 40 of the Order, which requires TU and its officers, employees, and agents—including Danaher—to comply with the Conduct Provisions. Order ¶¶ 40(a)-(d). Nothing in Paragraph 45 negates Danaher's authority to control TUI or absolves others who are required to comply with Paragraph 40, including Danaher. Indeed, as the President of TUI, Danaher was uniquely positioned to carry out the requirements of Paragraph 40. Not only did he fail to do so—he also actively thwarted TUI's compliance with the Conduct Provisions.

3. <u>The Complaint Alleges that Danaher Knew or Should Have Known that TUI was Violating the Order</u>

Danaher contends the Complaint "fails to plausibly allege that Danaher knew (or recklessly disregarded) that anyone violated paragraph 40 of the [Order]." Br. 19. Danaher also contends that the Bureau "fails to allege the factual predicate to give rise to an inference (1) that Danaher knew about Corporate Defendants' actions or inactions that allegedly violated paragraph 40; and (2) that Danaher knew that paragraph 40 was in effect." Br. 19. But this is not true and also misstates the applicable legal standard.

In the Seventh Circuit, an individual may be held liable for a company's violations if he "knew or should have known" about illegal practices, which may include that the individual had "actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." *FTC v. World Media Brokers, Inc.*, 415 F.3d 758, 764 (7th Cir. 2005) (citing *Amy Travel*, 875 F.2d at 573-74). "The degree of an individual's participation in business affairs is probative of knowledge." *FTC v. QT, Inc.*, No. 03-cv-3578(IHL), 2005 WL 2240874, *2 (N.D. Ill. Sept. 14, 2005) (citing *Amy Travel*, 875 F.2d at 574) (quotations omitted). Contrary to Danaher's suggestion, the Seventh Circuit's decision in *CFPB v. Consumer First Legal Grp., LLC,* 6 F.4th 694, 712 (7th Cir. 2021), did not displace the "knew or should have known" standard for individual liability. That decision concerned whether the defendants had "recklessly engage[d] in a violation of Federal consumer financial law" for purposes of the CFPA's civil money penalty provisions.[4] By contrast, where individual liability is at issue, as here, the Seventh Circuit has consistently applied the standard of whether a defendant "knew or should have known" about the illegal practices. *See Credit Bureau Center, LLC*, 937 F.3d at 769-70; *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 636-37 (7th Cir. 2005).

The Bureau is not required to plead unequivocally that Danaher knew that TUI was violating the Order, or that he shared the same interpretation of the Order as the Bureau.[5] Rather, the Bureau satisfies the standard for individual liability by pleading that Danaher knew or should have known about the illegal practices. For instance, in *Credit Bureau Center*, the Seventh

---

[4] The CFPA authorizes courts to assess civil penalties against defendants who violate Federal consumer financial laws. 12 U.S.C. § 5565(c)(2). It establishes three tiers of culpability: strict liability violations, reckless violations, and knowing violations. *Id*.

[5] Danaher's argument that his compliance with the Order is excused by the Bureau's failure to non-object to TU's Compliance Plan fails for the reasons set forth in pages 7-16 of the Bureau's Brief in Opposition to TU's Motion to Dismiss the Complaint.

Circuit held an individual liable for his company's illegal marketing of credit-monitoring subscriptions in violation of the Restore Online Shoppers Confidence Act (ROSCA), a statute enforced by the Federal Trade Commission that requires disclosures and restrictions on the marketing of subscriptions that are similar to the requirements of Paragraph 40(b) of the Order.[6] 937 F.3d at 769-70. The court held that the defendant was aware that his company's websites did not include certain disclosures, including that the websites did not disclose the terms of the credit-monitoring subscription before obtaining the consumer's billing information. *Id*. at 770. The court focused on whether the individual knew or should have known about the absence of the disclosures, not whether he knew or should have known that the absence of the disclosures violated ROSCA. *See id*. ("[I]t is undisputed that [the individual] controlled the websites and was aware of their content. That's enough to establish personal liability for the ROSCA violations."). Other cases have similarly applied "knew or should have known" to the fact of the practices, not whether they were illegal. *See, e.g.*, *New Mexico ex rel. Balderas v. Real Estate Law Center, P.C.*, 401 F. Supp. 3d 1229, 1311 (D. N.M. 2019) (stating that establishing whether an individual "knew or should have known" of the entity's acts "focuses on knowledge of the action and not on knowledge that the specific action was prohibited") (citing *Mort. L. Grp.,*196 F. Supp. 3d at 944); *FTC v. Lanier Law, LLC*, 194 F. Supp. 3d 1238, 1286-87 (M.D. Fla. 2016) (holding defendant individually liable where he was aware of misrepresentations made to consumers).[7] The foregoing is the applicable precedent, not *Consumer First*.

---

[6] 15 U.S.C. §§ 8401-8405. ROSCA prohibits the marketing of subscriptions with "negative option" features, which is defined by ROSCA as any ongoing subscription, not just trial offers, without (1) clearly and conspicuously disclosing all material terms of the transaction before obtaining the consumer's billing information; (2) obtaining a consumer's express informed consent before charging the consumer; and (3) providing simple mechanisms for a consumer to stop recurring charges. *Id*. § 8403; *see* 937 F.3d at 769.

[7] In *World Media Brokers*, the Seventh Circuit held several defendants individually liable for a company's scheme selling international lottery tickets. 415 F.3d at 764-65. While the court discussed that defendants

In any event, the Complaint plausibly alleges both that Danaher knew or should have known about TUI's practices that violated the Order and that he knew or should have known that the Order prohibited these practices. First, the Complaint alleges Danaher not only knew about but commanded the millions of violations of the Order by rolling back TUI's implementation of checkboxes to obtain consumers' informed consent as required by the Order. Compl. ¶¶ 170-71. As in *Credit Bureau Center*, Danaher knew TUI's websites did not contain the disclosures required by the Order. *See* 937 F.3d at 769-70. That alone is sufficient to satisfy notice pleading standards. The Complaint also alleges that Danaher and others created a plan to delay or avoid implementation of the Order. Compl. ¶¶ 170-71. Not only do these acts reflect Danaher's knowing violations of the Order, they also reflect his high degree of participation in business affairs, which is probative of knowledge. *See QT, Inc.*, 2005 WL 2240874, at *2.

Second, Danaher had actual notice of the Order on the date it was issued: January 3, 2017. Compl. ¶ 167. The Order was, by its terms, effective on that date. Order ¶ 3(h). The Order sets forth in detail the Bureau's findings regarding TU's deceptive marketing. *Id*. ¶¶ 4-39. The Conduct Provisions detail the actions TU and its officers are required to take, and the actions from which they must refrain, in order to comply with the Order. *Id*. The Order expressly binds officers, such as Danaher, to abide by the Conduct Provisions in Paragraph 40. *Id*. ¶ 40. The Order put Danaher on notice that he was required to make some changes at the company he had been leading for more than a decade as of 2017. The Order also put Danaher on notice that a refusal to implement the Conduct Provisions would violate a Federal consumer financial law and incur the risk of maximum civil penalties, among other consequences. *See* Order ¶ 82; Stip. ¶ 3.

---

knew selling Canadian lottery tickets in the United States was illegal, this reflected that defendants knew or should have known about the company's misrepresentations to consumers (that selling Canadian lottery tickets was legal), not that the defendants knew making such misrepresentations violated the prohibition on engaging in deceptive acts or practices. *See id*.

But, as set forth in the Complaint, Danaher delayed and frustrated TU's compliance with the Order.

Third, Danaher knew at least as of 2021 that the Bureau's Office of Enforcement believed he was violating the Order, Compl. ¶¶ 30-31, and given his position, likely knew much earlier that Bureau examiners had informed TUI that it was violating the Order. *Id.* ¶ 29. Under Danaher's leadership, however, Danaher nonetheless permitted TUI to continue to rack up the violations described in the Complaint after such notice.

Danaher cites *CFPB v. 1st Alliance Lending, LLC*, No. 21-cv-55(RNC), 2022 WL 993582, *7-9 (D. Conn. Mar. 31, 2022) to show the purported lack of adequate allegations in the Complaint. Br. 20. But that case actually supports the Bureau's position. In *1st Alliance*, the Bureau alleged that a mortgage company's employees were performing duties that required them to hold a mortgage-originator license in every state the company operated in. No. 21-cv-55(RNC), 2022 WL 993582, *1. The Bureau alleged that the company's compliance department began raising concerns to company leaders, including several named as individual defendants, that unlicensed employees were engaging in activities that required a license. *Id*. Because the complaint alleged the individual defendants were aware of the risk that unlicensed employees were conducting such activities, the court found on a motion to dismiss that the individual defendants were at least recklessly indifferent to that risk and could be held individually liable. *Id*. at 8. But the court found that the complaint had not alleged that the individuals were aware of a separate risk that the same employees were misrepresenting that they were actually licensed, so that part of the claim was dismissed. *Id*. Similar to the allegations in *1st Alliance* regarding the individuals' reckless disregard of the risk of unlicensed employees engaging in activities that required a license, the Bureau has alleged a direct connection between Danaher's awareness of

the risk (that noncompliance with the Conduct Provisions would violate the Order) and the violations (TUI's failure to comply with the Order). Therefore, the Bureau has plausibly alleged that Danaher "knew or should have known" about TUI's illegal practices.

### B. Count II Alleges that Danaher Committed Acts and Omissions in Violation of the Order, which is a Separate and Independent Basis of Liability

Even if the Complaint did not plead a basis for individual liability under the standard discussed above (which it does), Count II and the related allegations regarding Danaher would still state a claim. Specifically, Count II alleges that the Danaher is a covered person who committed acts or omissions in violation of a Federal consumer financial law, which is a violation of 12 U.S.C. § 5536(a)(1)(A).

Danaher does not dispute that he is a "related person," and therefore a "covered person," under 12 U.S.C. § 5481(25). *See* Compl. ¶ 14. Danaher also does not dispute that the Order is an "Order prescribed by the Bureau," Compl. ¶ 183, and it is therefore a Federal consumer financial law, Compl. ¶ 182. As set forth in Order Paragraph 40, Danaher, as an officer and President of TUI with actual knowledge of the Order, was required to take the affirmative steps set forth the Conduct Provisions, and to refrain from the acts prohibited by them. Compl. ¶¶ 184-87. Danaher, acting directly or indirectly, violated the Order, including by failing to ensure that TUI took the affirmative actions required by Paragraphs 40(a)(i)-(iii), (b)(i)-(ii), (c), and (d) of the Order and refrained from engaging in acts prohibited by those paragraphs of the Order. Compl. ¶ 187. Specifically, Danaher's plan to delay compliance with the Order and his direction regarding the checkbox were acts and omissions in violation of the Order, and therefore a Federal consumer financial law, in violation of 12 U.S.C. § 5536(a)(1)(A). *See* Compl. ¶ 171, 180-89.

## II. The Bureau's Enforcement Action Against Danaher is Proper

### A. The Bureau May Enforce the Order Against Danaher

Contrary to Danaher's argument, Br. 8-12, Danaher can be held liable for violating the Order. The CFPA makes it unlawful for any covered person to violate "a Federal consumer financial law," 12 U.S.C. § 5536(a)(1)(A), which includes an "order prescribed by the Bureau," *id.* § 5481(14).

Danaher erroneously argues that the Order against TUI did not bind him individually when he served as TUI's President because he was not a party to the Order. It is well established that when an order is entered against a corporation, the obligations in the order bind both the corporation and its officers. That is because "[a] corporation can act only through its agents." *Mandel Bros, Inc v. FTC*, 254 F.2d 18, 22 (7th Cir. 1958), *rev'd on other grounds*, 359 U.S. 385 (1959) ; *Korte v. Sebelius*, 735 F.3d 654, 668 (7th Cir. 2013) ("It is axiomatic that organizational associations, including corporations, act only through human agency."). Therefore, as the Supreme Court has explained, "[a] command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs." *Wilson v. United States*, 221 U.S. 361, 376 (1911). And if corporate officers, "apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience." *Id.*

Accordingly, courts have uniformly held that "injunctions and similar orders" issued against corporations are binding against corporate officers, whether or not they were a party to the prior proceedings. *See Reich v. Sea Sprite Boat Co*., 50 F.3d 413, 417 (7th Cir. 1995) (holding corporate president was bound to order enforcing agency decision); *see also In re Holland Furnace Co*., 341 F.2d 548, 555 (7th Cir. 1965), *aff'd sub nom. Cheff v. Schnackenberg*, 384 U.S. 373 (1966) (holding former corporate officers were bound to order enforcing agency

decision); *United States v. Seetapun*, 750 F.2d 601, 607 (7th Cir. 1984) (holding corporate officers, including person who functioned as an officer without any such title, was bound to summons). This background principle is baked into Federal Rule of Civil Procedure 65(d), which makes clear that injunctions can bind not only the parties to the action, but also (among others) the parties' "officers" and other persons who are "in active concert or participation" with the party. And Rule 65(d) "simply restates a norm of federal equity practice and therefore is equally germane to orders enforcing decisions of administrative agencies." *Reich*, 50 F.3d at 417.

Orders entered by consent are no different. After all, a command to a corporation is a command to its agents whether the command is in the form of an order entered in contested litigation or by consent. *See Brunswick Corp. v. Chrysler Corp.*, 408 F.2d 335, 337 (7th Cir. 1969) (observing that a consent decree "is as binding and conclusive between the parties and their privies as if the suit had been an adversary one"). Thus, the general rule cited by Danaher (Br. 11-12) that only consenting parties are bound to a consent order does not absolve him here because an order entered by the consent of a corporation also binds the corporation's officers. *See Connolly v. J.T. Ventures*, 851 F.2d 930, 935 (7th Cir. 1988) (holding corporate officers were bound by settlement agreement and could be held in contempt and personally liable for damages and attorneys' fees); *Colonial Williamsburg Found. v. Kittinger Co.*, 38 F.3d 133, 137 (4th Cir. 1994) (affirming contempt and monetary sanctions entered against corporate officers for violation of consent decree).

Likewise, it does not offend due process to hold corporate officers bound by orders, even though they did not participate in the underlying litigation. That is because an officer who has notice of an order is, by virtue of his relationship to the corporation, as bound to the order as the corporation itself. *See Reich*, 50 F.3d at 417. Courts have thus soundly rejected due process

challenges from nonparty corporate officers and others who act in concert with corporations, since notice and privity ensure due process is satisfied. *See Fuji Photo Film Co. v. Int'l Trade Comm'n*, 474 F.3d 1281, 1292-93 (Fed. Cir. 2007) (rejecting due process argument where corporate officer had "adequate notice" of the order); *Microsystems Software, Inc. v. Scandinavia Online AB*, 226 F.3d 35, 42-43 (1st Cir. 2000); (rejecting due process argument where nonparty was "in active concert or participation with the party specifically enjoined"). Indeed Rule 65(d) embodies these due process principles, making clear that injunctions are binding not only parties, but also on others who receive notice of the injunction and are sufficiently related to party, including the parties' "officers" and "other persons who are in active concert or participation" with the party. If Danaher's argument is correct, this rule would violate due process. That is, of course, mistaken.[8]

Finally, Danaher incorrectly claims, Br. 8-10, that an order resulting from the Bureau's administrative adjudication against a corporation under 12 U.S.C. § 5563, whether by consent or after a hearing, does not bind the corporation's officers. The CFPA provides that the "Bureau," in an "adjudication proceeding brought under Federal consumer financial law," (*i.e.*, a proceeding under § 5563), "shall have jurisdiction to grant *any* appropriate legal or equitable relief with respect to a violation of Federal consumer financial law." 12 U.S.C. § 5565(a)(1) (emphasis added). Injunctions are, of course, a classic form of equitable relief. And the principle that corporate officers and others who act in concert with a corporation are bound by injunctions entered against the corporation is, as the Seventh Circuit has explained, a basic "norm of federal

---

[8] Danaher's objection (Br. 10) that "[i]t cannot be" that the Bureau can bind "the public at large" is a red herring. The Order does not bind the public at large; rather, it binds TU's "officers, agents, servants, employees, and attorneys." Order 12. Here, Danaher, a corporate officer, acted with and on behalf of TUI in violating it—and that is why he can be held liable. *See In re Holland Furnace*, 341 F.2d at 554 (holding former corporate officers in criminal contempt for their role in causing, or aiding and abetting in causing, the corporation to violate a court order).

equity practice." *Reich*, 50 F.3d at 417. So, consistent with § 5565's expansive grant of remedial authority in administrative proceedings, the Bureau may issue orders imposing injunctive requirements on companies that violate Federal consumer financial laws. And consistent with the normal equitable practice, those injunctive requirements bind the company's officers and others who act in concert with the company.

Ignoring § 5565's plain terms, Danaher contends that the Bureau's orders against corporate respondents do not also bind their officers. This is so, he posits, because § 5563 requires the Bureau to employ certain procedures with respect to "the" respondent in an administrative proceeding and authorizes the Bureau to (among other things) require "the" respondent to "cease and desist from the subject activity." Br. 10. But the fact that the Bureau may order "the" corporate respondent in an administrative proceeding to cease and desist its unlawful activity does not mean that the corporation's officers are not bound. After all, as the Supreme Court has taught, "[a] command to *the* corporation is in effect a command to those who are officially responsible for the conduct of its affairs," so they, "no less than *the* corporation itself, are guilty of disobedience." *Wilson*, 221 U.S. at 376 (emphasis added). In other words, while the CFPA authorizes agencies to issue orders against parties and provide process to those parties, nothing in this statute displaces the established rule that corporate officers and other nonparties are bound to orders issued against corporations.

Accordingly, the Order, just like any other consent order entered against a corporate party, binds TU and its officers, which includes Danaher until his retirement in February 2022.

**B. The Court May Award Broad Relief for Danaher's Order Violations**

Danaher appears to misunderstand the basis for the Bureau's enforcement action against him. Danaher argues that under the enforcement provisions of 12 U.S.C. § 5563, the Court may only enforce the terms of the Order against him and may not impose any monetary relief.

Danaher argues that because the Court can at most only order Danaher to comply with the Conduct Provisions, Count II is moot because he no longer works at TUI and has no ability to affect TUI's compliance with the Order.[9] Br. 13-14. But the Bureau brings this action against TU and Danaher pursuant to its authority under 12 U.S.C. §§ 5564 and 5565, not its authority under § 5563. *See* Compl. ¶¶ 7-9. As discussed below, Section 5565 authorizes the Court to impose monetary relief, including damages and penalties, against Danaher for his violations of the Order. Accordingly, the Court should not dismiss Count II or limit the relief available to the Bureau in connection with Count II.

The CFPA provides more than one mechanism for the Bureau to address violations of Bureau orders. The Bureau brought this action under 12 U.S.C. § 5564(a), which authorizes the Bureau to bring a civil action in federal district court against "any person" who "violates a Federal consumer financial law." "Federal consumer financial law" includes "an order prescribed by the Bureau." 12 U.S.C. § 5481(14). *See* Compl. ¶ 9. After the Bureau files a civil action, Section 5565(a)(1) authorizes this Court to "grant any appropriate legal or equitable relief with respect to a violation of Federal consumer financial law, including a violation of a rule or order prescribed under a Federal consumer financial law." Section 5565 further authorizes the Court to award monetary relief, including damages and civil money penalties, for violations of Bureau orders. In particular, Section 5565(c)(1) provides that "[a]ny person that violates, through any act or omission, any provision of Federal consumer financial law shall forfeit and pay a civil penalty pursuant to this subsection." The Court therefore is authorized to impose monetary relief against Danaher for his violations of the Order, in addition to other appropriate legal or equitable relief.

---

[9] As Danaher notes, such relief would render Count II moot because Danaher no longer works at TUI and can no longer be compelled to comply with the Order. Br. 14.

Section 5563 provides another mechanism for the Bureau to seek enforcement of, or require compliance with, Bureau orders. *See* 12 U.S.C. § 5563(d)(1) (stating that the Bureau may in its discretion apply to a federal district court for the enforcement of a Bureau order, and the court would have authority to require compliance with the order). But the Bureau is not required to proceed under that provision and has not done so here. Accordingly, Danaher's arguments regarding the enforcement provisions of Section 5563 are irrelevant and the Court should not dismiss Count II on this basis.[10]

**III. The Bureau's Claims Against Danaher are Timely**

"Dismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009). "As long as there is a conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense," dismissal is inappropriate. *Sidney Hillman Health Ctr. v. Abbot Labs*, Inc., 782 F.3d 922, 928 (7th Cir. 2015). Thus, a motion to dismiss a claim as untimely should only be granted where "it is clear from the face of the [] complaint that it is hopelessly time-barred." *Cancer Found.*, 559 F.3d at 676. And because the Bureau is a government entity, the Court must strictly construe Section 5564(g)(1) in favor of the Bureau. *See Badaracco v. C.I.R.*, 464 U.S. 386, 391-92 (1984). Here, there is no basis for the Court to conclude that the Bureau's claims against Danaher are time-barred.

[10] Danaher's related argument that the Order's Paragraph 82 limits enforcement only to TU, not Danaher, Br. 13-14, fails for the reasons set forth in Part II.A., *supra*.

### A. The Complaint Alleges That Danaher's Violations Continued Until Less Than Three Months Before the Bureau Filed this Lawsuit—Conduct Clearly Within the Limitations Period

The CFPA provides that "[e]xcept as otherwise permitted by law or equity, no action may be brought under this title more than 3 years after the date of discovery of the violation to which an action relates." 12 U.S.C. § 5564(g)(1). According to the plain text, then, the CFPA's statute of limitations runs from the date of the Bureau's actual discovery of the violation, not when the Bureau could have, or should have, discovered a violation. The Bureau does not "discover" a violation until it discovers facts suggesting all necessary elements of a violation. *See CFPB v. Nationwide Biweekly Admin., Inc.*, No. 15-cv-2106, 2017 WL 3948396 (N.D. Cal. Sept. 8, 2017) (currently on appeal) (*citing Merck & Co. v. Reynolds*, 559 U.S. 633, 648-49 (2010).[11] A "violation" is "*any act or omission* that, if proved, would constitute a violation of any provision of Federal consumer financial law." 12 U.S.C. § 5561(5) (emphasis added).

When the Bureau's claims are based on discrete violations of law made in repeated transactions with consumers over a period of time, as they are here, each act or omission is a new and separate violation under the CFPA, and the limitations period runs separately for each new offense. *See CFPB v. NDG Fin. Corp.*, No. 15-cv-5211, 2016 WL 7188792, *19-20 (S.D.N.Y. Dec. 2, 2016); *CFPB v. Howard*, No. 17-cv-161(JLS), 2018 WL 4847015, *3 (C.D. Cal. May 3, 2018) (citing *United States v. Kivanc*, 714 F.3d 782, 790 (4th Cir. 2013)). Thus, at the pleading stage, if a Complaint alleges that some violations occurred within the limitations period, then the Bureau necessarily could not have discovered them outside the limitations period, and the Complaint should not be dismissed. *See CFPB v. Howard*, No. 17-cv-161(JLS), 2017 WL

[11] The court in *Nationwide Biweekly* suggested that a "reasonably diligent plaintiff" standard would apply to Section 5564(g)(1) instead of an actual discovery standard, but the court did not actually apply that standard to the case. *Id*.

10378953, *7 (C.D. Cal. May 30, 2017) (citing *U.S. ex rel. Air Control Techs, Inc. v. Pre Con Indus., Inc.*, 720 F.3d 1174, 1178 (9th Cir. 2013)); *see also Howard*, 2018 WL 4847015, *3 (even if Bureau was aware of defendants' scheme prior to the limitations period, defendants' violations that continued into the limitations period were not time-barred).

Here, the Complaint alleges that Danaher committed acts and omissions in violation of the Order through the date of his departure from TUI on February 1, 2022. Specifically, the Complaint alleges that Danaher, along with others, created a plan to delay and avoid implementing the requirements of Paragraph 40 of the Order and that Danaher directed TUI to violate the Order. Compl. ¶¶ 170-71. Under Danaher's leadership and direction, TUI continued violating the Order for five more years, and continued to fail to implement the Order, using marketing materials that violated the Order to enroll millions of consumers into TU products. *See, e.g.,* Compl. ¶¶ 64-67; 97-104; 166-89. The Bureau obviously could not have discovered any particular violation before the violation occurred. For that reason, regardless of when Danaher's violations started, any of his violations that occurred in the three years before the Bureau brought this suit cannot be time-barred under Section 5564(g)(1). Therefore, the Complaint pleads that actionable conduct occurred during the limitations period, and the Court may end its inquiry here.

### B. There is No Basis in the Complaint to Conclude that the Bureau Discovered Any of Danaher's Violations More Than Three Years Before Filing Suit

Ignoring that his violations continued until just less than three months before the Bureau brought this action, Danaher appears to claim that his *only* violations occurred on or before March 2017, when he and others at TU created a plan to avoid or delay implementation of the

Order and when he directed TUI to violate the Order. *See* Br. 28.[12] As discussed above, that is incorrect and inconsistent with the allegations in the Complaint, which reflect that Danaher committed acts and omissions in violation of the Order and, therefore, the CFPA on an ongoing basis through February 1, 2022. But even if the Court were to accept Danaher's faulty premise, it would not warrant dismissal. Despite Danaher's contention that the mere existence of the Order—in which TU promised not to violate the law—should have prompted an immediate inquiry by the Bureau into whether TU was violating the law, Br. 24, nothing in the Complaint establishes that the Bureau actually discovered Danaher's violations more than three years before the Complaint was filed.[13]

1. <u>Danaher's Statute of Limitations Argument Relies on Extrinsic Material that Cannot Be Considered on a Motion to Dismiss</u>

As an initial matter, Danaher's argument fails because it relies on a raft of extraneous documents that the Court should not consider. When evaluating whether a plaintiff's claims are "hopelessly time-barred," the Court is limited to the allegations on the face of the Complaint. *See Cancer Found.,* 559 F.3d at 675-76; *CFPB v. Nat'l Collegiate Master Student Loan Tr.*, No. 17-cv-1323(SB), 2021 WL 5936404, at *3 (D. Del. Dec. 13, 2021), *motion to certify appeal granted*, No. 17-cv-1323(SB), 2022 WL 548123 (D. Del. Feb 11, 2022). Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings only if they are referred to in the plaintiff's complaint and are central to its claim. *Venture Assocs. Grp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993). Here, Danaher variously asks the Court to consider TU's Compliance Progress Report (Report) (Br. 24), websites where TU advertises

[12] The Complaint does not allege when Danaher's plan occurred. Danaher asserts that it "must have occurred, at the latest, in March 2017." Br. at 28. For purposes of this motion only, the Bureau will use that date.

[13] As discussed below, Section 5564(g)(1) requires actual discovery, not constructive discovery.

Credit-Related Products (Br. 25), a Bureau press release, consumer information web page and supervisory manual (Br. 25-26), an acknowledgement of Danaher's receipt of the Order (Order Acknowledgement) (Br. 27-28), and a TU filing with the Securities and Exchange Commission (SEC) (Br. 28.) None of these were referred to in the Complaint, and none are relevant to the Bureau's claim against Danaher, much less "central."

Danaher does not — and cannot — contend that the Complaint makes any reference to the Bureau press releases, informational pages, or supervisory manuals that he attaches to his Motion. Likewise, the Complaint does not reference the SEC filing attached to the Motion. In addition, though the Complaint references other TUI Order acknowledgments that were not timely executed, Compl. ¶¶ 160-65, it does not reference Danaher's Order Acknowledgment because it was executed shortly after the Bureau issued the Order. Accordingly, the Court should disregard these documents. *See Venture Assocs. Grp.*, 987 F.2d at 431. The Court should also ignore the various "websites" Danaher refers to. *See* Br. 25. Danaher has not identified or attached any particular content for the Court to consider, much less established that it would be appropriate for the Court to consider such material at the pleading stage.[14]

With respect to the Report, Danaher contends it should be considered because it "is incorporated in the Complaint by reference because [it is] expressly referenced in the Consent Order." Br. 4 n.1. Yet the case Danaher cites for this proposition, *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730 (7th Cir. 2002), is inapposite. In *Trinity*, the Seventh Circuit held it proper that the

[14] If, instead, Danaher is asking the Court to take judicial notice of the websites as being "publicly accessible," the Court should also reject this argument. Not only does it raise inappropriate factual issues at the pleading stage, but it is also false. TU's marketing materials are not generally publicly available. Among other reasons, many of the marketing materials are only seen during the enrollment process. *See, e.g.*, Compl. ¶¶ 78-90. Also, much of TU's marketing is targeted toward specific consumers, like those who have applied for a loan, (*see, e.g.*, Compl. p. 23, fig. 3), or consumers that TU emails directly, (*see, e.g.*, Compl. p.13, fig. 2), and therefore not visible to the general population.

lower court considered a form attached to defendant's motion to dismiss that was alleged to supply terms and conditions of the contract referred to in the complaint. *Id.* at 735. Here, the Report supplies no terms and conditions of the Order; it is only a deliverable required of TU by one paragraph of the Order.

Rather, the Report's submission and contents are factual events described in a movant's brief, which this Court routinely disregards on a motion to dismiss. *See, e.g.*, *Carlson v. Bremen High Sch. Dist. 228*, 423 F. Supp. 2d 823, 826 (N.D. Ill. 2006) (Bucklo, J.) ("My review is limited to the pleadings on file, so I must exclude from my analysis any factual assertions either party made in their papers related to the motion to dismiss"), citing *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia,* 73 F.3d 1423, 1430 (7th Cir. 1996). Under the foregoing precedent, the Court should also disregard the fact of Danaher's submission of an Order Acknowledgement, facts relating to how the Bureau supervises consumer reporting agencies, and the fact that TU identified Danaher's title in an SEC filing.

Danaher alternatively states that the Report can be considered because it is subject to judicial notice as a public record and/or agency correspondence. Br. 3 n.1. But the Report is not a public record; TU labeled it "privileged and confidential" and formally requested confidential treatment of it. ECF No. 31-2, Att. C. Nor is it appropriate to take judicial notice of the Report as "agency correspondence." It represents only a partial record of the correspondence between parties which this Court correctly has eschewed reliance on in the motion to dismiss context. *See E.E.O.C. v. Supervalu, Inc.*, 674 F. Supp. 2d 1007, 1010 (N.D. Ill. 2009) (Bucklo, J.) (denying motion to dismiss based on correspondence with plaintiff attached to motion; stating "[I]t is unclear whether these documents represent the complete correspondence between the parties. It is also unclear whether other documents besides the parties' correspondence might be relevant to

assessing [plaintiff's] conciliation efforts.") In sum, none of Danaher's extraneous materials should be considered.

2. <u>There is No Factual Basis to Conclude that the Bureau Discovered Danaher's Violations Before April 12, 2019, Three Years Before the Complaint was Filed</u>

Danaher argues that the Bureau discovered, or should have discovered, his violations soon after the Effective Date and, therefore, its claims against him are time-barred. Br. 22-29. The Court should reject these arguments. First, Danaher relies on a misreading of Section 5564(g)(1) and fails to account for Congress's deliberate drafting of the statute to incorporate only an actual discovery standard, not a constructive discovery standard. Second, Danaher fails to identify allegations in the Complaint that would suggest either the Bureau's actual, or constructive, discovery of his violations.

If Congress had intended to incorporate a constructive discovery provision into Section 5564(g)(1), it would have done so explicitly. For example, it could have required the Bureau to sue within 3 years of the "date of discovery of a violation, *or the date when such discovery should have been made by the exercise of reasonable diligence*, *See* 15 U.S.C. § 77m (barring actions "unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence"); *see also* 21 U.S.C. § 335b(b)(3)(B) (barring actions initiated "more than 6 years after the date when the facts material to the act are known or reasonably should have been known by the Secretary"). But Congress did not choose that approach, for good reason. Applying a constructive or reasonably diligent discovery standard to Bureau enforcement actions would pose substantial difficulties. For example, with respect to the reasonably diligent discovery standard, the Supreme Court has indicated that "[i]t is unclear whether and how courts should consider agency priorities and resource constraints in applying that test to government enforcement

actions." *Gabelli v. SEC*, 568 U.S. 442, 452-53 (2013). Moreover, undertaking this analysis would mire courts in inquiries into an agency's funding, staffing, training, enforcement programs, statutory constraints, and other factors—all of which would be "further complicat[ed]" by the inevitable assertion of "various privileges, such as law enforcement, attorney-client, work product, or deliberative process. *Id*.

To support his argument that "discovery" runs from when the Bureau "should have" discovered a violation, Danaher relies on *Merck*, 559 U.S. at 653. As an initial matter, Danaher misstates the holding of *Merck*. He claims *Merck* held that, under a constructive discovery rule, "the statute of limitations begins to run 'when the facts would have prompted a reasonably diligent plaintiff *to begin investigating*.'" Br. 23 (emphasis added). The *Merck* Court expressly rejected that framing, holding that while "terms such as 'inquiry notice' and 'storm warnings' may be useful to . . . identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating[,] . . . [t]he limitations period does not begin to run until the plaintiff . . . *discovers* or a reasonably diligent plaintiff *would have discovered* 'the facts constituting the violation.'" 559 U.S. at 653 (emphasis added). As the Court noted, once a reasonably diligent plaintiff begins an investigation, it "may consume as little as a few days or as much as a few years to get to the bottom of the matter" and discover the facts. *See Merck*, 559 U.S. at 652 (quoting *Young v. Lepone*, 305 F.3d 1, 9 (1st Cir. 2002)).

Turning to the substance of Danaher's argument, the Supreme Court's rationale in *Merck* for applying a constructive discovery rule in that case does not apply here. *Merck* involved a statute that applied only to private plaintiffs; it did not address a situation where the plaintiff is a federal government enforcement agency acting in a law-enforcement capacity. The *Merck* Court based its interpretation of the term "discovery" on the history and precedent surrounding the use

of that term in cases involving private plaintiffs; as the Supreme Court later noted in *Gabelli*, those precedents do not apply to government enforcement actions. 568 U.S. at 449-54 (2013). Danaher also cites to two district court opinions that use constructive discovery language in applying Section 5564(g)(1). *See NDG Fin. Corp.*, 2016 WL 7188792, at * 19; *CFPB v. Ocwen Fin. Corp.*, 2019 U.S. Dist. LEXIS 152336, at *65 (S.D. Fla. Sept. 5, 2019) (quoting *NDG Fin. Corp.*). But those cases do not help Danaher here: first, in both cases, the court declined to dismiss the Bureau's claims as time-barred because, as here, the complaints had alleged conduct continuing into even the strictest reading of the limitations period. Second, neither court provides any basis for its citation of the constructive discovery standard. And finally, while the court in *Ocwen* cites *NDG*'s application of the constructive discovery rule, it rests its own ruling on an actual discovery standard: "Defendants cannot show as a matter of law on the face of the Complaint that the CFPB discovered Defendants' violations on or before January 2014." *Id.*

If this Court reaches this issue, which it need not do at this stage, it should adopt the reasoning of a recent opinion of another court that considered — and expressly rejected — the argument that a constructive discovery rule could be imported into Section 5564(g)(1). *See CFPB v. Chou Team Realty LLC*, No. 20-cv-0043(SB)(ADS), 2021 WL 4077110, at *5 (C.D. Cal. Aug. 10, 2021). Citing its obligation to construe limitations periods in favor of the government, that court held that "there is no 'constructive discovery' rule set forth in the statute—and [Defendant] has not shown that the Court is free to engraft one onto it." *Id*. The court should follow this well-reasoned opinion.

Danaher makes several arguments regarding what the Bureau actually discovered or should have discovered. Danaher contends that the Bureau "had actual knowledge" of his violations shortly after the Effective Date in 2017 when TU submitted documentation showing

that Danaher was the President of TUI and had received a copy of the Order. Br. 27-28. Danaher likewise cites to public securities filings that state Danaher's title. Br. 28, n.1. But even if the Court considers those extrinsic documents (which it should not) Danaher's title and his receipt of the Order, standing alone, would not establish all elements of the Bureau's claims against Danaher (*e.g.*, they do not reflect that Danaher committed acts or omissions in violation of the Order) and therefore cannot constitute "discovery" of the Bureau's violations against Danaher. *See Nationwide Biweekly Admin., Inc.*, 2017 WL 3948396, at *10 (Bureau has not discovered a violation if it lacks sufficient facts to file suit). Indeed, nothing in those documents or any of the extraneous documents Danaher attaches to the Motion reflects Danaher's plan to delay or avoid compliance with the Order.

Danaher asserts that given its supervisory powers, the Bureau should have initiated an investigation into TU's compliance with the Order early in 2017 due to its receipt of the Report and the public availability of websites where TU sells Credit-Related Products (as defined by the Order). Br. 24-26. Even if the Bureau were subject to a constructive discovery rule, Danaher's arguments still fail. The Report does not support Danaher's argument that TU's noncompliance was evident to the Bureau; for one thing, Attachment A to the Report entitled "Consent Order Significant Activities" states "After formulation of the working group, a meeting was held on January 18, 2017 [shortly after the Effective Date] to initiate efforts to comply with the Consent Order." ECF No. 31-2, Att. B at 5. With respect to the websites, Danaher does not point to the specific content that he contends was publicly available; in particular, he identifies nothing that implicates him personally, so it is unclear how TU's websites would have put the Bureau on notice of his violations. Danaher also cites the Order, which is attached to the Complaint. Among other things, the Order requires TU to cease engaging in the violations the Order describes; it is

unclear how that document would put the Bureau on notice that *TU* was continuing to violate the Order, let alone Danaher. In sum, none of these documents reference Danaher's non-compliance with the Order and he does not explain how these documents would have given the Bureau a reason to begin investigating his violations even if a constructive discovery standard applied to Section 5564(g)(1), which it does not.

## CONCLUSION

For the foregoing reasons, the Court should deny the Motion. In the event that the Court grants any part of it, the Bureau should be given leave to file an amended Complaint. *See, e.g.*, *Shachter v. City of Chicago*, No. 18-cv-5504, 2019 WL 4750083, *5 (N.D. Ill. Sept. 30, 2019) ("Under Federal Rule of Civil Procedure 15(a)(2), the court should 'freely give leave' to a plaintiff to amend his complaint 'when justice so requires.'").

Respectfully submitted,

Dated: August 12, 2022

Eric Halperin
*Enforcement Director*

David M. Rubenstein
*Deputy Enforcement Director*

Cynthia Gooen Lesser
*Assistant Deputy Enforcement Director*

s/ Jessica Rank Divine____________
Jessica Rank Divine
Tracy L. Hilmer
Mary K. Warren
Alisha Marie Nair
*Enforcement Attorneys*

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone: (202) 435-7863 (Divine)
Telephone: (202) 435-7459 (Hilmer)
Telephone: (202) 435-7815 (Warren)
Telephone: (202) 718-0339 (Nair)

Email: jessica.divine@cfpb.gov
Email: tracy.hilmer@cfpb.gov
Email: mary.warren@cfpb.gov
Email: alishamarie.nair@cfpb.gov

*Attorneys for Plaintiff Consumer Financial Protection Bureau*