# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:22-cv-1880 |
| TRANSUNION, TRANS UNION LLC, TRANSUNION INTERACTIVE, INC., and JOHN T. DANAHER, | ) ) ) ) | District Judge Elaine E. Bucklo |
| Defendants. | ) | |

**TRANSUNION, TRANS UNION LLC, AND TRANSUNION INTERACTIVE, INC.'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT**

## TABLE OF CONTENTS

**Contents**                                                                                                    **Page**

PRELIMINARY STATEMENT ............................................................................................ 1

ARGUMENT ...................................................................................................................... 3

    I.    The Bureau's failure to provide a non-objection or direction to revise TU's
           Compliance Plan bars Count I............................................................................. 3

    II.   The forward-looking, five-year Consent Order bars the Bureau's remaining
           claims under basic principles of res judicata.................................................... 7

    III.  The CFPB's claims are time-barred on the face of the Complaint. ................... 11

    IV. The CFPB's prosecution of this action is unconstitutional ................................ 13

CONCLUSION ................................................................................................................... 15

CERTIFICATE OF SERVICE ........................................................................................... 17

i

## TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*Bank of Am., N.A. v. Moglia,*
   330 F.3d 942 (7th Cir. 2003) ........................................................................4

*Bonte v. U.S. Bank, N.A.,*
   624 F.3d 461 (7th Cir. 2010) ........................................................................7

*CFPB v. All Am. Check Cashing, Inc.,*
   33 F.4th 218 (5th Cir. 2022) ..................................................................13, 14

*CFPB v. Chou Team Realty LLC,*
   No. 8:20-cv-00043-SB-ADS, 2021 WL 4077110 (C.D. Cal. Aug. 10, 2021).........................12

*CFPB v. Klopp,*
   957 F.3d 454 (4th Cir. 2020) ......................................................................12

*CFPB v. National Collegiate Master Student Loan Trust,*
   575 F. Supp. 3d 505 (D. Del. 2021)..............................................................11

*CFPB v. Ocwen Financial Corp.,*
   30 F.4th 1079 (11th Cir. 2022) ............................................................. passim

*Cheli v. Taylorville Cmty. Sch. Dist.,*
   986 F.3d 1035 (7th Cir. 2021) ...................................................................5, 6

*Cincinnati Ins. Co. v. E. Atl. Ins. Co.,*
   260 F.3d 742 (7th Cir. 2001) ........................................................................7

*Collins v. Yellen,*
   141 S. Ct. 1761 (2021)................................................................................14

*Cont'l Cas. Co. v. Steelcase Inc.,*
   No. 02-cv-8064, 2004 WL 1965699 (N.D. Ill. Aug. 23, 2004) ..................................3

*Friends of Milwaukee's Rivers v. Milwaukee Metropolitan Sewage Dist.,*
   382 F.3d 743 (7th Cir. 2004) ...................................................................1, 7, 8

*Gabelli v. S.E.C.,*
   568 U.S. 442 (2013)..................................................................................12

*Heritage Bank & Tr. Co. v. Abdnor,*
   906 F.2d 292 (7th Cir. 1990) .....................................................................3, 4

*In re Animation Workers Antitrust Litig.,*
   87 F. Supp. 3d 1195 (N.D. Cal. 2015) ...........................................................11

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
No. 1:00-cv-1898, 2015 WL 5051660 (S.D.N.Y. Aug. 26, 2015) ..............................8

*Intel Corp. Inv. Pol'y Comm. v. Sulyma*,
140 S. Ct. 768 (2020) .......................................................................................13

*Jacobeit v. Rich Twp. High Sch. Dist. 227*,
673 F. Supp. 2d 653 (N.D. Ill. 2009) ...................................................................7

*Jagla v. BMO Fin. Grp.*,
248 F. App'x 743 (7th Cir. 2007) ........................................................................7

*Kronenberg v. Baker & McKenzie LLP*,
692 F. Supp. 2d 994 (N.D. Ill. 2010) ..................................................................7

*Merck & Co. v. Reynolds*,
559 U.S. 633 (2010) ....................................................................................11, 12

*Navarro v. F.D.I.C.*,
371 F.3d 979 (7th Cir. 2004) ..........................................................................3, 4

*Perkins v. Bd. of Trs. of the Univ. of Ill.*,
116 F.3d 235 (7th Cir. 1997) ...............................................................................7

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*,
631 F.3d 436 (7th Cir. 2011) ...............................................................................6

*S.E.C. v. Fisher*,
No. 07-cv-4483, 2008 WL 2062699 (N.D. Ill. May 13, 2008)..............................12

*Supporters to Oppose Pollution, Inc. v. Heritage Grp.*,
973 F.2d 1320 (7th Cir. 1992) ................................................................9, 10, 11

*Taracorp, Inc. v. NL Indus., Inc.*,
73 F.3d 738 (7th Cir. 1996) .................................................................................4

*United States v. Olson*,
880 F.3d 873 (7th Cir. 2018) .............................................................................15

*Zero Zone, Inc. v. U.S. Dep't of Energy*,
832 F.3d 654 (7th Cir. 2016) .............................................................................15

**Statutes**

12 U.S.C. § 5561 ................................................................................................ 11

12 U.S.C. § 5564 ...................................................................................... 11, 12, 13

**Other Authorities**

Restatement (Second) of Contracts § 227(1) ..................................................................... 4

## PRELIMINARY STATEMENT

TU's motion to dismiss established that the Bureau cannot enforce the Consent Order because it did not meet the condition precedent of responding to TU's Compliance Plan. As we predicted, in response, the CFPB does not—and cannot—claim to have responded to TU's Compliance Plan. Instead, it resorts to arguing that the plain language of the Consent Order does not mean what it says. The CFPB contends that a Consent Order provision which gave it discretion to choose between two actions—issuing a non-objection or directing TU to revise the Compliance Plan—also included an unstated third option for the Bureau not to respond to TU's Compliance Plan at all. But that reading of the Consent Order is in direct conflict with basic principles of contract construction, rendering key provisions of the Consent Order superfluous, while also injecting significant inconsistencies between provisions. And it rewrites the Consent Order in a way that eliminates the very reason TU bargained for the provision in the first place—to obtain certainty from the Bureau regarding the adequacy of TU's Compliance Plan. Although the CFPB notes that conditions precedent are generally disfavored, the unique circumstances of this case and the relevant contract language are consistent with other cases where courts find and enforce conditions precedent. Count I should be dismissed.

The Bureau also misconstrues precedent establishing that its remaining claims (Counts III – VIII) are barred by res judicata. The Bureau argues that res judicata cannot apply to post-agreement conduct. But as with its condition precedent argument, this argument is based on the Bureau's improper reading of the terms and structure of the Consent Order. As TU showed in its moving brief, res judicata can apply to post-agreement conduct if that is what the parties provide for in their agreement. And indeed, that is what TU and the CFPB did here, just as the parties did in *CFPB v. Ocwen Financial Corp.*, 30 F.4th 1079, 1082-83 (11th Cir. 2022), and in *Friends of Milwaukee's Rivers v. Milwaukee Metropolitan Sewage District*, 382 F.3d 743, 758 (7th Cir.

2004), among other cases. The CFPB's attempt to distinguish *Ocwen* does not work—all three aspects of the consent judgment that warranted application of res judicata in *Ocwen* are present here. The Bureau argues that the parties in *Ocwen* agreed to more detail in their consent judgment, but the Bureau itself describes the TU Consent Order's provisions as "detailed," and it cannot evade the Consent Order's preclusive effect by failing to direct revisions to and approve the Compliance Plan, which itself established any number of detailed prescriptions.

This action is time-barred in any event. The Complaint establishes that the Bureau knew (and reasonably should have known) of the "violation" to which this action relates—*i.e.*, the TU practices at issue—outside the three-year statute of limitations. Neither the CFPB in its opposition, nor any of the decisions on which it relies, grapples with the text of the CFPA's discovery-based, three-year statute of limitations, or takes relevant Supreme Court precedent into account. Instead, the CFPB argues for a perverse interpretation of the statute—one that would allow it to bring claims for the same violation over and over and over again.

Finally, as TU established in its moving brief, this action is barred by constitutional deficiencies in the CFPB's funding structure and the anti-removal provision that was in effect when the Consent Order was issued. The CFPB contends that neither it, nor the statute authorizing its funding, is materially different from other agencies or relevant statutes. But the constitutional requirement that appropriations be "made by law" means more than authorizing access to non-appropriated funds, and none of those other agencies is comparable to the CFPB. And while the CFPB asserts that TU waived any challenge to the anti-removal provision in the Consent Order, any purported waiver is invalid to the same extent as the Consent Order itself. The CFPB also suggests that TU must show some proof of harm, but that is not the standard for constitutional injury. Given that the Consent Order was issued just 17 days before the inauguration of a new

President, the anti-removal provision surely could have affected the negotiations over the Consent Order. Nothing more is required.

## ARGUMENT

I.      **The Bureau's failure to provide a non-objection or direction to revise TU's Compliance Plan bars Count I.**

Count I should be dismissed because the Bureau failed to (and cannot) allege the satisfaction of a condition precedent to the Bureau's enforcement of the Consent Order—namely, providing TU with a determination of non-objection or direction to revise its Compliance Plan, as is required by the Consent Order. ECF 29 ("Br.") 6-8, 11-16. Nowhere in its opposition does the Bureau dispute TU's core contention that the Bureau failed to provide any such determination or direction to TU. The Bureau instead spends a third of its brief arguing that the Consent Order was effective on its Effective Date, and that TU therefore had to *comply* whether the Bureau provided a non-objection or not. ECF 40 ("Opp'n Br.") 7-16. But TU never said otherwise. *See* Br. 2, 13.[1]

Unable to allege that it satisfied this condition precedent, the Bureau instead distorts the language of the Consent Order. First, the Bureau argues the broad principle that "conditions precedent are generally disfavored." Opp'n Br. 8 (quoting *Navarro v. F.D.I.C.*, 371 F.3d 979, 981 (7th Cir. 2004)). But despite this general principle, courts routinely find and enforce conditions precedent in contracts. *See, e.g.*, *Heritage Bank & Tr. Co. v. Abdnor*, 906 F.2d 292, 298 (7th Cir. 1990); *Cont'l Cas. Co. v. Steelcase Inc.*, No. 02-cv-8064, 2004 WL 1965699, at *8, *11 (N.D. Ill. Aug. 23, 2004). As demonstrated by the authority on which the Bureau itself relies, courts often find conditions precedent where, as here, the condition "is within the obligee's control or the

---

[1] In fact, in its moving brief, TU explicitly stated: "To be clear, TU has complied with the Consent Order and its Compliance Plan in good faith, and it will continue to comply with all applicable laws regardless of whether the CFPB meets its own obligations. *This motion does not contend otherwise and is focused on whether the Bureau is required to fulfill its own obligations under the Consent Order if it wants to enforce it in court.*" Br. 2 (emphasis added).

circumstances indicate that [the obligee] has assumed the risk."  Restatement (Second) of Contracts § 227(1) (cited in *Navarro*, 371 F.3d at 981).  Here, the Bureau had complete "control" over whether it provided TU with a determination of non-objection or direction to revise the Compliance Plan.  And the Bureau certainly "assumed the risk" of failing to do so.  *See, e.g.*, *Abdnor*, 906 F.2d at 298.

Next, the CFPB contends that the Consent Order gave it the discretion to do nothing—in other words, that it was not required to provide a determination of non-objection or direction to revise TU's Compliance Plan.  Opp'n Br. 13-14.  But that is not what the Consent Order says.  Citing no case law in support of its argument, the Bureau relies solely on Paragraph 42 of the Order, which does state that the Bureau has "discretion."  *Id.* at 13.  But critically, the word "discretion" is immediately followed by the phrase "to make a determination of non-objection to the Compliance Plan *or* direct Respondents to revise it."  Consent Order ¶ 42 (emphasis added).  By specifically identifying these two options—non-objection or direction to revise—the parties clearly delineated the scope of the Bureau's discretion.  It makes no sense that the parties agreed to a third, unwritten option—that the CFPB could leave TU in suspense as to whether it approved or not.  *See, e.g.*, *Bank of Am., N.A. v. Moglia*, 330 F.3d 942, 946 (7th Cir. 2003).[2]  The Bureau's position—that TU was required to prepare and submit to the Bureau a Compliance Plan, which the Bureau could ignore and TU could not follow, Opp'n Br. 12-14—defies not only logic, but also basic principles of contract construction that the Bureau itself cites, requiring a contract to be interpreted in a way that "ascribes meaning to every clause, phrase and word used . . . ."  Opp'n

---

[2] Had the parties intended to give the Bureau that discretion, the Bureau knew "perfectly well" how to do that.  *Taracorp, Inc. v. NL Indus., Inc.*, 73 F.3d 738, 746 (7th Cir. 1996).  In a recent consent order, the Bureau required the submission of a compliance plan and omitted any obligation to respond to it with a non-objection or direction to revise, presumably in response to TU's arguments here.  *See In the Matter of U.S. Bank Nat'l Ass'n*, File No. 2022-CFPB-0006 (July 28, 2022), at 12-13 (*available at* https://files.consumerfinance.gov/f/documents/cfpb_us-bank_-na_consent-order_2022-07.pdf).

Br. 8 (quoting *Cheli v. Taylorville Cmty. Sch. Dist.*, 986 F.3d 1035, 1041-42 (7th Cir. 2021)).[3]

Indeed, not only is the CFPB's position in this regard inconsistent with the plain language of the Consent Order, but TU did not bargain for that result. TU bargained for the right to certainty concerning whether the Bureau approved its plan for compliance and, if it did not, what TU needed to do to obtain that approval. The Bureau failed to give TU the benefit of any input on its plan for complying with the Consent Order and then turned around and sued TU for alleged non-compliance with the Consent Order. This kind of "gotcha" approach deprives TU of the certainty it bargained for—namely, that if TU followed the agreed-upon Compliance Plan, the CFPB would be satisfied that TU's conduct was lawful.

In fact, the Bureau's "complete discretion" reading of Paragraph 42 would require the Court to interpret two identical provisions of the Consent Order completely differently. Paragraph 48 of the Consent Order, which deals with TU's Redress Plan, contains language identical to Paragraph 42. It gives the Bureau the discretion "to make a determination of non-objection" to TU's proposed Redress Plan *or* "direct Respondents to revise it." Consent Order ¶ 48. The CFPB now contends that its response to TU's Redress Plan was "necessary" because otherwise funds would not be distributed to consumers, while its response to TU's Compliance Plan was not. Opp'n Br. 14. But there is no basis for reading "discretion" one way in Paragraph 42 of the Consent Order and another, contradictory way in Paragraph 48. Once again, the Bureau's position goes against the basic principle of contract construction that the Bureau itself cites, requiring a contract to be interpreted in a way that "harmonizes all the various parts so that no provision is deemed

---

[3] While the Bureau claims that TU's reading would render the "discretion" language in the Consent Order superfluous, *id.* at 13, reading Paragraph 42 of the Consent Order as giving the Bureau complete discretion to do whatever it wanted—including nothing whatsoever—would not only render the remainder of the "discretion" sentence in Paragraph 42 superfluous, but would also render Section VI of the Consent Order, which deals with the Compliance Plan, meaningless as well.

conflicting with . . . any other." *Id.* at 8 (quoting *Cheli*, 986 F.3d at 1041-42). Both provisions were drafted to provide TU certainty that its conduct would be acceptable to the CFPB: once the CFPB provided TU with its non-objection to each plan, Paragraph 42 ensured TU that it could conduct its business with confidence that the CFPB would not later say that it should have acted differently, and Paragraph 48 ensured TU that it could distribute funds with confidence that the CFPB would not later say they should have been distributed differently.

Nor, as the Bureau contends, would holding the Bureau to its obligation to provide a non-objection or direction to revise the Compliance Plan "lead to an absurd result" by allowing TU to "deliberately avoid compliance with the Order indefinitely by submitting and resubmitting inadequate Compliance Plans." *Id.* at 14. Paragraph 42 requires that once TU receives a direction from the Bureau to revise the plan, TU "*must* make the revisions and resubmit." Consent Order ¶ 42 (emphasis added).[4]

Purportedly to show that TU "knew" that "compliance" was not contingent upon a non-objection, the Bureau includes in its brief factual allegations about the parties' negotiation of the Consent Order that appear nowhere in its Complaint. Opp'n Br. 15-16. This is unnecessary because TU is not arguing that non-objection was a condition precedent to *compliance* with the Consent Order. *See, e.g.*, Br. 1-2, 13. *But see* Opp'n Br. 2, 7, 9-16. Rather, TU argues that non-objection was a condition precedent to the CFPB suing TU for violating the Consent Order. Br. 13 ("The text and structure of the Consent Order demonstrate that the parties intended that the CFPB's determination of non-objection would be a condition precedent to *enforcement* of the Consent Order by the CFPB.") (emphasis added). Moreover, the CFPB, like any other plaintiff, may not amend its Complaint in a brief. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust*

---

[4] Contrary to the Bureau's assertion, the Compliance Plans are not "extrinsic evidence." Opp'n Br. 9. They are incorporated by reference in the Complaint. Br. 10-11.

*v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011). In any event, even if the Consent Order were ambiguous (and it is not), it must be construed in TU's favor because liability for violation of an order "requires a clear indication of what is prohibited." *CFPB v. Klopp*, 957 F.3d 454, 463-64 (4th Cir. 2020) (rejecting CFPB's proposed broader reading); *see also* Br. 14-15.[5]

## II.    The forward-looking, five-year Consent Order bars the Bureau's remaining claims under basic principles of res judicata.

The Bureau's remaining claims against TU (Claims III – VIII) are barred by res judicata. The parties agreed in the Consent Order to resolve disputes over TU's marketing of its Credit-Related Products for a five-year term through the process of establishing an approved Compliance Plan—in effect, a kind of pre-approval of TU's practices for the term of the Consent Order. Br. 16-22. As in *Friends of Milwaukee's Rivers* and *Ocwen*, that agreement precludes the CFPB from suing for alleged statutory or regulatory violations during the term of the Consent Order that were within the scope of the Consent Order.

The Bureau responds that res judicata cannot apply to future conduct—here, conduct that post-dates the Consent Order. Opp'n Br. 22. While that is the general rule, *id.*, neither of the decisions discussed by the Bureau (*Jagla v. BMO Fin. Grp.*, 248 F. App'x 743, 745 (7th Cir. 2007), and *Perkins v. Bd. of Trs. of the Univ. of Ill.*, 116 F.3d 235, 237 (7th Cir. 1997)), addresses, much less negates, the more relevant principle that the preclusive effect of a settlement agreement is determined by its terms. *See, e.g.*, *Friends of Milwaukee's Rivers*, 382 F.3d at 757-58. Here, the provisions of the Consent Order specifically establish a forward-looking compliance, monitoring,

---

[5] Count I can also be dismissed on the ground that the CFPB "did not attempt to refute or oppose [the] argument" that non-objection or direction to revise is a condition precedent to *enforcement* of the Consent Order. *Jacobeit v. Rich Twp. High Sch. Dist. 227*, 673 F. Supp. 2d 653, 659 (N.D. Ill. 2009). Where, as here, a party fails to respond to a proposed construction of a contract, the Seventh Circuit has found that "operates as a waiver" and has adopted the proposed construction (even one the court said was likely incorrect). *Cincinnati Ins. Co. v. E. Atl. Ins. Co.*, 260 F.3d 742, 747 (7th Cir. 2001) (Posner, J.); *see also Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010); *Kronenberg v. Baker & McKenzie LLP*, 692 F. Supp. 2d 994, 1000 (N.D. Ill. 2010) (Bucklo, J.) ("Plaintiff fails to respond to this argument . . . . Accordingly, his argument is waived.").

and enforcement regime with a prospective preclusive effect.  Br. 5-9, 18-20.

The Bureau is unable to seriously dispute the fact that courts prospectively apply res judicata in these circumstances, as shown in the authorities that TU cites.  *See* Opp'n Br. 24-26. In a footnote to its brief, the Bureau addresses *Friends of Milwaukee's Rivers* by asserting that "the court actually held that *res judicata* did *not* apply."  *Id.* at 24 n.12.  While it is true that the Seventh Circuit declined to apply res judicata in that case, that was only because there was a lack of privity between the parties, *see* 382 F.3d at 759, not because res judicata cannot be prospective. The Seventh Circuit's analysis of the "identity of causes of action" in that case, of course, is still binding on this Court.  And pursuant to that analysis, res judicata applies where, as here, "post-Stipulation violations are clearly related in origin to the pre-Stipulation violations and have the same factual basis."  *Id.* at 758; *see also* Br. 18-22.

The CFPB also argues that the agreement in *Friends of Milwaukee's Rivers*, supposedly in contrast to the agreement between TU and the CFPB here, contemplated violations of the law "for several years during the remediation."  Opp'n Br. 24 n.12.  But the Consent Order in this case likewise contemplates that subsequent violations could occur, as is apparent from the parties' agreement to establish a forward-looking compliance, monitoring, and enforcement regime.  *See* Br. 5-9, 18-20.  TU is not claiming, as the Bureau mistakenly suggests, that "the Bureau is forever estopped from bringing any other charges" against TU.  Opp'n Br. 21.  TU is simply making the basic point that the Consent Order binds the Bureau, and that during the Consent Order's five-year term, the Bureau is required to enforce through the mechanisms agreed to in that Order—including the establishment of a Compliance Plan acceptable to the Bureau, monitoring of compliance with that plan, and processes to investigate any concerns regarding non-compliance.  *See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, No. 1:00-cv-1898, 2015 WL 5051660, at *3 (S.D.N.Y.

Aug. 26, 2015) (similar outcome to *Friends of Milwaukee's Rivers* and *Ocwen* where the consent judgment at issue contained forward-looking conduct provisions).

The Bureau responds to *Ocwen* by contending that the Consent Order here is insufficiently detailed to have prospective preclusive effect. Opp'n Br. 25 (citing 30 F.4th at 1085). But the Consent Order includes Conduct Provisions that the CFPB itself describes as "detailed." *Id.* at 11. The Consent Order also details the Bureau's ability to monitor and enforce compliance. *See* Consent Order ¶¶ 41, 64, 71-73, 82. And significantly, in the Consent Order, the parties agreed that TU would prepare a Compliance Plan with, "at a minimum, . . . [d]etailed steps for addressing each action required by Section V [the Conduct Provisions]." *Id.* ¶ 41. As in *Ocwen*, the Consent Order's purpose was to channel allegations of violations into an agreed-upon enforcement framework, under which the CFPB would first confirm the adequacy of TU's plan for complying with the Consent Order which, in turn, was intended to ensure TU's compliance with the underlying federal consumer financial laws. The Bureau should not now be permitted to use its own failure to respond to the details of TU's Compliance Plan to avoid the preclusive effect of the Consent Order. *See Supporters to Oppose Pollution, Inc. v. Heritage Grp.*, 973 F.2d 1320, 1325-26 (7th Cir. 1992) (recognizing that plaintiff's "own laziness in the initial suit [was] hardly an equitable reason for allowing continued litigation," and that "the salutary principle of res judicata" is a "rule of fundamental and substantial justice" that cannot be overcome by equitable arguments). In other words, because the Bureau's claims are "covered by the standards" established by the Consent Order, *Ocwen*, 30 F.4th at 1085, they are barred by res judicata, Br. 22.

The Bureau's contention that *Ocwen* "hinged *exclusively* on the detailed Enforcement Terms" of the consent judgment in that case, Opp'n Br. 25 (citing 30 F.4th at 1085) (emphasis added), is wrong. *Ocwen* explicitly relied on "*three* aspects of the consent judgment," only one of

which addressed enforcement.  Br. 20 (citing 30 F.4th at 1082) (emphasis added).  Each of those factors further supports TU's res judicata argument.

First, the Consent Order here, like the consent judgment in *Ocwen*, is forward-looking: it "remain[s] operative for a [five]-year period . . . and require[s] [TU] to abide by specific [marketing] standards during that timeframe." *Ocwen*, 30 F.4th at 1082; *see* Br. 20.

Second, the Consent Order includes a release that is comparable to the release in *Ocwen*, 30 F.4th at 1082.  The Consent Order releases TU "from all potential liability for law violations that the Bureau has or might have asserted based on the practices described in Section IV . . . to the extent such practices occurred before the Effective Date."  Consent Order ¶ 77.  The *Ocwen* Order, similarly, released Ocwen "from all potential liability that has been or might have been asserted by the CFPB relating to the . . . practices described in the complaint."  *Ocwen*, 30 F.4th at 1082.  Moreover, the *Ocwen* court rejected the same release-based argument that the Bureau makes here, reasoning that no contractual provision—including the release—can be read "in isolation."  The court found that the agreement's "extensive three-year servicing-standard, monitoring, and enforcement regime indicates that if [Ocwen] committed a legal violation covered by the standards, the parties intended for the CFPB to remedy that violation through the agreed-upon processes—not through a separate court proceeding." *Id.* at 1085.

In another effort to avoid the impact of res judicata on its claims against TU, the Bureau now claims that TU engaged in "other" improper marketing practices after the parties agreed to the Consent Order.  Opp'n Br. 1, 5.  But for purposes of this motion, the CFPB must be held to the allegations in its Complaint, *see supra* at 6-7, which alleges that all of the improper practices at issue were already occurring as of the Consent Order's Effective Date in January 2017, *see* Compl. ¶¶ 49, 64, 80, 85, 97, 136; Br. 22.  As a result, there can be no "new wrongful conduct" beyond

the reach of res judicata. *Supporters to Oppose Pollution, Inc.*, 973 F.2d at 1325-26 ("new evidence of injury differs from a new wrong"); *see also id.* at 1327 (explaining that "claim-splitting that flows from the plaintiff's choice" is impermissible under principles of res judicata). Because the Bureau's claims "were or could have been raised against the parties and their privies in the first case," *id.* at 1325, they are also barred by res judicata. Br. 22.[6]

### III. The CFPB's claims are time-barred on the face of the Complaint.

The Bureau's claims are also independently barred by the CFPA's three-year, discovery-based statute of limitations. Br. 22-26. The CFPB's main argument in this regard—that "the limitations period runs separately" for each and every individual consumer enrollment and that the Bureau could not have "discovered" each enrollment before it actually happened, Opp'n Br. 17—is not consistent with the statutory language and would lead to absurd results.

The CFPA does not give the Bureau three years from discovery of the facts "constituting" each individual "act or omission" to bring suit. *Cf. Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010) (interpreting Securities Exchange Act Section 10(b)'s discovery rule). Rather, it provides three years from "discovery of *the violation*." 12 U.S.C. § 5564(g)(1) (emphasis added). As the CFPB observes, the CFPA defines "violation" as "*any act or omission* that, if proved, would constitute a violation of any provision of Federal consumer financial law." Opp'n Br. 17 (quoting 12 U.S.C. § 5561(5)) (emphasis in Brief).

The CFPB argues that TU's interpretation amounts to an "estoppel theory" that would somehow "prevent the Bureau from enforcing the law against recidivists." *Id.* at 18. That is not

---

[6] The Bureau relies on *CFPB v. National Collegiate Master Student Loan Trust*, 575 F. Supp. 3d 505 (D. Del. 2021), for the proposition that the Court may not take judicial notice of the 2015 Civil Investigative Demand ("CID"). Opp'n Br. 21. The court in that case, however, did not conclude that it would be improper to take judicial notice of the CID for any purpose; rather, it simply declined to find that the case was time-barred on the face of the complaint. *See Nat'l Collegiate Master Student Loan Tr.*, 575 F. Supp. 3d at 508. Courts do take judicial notice of CIDs. *See, e.g.*, *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1198 n.2 (N.D. Cal. 2015); Br. 11, 18-19.

correct. The purpose of a statute of limitations is to prevent a plaintiff—here, the Bureau— from sitting on its hands after learning of conduct that it believes gives rise to a claim. Once it discovers a *practice* that it believes violates the law, the Bureau must act within the statutory three years. The Bureau should not be heard to claim that each incidence of that *practice* gives rise to a new "discovery." Congress could not have intended to give the Bureau such latitude when there is no statute of repose in the CFPA. *See Merck & Co.*, 559 U.S. at 650 (rejecting concern that Section 10(b)'s discovery rule could "subject defendants to liability for acts taken long ago" in light of five-year statute of repose). This is particularly true where, as here, the Bureau has unique advantages that individuals do not have, including its subpoena power and a "cadre of publicly employed investigators," all of which distinguish it from a run-of-the-mill private litigant. Br. 24 (quoting *S.E.C. v. Fisher*, No. 07-cv-4483, 2008 WL 2062699, at *6 (N.D. Ill. May 13, 2008)).[7]

The Bureau argues as a last resort that the CFPA's statute of limitations is not triggered by constructive discovery. Opp'n Br. 19-20. But again, the Bureau fails to meaningfully engage with the CFPA's statutory text, nor does it address the Supreme Court's recognition in *Merck & Co.* that "discovery" in the statute of limitations context is a "term of art" that references the "discovery rule"—*i.e.*, "not only those facts the plaintiff actually knew, but also those facts a reasonably diligent plaintiff would have known." 559 U.S. at 644, 648. *CFPB v. Chou Team Realty LLC*, No. 8:20-cv-00043-SB-ADS, 2021 WL 4077110 (C.D. Cal. Aug. 20, 2021), on which the CFPB relies, adds nothing different. *See id.* at *5 (summarily finding "there is no 'constructive discovery'

---

[7] Although the Bureau appears to suggest that TU has misinterpreted or otherwise ignored certain non-binding authorities, *see* Opp'n Br. 17-19, TU affirmatively identified all of the decisions mentioned by the Bureau in its moving brief, explaining that those decisions, like the Bureau here, "simply assume[d] that the limitations period for a single violation can start over and over again and fail[ed] to consider how that conclusion can be reconciled with the CFPA's statutory language." Br. 25.

rule set forth in [Section 5564]" and that the defendant was not "free to engraft one onto it").[8]

Section 5564(g)(1) of the CFPA uses the term "discovery" without qualification, so it only stands to reason that the discovery rule applies. *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 776 (2020) (citing *Merck & Co.*). In this regard, it is the CFPB, and not TU, who is seeking to "engraft" something onto the statute—namely, the concept of "actual" discovery. *See* Opp'n Br. 19-21; *see also, e.g.*, *Sulyma*, 140 S. Ct. at 776 (rejecting constructive discovery rule in ERISA case because Congress included word "actual"). Because the Bureau knew, as it alleges in the Complaint, *see* Br. App. I, or reasonably should have known, of the practices at issue more than three years before it brought suit, its claims are time-barred. And even if the CFPB's interpretation of the statute of limitations were correct, any enrollments prior to February 4, 2018 (accounting for the parties' tolling agreements) are, without question, untimely. Br. 25-26.

## IV. The CFPB's prosecution of this action is unconstitutional.

Finally, as TU showed in its moving brief, this action should be dismissed because it suffers from two constitutional defects. Br. 26-29.

First, as five Fifth Circuit judges recently concluded, the CFPB's structure violates the Appropriations Clause, and dismissal of this action is the appropriate remedy. *See CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 220 (5th Cir. 2022) (en banc) (Jones, J., concurring). The CFPB's critiques of the Fifth Circuit concurrence's reasoning do not hold water.

---

[8] The Bureau argues in opposition to John Danaher's Memorandum in Support of his Motion to Dismiss that *Merck & Co.* does not apply to government enforcement actions. ECF 41 at 27-28 (citing *Gabelli v. S.E.C.*, 568 U.S. 442, 449-54 (2013)). That is not correct. In *Gabelli*, the statute of limitations was tied to when the claim "accrued," and the SEC sought to have more time to bring suit by "grafting the discovery rule" on to the statute's terms. *Id.* at 447-48, 452. The Supreme Court rejected that effort, finding that it "would be utterly repugnant to the genius of our laws if actions for penalties could be brought at any distance of time." *Id.* at 452 (citation and quotation marks omitted). *Gabelli* explicitly recognized that Congress can establish a statute of limitations that employs the discovery rule, even in enforcement actions, by using appropriate language. *See Gabelli*, 568 U.S. at 453. That is precisely what Congress did in the CFPA when it used the word "discovery," which has a well-settled meaning under *Merck & Co.* and *Sulyma. See supra* at 12-13.

The CFPB insists that the Appropriations Clause requires only that an Act of Congress authorizes the appropriation of money, and a statute authorizes the CFPB's guarantee of permanent funding. Opp'n Br. 27-28. The Appropriations Clause has more teeth than that. The Appropriations Clause's command that appropriations be "made by Law" requires that Congress enact laws authorizing the Treasury to appropriate particular amounts of money to particular agencies, not to withdraw amounts of their choosing from the Federal Reserve, whose budget consists of *non-appropriated* funds levied from banks. *All Am.*, 33 F.4th at 233 (Jones, J., concurring) ("Congressional oversight is meaningless without the leverage normally provided by Congress's appropriations power to back it up.").[9]

The CFPB also argues that its funding structure is no different than the funding structure of the OCC, Federal Reserve, and FDIC. Opp'n Br. 28. But as the Fifth Circuit concurrence explained, "those agencies are hardly comparable." *All Am.*, 33 F.4th at 235. Whereas "the mission and corresponding authority of those agencies is more targeted," the CFPB is in an "entirely different league," acting as "a mini legislature, prosecutor, and court." *Id.* at 235-36 (citation omitted). Those agencies also have other constraints, such as multi-member leadership bodies to ensure that "some level of political accountability is preserved," but "[n]one of these auxiliary structures constrains the CFPB." *Id.* at 236. And contrary to the CFPB's contention, Opp'n Br. 19-21, the Constitution's express, textual time limits on some appropriations does not mean that other, endless appropriations cannot run afoul of the Constitution's *structural* separation of powers. *See All Am.*, 33 F.4th at 232 n.50.

Finally, the CFPB argues that this constitutional defect would not justify dismissal, citing *Collins v. Yellen*, 141 S. Ct. 1761 (2021). Opp'n Br. 28. The Fifth Circuit concurrence correctly

---

[9] The CFPB cites a handful of cases that have rejected Appropriations Clause challenges, yet none "seriously wrestles with the overwhelming separation of powers problem" identified in *All American*. 33 F.4th at 239-40.

distinguished *Collins*, explaining that "a government actor cannot exercise even its lawful authority using money the actor cannot lawfully spend." *All Am.*, 33 F.4th at 242.

Moreover, the Consent Order is unenforceable because it was negotiated by a Director who was unconstitutionally insulated from removal by the President. Br. 27-29. As a result, this action should be dismissed. The CFPB's arguments to the contrary fall short.

The CFPB argues that TU waived its argument because the Consent Order recites that TU waived any challenges. Opp'n Br. 29. But that purported waiver is invalid because it was negotiated by a Director who was unconstitutionally insulated from removal. *See, e.g.*, *United States v. Olson*, 880 F.3d 873, 880 (7th Cir. 2018) ("Waivers of appeal must stand or fall with the agreements of which they are a part.") (citation omitted).

The CFPB also argues that TU was not prejudiced by the unconstitutional anti-removal provision. Opp'n Br. 29. But the CFPB refuses to engage with TU's argument to the contrary. The party challenging agency action must show that the error "*could* have affected the outcome." *Zero Zone, Inc. v. U.S. Dep't of Energy*, 832 F.3d 654, 682 (7th Cir. 2016) (emphasis added; quotation marks and citation omitted). As TU explained, Director Cordray personally negotiated and signed the Consent Order during the lame duck period of the Obama administration. If the Constitution had been followed, he would have been on the verge of replacement by a new President. In this scenario, TU could have held out and attempted to negotiate a different deal with a new Director who may have had different views, and that clearly "could have affected the outcome." Br. 28-29.

## CONCLUSION

For the foregoing reasons and the reasons set forth in TU's moving brief, the Court should grant this motion, dismiss the Complaint with prejudice, and order any such other and further relief as may be appropriate.

15

Dated: September 9, 2022

Respectfully Submitted,

By: /s/ Valerie L. Hletko

Roberta A. Kaplan*
*rkaplan@kaplanhecker.com*
Gabrielle E. Tenzer*
*gtenzer@kaplanhecker.com*
D. Brandon Trice*
*btrice@kaplanhecker.com*
Rebecca Sussman*
*rsussman@kaplanhecker.com*
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Tel.: (212) 763-0883

Valerie L. Hletko
*vhletko@kaplanhecker.com*
KAPLAN HECKER & FINK LLP
1050 K Street, NW, Suite 1040
Washington, DC 20001
Tel.: (212) 763-0883

Terri L. Mascherin
*tmascherin@jenner.com*
Megan B. Poetzel
*mpoetzel@jenner.com*
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel.: (312) 222-9350

*Attorneys for TransUnion, Trans Union LLC, and TransUnion Interactive, Inc.*

*\*Admitted pro hac vice*

16

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 9, 2022, I caused a true and correct copy of the foregoing to be served upon counsel of record as of this date by electronic filing.


/s/ Valerie L. Hletko
One of the attorneys for TransUnion, Trans Union LLC, and TransUnion Interactive, Inc.