IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Consumer Financial Protection )
Bureau, )
  )
   Plaintiff, )
  )
  )
  v. )  No. 22 C 1880
  )
  )
TransUnion, Trans Union LLC, )
TransUnion Interactive, Inc., )
and John T. Danaher, )
  )
   Defendants. )

<u>Memorandum Opinion & Order</u>

On January 3, 2017, the Consumer Financial Protection Bureau
("Bureau" or "CFPB") entered into a Consent Order with TransUnion,
Trans Union LLC, and TransUnion Interactive, Inc. (collectively,
"TU"). Dkt. No. 1-1 ("Consent Order"); *see* Dkt. No. 1-2
("Stipulation"). The Consent Order was the result of an
administrative proceeding in which the Bureau determined that TU
had violated the Consumer Financial Protection Act ("CFPA"). The
Bureau then brought this suit against TU and John T. Danaher, who
served as President of TransUnion Interactive, LLC from 2004 until
April 1, 2021, and Executive Vice President from April 2, 2021,
until February 1, 2022. The complaint alleges violation of the
Consent Order against both TU and Danaher. Dkt. No. 1

("Complaint"). Additionally, as to TU it alleges violations of the CFPA, the Electronic Fund Transfer Act ("EFTA"), the Fair Credit Reporting Act ("FCRA"), and the implementing regulations of the EFTA and FCRA. *Id.* TU and Danaher now separately move to dismiss the counts against them under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the motions are denied.

I.

A.

TU first argues that the Bureau cannot enforce the Consent Order because it failed to satisfy a condition precedent: responding to TU's proposed Compliance Plan (governed by Section VI of the Consent Order). In TU's view, because the Bureau never responded, Count I--which asserts violations of the Consent Order --is untenable.

The same principles used to interpret a contract are applicable to interpreting the Consent Order. *See Ferrell v. Pierce*, 743 F.2d 454, 461 (7th Cir. 1984) ("The construction of a consent decree is a matter of contract interpretation." (citation omitted)).[1] The parties do not dispute what law controls, presumably because the relevant principles do not differ among Illinois, federal, or some other common law. *See FTC v. A1*

---

[1] Neither TU nor the Bureau indicates that there are differences between administrative consent orders and judicial consent decrees that would impact the analysis in this order. *See Navajo Nation v. Wells Fargo*, 344 F. Supp. 3d 1292, 1302-03 (D.N.M. 2018).

2

*Janitorial Supply Corp.*, No. 17 C 7790, 2018 WL 7508265, at *2 n.2 (N.D. Ill. Sept. 21, 2018). A condition precedent may be express or implied and is "a condition 'which is to be performed before some right dependent thereon accrues, or some act dependent thereon is performed.'" *Heritage Bank & Tr. Co. v. Abdnor*, 906 F.2d 292, 297–98 (7th Cir. 1990) (quoting *Condition precedent*, Black's Law Dictionary (5th ed. 1979)). Conditions precedent are generally disfavored. *Navarro v. FDIC*, 371 F.3d 979, 981 (7th Cir. 2004) (citing Restatement (Second) of Contracts § 227(1) (Am. Law Inst. 1981)).

As TU recognizes, the Consent Order was effective on January 3, 2017, and that was the date TU was required to begin abiding by its terms. Consent Order ¶ 3(h) (defining "Effective Date" as "the date on which the Consent Order is issued"); Stipulation ¶ 3 (acknowledging that "the Order will become a final order, effective upon issuance"). Furthermore, not only do the Conduct Provisions (Section V of the Consent Order) offer specific steps that TU was required to take, *see, e.g.*, Consent Order ¶¶ 40(b), 40(c), but Section IV of the Consent Order, titled "Bureau Findings and Conclusions," identified the practices that the Bureau found violated federal consumer law. TU's argument that the Conduct Provisions were too general for it to know what to do without the Bureau's feedback on its more specific Compliance Plan is therefore unavailing. Of course, as this litigation proceeds, a central issue

will likely be what TU was required to do under the terms of the Consent Order. For now, it is enough that the Conduct Provisions required TU to take certain actions.

It is true that the word "[a]fter" in paragraph 43 of the Consent Order suggests the creation of a condition precedent. *See Stoller v. CMH Mfg. W., Inc.*, No. 18 C 0047, 2020 WL 616464, at *2 (N.D. Ill. Feb. 10, 2020) (citation omitted), *aff'd sub nom. Stoller v. CMH Mfg., Inc.*, No. 20-1227, 2021 WL 4975294 (7th Cir. Oct. 26, 2021). But if that language did in fact create a condition precedent, TU misunderstands what it was a condition precedent *to*. The provision states:

> After receiving notification that the Assistant Deputy for Consumer Reporting has made a determination of non-objection to the Compliance Plan, Respondents must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Compliance Plan.

Consent Order ¶ 43. The text is clear: only after non-objection by the Bureau will the Compliance Plan become enforceable against TU. But the Bureau is suing for violations of the Consent Order, not the Compliance Plan. Responding to the proposed Compliance Plan was not a condition precedent to the enforceability of the Consent Order as a whole.

TU further observes (1) the text concerning the Redress Plan (Section VIII of the Consent Order) is nearly identical to that concerning the Compliance Plan, and (2) the Bureau responded to

TU's proposed Redress Plan. From this, TU concludes that the Bureau was required to respond to the proposed Compliance Plan too. But just as the consequence for the Bureau's non-response to the Compliance Plan is that the Compliance Plan itself did not take effect, if the Bureau had failed to respond to the Redress Plan, then the Redress Plan would not have been implemented. Whether the Bureau responded or not to either plan has no bearing on the enforceability of the Consent Order as a whole.[2]

B.

TU contends that Counts III-VIII are barred by the doctrine of claim preclusion and should therefore be dismissed.[3] Claim preclusion prevents parties from relitigating the same claim where the following three conditions were satisfied in a prior action: (1) final judgment on the merits, (2) identity of the parties, and

---

[2] I reject TU's assertion that the Bureau waived any argument regarding the alleged condition precedent's effect on the enforceability of the Consent Order. The Bureau argues that the Consent Order was "effective" on January 3, 2017, and that it became enforceable on that date as well. *See* Dkt. No. 40 at 17 (citing definition of "Effective Date" in the Consent Order and paragraph in the Stipulation to argue that the Consent Order became enforceable on the Effective Date); *id.* at 21 (responding to TU's argument that the word "after" in the Consent Order created a condition precedent, stating "[p]aragraph 43 does not limit TU's obligations to comply with the Order or the Bureau's ability to enforce it").

[3] The parties use the term "res judicata" in their briefs, which is often used interchangeably with the term "claim preclusion." But because res judicata can refer to both claim preclusion and issue preclusion, I use "claim preclusion" in this order. *See Brownback v. King*, 141 S. Ct. 740, 747 n.3 (2021).

5

(3) identity of the causes of action. *Highway J Citizens Grp. v. U.S. Dep't of Transp.*, 456 F.3d 734, 741 (7th Cir. 2006) (citation omitted). If these requirements are met, the doctrine "bars not only those issues which were actually decided in a prior [action], but also all issues which could have been raised in that action." *Id.* (citation and quotation marks omitted). Because claim preclusion is an affirmative defense, it is not appropriate for consideration on a motion to dismiss unless "a plaintiff has pleaded [itself] out of court by establishing the facts that prove the defense." *Novickas v. Proviso Twp. High Sch. 209*, No. 09-cv-3982, 2010 WL 3515793, at *2 (N.D. Ill. Aug. 31, 2010) (citing *Muhammad v. Oliver*, 547 F.3d 874, 878 (7th Cir. 2008)).

The parties agree that the first two elements are met but disagree on the third--whether the causes of action in Counts III-VIII are "identical" to those addressed in the Consent Order. Actions involve the same claim or cause of action "when they aris[e] from the same transaction or involve a common nucleus of operative facts." *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1595 (2020) (alteration in original) (citations and quotation marks omitted). The Bureau is correct that "[c]laim preclusion generally 'does not bar claims that are predicated on events that postdate the filing of the initial complaint.'" *Id.* at 1596 (quoting *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 600 (2016), *abrogated on other grounds*

6

by *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022); additional citation omitted); *see Perkins v. Bd. of Trs. of the Univ. of Ill.*, 116 F.3d 235, 236 (7th Cir. 1997) ("[I]f the supposedly wrongful events are separated by time and function, multiple suits are permissible."). In this suit, the Bureau only alleges violations that occurred after January 3, 2017--the Effective Date of the Consent Order--so it appears that claim preclusion is not a viable defense.

The wrinkle, according to TU, is that in this case, the Bureau was required to pursue violations like those described in the Consent Order through the order's enforcement provisions. In support, TU cites a recent decision from the Eleventh Circuit, where the court held that certain CFPB claims were barred by claim preclusion and had to be addressed by the mechanisms in a consent judgment in that case. *CFPB v. Ocwen Fin. Corp.*, 30 F. 4th 1079 (11th Cir. 2022). In reaching its determination, the court found that "the settlement agreement's extensive three-year servicing-standard, monitoring, and enforcement regime indicates that if [Ocwen] committed a legal violation covered by the standards, the parties intended for the CFPB to remedy that violation through the agreed-upon processes--not through a separate court proceeding." *Id.* at 1085.

The consent judgment in *Ocwen* is materially different from the Consent Order here. That consent judgment "specified that if

7

Ocwen violated a servicing standard by exceeding the threshold error rate for the applicable compliance metric, it would have the right to cure the violation pursuant to a corrective-action plan," which, if successful, meant "no party to the consent judgment could seek relief with respect to that violation." *Id.* at 1082. Only if the violation was not cured did the *Ocwen* consent judgment permit the Bureau to bring suit. *Id.* Here, there is no curing process. Indeed, unlike the provision in the *Ocwen* consent judgment expressly barring the Bureau from suing for cured violations, the Consent Order here expressly contemplates the possibility of bringing suit in federal court. *See* Consent Order ¶ 82 ("The provisions of this Consent Order will be enforceable by the Bureau. . . . In connection with any attempt by the Bureau to enforce this Consent Order in federal district court, the Bureau may serve Respondents wherever Respondents may be found and Respondents may not contest that court's personal jurisdiction over Respondents."). Although the Bureau here "release[d] and discharge[d] [TU] from all potential liability for law violations that the Bureau has or might have asserted based on the practices described in Section IV of th[e] Consent Order," it only did so "to the extent such practices occurred before the Effective Date." *Id.* ¶ 77. To remove doubt, the release provision also reserves the Bureau's right "to seek penalties for any violations of the Consent Order." *Id.*

8

TU also cites *Friends of Milwaukee's Rivers v. Milwaukee Metropolitan Sewerage District*, 382 F.3d 743 (7th Cir. 2004), as an example of a case in which violations that occurred after a consent judgment (there, a "stipulation") was subject to claim preclusion. However, in that case, the court reasoned that post-stipulation violations were not separate causes of action from the pre-stipulation violations because the stipulation "was intended to address the underlying causes of the continuing violations by implementing remedial measures some of which, due to their large scale, will take several years to complete." *Id.* at 758. That makes sense, since the stipulation in that case envisioned expending $907 million to construct deep tunnels. *Id.* at 750–51. Here, the Consent Order does not contemplate delayed implementation of many of the Conduct Provisions.[4]

In short, TU fails to disturb the general rule that events that take place after a "final judgment" for claim preclusion purposes are not barred. *Lucky Brand*, 140 S. Ct. at 1596. The consent judgment in *Ocwen* included detailed enforcement provisions that made clear the parties' intent to cure violations through prescribed processes, and the stipulation in *Friends of*

---

[4] Some provisions indicate delayed compliance timelines, but even those are less than the "several years" contemplated in *Friends of Milwaukee's Rivers*. *See, e.g.*, Consent Order ¶ 40(b)(ii) ("reasonable time after the Effective Date"); *id.* ¶ 53 ("within 10 days of the Effective Date").

*Milwaukee's Rivers* contemplated compliance to take years. Neither rationale applies here.

C.

TU also argues that the complaint is time-barred. The CFPA provides that an action must be brought no more than "3 years after the date of discovery of the violation to which an action relates." 12 U.S.C. § 5564(g)(1).[5] A "violation" is defined in the statute as "any act or omission that, if proved, would constitute a violation of any provision of Federal consumer financial law." 12 U.S.C. § 5561(5). Thus, by its terms, the limitations period runs separately for each violation. *See CFPB v. Howard*, No. 8:17-cv-00161-JLS-JEM, 2018 WL 4847015, at *3 (C.D. Cal. May 3, 2018) (holding each violation of CFPA, even if part of continuing course of conduct, has its own limitations period); *CFPB v. NDG Fin. Corp.*, No. 15-cv-5211 (CM), 2016 WL 7188792, at *19–20 (S.D.N.Y. Dec. 2, 2016) (holding that each violation "would constitute a new and separate cause of action under the CFPA").

TU argues that at the very least, I should narrow the temporal scope of this litigation to exclude any claims for violations which occurred prior to what it asserts is the start date for the limitations period, February 4, 2018. I decline to do so because

---

[5] For purposes of this motion only, TU does not contest that this limitations period applies to all the Bureau's claims. *See* Dkt. No. 29 at 31 n.12.

dismissal on timeliness grounds is only appropriate where "it is clear from the face of the . . . complaint that it is hopelessly time-barred." *Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*, 559 F.3d 671, 675 (7th Cir. 2009). The complaint sufficiently alleges violations occurring within the limitations period (or at least does not establish that each violation occurred outside that period), *see, e.g.*, Complaint ¶¶ 21, 49–55, 98, and partial dismissal is unwarranted, *cf. BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) ("A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief." (emphasis in original) (citation omitted)); *see also CFPB v. Howard*, No. 8:17-cv-00161-JLS-JEM, 2017 WL 10378953, at *7 (C.D. Cal. May 30, 2017) (declining, on a motion to dismiss, to narrow scope of claims to violations occurring within limitations period, since at least some violations allegedly occurred within limitations period).

Danaher also seeks dismissal on statute of limitations grounds. I decline to do so for the reasons stated above--namely, "there is a conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense." *Sidney Hillman Health Ctr. v. Abbott Lab'ys, Inc.*, 782 F.3d 922, 928 (7th Cir. 2015).

D.

TU next lodges two constitutional arguments against the Bureau's ability to bring this suit. First, relying on recent Fifth Circuit opinions, TU argues that the Bureau's funding structure violates the Appropriations Clause,[6] so it cannot use its funds to bring this action. *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616 (5th Cir. 2022), *petition for cert. filed*, No. 22-448 (U.S. Nov. 14, 2022); *CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 218 (5th Cir. 2022) (en banc) (Jones, J., concurring). Second, TU argues that Count I should be dismissed because an unconstitutional restriction on removal of the Bureau's director was in effect at the time the Consent Order was entered, rendering it unenforceable. Neither argument is persuasive.

The Appropriations Clause "'means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress,'" which is to say that "the payment of money from the Treasury must be authorized by statute." *OPM v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)). Courts are ill-equipped to second guess exactly how Congress chooses to structure the funding of financial regulators like the Bureau, so long as the funding remains tethered

---

[6] This clause states that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.

to a law passed by Congress. *See Am. Fed'n of Gov't Emps., AFL-CIO, Loc. 1647 v. Fed. Lab. Rels. Auth.*, 388 F.3d 405, 409 (3d Cir. 2004) ("Congress itself may choose, however, to loosen its own reins on public expenditure. So, for example, although Congress ordinarily requires that appropriations be spent within a single year, it may also authorize appropriations that continue for a longer period of time." (citation omitted)). The Bureau receives its funding pursuant to a statute passed by Congress,[7] which Congress has the power to amend or repeal. *See CFPB v. Fair Collections & Outsourcing, Inc.*, No. GJH-19-2817, 2020 WL 7043847, at *7-9 (D. Md. Nov. 30, 2020) ("Here, an act of Congress provided for the CFPB's funding, satisfying the Appropriations Clause's simple mandate. That Congress funded the CFPB outside the normal appropriations process does not create a constitutional problem."). Until the Fifth Circuit's decision last month, courts confronted with the issue had uniformly upheld the Bureau's funding structure. *See, e.g., Cmty. Fin. Servs.*, 51 F.4th at 641 & n.15 (collecting cases and recognizing that every other court to have considered the issue reached the opposite conclusion). For the

---

[7] *See* 12 U.S.C. §§ 5497(a)(1)-(2) (allowing the Bureau's director to annually request an amount not exceeding 12 percent of the Federal Reserve's total operating expenses); *id.* § 5497(d) (allowing the Bureau to use penalties it has collected in enforcement actions).

reasons above, I agree with the conclusion reached by this substantial majority of courts.

TU's contention that the Consent Order is invalid because it was entered into while an unconstitutional removal provision was in place also fails. The Supreme Court clarified after holding the removal provision unconstitutional in *Seila Law* that "[s]ettled precedent . . . confirms that the unlawfulness of the [CFPB] removal provision does not strip the Director of the power to undertake the other responsibilities of his office." *Collins v. Yellen*, 141 S. Ct. 1761, 1788 n.23 (2021) (citing *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2207–11 (2020)). Such responsibilities include entering into consent orders.

II.

A.

Danaher argues that the Consent Order is only enforceable against TU, so he cannot be held liable for violating it. For starters, the parties agree that the Bureau may "commence a civil action" against any person who "violates a Federal consumer financial law," 12 U.S.C. § 5564(a), including "any rule or order prescribed by the Bureau," *id.* § 5481(14), such as the Consent Order here. But according to Danaher, because he was not a party to the Consent Order and was not afforded the procedural safeguards enumerated in § 5563, the Consent Order may not be enforced against him.

It is an "elementary" rule of law that "[a] corporation can act only through its agents." *Mandel Bros., Inc. v. FTC*, 254 F.2d 18, 22 (7th Cir. 1958), *rev'd on other grounds*, 359 U.S. 385 (1959); *see Korte v. Sebelius*, 735 F.3d 654, 668 (7th Cir. 2013) ("It is axiomatic that organizational associations, including corporations, act only through human agency." (citing *Reich v. Sea Sprite Boat Co.*, 50 F.3d 413, 417 (7th Cir. 1995))). In *Reich*, the Seventh Circuit held that a corporation's president was bound by a court order enforcing the decision of an administrative agency against that corporation. 50 F.3d at 417; *see id.* ("An order issued to a corporation is identical to an order issued to its officers, for incorporeal abstractions act through agents."). It is true that *Reich* and some other cases cited by the Bureau dealt with court orders, rather than administrative consent orders. But where administrative agencies act in their judicial capacities, the same standard applies. *See United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236 n.10 (1975) ("Consent decrees and orders have attributes both of contracts and of judicial decrees or, in this case, administrative orders. While they are arrived at by negotiation between the parties and often admit no violation of law, they are motivated by threatened or pending litigation and must be approved by the court or administrative agency.").

As a general matter, the Supreme Court has held:

> A command to the corporation is in effect a command to
> those who are officially responsible for the conduct of
> its affairs. If they, apprised of the writ directed to
> the corporation, prevent compliance or fail to take
> appropriate action within their power for the
> performance of the corporate duty, they, no less than
> the corporation itself, are guilty of disobedience
> . . . .

*Wilson v. United States*, 221 U.S. 361, 376 (1911). The Federal Circuit recognized that this principle supports the notion that an order issued by an administrative agency can bind a corporation's officers, even where "the administrative complaint and proceedings were directed solely to the corporation and there was no specific statutory authority for the issuance of orders to corporate officers." *Fuji Photo Film Co. v. Int'l Trade Comm'n*, 474 F.3d 1281, 1292 (Fed. Cir. 2007) (citing *W. Fruit Growers Sales Co. v. FTC*, 322 F.2d 67, 70 (9th Cir. 1963); *Mandel Bros.*, 254 F.2d at 22)). Thus, even though Federal Rule of Civil Procedure 65(d), which binds corporate officers to injunctions issued to their corporations, does not apply to administrative proceedings, the common law principle underlying the rule, and expressed by the Court in *Wilson*, does apply. *See FTC v. Standard Educ. Soc'y*, 302 U.S. 112, 119 (1937) (reiterating the principle announced in *Wilson* and concluding that individuals "who are in charge and control of the affairs of respondent corporation[] would be bound by a cease and desist order rendered [by the FTC] against the corporation[]").

16

The Consent Order bears the hallmarks of a final adjudicative determination by the Bureau. Perhaps most simply, it is identified on its cover page as part of an "Administrative Proceeding" and titled "In the Matter of: TransUnion Interactive, Inc., Trans Union LLC, and TransUnion." Consent Order at 2. More substantially, it was issued pursuant to 12 U.S.C. §§ 5563 and 5565, which authorize the Bureau to conduct adjudication proceedings, including "determin[ing] a controversy by consent," 5 U.S.C. § 554(c)(2). *See also* Consent Order ¶ 78 (noting it "is intended to be, and will be construed as, a final Consent Order issued under . . . § 5563"); Stipulation ¶ 3 (agreeing that "the [Consent] Order will become a final order, effective upon issuance, and will be fully enforceable by the Bureau"). It also contains findings of fact and conclusions of law, and constitutes a final judgment on the merits for claim preclusion purposes. *See B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 148 (2015). Accordingly, the Consent Order constitutes a final adjudication and therefore binds not only TU, but Danaher as well.

I am not persuaded by Danaher's argument that enforcing the Consent Order against him violates due process. Danaher had adequate notice of the Consent Order, *see* Dkt. No. 31-2 at 8, and, as president, was "in active concert or participation with the party specifically enjoined." *Microsystems Software, Inc. v. Scandinavia Online AB*, 226 F.3d 35, 42-43 (1st Cir. 2000)

17

(considering whether a non-party to an injunction can be held in contempt); *see Fuji Photo Film Co.*, 474 F.3d at 1292–93. As explained below, Danaher had the authority to control TU's actions with respect to at least some of the alleged violations, and he knew of the violating conduct.

Moreover, contrary to Danaher's assertion, the Bureau is permitted under the CFPA to seek monetary relief in this action. Section 5564(a) allows the Bureau to bring a civil action against any person for violation of "[f]ederal consumer financial law," which, pursuant to § 5481(14), includes an "order prescribed by the Bureau," like the Consent Order. Once a civil action is brought, § 5565(a)(1) authorizes the court to "grant any appropriate legal or equitable relief with respect to a violation of Federal consumer financial law, including a violation of a rule or order prescribed under a Federal consumer financial law." Thus, if Danaher violated the Consent Order, he may be liable for monetary damages. *See also* 12 U.S.C. § 5565(c)(1) (providing that "[a]ny person that violates, through any act or omission, any provision of Federal consumer financial law shall forfeit and pay a civil penalty pursuant to this subsection").

## B.

Danaher next argues that the Bureau's complaint falls short of what is required to allege individual liability in this case. To hold Danaher liable for TU's violations, the parties agree for

18

the purposes of this motion that the Bureau must allege that he: "(1) participated directly in the illegal practices or acts or had the authority to control them; and (2) knew or should have known about the illegal practices." *CFPB v. Mortg. L. Grp., LLP*, 196 F. Supp. 3d 920, 944 (W.D. Wis. 2016) (citations omitted).[8]

Some courts have held that an individual's status as a corporate officer alone is sufficient to allege authority to control. *United States v. MyLife.com, Inc.*, 499 F. Supp. 3d 751, 754–55 (C.D. Cal. 2020) (citation and quotation marks omitted); *see FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989) ("Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." (citations omitted)), *overruled on other grounds by FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764 (7th Cir. 2019). *But see FTC v. Swish Mktg.*, No. C 09-03814 RS, 2010 WL 653486, at *5 (N.D. Cal. Feb. 22, 2010) (finding allegations that individual defendant was CEO of defendant corporation insufficient to show authority to control). Indeed, where an individual defendant was an officer of multiple corporations, the Seventh Circuit noted that the defendant "would be hard-pressed to establish that he lacked authority or control

---

[8] The Bureau also argues that Danaher is independently liable based on his own violations of the Consent Order. Because I find the complaint sufficiently alleges Danaher's liability for TU's violations, I do not address that argument here.

over them." *FTC v. World Media Brokers, Inc.*, 415 F.3d 758, 764 (7th Cir. 2005).

The complaint here alleges that Danaher was President of TUI from 2004 until April 1, 2021, and Executive Vice President of TUI from April 2, 2021, until February 1, 2022. Complaint ¶ 14. But the complaint also alleges that Danaher "ha[d] the authority" to "ensure Corporate Defendants' compliance with the [Consent] Order," *id.* ¶ 170, and details that he "determined that complying with the [Consent] Order would reduce TUI's revenue and created a plan to delay or avoid implementation of the requirements of Paragraph 40 of the [Consent] Order," *id.* ¶ 171. *See id.* ("Danaher instructed TUI to cease using the checkbox in Affiliate marketing."). That is sufficient at the pleading stage to allege authority to control. As for Danaher's argument regarding paragraph 45 of the Consent Order, which states that "the Board will have the ultimate responsibility for proper and sound management of Respondents and for ensuring that Respondents comply with Federal consumer financial law and this Consent Order," I find that does not negate the broader command in the Conduct Provisions prohibiting CFPA violations by "Respondents, their officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly," Consent Order ¶ 40.

The Bureau has also sufficiently alleged that Danaher knew or should have known about the illegal practices. The complaint alleges that Danaher knew about at least one of the activities the Bureau claims violated the Consent Order. *See* Complaint ¶ 171 ("Danaher instructed TUI to cease using the checkbox in Affiliate marketing."). But Danaher argues that the Bureau must also allege that Danaher knew that, or was recklessly indifferent to the fact that, the actions violated the Consent Order. *See CFPB v. Consumer First Legal Grp., LLC*, 6 F.4th 694, 711 (7th Cir. 2021) (agreeing with the district court that the Bureau was required to prove recklessness with respect to the illegality of the conduct at issue, "since the conduct at issue here is not obviously wrongful, dangerous, or illegal on its face" (citation omitted)). Even if the standard applied in *Consumer First* applies here, this case is only at the pleading stage, and all the Bureau must do is plausibly allege that Danaher was recklessly indifferent to the wrongfulness of TU's actions over which he had authority. I conclude it has done so because it alleges that because of financial implications, Danaher actively "created a plan to delay or avoid" implementing the Consent Order. Complaint ¶ 171. The Bureau even specifically alleges that TU initially complied with the checkbox requirement from Consent Order ¶ 40(b)(i), but ceased doing so at Danaher's instruction because he determined that complying had negative financial consequences. Complaint ¶ 171. Danaher suggests that the

checkbox requirement does not extend to affiliates, but I accept as true the allegation that the affiliates were under TU's control, *id.* ¶ 20, which supports the notion that the affiliates were required under the Consent Order to implement the checkbox requirement while acting on TU's behalf. Taken together, that is enough for me to plausibly infer Danaher's knowledge of the conduct and his reckless indifference to its wrongfulness.

### III.

For the foregoing reasons, the motions to dismiss are denied.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: November 18, 2022

22