IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Consumer Financial Protection Bureau,<br><br>Plaintiff,<br><br>v.<br><br>TransUnion, Trans Union LLC, TransUnion Interactive, Inc., and John T. Danaher,<br><br>Defendants. | Case No. 1:22-cv-1880<br><br>Honorable Judge Elaine E. Bucklo |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO DISMISS CORPORATE DEFENDANTS' COUNTERCLAIM**

Plaintiff Consumer Financial Protection Bureau ("Bureau" or "CFPB") respectfully moves pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss the Counterclaim brought by Defendants TransUnion, Trans Union LLC, and TransUnion Interactive, Inc. (collectively, "Corporate Defendants").

The present dispute concerns Corporate Defendants' attempt to recover nearly $5 million from the federal fisc after they remitted that money to the Federal Government as disgorgement. This attempt should fail for two reasons. First, the Government has not waived sovereign immunity for such a claim either under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, or by filing this action. Second, Corporate Defendants have failed to state a claim that they have any legal right to these funds. The counterclaim should therefore be dismissed.

## BACKGROUND

In 2017, after finding that Corporate Defendants had engaged in deceptive acts and practices in violation of the Consumer Financial Protection Act ("CFPA"), the Bureau issued a Consent Order that required Corporate Defendants to pay redress to affected consumers, pay a civil penalty to the Bureau, and abide by certain conduct provisions going forward. *See* Consent Order, ECF No. 99-1 ("Order"). As relevant here, the Order breaks down these requirements into separate sections: Section VIII of the Order contains the "Order to Pay Redress" ("Redress Provisions"), which ordered backward-looking relief to a class of consumers harmed prior to the Order's Effective Date, and Section V of the Order contains the "Conduct Provisions," which impose forward-looking obligations on Corporate Defendants (including their officers, agents, servants, employees, and attorneys) after the Order's Effective Date.

Section VIII's Redress Provisions set forth the steps for Corporate Defendants to provide redress to consumers. According to the Redress Provisions, Corporate Defendants "must reserve or deposit into a segregated deposit account $13,930,000 for the purpose of providing redress to Affected Consumers." Order ¶ 47. Corporate Defendants were also obligated to create a "Redress Plan" to, among other things, "determine the population of Affected Consumers and the appropriate redress for each Affected Consumer, the manner and form in which redress payments will be distributed to Affected Consumers, and procedures to issue and track redress payments." *Id.* ¶ 49.a. After completing the Redress Plan, the Redress Provisions required Corporate Defendants to pay any leftover funds to the Bureau "so that such funds may be distributed to the U.S. Treasury as disgorgement." *Id.* ¶ 50. Section X of the Order, which contains additional monetary provisions, further provides that Corporate Defendants "must

relinquish all dominion, control, and title to the funds paid to the fullest extent permitted by law and no part of the funds may be returned." *Id.* ¶ 58.

The Order defined the class of "Affected Consumers" who would receive redress to mean "the approximately 700,000 consumers identified by the Bureau and Respondents who were enrolled in [TransUnion Credit Monitoring Product] through a Negative Option offer during the Relevant Period, and then cancelled their subscriptions within two billing cycles of enrollment without receiving a refund of fees paid." Order ¶ 3.a. The "Relevant Period" means "the period from July 21, 2011 until the Effective Date," *id.* ¶ 3.m, with the "Effective Date" meaning "the date on which the Consent Order is issued," *id.* ¶ 3.h, which was January 3, 2017.

In short, the Redress Provisions required Corporate Defendants to establish a nearly $14 million fund to provide redress payments in the form of refunded subscription payments to a specified class of Affected Consumers harmed by their unlawful conduct from July 21, 2011, to January 3, 2017. If any money was left over after completing these redress payments (because certain consumers in the class of Affected Consumers did not claim the funds by cashing or depositing the checks they received), Corporate Defendants were required to remit those funds to the Bureau for distribution to the U.S. Treasury as disgorgement. So, all of the money in the $14 million fund belonged either to (1) Affected Consumers as redress or (2) the Treasury as disgorgement. In no event were Corporate Defendants entitled to keep it, nor could they allocate the funds elsewhere, such as by giving any leftover funds to different consumers outside the class of consumers identified as Affected Consumers.

Separate and distinct from this backward-looking monetary relief, Section V's Conduct Provisions imposed on Corporate Defendants certain affirmative obligations in connection with the offering of Credit-Related Products (including, but not limited to, the TransUnion Credit

Monitoring Product) after the Order's Effective Date. As relevant here, the Conduct Provisions require Corporate Defendants, as well as "their officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly," to "obtain the express informed consent from the consumer" through an "affirmative selection checkbox" before enrolling any consumer into a Credit-Related Product with a Negative Option feature. Order ¶ 40(b)(i).

The Bureau's First Amended Complaint ("FAC"), ECF No. 99, alleges that Corporate Defendants violated the Order's Conduct Provisions and other federal consumer financial laws. Among other things, the Bureau alleges that Corporate Defendants violated the Order's checkbox requirement and the CFPA's prohibition on deceptive acts and practices when marketing its Credit-Related Products through its marketing affiliates ("Affiliates") after the Effective Date.[1] The FAC contains no allegations regarding Affiliates' marketing prior to the Effective Date, nor does the FAC seek relief regarding such conduct. The FAC also does not allege that Corporate Defendants violated the Redress Provisions of the Order.

Now, Corporate Defendants seek a refund of the disgorgement that they remitted to the Bureau. *See* Counterclaim, ECF No. 109. According to Corporate Defendants, after they completed the redress payments, and after they remitted the disgorgement payment, the Bureau "indicated" that the Redress Plan should have covered not only individuals who purchased

---

[1] For example, the Bureau alleges that "for most Negative Option enrollments that Corporate Defendants have completed since the Effective Date, which represent millions of consumer enrollments, Corporate Defendants have failed to use an affirmative selection checkbox as required by Paragraph 40(b)(i) [of the Order]." FAC ¶ 95; *see also id*. ¶ 96 (noting that such enrollments occurred "via enrollment processes hosted by Affiliates on behalf of and at the direction of Corporate Defendants"). Similarly, the Bureau alleges that Corporate Defendants' marketing of "free" or "$1" credit scores and reports through Affiliates after the Effective Date violated the CFPA's prohibition on deceptive acts and practices. FAC ¶¶ 106, 207-09.

Credit-Related Products offered directly to consumers, but also individuals who purchased such products offered through Affiliates. Counterclaim ¶ 6. In their view, had the Bureau communicated this position sooner, Corporate Defendants would have distributed the remaining funds to these other consumers and there would have been nothing left to disgorge. *Id.* ¶ 7. Corporate Defendants characterize their demand for the disgorgement funds as specific relief, or in the alternative as recoupment or setoff.

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of a claim when the district court lacks subject matter jurisdiction. *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020). When considering a Rule 12(b)(1) motion, this Court accepts as true well-pleaded facts and draws reasonable inferences in the non-movant's favor. *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588 (7th Cir. 2014). The claimant bears the burden, however, of proving the jurisdictional requirements have been met. *Id.* Courts evaluating Rule 12(b)(1) motions may look beyond the complaint to consider whatever evidence has been submitted on the issue to determine whether subject matter jurisdiction exists. *BIC Corp. v. Chicago Imp., Inc.*, 540 F. Supp. 3d 786, 792 (N.D. Ill. 2021).

A motion under Rule 12(b)(6) challenges the sufficiency of the complaint. Dismissal is warranted under Rule 12(b)(6) if the allegations in the counterclaim do not plausibly suggest that Corporate Defendants have a right to relief. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). When determining whether a complaint states a claim for relief, this Court construes the pleading in the light most favorable to the non-moving party, but need not accept as true "legal conclusions" or "mere conclusory statements." *Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). Rule 12(b)(6) limits this Court's consideration

to allegations set forth in the complaint itself, documents attached to the complaint, documents central to the complaint and referred to in it, and information properly subject to judicial notice. *BIC Corp.*, 540 F. Supp. 3d at 792.

## ARGUMENT

Corporate Defendants' counterclaim should be dismissed for two reasons: First, the Government has not waived its sovereign immunity from the claim that Corporate Defendants assert against the Bureau, so, notwithstanding the merits of Corporate Defendants' claim, sovereign immunity bars this suit.[2] Second, Corporate Defendants' counterclaim fails to state a claim for relief because it does not (and cannot) plausibly allege that Corporate Defendants are owed any money by the Bureau. Corporate Defendants relinquished all control of and waived any right to recover any of the $14 million in redress funds, and thus have no legal right to them in any circumstance. Also, Corporate Defendants' counterclaim rests on a mischaracterization of the clear language of the Order and the Bureau's claims in this matter.

### I. The Government has not waived its sovereign immunity.

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Speedy Check Cashers, Inc. v. U.S. Postal Serv.*, 286 F. Supp. 3d 934, 936 (N.D. Ill. 2017) (quoting *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994)). Corporate Defendants contend that sovereign immunity is waived under the APA, 5 U.S.C. § 702, or alternatively that Corporate

[2] The Seventh Circuit appears split as to whether sovereign immunity is properly considered a "jurisdictional defense." *Compare Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 520 (7th Cir. 2021), *reh'g denied* (Nov. 16, 2021) (calling sovereign immunity a "jurisdictional defense"); *McHugh v. Ill. Dep't of Transp.*, 55 F.4th 529, 535 (7th Cir. 2022) (holding district court lacked jurisdiction over immune defendant); *with Meyers v. Oneida Tribe of Indians of Wis.*, 836 F.3d 818, 822 (7th Cir. 2016) (noting "the question of sovereign immunity is not a jurisdictional one"). Regardless of whether sovereign immunity is a defense under Rule 12(b)(1) or 12(b)(6), "it is nevertheless a threshold ground for denying audience to a case on the merits." *Meyers*, 836 F.3d at 822 (cleaned up).

Defendants are entitled to recoupment and/or setoff. Neither theory, however, supports a waiver of sovereign immunity in this action.

First, the counterclaim does not fall within the limited waiver of sovereign immunity in the APA, which applies only to claims seeking "relief other than money damages." 5 U.S.C. § 702. As the Supreme Court has explained, a party seeks "money damages" if they seek "substitute" or "compensatory" relief rather than "specific" relief. *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999). In other words, money damages "are given to the plaintiff to substitute for a suffered loss, whereas specific remedies are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." *Id.* (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 895 (1988) (cleaned up)). Applying this dichotomy, the Supreme Court has held that a suit "to seize or attach money in the hands of the Government as compensation for the loss" resulting from a breached contract is money damages, *id.* at 263, whereas a suit "to enforce the statutory mandate" entitling a party to Government funds was a suit for specific relief, *Bowen*, 487 U.S. at 900. Consistent with this framework, when a party seeks to recover money from the Government but cannot show "a legal entitlement to that specific money transfer," the money is considered "money damages." *Veluchamy v. F.D.I.C.*, 706 F.3d 810, 816 (7th Cir. 2013); *see also Shahi v. U.S. Dep't of State*, 572 F. Supp. 3d 470, 480 (N.D. Ill. 2021) (holding plaintiffs were seeking money damages where they were "not seeking to compel the government to pay money that a statute requires it to pay them") *aff'd*, 33 F.4th 927 (7th Cir. 2022); *ITServe All., Inc. v. Cuccinelli*, 502 F. Supp. 3d 278, 285 (D.D.C. 2020) (same where plaintiffs "point to no statute that mandates the government return illegally assessed fees").

Here, Corporate Defendants do not (and cannot) allege that they have any legal entitlement to the disgorgement funds that they paid to the Bureau. *See Veluchamy*, 706 F.3d at 816. They point to no statute or regulation that mandates the return of this money. *See Shahi*, 572 F. Supp. 3d at 480; *ITServe All.*, 502 F. Supp. 3d at 285. Nor do they identify any provision in the Order that gives them a right to the disgorgement funds. To the contrary, the Order makes clear in two related ways that Corporate Defendants are *not* entitled to recover the disgorgement funds. First, the Order specifically provides that Corporate Defendants must "relinquish all dominion, control, and title to the funds paid" and that "no part of the funds may be returned," Order ¶ 58, so Corporate Defendants waived any right to recover the funds. Second, as Corporate Defendants appear to concede, the money from the $14 million redress fund was either to be paid to the specific consumers identified in the Order as Affected Consumers as redress or sent to the U.S. Treasury via the Bureau as disgorgement. *See* Counterclaim ¶ 7 (claiming leftover funds would have gone to consumers rather than the Bureau). In other words, Corporate Defendants have no legal entitlement to take back any of the $14 million redress fund (either for themselves or to allocate it to different consumers outside the class of Affected Consumers), and their "failure to demonstrate (or even to assert) a legal entitlement to that specific money transfer ... make[s] such relief 'money damages.'" *Veluchamy*, 706 F.3d at 816. Despite Corporate Defendants' attempt to dress up their claim as one for specific relief, what they actually seek is money damages to compensate them for their alleged loss.

Corporate Defendants' failure to allege that the Bureau has possession of the funds that Corporate Defendants seek provides further confirmation that Defendants seek money damages and not specific relief. Under the Order, Corporate Defendants were required to remit payment to the Bureau after completing the Redress Plan "so that such funds may be distributed to the U.S.

Treasury as disgorgement." Order ¶ 50. Indeed, the Bureau does not retain or deposit any disgorged funds into an account that it controls; instead, it deposits that money with the U.S. Treasury.[3] Since Corporate Defendants do not (and cannot) allege that the Bureau possesses the disgorged funds, the counterclaim does not (and cannot) support a claim seeking the return of that specific money. Thus, any order requiring the Bureau to pay Corporate Defendants would be an order for substitute funds rather than the "very thing" to which Corporate Defendants say they are entitled. And as the Tenth Circuit has explained, sovereign immunity bars a district court from ordering the Government to provide a "cash equivalent" of what Defendants allege is a "wrongfully withheld overpayment[]." *Modoc Lassen Indian Hous. Auth. v. U.S. Dep't of Hous. & Urb. Dev.*, 881 F.3d 1181, 1197 (10th Cir. 2017). Because only money damages are available, the APA's limited waiver of sovereign immunity does not apply, and sovereign immunity bars Corporate Defendants' counterclaim.[4]

[3] All disgorgement that the Bureau collects in connection with any public enforcement action is deposited with the U.S. Treasury as soon as is practicable, pursuant to the Miscellaneous Receipts Act. *See* 31 U.S.C. § 3302(b); Financial Report of the Consumer Financial Protection Bureau, Fiscal Year 2021 (2021 Report), at 52, 82 (Nov. 15, 2021). The Bureau has no control over or rights to such funds, nor does it have possession of them. *Id.* at 82. For these same reasons, Corporate Defendants fail to plausibly allege a right to relief, because the Bureau cannot return the disgorgement to them. The Court may take judicial notice of the 2021 Report because it is the report of an administrative agency and available on a government website. *See Denius v. Dunlap*, 330 F.3d 919, 926-27 (7th Cir. 2003).

[4] Even if Corporate Defendants were seeking monetary relief that did not qualify as money damages (which they are not), they would still need to show that any claim for relief belongs in this court. Although it is unclear on what basis Corporate Defendants believe they are entitled to recover nearly $5 million from the Bureau (as discussed below), Corporate Defendants' claim may need to be brought (if at all) in the Court of Federal Claims in light of the Tucker Act, 28 U.S.C. § 1491(a)(1). *See, e.g.*, *Sutton v. United States*, 597 Fed. Appx. 890, 891 (7th Cir. 2015) ("[J]urisdiction over constitutional claims against the government for monetary relief in excess of $10,000 lies only in the Court of Federal Claims."); *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 480 F.3d 1116, 1126 (Fed. Cir. 2007) (holding that "despite the form of the complaint," the claim was "in substance a contract-based action asking for monetary relief from the Government" and had to be brought in the Court of Federal Claims rather than in district court).

In the alternative, Corporate Defendants argue that they are entitled to a recoupment and/or setoff against any damages or other compensation awarded pursuant to this action. They appear to argue that their counterclaim falls within the limited circumstances in which the Government can waive sovereign immunity by filing suit. But the Seventh Circuit has made clear that such a "waiver of immunity is limited to matters in recoupment arising out of the same transaction or occurrence which is the subject matter of the suit, to the extent of defeating the plaintiff's claim." *Fed. Sav. & Loan Ins. Corp. v. Quinn*, 419 F.2d 1014, 1017-18 (7th Cir. 1969); *see also Bd. of Regents of Univ. Of Wis. Sys. v. Phoenix Int'l Software, Inc.*, 653 F.3d 448, 468 (7th Cir. 2011) ("[T]he United States is subject only to counterclaims that both arise out of the same transaction or occurrence and are limited to recoupment."). In other words, when a federal agency files suit, sovereign immunity is waived only for the subset of compulsory counterclaims that are for recoupment. *See Phoenix Int'l Software*, 653 F.3d at 468.[5]

Corporate Defendants' counterclaims are neither compulsory nor for recoupment. First, a compulsory counterclaim is one that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." Fed. R. Civ. P. 13(a). The Seventh Circuit uses the "logical relationship" test to decide whether two matters arise from the same transaction or occurrence. *Phoenix Int'l Software*, 653 F.3d at 470. For this test, "[a] court should consider the totality of the claims, including the nature of the claims, the legal basis for recovery, the law

[5] While Corporate Defendants use the terms "recoupment" and "setoff" interchangeably, they are not the same thing. And since sovereign immunity is waived only for claims of recoupment that arise out of the *same* transaction or occurrence, it is not waived for claims of setoff, which by definition arise out of a *different* transaction. *Compare* Recoupment, Black's Law Dictionary (11th ed. 2019) ("Reduction of a plaintiff's damages because of a demand by the defendant arising out of the same transaction."), *with* Setoff, Black's Law Dictionary (11th ed. 2019) ("A defendant's counterdemand against the plaintiff, arising out of a transaction independent of the plaintiff's claim.").

involved, and the respective factual backgrounds." *Id.* The test is a "'narrow' one, that perhaps asks little more than whether the plaintiff's claims would be barred by res judicata." *Colonial Penn Life Ins. Co. v. Hallmark Ins. Adm'rs, Inc.*, 31 F.3d 445, 448 (7th Cir. 1994).

Here, Corporate Defendants' claim for monetary relief does not arise out of the same transaction as the claims in the FAC. The "sole connection" between the claims "is the initial execution of the [Order] document," and "this connection is so insignificant that compulsory adjudication of both claims in a single lawsuit will secure few, if any, of the advantages envisioned in Rule 13(a)." *See Valencia v. Anderson Bros. Ford*, 617 F.2d 1278, 1291 (7th Cir. 1980), *rev'd on other grounds*, 452 U.S. 205 (1981). Corporate Defendants' counterclaim arises from the meaning of the Redress Provisions and the redress that Corporate Defendants did not provide to consumers who were harmed by Affiliate marketing *prior to* the Order's Effective Date. In contrast, the relevant allegations in the present action concern the application of the Conduct Provisions to Corporate Defendants' marketing through Affiliates *after* the Order's Effective Date on January 3, 2017. The FAC does not contain *any* allegations regarding Affiliate marketing *prior to* the Effective Date, nor does it contain *any* allegations regarding a violation of the Redress Provisions. Overall, then, the Bureau's claims and Corporate Defendants' counterclaim concern separate time periods, independent provisions of the Order, and different classes of consumers; they do not arise from the same transaction or occurrence.

Further, "a recoupment counterclaim must, in addition to addressing the same transactions or occurrences as the main claim, aim only at 'defeating the government's claim.'" *F.D.I.C. v. Miller*, 781 F. Supp. 1280, 1285 (N.D. Ill. 1991) (quoting *Quinn*, 419 F.2d at 1017). Thus, the Seventh Circuit has said that actions are "entirely separate" if "recovery against the [Government] would not decrease the amount claimed by the [Government] nor would it affect

the legal basis on which the claim is made." *In re Friendship Med. Ctr., Ltd.*, 710 F.2d 1297, 1301 (7th Cir. 1983). Here, Corporate Defendants' claims "do not aim only to reduce or eliminate any award granted to the government, but also seek affirmative recovery from the government." *Miller*, 781 F. Supp. at 1286. So if the Bureau's claims were to fail on the merits but the counterclaim were to succeed, Corporate Defendants "would not only defeat the government's recovery, but would recover additional damages which would have to be paid by the government." *Id.* Accordingly, the counterclaim is "affirmative" rather "defensive," and it is outside the recoupment exception to sovereign immunity.

In sum, neither the APA nor the filing of this lawsuit have waived the Government's sovereign immunity, and the counterclaim should be dismissed on this threshold issue.

**II. Corporate Defendants have failed to state a claim on the merits.**

Whether Corporate Defendants characterize their claim as setoff, recoupment, specific relief, or something else, they have pleaded no legal basis for recovery. Both setoff and recoupment are methods for a defendant to allege that a plaintiff owes the defendant money. *Ace Hardware Corp. v. Marn, Inc.*, No. 06-cv-5335, 2008 WL 4286975, *8 (N.D. Ill. Sept. 16, 2008); *see Coplay Cement Co. v. Willis & Paul Group*, 983 F.2d 1435, 1440 (7th Cir. 1993) (describing recoupment and setoff). In order to plead either claim, Corporate Defendants must establish that they have a right to the money they claim they are owed. *See Ace Hardware Corp.*, 2008 WL 4286975, at *8. The same is true for specific relief, which necessarily requires that Corporate Defendants establish that they are entitled to the money they seek. *See Shahi*, 572 F. Supp. 3d at 480 (defining "specific relief" as "giv[ing] the plaintiff the very thing to which he was entitled"). Here, Corporate Defendants cannot establish a right to the money they seek, and thus do not state a claim for recoupment, setoff, or specific relief.

First, Corporate Defendants expressly waived any right to the funds they paid to the Bureau as disgorgement. Indeed, it is difficult to imagine language that would more expressly and clearly waive Corporate Defendants' right to those funds than the language in Paragraph 58 of the Order, which provides that Corporate Defendants "must relinquish *all* dominion, control, and title to the funds paid *to the fullest extent permitted by law* and *no part* of the funds may be returned to" them. Order ¶ 58 (emphasis added). Since "[t]he same principles used to interpret a contract are applicable to interpreting the Consent Order," Memorandum Opinion & Order, ECF No. 52 at 2 (citing *Ferrell v. Pierce*, 743 F.2d 454, 461 (7th Cir. 1984)), this Court should give effect "to the plain, obvious, and generally accepted meaning of its terms," *Hampton v. Ford Motor Co.*, 561 F.3d 709, 714 (7th Cir. 2009). Here, there is "no ambiguity in the [w]aiver," *id.* at 715, and therefore Corporate Defendants have waived their right to any and all claims seeking to recover the disgorgement funds.

Second, Corporate Defendants allege no other basis to recover the funds. In their counterclaim, they plead no constitutional, statutory, or regulatory violation, nor have they alleged any violation of the Order's terms. Instead, their allegations appear to rest on an alleged inconsistency between the application of the Redress Provisions and the Conduct Provisions. But any interpretation of the Redress Plan is wholly irrelevant to the claims in this case. As discussed above, *see supra* pp. 2-4, the Order's Redress and Conduct Provisions are in entirely separate parts of the Order and serve different purposes. The Redress Provisions are backward-looking and concern the class of defined Affected Consumers harmed before January 3, 2017. In contrast, the Conduct Provisions are forward-looking and concern marketing to consumers after January 3, 2017. The Conduct Provisions do not incorporate the same definition of "Affected Consumers" used in the Redress Provisions; instead, the Conduct Provisions apply broadly to the

future marketing of "Credit-Related Products" by Corporate Defendants, and "their officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly." Order ¶ 40. These separate definitions and terms make sense: the Redress Provisions address past harms, while the Conduct Provisions prevent future harm. This also means that any interpretation of the Conduct Provisions, and whether Corporate Defendants violated them, has nothing to do with the Redress Provisions, and vice versa. The alleged "inconsistency" in the Bureau's "positions" does not exist.[6]

Corporate Defendants purported concerns about "duplicate payments" are equally without merit. Corporate Defendants contend that they are entitled to a refund because they "should not be required to pay amounts to the Bureau and/or consumers that duplicate the Residual Redress Payment." Counterclaim ¶ 9. But there are no duplicate payments. Corporate Defendants incorrectly characterize payments as duplicates by, yet again, conflating the Redress Provisions with the Conduct Provisions. Under the Redress Provisions, Corporate Defendants were required to pay redress to "Affected Consumers," which (again) the Order defines as certain consumers affected by the Corporate Defendants' unlawful conduct *before* January 3, 2017. By contrast, the Bureau's current claims regarding Affiliate marketing in violation of the Conduct Provisions concern conduct *after* January 3, 2017. The time periods are different with no overlap in transactions, so there are no duplicate payments. And contrary to any suggestion

[6] Likewise, Corporate Defendants' allegations regarding the Bureau's previous "position" on the meaning of the Redress Plan (Counterclaim ¶¶ 6, 32) and the Bureau's "receipt" of the disgorgement payments (*id.* ¶ 43) are irrelevant to this action. These allegations relate to the scope of Affected Consumers in the Redress Provisions and Redress Plan, which has no bearing on this action—the FAC alleges that Corporate Defendants violated the Conduct Provisions through Affiliate marketing after the Effective Date and contains no allegations regarding Affiliate marketing prior to the Effective Date nor any allegation that Corporate Defendants violated the Redress Provisions or Redress Plan.

otherwise, the Bureau has not alleged (nor is it arguing now) that the Redress Plan should be changed or that Corporate Defendants should redress any consumers who enrolled through Affiliates prior to the Order's Effective Date.

## CONCLUSION

Corporate Defendants seek money to which they have no entitlement. Under the Order's Redress Provisions, the $14 million in redress was to go either to Affected Consumers or to the U.S. Treasury; Corporate Defendants expressly relinquished their rights to it. To return the funds to Corporate Defendants, either directly or by offsetting against any judgment in this litigation, would be a windfall of money to which they were never entitled. And even if such a claim might be available in other circumstances, neither the APA's waiver of sovereign immunity nor the limited waiver of immunity for claims in recoupment allow private parties to seek such money from an agency of the United States.

For the foregoing reasons, Corporate Defendants' counterclaim should be dismissed.

Dated: July 28, 2023

Respectfully submitted,

s/ Lauren Gorodetsky

Lauren Gorodetsky
Jessica Rank Divine
Mary K. Warren
Tracy L. Hilmer
Anjali Garg
*Attorneys*

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

Telephone: (202) 435-7560 (Gorodetsky)
Telephone: (202) 435-7863 (Divine)
Telephone: (202) 435-7815 (Warren)
Telephone: (202) 435-7459 (Hilmer)
Telephone: (202) 435-9217 (Garg)

Email: lauren.gorodetsky@cfpb.gov
Email: mary.warren@cfpb.gov
Email: jessica.divine@cfpb.gov
Email: tracy.hilmer@cfpb.gov
Email: anjali.garg@cfpb.gov

*Attorneys for Plaintiff Consumer Financial Protection Bureau*