IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Consumer Financial Protection Bureau, | |
| Plaintiff, | Case No. 1:22-cv-1880 |
| v. | Hon. Judge Elaine E. Bucklo<br>Hon. Magistrate Judge Young B. Kim |
| TransUnion, Trans Union LLC, TransUnion Interactive, Inc., and John T. Danaher, | **Redacted Public Version** |
| Defendants. | |

**PLAINTIFF'S MOTION TO COMPEL AND FOR SANCTIONS REGARDING
CORPORATE DEFENDANTS' FAILURE TO COMPLY WITH THE COURT'S
JANUARY 8, 2024 ORDER (ECF NO. 187) – INTERROGATORY NO. 1**

Plaintiff Consumer Financial Protection Bureau (Bureau) hereby respectfully moves the

Court to compel and to impose sanctions as consequences for the failure of TransUnion, Trans

Union LLC, TransUnion Interactive, Inc. (collectively TU) to comply with the Court's January

8, 2024 Order (ECF No. 187) (January 8 Order) directing TU to respond to the Bureau's

Interrogatory No. 1, as modified by the January 8 Order.[1]

**I. Background**

A central factual issue in this case is the manner in which TU has marketed Credit-

Related Products to consumers since the January 3, 2017 Effective Date of the Bureau's Consent

---

[1] In a Minute Order of the same date, the Court set a deadline of January 26, 2024 for TU's response to Bureau Interrogatory No. 1. ECF No. 186. The Court later ordered TU to provide any supplemental response to Interrogatory No. 1 by March 1, 2024. ECF No. 214.

Order (Consent Order).[2] The Consent Order concerned TU's deceptive marketing of Credit-Related Products through various marketing channels, including TU's own website (www.transunion.com), search engines like Google, direct emails to consumers, and TU's marketing affiliates' websites. *See* Consent Order, ECF No. 99-1, ¶3(f), (o); ¶10. The Consent Order prohibited TU from continuing to engage in deceptive marketing practices, imposed specific affirmative requirements to ensure that TU's future marketing was not deceptive and otherwise conformed to Federal consumer financial law, and required TU to pay $16,930,000 in consumer redress and civil money penalties. *See id.* §§ V, VIII, IX.

The Consent Order also required TU to create and retain records of its marketing materials and provide them to the Bureau within 30 days of such request from the Bureau. Consent Order, ECF No. 99-1, ¶¶68(j), 71. The records TU must create and retain include:

- Copies of all internet (website), direct email, and print advertisements, sufficient to demonstrate the experience of consumers on each materially different version of each advertisement, including all order flow pages…and any other marketing material, including… any such materials used by a third party or affiliate on behalf of [TU] (Consent Order, ECF No. 99-1, ¶68(c));

- For each internet (website), direct email, print advertisement, or other marketing material relating to Credit-Related Products: A record of the date(s) and locations or placements where the advertisement is publicly accessible to the extent that information is available; the number, type, and cost of all Credit-Related Products purchased through the advertisement; and any and all modifications made to the advertisement, including to any disclosure(s) on the advertisement (Consent Order, ECF No. 99-1, ¶68(d)); and

- For each internet (website) advertisement, the number of visits to, unique visitors, impressions of, and clicks on the advertisement and any associated landing and flow page(s), to the extent the information is available; and the number of conversions, purchases of a Credit-Related Product, and consumers acquired through the advertisement (Consent Order, ECF No. 99-1, ¶68(f)).

---

[2] The Consent Order is Appendix A to the Bureau's First Amended Complaint (FAC), ECF No. 99-1, and is also available on the Bureau's website: https://files.consumerfinance.gov/f/documents/201701_cfpb_Transunion-consent-order.pdf.

The Bureau served its first Requests for Production over thirteen months ago. Ex. 1 (February 16, 2023 Bureau Requests for Production). Among other things, the Bureau posed Requests seeking information about the marketing materials TU presented to consumers, information that TU should have created and retained pursuant to the Consent Order. For example, Request 20 sought documents regarding each of TU's marketing campaigns, including the advertisements and order flows used, the websites used to host the campaigns, and the time period of the campaigns. *Id*. at 22. Request 22 sought all advertisements, the subsequent webpages shown to consumers, and the relevant source code for such materials. *Id*. at 22-23. Request 23 sought information regarding the visitors, impressions, clicks, and conversions regarding TU's marketing materials, including order flows. *Id*. at 23-24. Finally, Request 34 sought transactional data for consumers who purchased TU products, including the specific advertisements, order flows, and other marketing materials presented to the consumers. *Id*. at 32-34.

TU did not produce a single document in response to any of the Bureau's Requests for five months, and only began producing limited information (such as organizational charts) in late July 2023 after the Bureau moved to compel. *See* Aug. 3, 2023 Decl. of V. Hletko at ¶25, ECF No. 133-1. During meet and confers in the fall of 2023, TU made clear would not be producing information that would reflect which consumers saw which marketing materials, in which marketing channel, and during which time period. *See* ECF No. 156 at 2-3. TU suggested that the Bureau should pose an interrogatory if it wanted that information. *See id*.

The Bureau did just that. In November 2023, the Bureau sought leave to serve Interrogatory No. 1, which sought specific information regarding the specific marketing materials TU presented to consumers. *See* ECF No. 156 at 2-3 (explaining the Bureau's

justification for seeking leave to serve Interrogatory No. 1); ECF No. 156-1 at 13-14 (proposed Interrogatory No. 1). The Bureau tied Interrogatory No. 1 to its Request 34, which sought transactional data, in order to ensure that the Bureau would receive information about the marketing practices that were actually in use by TU during the relevant time period. TU then opposed the Bureau's motion for leave to serve Interrogatory No. 1 (ECF No. 169) but conceded that it could provide the information the Bureau requested. *Id*. at 5 ("TransUnion can provide information about the dates that certain advertisements, order flows, and exemplar email communications were in effect, so that [the Bureau] can tie that information to the data produced in response to Request No. 34.").

The Court granted the Bureau's motion for leave to serve Interrogatory No. 1. Jan. 8 Order, ECF No. 187 at 2. The Court explained that "[g]iven that the marketing scheme alleged to be unlawful is automated, the information responsive to 1(a)-(e) that is proportional to the needs of the case is the practice that was in place during finite periods of time." The Court further stated that if TU engaged in different practices over the relevant time period, "TU can divide the relevant transaction period into sub-periods and answer [Interrogatory No. 1] for those particular periods." The Court concluded that, "[t]his way, as TU asserts, the government can discover the online practice . . . in place for each consumer transaction that took place based on the transaction date." *Id*. at 2. The Court ordered TU to respond to Interrogatory No. 1 by January 26, 2024. ECF No. 186.

TU has produced information in response to other Bureau Requests that is relevant to this Motion. In response to Request 23, TU produced information regarding the total number of enrollments TU achieved through certain marketing materials, which the response identified by certain campaign identifiers (which TU sometimes refers to as advertisement names or campaign

codes) that appear to refer to specific marketing materials. *See* Ex. 2 (under seal). TU's response

to Request 34, which sought transactional data, also used campaign identifiers to refer to some of

the marketing materials consumers viewed before enrolling. *See* Ex. 3 (under seal). The Bureau

does not know what the campaign identifiers mean; they appear to relate to some type of internal

TU naming convention used to identify and track the performance of specific marketing

materials, but TU has not produced identifying information or records. Separately, TU has

produced various static images of its marketing materials, usually without reference to any

information that identifies when and where the marketing materials were in use, or their

campaign identifiers. Ex. 4.[3] As a result, the Bureau has numerous campaign identifiers on the

one hand, numerous images of marketing materials on the other, and no way to connect the two.

## II. TU's January 26, 2024 Response to Interrogatory No. 1 Failed to Comply with the Court's Order

TU's January 26, 2024 response to Interrogatory No. 1 was insufficient because TU did

not identify particular marketing practices and the finite periods of time those practices were in

place; instead, TU referred the Bureau to dozens of documents that did not contain the answers

to the interrogatory. *See* 8B Charles Alan Wright & Arthur R. Miller, *Federal Practice and

Procedure* § 2178 (3d ed.) ("[B]y invoking Rule 33(d) the responding party represents that the

information is in the designated records and…must further specify where in the records it can be

---

[3] By way of example, Exhibit 4 includes three static images that TU has produced at TU-CFPB-LIT-0018221, TU-CFPB-LIT-0030481, and TU-CFPB-0030487. (The Bureau has endorsed the full-color images of these materials to reflect the Bates numbers associated with those images). In its interrogatory responses, TU has not identified those images by Bates number, nor does it appear that TU has produced or identified any other information, such as campaign identifiers, that would allow the Bureau to tie those advertisements to specific time periods and channels or specific consumer transactions. These images are only three examples of what the Bureau believes are likely hundreds of advertisements and webpages TU has produced without any identifying information.

found.").[4] The specific problems with TU's January 26 response are discussed below.

Interrogatory No. 1 subpart (a)

Subpart (a) of Interrogatory No. 1 seeks information regarding the specific advertisements presented to consumers (ECF No. 156-1 at 13), which the Court ordered TU to provide as to "finite periods of time" so that the Bureau "can discover the online practice … which was in place for each consumer transaction that took place based on the transaction date." Jan. 8 Order, ECF No. 187, at 2. In response to Interrogatory No. 1(a), however, TU merely referred the Bureau back to the transactional data that it produced in response to Request 34. *See* Ex. 5 at 2-3 (containing Bates numbers of 16 files that contain consumer transaction data). This is a circular non-response; indeed, the transactional data is the very same information that the Court observed would *not* answer the question of what marketing materials TU presented to consumers. Jan. 8 Order, ECF No. 187 at 2 ("This promised data only covers half the equation in that the data would not reflect information consumers viewed before completing their transactions.").

Interrogatory No. 1 subparts (b)-(d)

Interrogatory No. 1(b) seeks information regarding the specific Order Flows that consumers viewed before they were enrolled into TU's products (ECF No. 156-1 at 13). In response to subpart (b), however, TU again invoked Fed. R. Civ. P. 33(d) and broadly referred the Bureau to 77 documents it indicated were used "since January 1, 2016." *See* Ex. 5 at 3-4. TU's sworn narrative response provided no further detail about when any particular Order Flow

---

[4] TU also cannot make a showing that answering the interrogatory without invoking Fed. R. Civ. P. 33(d) would impose burden on it and that the burden of compiling the information would be substantially the same for the Bureau as for TU. *See id*. These are TU's records and TU presumably has in its possession the information necessary to identify and explain what they are.

was in use, or the marketing channel in which it was used.[5] Thus, the response left the Bureau unable to determine which Order Flow was in place for each consumer transaction, or even to narrow down the transactions to some period of time other than "since January 1, 2016."

Subparts (c) and (d) of Interrogatory No. 1 seek information about whether an affirmative selection checkbox and certain disclosures required by Paragraph 40(b) of the Consent Order were present on Order Flows. In response, TU again invoked Rule 33(d) and listed many of the same documents as it did in response to subpart (b). Ex. 5 at 4-6. This response gave no indication of when these various documents were in use, or the marketing channels in which they were used, and was therefore insufficient.

Interrogatory No. 1 subpart (e)

Subpart (e) seeks information regarding the confirmation messages shown to consumers. In response, TU again invoked Rule 33(d) and identified 38 documents that it indicated were "shown or sent to consumers since January 1, 2016." *See* Ex. 5 at 6. This response gave no indication of when these various documents were in use, or the marketing channels in which they were used, and was therefore insufficient.

**III. TU Failed to Supplement its Response to Interrogatory No. 1 by the Court's March 1, 2024 Deadline**

The Bureau met and conferred with TU and explained its specific concerns with TU's January 26, 2024 response to Interrogatory No. 1. TU agreed to supplement its response. The Bureau also raised these issues at a February 8, 2024 hearing before the Court. TU agreed that it would supplement its response and agreed to a March 1, 2024 deadline, which the Court ordered.

---

[5] Although TU has suggested that the Bureau should look to the file names of certain documents to deduce the date a document was in use, the Bureau's guess as to what a filename means, absent a sworn narrative response from TU, does not satisfy TU's obligation to provide a sworn interrogatory response.

See Feb. 8, 2024 Hrg. Tr., ECF No. 217, at 9:5-10; 12:14-25; Feb. 8, 2024 Order, ECF No. 214. TU did not meet the March 1, 2024 deadline and sought an extension, which the Bureau opposed, and the Court denied. March 3, 2024 Order, ECF No. 236.

TU has suggested that the Bureau's willingness to entertain and even propose alternative ways for TU to satisfy its obligation to respond to Interrogatory No. 1 somehow reflects that the Bureau either did not know what it wanted or has changed its position. This is false. The Bureau has repeatedly attempted to work with TU to obtain information regarding TU's marketing, including by serving an interrogatory, considering alternative production formats, and offering additional time for TU to supplement its response after TU's initial, deficient January 26 response to Interrogatory No. 1. This is good faith participation in the meet and confer process. Nonetheless, TU has remained unwilling or unable to produce much of the information.

## IV. TU's March 15, 2024 Supplemental Response to Interrogatory No. 1 is Insufficient

On March 15, 2024, TU served a supplemental response to Interrogatory No. 1 (March 15 Supplement) and produced 916 documents in connection the response. In addition, the response itself cites to several appendices listing around 300 documents by Bates number. Ex. 6. The Bureau has not been able to review or analyze all of this information. Nonetheless, the supplemental response remains insufficient in at least several significant ways and the Bureau remains unable to "discover the online practice . . . in place for each consumer transaction that took place based on the transaction date." *See* Jan. 8, 2024 Order, ECF No. 187, at 2.

<u>Interrogatory No. 1 subpart (a)</u>

In its March 15 Supplement, TU provided a chart at Exhibit A that identifies the publication date ranges, marketing channels, and product associated with certain advertisements, which TU identifies by Bates number. While these charts are an improvement on TU's original response, they still fall well short of what the Court ordered TU to provide.

First, the date ranges provided for each advertisement are not precise enough to allow the Bureau to determine what materials consumers saw. *See* Jan. 8, 2024 Order, ECF No. 187, at 2. For example, the entire calendar year of 2019 is encompassed within the date ranges provided for 24 separate advertisements in the ACR marketing channel. According to this information, the over ███████ consumers who enrolled in TUCM during 2019, via that channel, could have seen any of these 24 advertisements.[6]

If this was the best information available in TU's business records, that would be one thing, and TU could simply swear in a narrative response that it has no further information. But TU does have more specific information. TU uses a unique campaign identifier (sometimes referred to as "advertisement name") for particular advertisements or groups of advertisements, which TU included for each consumer enrollment in the transaction data, where available.[7] These identifiers appear to serve the business purpose of allowing TU to track the effectiveness of its advertising efforts. During the Bureau's investigation, TU was able to produce

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

Exhibit 7 (under seal) is a sample page from one such spreadsheet. TU's business records plainly have more specificity than TU has provided in its supplemental response to Interrogatory 1(a), and TU should be ordered to provide it. If TU does not have this information, then it should be

---

[6] The Bureau made this calculation based on an analysis of the TUCM enrollment data that TU produced to the Bureau in response to Request 34.

[7] The transaction data does not include these detailed identifiers for certain Consumer Track enrollments, for example.

required to attest to that fact.

The March 15 Supplement also omits certain marketing channels altogether—most notably Paid Search, Natural Search, and Email which together account for over ▮▮ of enrollments.[8] TU proposed on February 26, 2024 to provide spreadsheets that would map particular campaign identifiers onto advertisements or groups of advertisements, and they provided samples from the Paid Search marketing channel. *See* Exs. 8 (February 26, 2024 email), 9 (excerpted sample of data for Paid Search marketing channel) (under seal). TU has now presumably rescinded that offer, following the Bureau's decision not to consent to the lengthy extension of time TU requested to compile it. But there is no question that they have the records necessary to provide this information for at least the Paid Search channel. And if they lack records sufficient to respond to this interrogatory with respect to the Natural Search channel, then they should attest to that fact.

More generally, the Bureau cannot confirm that the March 15 Supplement provides responsive information about all the marketing materials it has used, even for the marketing channels that appear to be covered by this document. As the Bureau has noted in footnote 3, *supra*, TU appears to have produced marketing materials that it has not identified in its interrogatory response.

At present, the Bureau does not know whether (1) TU has the information but is refusing to provide it on the basis of burden or proportionality, or (2) does not have the information at all.

---

[8] The percentage of transactions attributed to each channel, based on the Bureau's analysis of the consumer transaction data TU produced, was submitted to the Court in Exhibit 11 to ECF No. 272. It is possible that TU has grouped these three channels together into the "Direct" channel that it references in the March 15 Supplement; "Direct" is not one of the marketing channels used in the consumer transaction data TU produced in response to RFP No. 34. If so, then this response is insufficiently specific, because it does not allow the Bureau to tie these advertisements even to a single marketing channel in the data, much less to any consumer.

This leaves the Bureau in the untenable position of having less information than TU has about the advertisements and webpages that consumers would have seen. It also impedes the Bureau's ability to establish whether TU violated the recordkeeping requirements of the Consent Order. *See* Consent Order ¶68, ECF No. 99-1. This response is facially insufficient.

Interrogatory No. 1 subparts (b)-(d)

In Exhibit B to the March 15 Supplement, TU provides several charts identifying enrollment forms,[9] along with the "channel" and "dates in use" for each. This supplemental response remains deficient for at least three reasons.

First, TU has again referred to marketing channels in this Supplement that do not appear in the consumer transaction data: "Direct" and "Mobile App." The Bureau consequently has no way of lining up these portions of the response with any particular consumer or group of consumers in that transaction data.

Second, the March 15 Supplement is missing certain enrollment forms that the Bureau understands were in use. Specifically, the March 15 Supplement identifies no enrollment forms whatsoever for the year 2017 for "Consumer Track / Affiliate Partners," even though the Bureau's allegations regarding ConsumerTrack cover 2017. *See* First Am. Compl. (FAC) ¶99, ECF No. 99.[10] And the March 15 Supplement omits information that TU admitted in its Answer.

---

[9] Interrogatory No. 1 subparts (b) through (d) refer to Order Flows, which the Bureau defined as "the landing page(s) and all pages necessary for a user to visit in order to complete the purchase or enrollment process for a product." ECF No. 156-1 at 7. Although the terms "enrollment forms" and "Order Flows" might be used interchangeably, the term "Order Flows" is broader because it encompasses all webpages a consumer views or visits to complete the enrollment process. Thus, to the extent that TU is only identifying the forms a consumer fills out, TU is not fully answering the interrogatory.

[10] TU's March 15, 2024 supplemental document production includes a number of documents that might be 2017 enrollment forms for Consumer Track, based on the file names. But TU did not identify those enrollment forms in its March 15 Supplement, which omits that time period.

For example, TU has admitted that a particular version of the Consumer Track enrollment form appended as Appendix D.1 to the FAC (ECF No. 99-4, at 5) was in use on a particular date (November 21, 2020). *See* TU Answer and Aff. Def., ECF No. 109, ¶ 21. Yet that version of the enrollment form is not among the documents TU identified in the March 15 Supplement as enrollment forms in use by Consumer Track on that date. And this omission appears to favor TU's position in the litigation: while Appendix D.1 to the FAC fails to include the checkbox, in violation of Paragraph 40(b)(i) of the Consent Order, one of the enrollment forms identified by TU in the March 15 Supplement as being in place during that same time period does include a checkbox.

Similarly, some of the enrollment forms identified in TU's response omit the "identity verification" page that is a part of the order enrollment process, and which the Bureau alleges is part of TU's deceptive marketing. *See* FAC ¶¶40, 89, ECF No. 99 (alleging that the identity verification process in TU's Homepage Enrollment Form, Appendix C to the FAC, is misleading and gives consumers the impression that they are providing payment information for identity verification, not to be charged); *see id*. App'x C, ECF No. 99-3 (reflecting the Homepage Enrollment Form at Appendix C, including the identity verification questions). TU admitted that Appendix C was the enrollment form in use from June 2019 through May 2020. TU Answer and Aff. Def., ECF No. 109, ¶21. But the enrollment form identified by TU in the March 15 supplement as in place during that same time period only includes the first two pages of Appendix C.[11]

---

[11] A document that TU cites in Exhibit B of its March 15 Supplement as having been in effect from January 2017 through November 2019 is TUCFPB-004-0000201, which is attached to ECF No. 272 as Ex. 8 and filed under seal. That document does not include the identity verification questions that are present in Appendix C.

12

Third, the heading "Consumer Track / Affiliate Partners" is itself too generalized. The Bureau's understanding is that Consumer Track used unique, identifiable enrollment forms, while other affiliates may have routed consumers to the Homepage Enrollment Form. *See* Exh. 10. The March 15 Supplement does not account for this important distinction; it appears to represent that all "affiliate" enrollments took place via the Consumer Track enrollment form and provides no information that the Bureau could use to confirm which enrollment forms were in use, for any period of time, for other affiliates.

## V. The Court Should Compel TU to Fully Respond to Interrogatory No. 1

The Bureau respectfully requests that the Court compel TU to fully respond to Interrogatory No. 1 so that the Bureau can tie specific marketing materials (including the initial advertisements or webpages viewed by consumers, and all subsequent webpages, used in connection with effectuating a transaction, such as order flows, identity verification forms, and confirmation messages) (Marketing Materials) to specific transactions.

Because TU has not complied with the Court's January 8 Order, the Bureau requests that the Court further order TU to provide the following information from January 3, 2017 to date to the full extent it is available in TU's records:

- Identify in writing, using Bates numbers for produced documents, all materially-different Marketing Materials that TU has used, including the time period and channel in which such Marketing Materials were used;

- Identify in writing, using Bates numbers for produced documents, the Marketing Materials associated with each distinct campaign identifier identified in TU's productions in response to Requests 23 and 34 and the specific dates and marketing channels in which such campaign identifiers were in use;

- Identify in writing, using Bates numbers for produced documents, each materially-different order flow and the specific dates and marketing channels in which such order flows were in use, with sufficient information to tie the order flow to specific campaign identifiers, advertisements, webpages, and enrollments;

- Identify in writing, using Bates numbers for produced documents, whether the order flows TU has identified included the checkboxes and disclosures required for trial offers by Paragraph 40(b)(i) of the Consent Order; and

- Identify in writing, using Bates numbers for produced documents, all materially-different confirmation messages, including e-mail messages and messages presented to consumers on a screen at the time of or immediately following the transaction, and the specific dates and marketing channels in which such confirmation messages were in use.

TU contends that the January 8 Order permits TU to designate "finite periods of time" without regard to the periods of time it actually engaged in certain marketing practices. Thus, TU has in certain instances designated an entire calendar year and included many different marketing materials in that timeframe. *See supra* p. 9. But TU should not be permitted to do this unless the marketing practices identified began on January 1 and continued through December 31 of the identified year. Thus, the Bureau respectfully requests that the Court require TU to identify the timeframe each materially-different practice was actually in place, not arbitrary timeframes that apply to many different practices.

If TU cannot identify all of its materially-different Marketing Materials, or cannot identify the specific date range and channel for which a particular practice was in place (as TU appears to admit in unsworn correspondence, *see* Ex. 8) TU should be required to so state, unequivocally, in a sworn response. This will ensure that there is a clear record of what information TU can or cannot provide, which is relevant to demonstrating a violation of the Consent Order's recordkeeping provisions and to ensuring that TU cannot later use or rely upon more specific information in connection with its defenses to the Bureau's claims.

The Bureau also requests that the Court warn TU that if it does not produce this information, the Court will consider a Bureau request for an adverse inference as to the nature of the marketing materials that TU presented to consumers. For example, if TU is unable or unwilling to provide sufficient information to allow the Bureau to identify the specific time

14

periods and channels in which it was using certain marketing practices, then the Bureau will seek an inference that consumers who enrolled during that time period or through those channels saw materials that were deceptive and/or violated the Consent Order or other federal consumer financial laws.

## VI. The Court Should Sanction TU by Requiring TU to Produce a Corporate Designee to Testify Regarding Interrogatory No. 1 and TU's Retention of Marketing Materials

TU's excessive delay in providing basic, foundational information regarding its marketing is impeding the progress of discovery in this matter. This delay is particularly concerning because the Consent Order required TU to retain detailed records regarding its marketing materials and to produce them promptly upon request.[12] Either TU failed to comply with the record retention requirements of the Consent Order or TU has the information and is willfully refusing to produce it. The Bureau and the Court are entitled to know the answer.

Because TU has twice failed to provide adequate responses to Interrogatory No. 1, the Bureau respectfully requests that the Court sanction TU by ordering TU to produce for a deposition a corporate designee or designees to testify as to each of Interrogatory No. 1's subparts, including the records TU has or had relevant to those topics. Such a deposition could meaningfully advance the progress of discovery, is warranted because of the delays TU has caused, and would mitigate the need for the Bureau to seek the Court's intervention once again on this Interrogatory because the Bureau could learn directly from TU what information and records TU does or does not have. And because it is a sanction for TU's discovery violation, the deposition should not count against the Bureau's fact deposition allocation.

---

[12] As the Bureau has explained in ECF No. 272, TU also was under an obligation to retain documentation of its marketing materials after on notice of a potential Bureau enforcement action.

Dated: March 22, 2024                        Respectfully submitted,

<u>s/ *Jessica Rank Divine*</u>
Jessica Rank Divine
Tracy L. Hilmer
Mary K. Warren
Anjali Garg
Johanna M. Hickman
*Enforcement Attorneys*

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone: (202) 435-7863 (Divine)
Telephone: (202) 435-7459 (Hilmer)
Telephone: (202) 435-7815 (Warren)
Telephone: (202) 435-9217 (Garg)
Telephone: (202) 679-7903 (Hickman)

Email: jessica.divine@cfpb.gov
Email: tracy.hilmer@cfpb.gov
Email: mary.warren@cfpb.gov
Email: anjali.garg@cfpb.gov
Email: johanna.hickman@cfpb.gov

*Attorneys for Plaintiff Consumer Financial Protection Bureau*

16