UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | ) ) ) | No. 22 CV 1880 |
| Plaintiff, | ) ) | |
| v. | ) ) | Magistrate Judge Young B. Kim |
| TRANSUNION, TRANSUNION, LLC, TRANSUNION INTERACTIVE, INC., and JOHN T. DANAHER, | ) ) ) ) ) | |
| Defendants. | ) ) | June 10, 2024 |

MEMORANDUM OPINION and ORDER

Plaintiff Consumer Financial Protection Bureau ("the government") sues Defendants for violating the terms of the January 3, 2017 consent order ("Consent Order") it issued against them in *In re TransUnion Interactive, Inc., et al.*, No. 2017-CFPB-0002, pursuant to the Consumer Financial Protection Act, the Electronic Fund Transfer Act, and the Fair Credit Reporting Act. The complaint includes nine separate counts of wrongdoing, but the government's theory of liability is that Defendants misled millions of consumers into unknowingly signing up for credit-monitoring subscription services, charged them a monthly fee on an automatic payment basis, and made it difficult for them to cancel the subscription once realizing what they had purchased.

Before the court is the government's motion to compel Defendants TransUnion, TransUnion, LLC, and TransUnion Interactive, Inc. (collectively, "TU") to search attorney files and produce responsive documents relating to the Consent Order based

on TU's "express[] and intentional[]" waiver of the attorney-client privilege and the work-product doctrine ("Privilege Waiver"). (R. 241, Govt.'s Mem. at 1.)[1] During the government's investigation preceding this lawsuit ("Investigation"), TU effected the Privilege Waiver when it relied on the advice of former counsel to explain its delay in implementing compliance provisions in the Consent Order. (Id.) According to the government, the Privilege Waiver applies to "the entire subject matter of the legal advice TU sought and received from its in-house and outside counsel, and related attorney work product concerning the Consent Order's requirements and TU's decisions and deliberations about whether, when, and how to comply with those requirements." (R. 240, Govt.'s Mot. at 2.) TU opposes the motion, asserting that the scope of the Privilege Waiver is far narrower than the scope the government claims and applies only to the "when," and not the "what" or the "how," of complying with the Consent Order. (R. 284, TU's Resp.) For the following reasons, the motion is denied:

## Background

The government served requests for the production of documents ("Requests") asking TU for information relating to the Consent Order and the subsequent Investigation regarding TU's compliance with that Order, among other items.

---

[1] The court allowed the government to file under seal confidential information in its memorandum supporting the motion and certain exhibits thereto. (R. 249.) The court refers to such confidential information only to the extent required to rule on the present motion.

(See R. 241, Govt.'s Mem. at 1-2, Exs. 2, 3.) Specifically, the government asserts that

Request Nos. 36, 38, and 41-43 seek documents regarding the following topics:

> (1) the 2016 negotiation of the Consent Order and TU's Stipulation thereto; (2) TU's deliberations and decisions concerning the implementation of the Consent Order's terms, including the timing of TU's compliance with the Order's Requirements; (3) TU's preparation and submission of its proposed compliance plan; (4) the effect (if any) of the [government's] response or non-response to the proposed compliance plan; and (5) TU's deliberations about whether to ask the [government] for a modification of the Consent Order.

(Id. at 1-2, Exs. 2-3.) The government argues that TU is improperly withholding

responsive documents, including from attorney files, spanning the period from at

least January 1, 2016, through August 6, 2021. (Id. at 1-6; see also R. 240, Govt.'s

Mot. at 2.) The government asserts that these documents must be produced because

of the Privilege Waiver. (Id.)

TU disagrees with the government's characterization of the scope of the

Privilege Waiver. (R. 284, TU's Resp.) TU explains that after the parties executed

the Consent Order in January 2017 it submitted a "comprehensive compliance plan,"

and the government was then supposed to render a "determination of non-objection"

or provide feedback regarding its plan. (Id. at 2.) The government did neither,

waiting more than a year to take any action on the compliance plan. (Id.) In October

2018 the government notified TU that it would examine TU's compliance with the

Consent Order and launched its Investigation. (Id.) As part of the Investigation, the

government issued Civil Investigative Demands ("CID") to TU, and in response TU

disclosed its understanding, based on advice from its former outside attorney—"a

former [government] enforcement lawyer herself"—that it was not required to take

any action pursuant to its proposed compliance plan until the government either rendered its non-objection determination or provided feedback.[2]  (Id. at 1-3.)  During administrative hearings in February 2020, the government questioned TU about its delay in implementing the compliance plan and in response TU waived its attorney-client privilege to allow a witness "to testify about the advice [TU] received with respect to the compliance plan and nonobjection."  (Id. at 3 (quoting R. 241, Govt.'s Mem. Ex. 8 at 5-6, 13-16).)  At the same time, TU asserted the attorney-client privilege as to discussions with its in-house attorney regarding the placement of an advertisement.  (Id. at 4 (citing R. 241, Govt.'s Mem. Ex. 9 at 13-14).)

In response to the government's CID No. 16—which sought information "reflect[ing] legal advice provided to or requested by" TU as to the negotiation, implementation, compliance, and effect of the government's non-objection under the Consent Order[3]—TU agreed to produce only those documents "limited to substantiating [TU]'s assertion that delays [in compliance] were caused, in part, by its understanding of the timing of its obligation to implement" conduct provisions in the compliance plan.  (Id. at 5 (citing id. Ex. 5 at 6-7).)  TU produced 124 documents

---

[2]  TU has since acknowledged that the advice it received from its outside attorney was ill-advised.  (See R. 241, Govt.'s Mem. Ex. 8 at 3 (Feb. 2020 testimony that TU was "operating under what has clearly turned out to be not good or clear advice that . . . timing of addressing all of the conduct provisions under the [Consent Order] . . . was contingent upon a nonobjection to the compliance plan").)

[3]  Request No. 42 in this case "largely tracks" CID No. 16.  (R. 241, Govt.'s Mem. Ex. 1 at 2.)

in response to CID No. 16, compared with "tens of thousands of documents" in response to other CIDs.[4] (Id.)

The government points out that documents TU produced in response to CID No. 16 include "advice and work product of[] at least five in-house TU attorneys" and "two sets of outside counsel" who discussed: "negotiation strategies (relating to the Consent Order); mark-ups of Order drafts; and drafts of TU's proposed compliance plan containing differing, and at times conflicting, comments from internal and outside counsel." (R. 241, Govt.'s Mem. at 5-6.) The government argues that many more responsive documents would not be identified on TU's privilege log without searching attorney files and TU may be permitted to raise an advice-of-counsel defense without the government being able to discover relevant information undermining such defense. (R. 240, Govt.'s Mot. at 2-3.) The government therefore moves to compel TU to search attorney files and to produce responsive documents to its Request Nos. 36, 38, and 41-43. (Id.)

## Analysis

Federal law provides the rules of decision in this case, (see R. 1, Compl.), so issues of privilege are governed by federal common law. *See* Fed. R. Evid. 501; *Jaffee v. Redmond,* 518 U.S. 1, 5-6 (1996) (applying federal common law of privileges to case including claim under 42 U.S.C. § 1983); *In re Pebsworth,* 705 F.2d 261, 262 (7th Cir.

---

[4] In total, the government says TU produced "at least 185 documents" during the Investigation pursuant to the Privilege Waiver but withheld potentially hundreds more, according to a privilege log TU submitted during the Investigation. (R. 241, Govt.'s Mem. Ex. 1 at 7-10.)

1983) (in non-diversity actions privileges are matters of federal common law). The purpose of the attorney-client privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

The Seventh Circuit has articulated the following standard for determining whether the attorney-client privilege attaches:

> "(1) [w]here legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived."

*United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997) (quoting 8 John Henry Wigmore, *Evidence in Trials at Common Law* § 2292 (1961)); *see also Jenkins v. Bartlett,* 487 F.3d 482, 490 (7th Cir. 2007). Because the privilege is "in derogation of the search for the truth," this court construes it narrowly, *Evans*, 113 F.3d at 1461, and the party seeking privilege protection carries the burden of showing that it applies, *Valero Energy Corp. v. United States,* 569 F.3d 626, 630 (7th Cir. 2009).

Here, the parties do not dispute that the government is indeed seeking confidential attorney-client communications related to legal advice TU sought and received. They disagree, however, about the scope of the Privilege Waiver and whether this waiver extends to the documents the government seeks in discovery. Under federal common law, the attorney-client privilege may be waived through public disclosure of protected communications. *See Patrick v. City of Chi.*, 154

6

F. Supp. 3d 705, 711 (N.D. Ill. 2015). "Disclosure of confidential communications is inconsistent with the attorney-client relationship and almost invariably waives the privilege 'with respect to the world at large; selective disclosure is not an option.'" *Id.* (citation omitted). Once a party discloses protected information, it "waives the attorney-client privilege as to future proceedings." *Id.* And under the implied waiver doctrine, "when a party takes a position in litigation that makes it unfair to protect that party's privileged communications . . . [the] party may not use privilege as a tool for manipulation of the truth-seeking process." *Id.*

The government cites these waiver principles in arguing that, having divulged information about legal advice regarding its implementation of conduct provisions in the Consent Order, TU cannot now use the privilege to shield a broader category of privileged documents relating to the Consent Order. (R. 241, Govt.'s Mem. at 6-11.) But as an initial matter, the government has not demonstrated that the information it seeks is relevant to the parties' claims or defenses. The government's claims focus on TU's efforts to trick consumers into unknowingly buying credit-monitoring subscription services, then charging them a recurring monthly fee, and making it nearly impossible to cancel such services. (R. 1, Compl.) As to these claims, TU does not assert an advice-of-counsel defense. (R. 284, TU's Resp. at 12-14.) Yet the motion seeks to compel TU to open its attorney files from January 1, 2016, through August 6, 2021[5]—both for in-house and outside attorneys—so that the government can

---

[5] The government says the Privilege Waiver applies to documents dated January 1, 2016, through August 6, 2021, and perhaps even until February 1, 2022. (R. 240, Govt.'s Mot. at 2; see also R. 241, Govt.'s Mem. at 12-13, 15.) TU responds that "[t]he

explore confidential discussions held between TU and its attorneys about "all the advice received regarding the negotiation of, implementation of, and compliance with the [January 2017 Consent] Order." (R. 240, Govt.'s Mot. at 2; R. 241, Govt.'s Mem. at 4, 8-10.)

The government asks for too much. Without making the necessary showing that the documents it seeks fall within the permissible scope of discovery, the court cannot permit the government to discover what lies within TU's attorney files. As Federal Rule of Civil Procedure 26(b)(1) provides:

> [p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

The government has not satisfied this standard here. Even if the documents the government requests are relevant, the court finds no support for the argument that TU intended its Privilege Waiver to open the door to discovery of in-house and outside attorney files for a "broad" range of topics related to the Consent Order over a period of more than five years. (See R. 240, Govt.'s Mot. at 2; R. 241, Govt.'s Mem. at 8.) TU no doubt waived the privilege during the Investigation as to certain attorney-client communications, but the key inquiry turns on the scope of this waiver. When considering whether the Privilege Waiver applies to the documents the government

---

only request calling for legal advice related to [TU's] implementation of the Consent Order—Request No. 42—had a cut-off of May 23, 2019," which TU says is the date through which TU relied on advice from counsel. (R. 284, TU's Resp. at 11.)

seeks, the court looks to statements TU made during the Investigation defining the parameters of its disclosure.

During the February 2020 administrative hearings, the government questioned TU about its delay in implementing the compliance plan it had proposed in connection with the Consent Order, and TU waived the attorney-client privilege to allow a witness to testify about legal advice it received regarding its obligations while awaiting non-objection or feedback from the government. (R. 284, TU's Resp. at 3 (citing R. 241, Govt.'s Mem. Ex. 8 at 5-6, 13-16).) Specifically, that advice related to when TU should implement conduct provisions set forth in the compliance plan it proposed to the government. (Id.) Here, the government pushes for an implied waiver with a broader scope, arguing that TU invoked the Privilege Waiver to avoid an enforcement action by the government and, as such, fairness principles require the expansion it seeks. (R. 241, Govt.'s Mem. at 12-13.) The court disagrees. As TU points out, the explanatory note to Federal Rule of Evidence 502(a) states:

> a voluntary disclosure in a federal proceeding or to a federal office or agency, if a waiver, generally results in a waiver only of the communication or information disclosed; a subject matter waiver (of either privilege or work product) is reserved for those unusual situations in which fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary.

(R. 284, TU's Resp. at 8 (citing Fed. R. Evid. 502(a).) This is not the "unusual situation[]" in which the information the government seeks must be disclosed "to prevent a selective and misleading presentation of evidence." Fed. R. Evid. 502(a).

9

To be sure, TU demonstrates that it was careful to limit the scope of the Privilege Waiver to legal advice related to the timing of its compliance obligations. During the February 2020 administrative hearings, a witness was asked about discussions with in-house attorneys regarding the placement of an advertisement, and TU asserted its attorney-client privilege. (R. 284, TU's Resp. at 4 (citing R. 241, Govt.'s Mem. Ex. 9 at 13-14).) TU also limited the types of documents it produced in response to CID No. 16, producing only those documents relating to its delay in implementing conduct provisions "based on the advice of outside counsel." (Id. at 4-5.) The number of documents TU produced in response to that demand is limited—124 documents—compared with the rest of its production, which numbered in the "tens of thousands." (Id. at 5.) TU further declined to produce a broader range of documents relating to other aspects of the negotiation, implementation, and compliance of the Consent Order—and repeatedly refuted the government's efforts to expand the scope of the Privilege Waiver throughout the enforcement proceedings.[6] (Id. at 5-6.)

Based on the circumstances presented, the court finds that TU effected the Privilege Waiver limited to the timing of TU's compliance with the Consent Order. As such, the court declines to extend that Waiver to matters extending beyond the timing of TU's compliance with the Consent Order.

---

[6] Although the government suggests that TU agreed to disclose information relating to negotiation strategies, mark-ups, and drafts of the Consent Order and/or proposed compliance plan during the Investigation, (R. 241, Govt.'s Mem. at 5-6), the government has not sufficiently explained how such disclosure opens the door to the broad search of attorney files it seeks here.

## Conclusion

For the foregoing reasons, the government's motion to compel is denied.

ENTER:

Young B. Kim
United States Magistrate Judge

11